JS 44C/SDNY
REV. 12/2005

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for use of the Clerk of Court for the purpose of initiating the civil docket sheet.

**PLAINTIFFS** AXA Equitable Life Insurance Company

**DEFENDANTS** Centre Life Insurance Company

**ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER**

See Addendum A

**ATTORNEYS (IF KNOWN)**

See Addendum B

CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE)

Federal Rule of Civil Procedure 65  - Injunctive Relief

Has this or a similar case been previously filed in SDNY at any time? No [x]  Yes? [ ]    Judge Previously Assigned

If yes, was this case Vol [ ] Invol. [ ]  Dismissed. No [ ]  Yes [ ]   If yes, give date _____   & Case No. _____

*(PLACE AN [x] IN ONE BOX ONLY)*    NATURE OF SUIT

ACTIONS UNDER STATUTES

**TORTS**

**CONTRACT**

- [ ] 110 INSURANCE
- [ ] 120 MARINE
- [ ] 130 MILLER ACT
- [ ] 140 NEGOTIABLE INSTRUMENT
- [ ] 150 RECOVERY OF OVERPAYMENT & ENFORCEMENT OF JUDGMENT
- [ ] 151 MEDICARE ACT
- [ ] 152 RECOVERY OF DEFAULTED STUDENT LOANS (EXCL. VETERANS)
- [ ] 153 RECOVERY OF OVERPAYMENT OF VETERANS BENEFITS
- [ ] 160 STOCKHOLDERS SUITS
- [x] 190 OTHER CONTRACT
- [ ] 195 CONTRACT PRODUCT LIABILITY
- [ ] 196 FRANCHISE

**PERSONAL INJURY**

- [ ] 310 AIRPLANE
- [ ] 315 AIRPLANE PRODUCT LIABILITY
- [ ] 320 ASSAULT, LIBEL & SLANDER
- [ ] 330 FEDERAL EMPLOYERS' LIABILITY
- [ ] 340 MARINE
- [ ] 345 MARINE PRODUCT LIABILITY
- [ ] 350 MOTOR VEHICLE
- [ ] 355 MOTOR VEHICLE PRODUCT LIABILITY
- [ ] 360 OTHER PERSONAL INJURY

**PERSONAL INJURY**

- [ ] 362 PERSONAL INJURY - MED MALPRACTICE
- [ ] 365 PERSONAL INJURY PRODUCT LIABILITY
- [ ] 368 ASBESTOS PERSONAL INJURY PRODUCT LIABILITY

**PERSONAL PROPERTY**

- [ ] 370 OTHER FRAUD
- [ ] 371 TRUTH IN LENDING
- [ ] 380 OTHER PERSONAL PROPERTY DAMAGE
- [ ] 385 PROPERTY DAMAGE PRODUCT LIABILITY

**FORFEITURE/PENALTY**

- [ ] 610 AGRICULTURE
- [ ] 620 FOOD & DRUG
- [ ] 625 DRUG RELATED SEIZURE OF PROPERTY 21 USC 881
- [ ] 630 LIQUOR LAWS
- [ ] 640 RR & TRUCK
- [ ] 650 AIRLINE REGS
- [ ] 660 OCCUPATIONAL SAFETY/HEALTH
- [ ] 690 OTHER

**LABOR**

- [ ] 710 FAIR LABOR STANDARDS ACT
- [ ] 720 LABOR/MGMT RELATIONS
- [ ] 730 LABOR/MGMT REPORTING & DISCLOSURE ACT
- [ ] 740 RAILWAY LABOR ACT
- [ ] 790 OTHER LABOR LITIGATION
- [ ] 791 EMPL RET INC SECURITY ACT

**BANKRUPTCY**

- [ ] 422 APPEAL 28 USC 158
- [ ] 423 WITHDRAWAL 28 USC 157

**PROPERTY RIGHTS**

- [ ] 820 COPYRIGHTS
- [ ] 830 PATENT
- [ ] 840 TRADEMARK

**SOCIAL SECURITY**

- [ ] 861 MIA (1395FF)
- [ ] 862 BLACK LUNG (923)
- [ ] 863 DIWC (405(g))
- [ ] 863 DIWW (405(g))
- [ ] 864 SSID TITLE XVI
- [ ] 865 RSI (405(g))

**FEDERAL TAX SUITS**

- [ ] 870 TAXES
- [ ] 871 IRS-THIRD PARTY 20 USC 7609

**OTHER STATUTES**

- [ ] 400 STATE REAPPORTIONMENT
- [ ] 410 ANTITRUST
- [ ] 430 BANKS & BANKING
- [ ] 450 COMMERCE/ICC RATES/ETC
- [ ] 460 DEPORTATION
- [ ] 470 RACKETEER INFLUENCED & CORRUPT ORGANIZATION ACT (RICO)
- [ ] 480 CONSUMER CREDIT
- [ ] 490 CABLE/SATELLITE TV
- [ ] 810 SELECTIVE SERVICE
- [ ] 850 SECURITIES/COMMODITIES/EXCHANGE
- [ ] 875 CUSTOMER CHALLENGE 12 USC 3410
- [ ] 891 AGRICULTURE ACTS
- [ ] 892 ECONOMIC STABILIZATION ACT
- [ ] 893 ENVIRONMENTAL MATTERS
- [ ] 894 ENERGY ALLOCATION ACT
- [ ] 895 FREEDOM OF INFORMATION ACT
- [ ] 900 APPEAL OF FEE DETERMINATION UNDER EQUAL ACCESS TO JUSTICE
- [ ] 950 CONSTITUTIONALITY OF STATE STATUTES
- [ ] 890 OTHER STATUTORY ACTIONS

**ACTIONS UNDER STATUTES**

**REAL PROPERTY**

- [ ] 210 LAND CONDEMNATION
- [ ] 220 FORECLOSURE
- [ ] 230 RENT LEASE & EJECTMENT
- [ ] 240 TORTS TO LAND
- [ ] 245 TORT PRODUCT LIABILITY
- [ ] 290 ALL OTHER REAL PROPERTY

**CIVIL RIGHTS**

- [ ] 441 VOTING
- [ ] 442 EMPLOYMENT
- [ ] 443 HOUSING ACCOMMODATIONS
- [ ] 444 WELFARE
- [ ] 445 AMERICANS WITH DISABILITIES - EMPLOYMENT
- [ ] 446 AMERICANS WITH DISABILITIES -OTHER
- [ ] 440 OTHER CIVIL RIGHTS

**PRISONER PETITIONS**

- [ ] 510 MOTIONS TO VACATE SENTENCE 28 USC 2255
- [ ] 530 HABEAS CORPUS
- [ ] 535 DEATH PENALTY
- [ ] 540 MANDAMUS & OTHER
- [ ] 550 CIVIL RIGHTS
- [ ] 555 PRISON CONDITION

*Check if demanded in complaint:*

CHECK IF THIS IS A CLASS ACTION
UNDER F.R.C.P. 23

DO YOU CLAIM THIS CASE IS RELATED TO A CIVIL CASE NOW PENDING IN S.D.N.Y.?
IF SO, STATE:

DEMAND $ _____ OTHER _____    JUDGE _____    DOCKET NUMBER _____

*Check YES only if demanded in complaint*
JURY DEMAND: [ ] YES  [x] NO

NOTE:  Please submit at the time of filing an explanation of why cases are deemed related.

(SEE REVERSE)

**(PLACE AN x IN ONE BOX ONLY)**  ORIGIN

[x] 1 Original Proceeding  [ ] 2a. Removed from State Court  [ ] 3 Remanded from Appellate Court  [ ] 4 Reinstated or Reopened  [ ] 5 Transferred from (Specify District)  [ ] 6 Multidistrict Litigation  [ ] 7 Appeal to District Judge from Magistrate Judge Judgment

[ ] 2b. Removed from State Court AND at least one party is a pro se litigant

**(PLACE AN x IN ONE BOX ONLY)**  BASIS OF JURISDICTION  *IF DIVERSITY, INDICATE CITIZENSHIP BELOW. (28 USC 1332, 1441)*

[ ] 1 U.S. PLAINTIFF   [ ] 2 U.S. DEFENDANT   [ ] 3 FEDERAL QUESTION (U.S. NOT A PARTY)   [x] 4 DIVERSITY

CITIZENSHIP OF PRINCIPAL PARTIES (FOR DIVERSITY CASES ONLY)

(Place an [X] in one box for Plaintiff and one box for Defendant)

|  | PTF | DEF |  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|---|---|---|
| CITIZEN OF THIS STATE | [x] 1 | [ ] 1 | CITIZEN OR SUBJECT OF A FOREIGN COUNTRY | [ ] 3 | [ ] 3 | INCORPORATED and PRINCIPAL PLACE OF BUSINESS IN ANOTHER STATE | [ ] 5 | [ ] 5 |
| CITIZEN OF ANOTHER STATE | [ ] 2 | [x] 2 | INCORPORATED or PRINCIPAL PLACE OF BUSINESS IN THIS STATE | [ ] 4 | [ ] 4 | FOREIGN NATION | [ ] 6 | [ ] 6 |

PLAINTIFF(S) ADDRESS(ES) AND COUNTY(IES)

AXA Equitable Life Insurance Company
1290 Avenue of the Americas
New York, NY 10104

DEFENDANT(S) ADDRESS(ES) AND COUNTY(IES)

Centre Life Insurance Company
1350 Main Street
Springfield, MA 01103

DEFENDANT(S) ADDRESS UNKNOWN
   REPRESENTATION IS HEREBY MADE THAT, AT THIS TIME, I HAVE BEEN UNABLE, WITH REASONABLE DILIGENCE, TO ASCERTAIN THE RESIDENCE ADDRESSES OF THE FOLLOWING DEFENDANTS:

Check one:  THIS ACTION SHOULD BE ASSIGNED TO:   [ ] WHITE PLAINS   [x] FOLEY SQUARE
(DO NOT check either box if this a PRISONER PETITION.)

DATE  2/19/08   SIGNATURE OF ATTORNEY OF RECORD   *Linda M Martin*   ADMITTED TO PRACTICE IN THIS DISTRICT
[ ] NO
[x] YES (DATE ADMITTED Mo. July  Yr. 1997 )
RECEIPT #   Attorney Bar Code # LM 9219

Magistrate Judge is to be designated by the Clerk of the Court.

Magistrate Judge _____ is so Designated.

J Michael McMahon, Clerk of Court by _____ Deputy Clerk, DATED _____.

UNITED STATES DISTRICT COURT (NEW YORK SOUTHERN)

# Addendum A

Barry R. Ostrager
Linda H. Martin
Agnès Dunogué
Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, NY 10017
(212) 455-2000

Attorneys for Plaintiff AXA Equitable Life Insurance Company

# Addendum B

Alan B. Vickery
Boies, Schiller & Flexner LLP
575 Lexington Avenue, 7th Floor
New York, NY 10022
(212) 446-2300

Thorn Rosenthal
Cahill Gordon & Reindel LLP
Eighty Pine Street
New York, NY  10005
(212) 701-3000

Attorneys for Defendant Centre Life Insurance Company

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

```
----------------------------------------------------------x
AXA EQUITABLE LIFE INSURANCE              :
COMPANY (f/k/a THE EQUITABLE LIFE         :   Case No.: _____
ASSURANCE SOCIETY OF THE UNITED           :
STATES),                                  :
                                          :   [CONDITIONALLY] FILED UNDER
                              Plaintiff,: SEAL
                                          :
                                          :   [SUBJECT TO MOTION TO FILE
                    vs.                   :   UNDER SEAL]
                                          :
CENTRE LIFE INSURANCE COMPANY,            :
                                          :
                             Defendant.:
                                          :
----------------------------------------------------------x
```

## VERIFIED COMPLAINT

Plaintiff AXA Equitable Life Insurance Company ("AXA Equitable") by its

attorneys Simpson Thacher & Bartlett LLP, for its complaint against defendant Centre Life

Insurance Company ("Centre Life" or "Centre"), respectfully alleges as follows:

### NATURE OF ACTION

1.      While in run-off and in an apparently serious financial condition, Centre

Life Insurance Co. ("Centre" or "Centre Life") is in breach of its obligation to fund a trust which

was established for the purpose of insulating AXA Equitable from weakness in Centre's

financial condition.  Specifically, Centre has not deposited funds to make up a shortfall in the

trust – a shortfall which now stands at $179,454,336.

2.      In July 2000, AXA Equitable transferred its closed block of individual

disability income insurance policies (the "Disability Block") to Centre.  At the time of the

transaction, AXA Equitable stated its clear intention to be entirely out of the business.

Therefore, and as a result of legal restrictions on AXA Equitable's ability to assign the primary

liability for the underlying disability insurance policies, the transaction was structured as a 100% indemnity reinsurance agreement (the "Reinsurance Agreement"), together with a number of ancillary credit support agreements designed to insulate AXA Equitable completely from the cost of future claims in the event Centre became insolvent. As part of the transaction, Centre agreed to bear 100% of the financial risk in connection with the Disability Block and, in return, AXA Equitable paid Centre approximately $1.5 billion.

3.      The credit support agreements required Centre to maintain the portion of its assets supporting its liabilities (known as "reserves") for the business in a reserve trust (the "Reserve Trust") in which Equitable holds a security interest, so that Equitable could ensure that Centre would be able to meet its actuarially expected obligations under the Reinsurance Agreement. Pursuant to the relevant agreements, Centre is required to "true-up" the Reserve Trust each quarter to account for fluctuations in the value of the assets and in the calculation of Centre's reserves.

4.      Centre's most recent reports show that the trust has a current shortfall of nearly *$180 million*. Centre, however, is refusing to fund the shortfall. Moreover, Centre Life's unwillingness or inability to obtain support from its contractual sureties and guarantors, including its ultimate, Switzerland-based parent Zurich Insurance Company, bodes ill for AXA Equitable's own ability to seek relief from those entities. Centre's financial condition, and inability or refusal to fund the shortfall in the Reserve Trust, subjects AXA Equitable to irreparable harm in the event injunctive relief is not granted.

5.      Centre's under-funding of the Reserve Trust comes on the eve of an arbitration between the parties involving separate issues and claims, which Centre has claimed somehow relieves it of its obligation to fund the indisputable shortfall in the Reserve Trust.

Centre's speculative and disputed arbitration claims against AXA Equitable will be resolved at some indeterminate future time by the arbitral panel. In the meantime, there is no basis for Centre to refuse to deposit into the Reserve Trust the funds that are now due and owing.

6.      It is undisputed that the Reserve Trust is under-funded. It also is beyond dispute that the Reserve Trust shortfall is owed to the Reserve Trust – and not to AXA Equitable – and therefore does not constitute an asset owned by AXA Equitable, or a debt owed by Centre Life to AXA Equitable. Rather, the agreements provide that the funds were set aside in a trust to ensure Centre's ability to meet its indemnity obligations with respect to the claims of the 90,000 disability insurance policyholders in the Disability Block. As a result, Centre should be immediately required to fund the shortfall in the Reserve Trust, and to continue to fund any shortfalls that arise in the future.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction pursuant to 28 U.S.C. § 1332 and 28 U.S.C. § 1367.

8.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and (c) because a substantial part of the events that give rise to this action occurred in this district and because, upon information and belief, Centre Life transacts business in this district.

9.      The parties also specifically agreed in a Credit Support Agreement dated as of July 1, 2000 that each is entitled to obtain "injunctive or other equitable relief to prevent breaches and to enforce specifically the terms and provisions of th[e] Credit Support Agreement

in any court in the State of New York, or any court of the United States located in the State of

New York." Ex. 4 (Credit Support Agreement) § 7.4.[1]

## PARTIES

10.     AXA Equitable, formerly known as The Equitable Life Assurance Society

of the United States, is a New York corporation whose principal place of business is in New

York.

11.     Centre Life, formerly known as Massachusetts Casualty Insurance

Company ("Massachusetts Casualty"), is incorporated under the laws of Massachusetts and has

its principal place of business in Massachusetts.  In 1999, Massachusetts Casualty was acquired

by the Zurich Financial Services Group and changed its name to Centre Life Insurance

Company.  Upon information and belief, Centre Life is currently in run-off.

## FACTUAL BACKGROUND

**I.     AXA EQUITABLE SEEKS TO DISPOSE OF ITS BLOCK OF INDIVIDUAL DISABILITY INCOME INSURANCE BUSINESS**

12.     In 1999, AXA Equitable decided to exit the individual disability insurance

business by transferring the Disability Block to another insurance company.

13.     AXA Equitable engaged the services of prominent investment bank

Goldman, Sachs & Co. ("Goldman"), to market and solicit bids for the Disability Block.

14.     AXA Equitable's goal in the transaction, as Centre Life recognized and

acknowledged, was for AXA Equitable to be 100% out of the business when the transaction was

concluded.

---

[1]     All references to "Ex." herein are to exhibits annexed to the Affidavit of Linda H. Martin, dated February 19, 2008, and submitted herewith and in connection with AXA Equitable's Motion, By Order To Show Cause, for Temporary Restraining Order and Preliminary And Permanent Injunction.

15.    Goldman prepared and, in August 1999, circulated an information package to potential purchasers containing data and detailed projections of future experience under the Disability Block ("the Offering Memorandum"). The information in the Offering Memorandum was provided subject to an express disclaimer of representations and warranties.

16.    The following month, before any negotiations or due diligence commenced, Centre Life and AXA Equitable executed a formal, written Confidentiality Agreement, which included an express disclaimer of representations and warranties made during due diligence.

## II.    AXA EQUITABLE ENTERS INTO AGREEMENTS WITH CENTRE LIFE, INCLUDING REINSURANCE AGREEMENT AND RELATED AGREEMENTS PROVIDING FOR CREDIT SUPPORT OBLIGATIONS OF CENTRE LIFE

17.    On July 20, 2000, Centre Life and AXA Equitable entered into a 100% Quota Share Reinsurance Agreement (the "Reinsurance Agreement"). Ex. 3. The transaction was structured as a 100% indemnity reinsurance contract together with various other related agreements to protect AXA Equitable against credit risk exposure to Centre Life. *Id.* Although AXA Equitable remained liable as the insurer on the disability insurance policies, the transaction was structured to relieve AXA Equitable of all future financial risk on its Disability Block. *See id.*

18.    AXA Equitable paid over $1.5 billion in transferring this business – and that financial risk – to Centre Life.

19.    AXA Equitable received extensive credit support for Centre Life's obligations. The parties agreed that Centre Life would provide the credit support memorialized in a Credit Support Agreement, dated as of July 1, 2000, by and between AXA Equitable and Centre Life ("Credit Support Agreement"), Ex. 4, as well as other related agreements. These included a Reserve Trust Agreement, dated as of July 1, 2000, by and between AXA Equitable,

Centre Life and The Bank of New York ("Reserve Trust Agreement"), Ex. 5, and a Security

Trust Agreement, dated as of July 1, 2000, by and between AXA Equitable, Centre Life and The

Bank of New York ("Security Trust Agreement"), Ex. 6.

   20. Inadequate credit support from Centre Life was a deal-breaker for AXA

Equitable. The credit support memorialized in the Reinsurance Agreement and the related

agreements was consistent with AXA Equitable's conditioning of the closing of the transaction

on (i) the execution and delivery of a credit support agreement, and (ii) AXA Equitable finding

satisfactory Centre Life's credit support proposal. *See* Ex. 2 (Letter of Intent between Centre

Life and AXA Equitable, dated May 18, 2000) at sec. 1(a)(v), (f). In addition, AXA Equitable

reserved the right to walk away from the transaction if Centre Life's credit support proposal

proved unsatisfactory. *See id.* at sec. 3(g).

   21. Under these credit support obligations, Centre Life must maintain, in a

"Reserve Trust," assets at a market value equal to or in excess of its reserves with respect to the

Disability Block computed quarterly on a U.S. GAAP basis (the "Reserve Amount"). *See* Ex. 4

(Credit Support Agreement) at Exhibit A, sec. A.1.a. (providing that Reserve Trust "will at all

times during the term of the Transaction hold assets at market value equal to or in excess of the

[Centre Life] reserves . . . attributable to the reinsured disability income business, computed

quarterly on a U.S. GAAP basis"); Ex. 5 (Reserve Trust Agreement) § 1(a), (d); *id.* § 10

(defining "Reserve Amount" as "the amount of gross reserves and other liabilities or contra

assets attributable to the liabilities of [Centre Life] under the [Reinsurance Agreement],

calculated . . . in accordance with generally accepted accounting principles in the United

States"); *see also* Ex. 3 (Reinsurance Agreement) art. IX (providing that Centre Life "shall

establish and maintain adequate reserves with respect to the [Disability Block]").

22.    If at the end of any calendar quarter the current fair market value of the assets in the Reserve Trust (as set forth in a Trustee Valuation Report) is less than the Reserve Amount, Centre Life is required to deposit the difference in the Reserve Trust within ten business days after the Trustee's delivery of the Valuation Report (which must be sent within ten business days after the end of each month). Ex. 5 (Reserve Trust Agreement) § 1(d), (e).

23.    AXA Equitable is the beneficiary of the Reserve Trust, and of a security interest in it, but does not own the Trust or the funds therein. *See* Ex. 5 (Reserve Trust Agreement) § 1(a), (f); *see also* Ex. 7 (UCC Financing Statement). Furthermore, AXA Equitable is entitled to withdraw funds from the Reserve Trust in the ordinary course to "pay[] or reimburs[e] payment of then current claims and claims expenses under the reinsured business." *See* Ex. 4 (Credit Support Agreement) § 5.1(b) & Exhibit A, sec. D.1.c.

24.    Centre Life also entered into related surety bond agreements, dated as of January 1, 2000, with Centre Reinsurance (U.S.) Limited ("CRUS") and Centre Solutions (U.S.) Limited ("CSUS"), under which CRUS and CSUS agreed to provide Centre Life with sufficient funds to make up certain shortfalls in Centre Life's net worth. *See* Exs. 8 and 9. Under these agreements, Centre Life must enforce its rights against the sureties, for the benefit of AXA Equitable, if it fails to meet its obligations to fund the Reserve Trust. Ex. 8 § 7; Ex. 9 § 7.

25.    In February 2004, Standard & Poor's ("S&P") downgraded the credit rating of various Centre companies, including downgrading CRUS and CSUS to an "A-" rating. After its ratings downgrade, CRUS entered into a Guarantee Agreement with its parent Zurich Insurance Company ("ZIC"), pursuant to which the latter guaranteed CRUS's obligation under the Surety Bond. *See* Ex. 10; *see also* Ex. 11 (Guaranty Rights Agreement).

### III. CENTRE LIFE BREACHES THE PARTIES' AGREEMENTS, INCLUDING THE CREDIT SUPPORT AGREEMENT AND THE RESERVE TRUST AGREEMENT

26.    At the end of 2007, and as was notified to AXA Equitable just weeks ago, Centre restated its reserves in connection with the Disability Book. As a result, the Reserve Trust is under-funded by about $180 million.

27.    Specifically, as of December 31, 2007, Centre Life's Reserve Amount was $1,751,546,000, as reflected in the Reserve Amount Statement 4Q2007. Ex 19. At the same time, a Valuation Report issued by the trustee in January shows the market value of the assets in the Reserve Trust to be $1,572,091,664 as of December 31, 2007. Ex 12. This results in a difference of *$179,454,336* (the "Reserve Trust Shortfall").

28.    Centre was required to deposit this amount in the Reserve Trust within ten days of receiving the Valuation Report, *see* Ex. 5 (Reserve Trust Agreement) § 1(d), but upon information and belief has not done so.

29.    The market value of the assets in the Reserve Trust has fluctuated over the past two years primarily due to interest rate changes which has resulted in prior instances of under- or over- funding.[2] The Reserve Trust Shortfall has increased fourfold from the prior shortfall of about $42.4 million in the third quarter of 2007. *See* Ex. 21 (Reserve Amount Statement for 3Q2007), Ex. 13 (Valuation Report for 3Q2007 (excerpt)). Furthermore, contrary to prior shortfalls, the current Shortfall is primarily due to the restatement by Centre Life of its

---

[2]    The Reserve Trust was over-funded by about $15.6 million at one point (the second quarter of 2006), and under-funded by varying amounts during other quarters. *See* Exs. 12 to 24 (Valuation Reports (relevant excerpts) and Reserve Amount Statements). At the time of the largest prior shortfall, in the second quarter of 2006, AXA Equitable notified Centre Life that the latter was required to deposit the difference of $104 million into the Reserve Trust within ten business days after receipt of the Trustee's June 30, 2006 Valuation Report. Pursuant to section 2(b) of the Security Trust Agreement, Centre Life then requested that the approximately $59.5 million in a "Security Trust Account." The Security Trust now is entirely depleted. *See* Ex. 25.

reserves made, according to Centre Life, "after an extensive review of claims experience." *See* Ex. 34 (Email from Timothy P. Swankey, Actuary, Disability Management Services, Inc., to Samuel Gut, AXA Equitable Life Insurance Company, *et al.* (Jan. 9, 2008)).[3]  According to Centre Life, these restatements reflect its own "best estimates based on mortality improvements seen in past experience and expected in the future." *Id.*

30.    Finally, unlike prior instances of under-funding, this Shortfall results from a reserve increase during the fourth quarter of 2007.  Although Centre Life's 2007 year-end financial statement has not yet been released, its third quarter statement as of September 30, 2007, shows a surplus of only approximately $85 million. *See* Ex. 35.

**IV.    CENTRE'S BREACH OCCURS ON THE EVE OF ARBITRATION PERTAINING TO SEPARATE CLAIMS BROUGHT BY CENTRE AND IN THE FACE OF CENTRE'S QUESTIONABLE FINANCIAL CONDITION**

31.    The current Reserve Trust Shortfall comes on the eve of an arbitration hearing, concerning separate claims brought by Centre Life (the "Arbitration").  Centre improperly has used the existence of the Arbitration, and its alleged and disputed claims against Equitable, to argue that it does not need to fund the Reserve Trust Shortfall.  The Arbitration claims against Equitable are distinct and separate from Centre's obligations to the Reserve Trust.

32.    At approximately the time when S&P downgraded the credit rating of various Centre companies, and after having entered runoff, Centre Life brought in new management, resulting in a change in tone between Centre Life and AXA Equitable.  On April 29, 2005, Centre Life's new president, run-off specialist Richard Grilli, sent a letter to AXA Equitable complaining about, *inter alia*, alleged errors in data provided in connection with the reinsurance transaction.

---

[3]    Upon information and belief, Disability Management Services, Inc. ("DMS"), in which Centre Life has an ownership interest, is the administrator of the Disability Block.

33.    Centre Life initiated arbitration in June 2006 and a hearing is scheduled to begin on March 10, 2008, with respect to this dispute.  An arbitral award will be issued in due course; there is of course no known time-line for an ultimate resolution.

34.    When AXA Equitable has demanded previously that Centre Life make up what then was a smaller shortfall in the trust, Centre Life responded by citing to the right of offset provided in Article XII of the Reinsurance Agreement.

35.    That provision provides Centre Life with the right to set off mutual debts, *i.e.,* "[a]ny debts or credits . . . in favor of or against either the Company [AXA Equitable] or the Reinsurer [Centre Life]" under the inter-related transaction documents.  Ex. 3 art. XII.  The offset provision does not state that "disputed" debts are entitled to set-off.  Instead, it states only that mutual "debts or credits" which are "matured or unmatured" or "liquidated or unliquidated" are subject to the offset right.  *Id.*

## COUNT I

### (Injunctive Relief – Violations of the Reserve Trust Agreement)

36.    AXA Equitable hereby repeats and realleges each and every allegation made in paragraphs 1 through 35 of this Complaint as if fully set forth herein.

37.    The Reserve Trust Agreement requires Centre to establish a Reserve Trust Account.  Ex. 5 (Reserve Trust Agreement) § 1(a).

38.    The Reserve Trust Agreement further states that:

If at the end of any calendar quarter the current fair market value of the [a]ssets in the Reserve Trust Account shown on the Trustee's Valuation Report for the end of that quarter is less than the Reserve Amount shown in the Reserve Amount Statement for the end of that quarter, [Centre] shall within ten (10) Business Days after the delivery of the Valuation Report deposit or cause to be deposited additional Assets into the Reserve Trust Account such that the fair market value of the Assets at the end of the calendar quarter, after giving effect to such additional deposit, is at least equal to the Reserve Amount.

*Id.* § 1(d).

39.    The Reserve Amount is "the amount of gross reserves and other liabilities or contra assets attributable to the liabilities of [Centre Life] under the [Reinsurance Agreement], calculated . . . in accordance with generally accepted accounting principles in the United States." *Id.* § 10.

40.    On December 31, 2007, Centre Life's Reserve Amount was $1,751,546,000.

41.    The Valuation Report issued by the trustee in January shows the market value of the assets in the Reserve Trust to be $1,572,091,664 as of December 31, 2007.

42.    The market value of the assets in the Reserve Trust is $179,454,336 below the Reserve Amount.

43.    Centre was obligated to pay or cause to be paid $179,454,336 into the Reserve Trust Account within ten business days after receiving the January Valuation Report.

44.    Upon information and belief, Centre has not paid or caused to be paid $179,454,336 into the Reserve Trust Account.

45.    By failing to maintain the full amount of the Reserve Amount in the Reserve Trust, Centre has breached the Reserve Trust Agreement.

46.    Accordingly, AXA Equitable requests that the Court demand that Centre immediately deposit, or cause to be deposited, $179,454,336 into the Reserve Trust.

47.    AXA Equitable further requests that the Court demand that Centre fund, or cause to be funded, any shortfall in the Reserve Trust that arises in the future.

## COUNT II
### (Injunctive Relief – Violations of the Credit Support Agreement)

48.     AXA Equitable hereby repeats and realleges each and every allegation made in paragraphs 1 through 47 of this Complaint as if fully set forth herein.

49.     The Credit Support Agreement provides that Centre "will provide Credit Support consisting of its own net worth and the Reserve Trust." Ex. 4 (Credit Support Agreement) at Exhibit A, sec. A.1

50.     The Credit Support Agreement further provides that a "Reserve Trust" "will at all times during the term of the Transaction hold assets at market value equal to or in excess of the [Centre Life] reserves . . . attributable to the reinsured disability income business, computed quarterly on a U.S. GAAP basis." *Id.* at Exhibit A, sec. A.1.a.

51.     On December 31, 2007, the Centre Life reserves attributable to the reinsured disability income business totaled $1,751,546,000.

52.     The Valuation Report issued by the trustee in January shows the market value of the assets in the Reserve Trust to be $1,572,091,664 as of December 31, 2007.

53.     The Reserve Trust is under-funded by $179,454,336.

54.     By failing to maintain in the Reserve Trust "assets at market value equal to or in excess of the [Centre Life] reserves . . . attributable to the reinsured disability income business, computed quarterly on a U.S. GAAP basis," Centre has breached the Credit Support Agreement.

55.     Accordingly, AXA Equitable requests that the Court demand that Centre immediately deposit, or cause to be deposited, $179,454,336 into the Reserve Trust.

56.     AXA Equitable further requests that the Court demand that Centre fund, or cause to be funded, any shortfall in the Reserve Trust that arises in the future.

## COUNT III
### (Injunctive Relief – Violations of the Centre Reinsurance (U.S.) Limited Surety Bond)

57.    AXA Equitable hereby repeats and realleges each and every allegation made in paragraphs 1 through 56 of this Complaint as if fully set forth herein.

58.    The Surety Bond between Centre Reinsurance (U.S.) Limited in favor of Centre Life, dated as of January 1, 2000 ("CRUS Surety Bond"), states that "[u]pon failure by [Centre] to meet its payment obligations to any Counterparty in respect of any Covered Product, [Centre] agrees, for the benefit of such Counterparty, that [Centre] will enforce its rights against Surety under this Surety Bond." Ex. 9 (CRUS Surety Bond) § 7.

59.    "Counterparty" in the CRUS Surety Bond means "any Person that is party to, or is entitled to payment or performance by [Centre] under, any Covered Product." *Id.* § 1.

60.    "Covered Product" in the CRUS Surety Bond means "any of the following if issued or executed and delivered on or after January 1, 2000: any insurance, reinsurance, surety or derivative contract; . . . any obligation to post margin or collateral; any obligation to provide liquidity or otherwise provide funds to any other Person; any other product or instrument similar to any of the foregoing; and any other product or instrument identified as a 'Covered Product' in a certificate executed by an authorized officer of Surety." *Id.*

61.    The trustee of the Reserve Trust is a Counterparty within the meaning of the CRUS Surety Bond, and the Reserve Trust Agreement and Credit Support Agreement are Covered Products within the meaning of the CRUS Surety Bond.

62.    Centre has failed to meet its payment obligations to the trustee of the Reserve Trust, as set forth in the Reserve Trust Agreement and Credit Support Agreement.

63.    Centre therefore is obligated to "enforce its rights against" CRUS for the benefit of the trustee of the Reserve Trust. Upon information and belief, it has failed to do so.

64.    Accordingly, AXA Equitable requests that the Court demand that Centre enforce its rights against CRUS and demand that CRUS immediately deposit, or cause to be deposited, $179,454,336 into the Reserve Trust.

65.    AXA Equitable further requests that the Court demand that Centre fund, or cause to be funded, any shortfall in the Reserve Trust that arises in the future.

### COUNT IV
### (Injunctive Relief – Violations of the Centre Solutions (U.S.) Limited Surety Bond)

66.    AXA Equitable hereby repeats and realleges each and every allegation made in paragraphs 1 through 65 of this Complaint as if fully set forth herein.

67.    The Surety Bond between Centre Solutions (U.S.) Limited in favor of Centre Life, dated as of January 1, 2000 ("CSUS Surety Bond"), states that "[u]pon failure by [Centre] to meet its payment obligations to any Counterparty in respect of any Covered Product, [Centre] agrees, for the benefit of such Counterparty, that [Centre] will enforce its rights against Surety under this Surety Bond."  Ex. 8 (CSUS Surety Bond) § 7.

68.    "Counterparty" in the CSUS Surety Bond means "any Person that is party to, or is entitled to payment or performance by [Centre] under, any Covered Product."  *Id.* § 1.

69.    "Covered Product" in the CSUS Surety Bond means "any of the following if issued or executed and delivered on or after January 1, 2000: any insurance, reinsurance, surety or derivative contract; . . . any obligation to post margin or collateral; any obligation to provide liquidity or otherwise provide funds to any other Person; any other product or instrument similar to any of the foregoing; and any other product or instrument identified as a 'Covered Product' in a certificate executed by an authorized officer of Surety."  *Id.*

70.    The trustee of the Reserve Trust is a Counterparty within the meaning of the CSUS Surety Bond, and the Reserve Trust Agreement and Credit Support Agreement are Covered Products within the meaning of the CSUS Surety Bond.

71.    Centre has failed to meet its payment obligations to the trustee of the Reserve Trust, as set forth in the Reserve Trust Agreement and Credit Support Agreement.

72.    Centre therefore is obligated to "enforce its rights against" CSUS for the benefit of the trustee of the Reserve Trust. Upon information and belief, it has failed to do so.

73.    Accordingly, AXA Equitable requests that the Court demand that Centre enforce its rights against CSUS and demand that CSUS immediately deposit, or cause to be deposited, $179,454,336 into the Reserve Trust.

74.    AXA Equitable further requests that the Court demand that Centre fund, or cause to be funded, any shortfall in the Reserve Trust that arises in the future.

## PRAYER FOR RELIEF

WHEREFORE, AXA Equitable prays that the Court enter judgment against Centre Life as follows:

 a. A preliminary and permanent injunction compelling Centre Life to immediately deposit, or cause to be deposited, $179,454,336 into the Reserve Trust;

 b. A preliminary and permanent injunction compelling Centre Life, in the alternative, to enforce its rights against CRUS and/or CSUS and demand that CRUS and/or CSUS immediately deposit, or cause to be deposited, $179,454,336 into the Reserve Trust;

c.  A preliminary and permanent injunction compelling Centre Life to fund, or cause to be funded, any shortfall in the Reserve Trust that arises in the future;

d.  For such other and further relief as this Court may deem just and proper.

Dated: February 19, 2008

SIMPSON THACHER & BARTLETT LLP

By: _____

Barry R. Ostrager (BR 5379)
    Email: bostrager@stblaw.com
Linda H. Martin (LM 9219)
    Email: lmartin@stblaw.com
Agnès Dunogué (AD 1977)
    Email: adunogue@stblaw.com
25 Lexington Avenue
New York, New York 10017-3909
Telephone: (212) 455-2000
Facsimile: (212) 455-2502

*Attorneys for Plaintiff AXA Equitable Life Insurance Company*

## VERIFICATION

I, Jonathan E. Gaines, declare as follows:

I am a Vice President and Associate General Counsel at AXA Equitable Life Insurance Company ("AXA Equitable"), and I am authorized to make this declaration on behalf of AXA Equitable.  I have read and know the contents of the foregoing Complaint; that the same is true to my own knowledge or based on a review by me of records and documents in my possession or in the possession of AXA Equitable, except as to matters therein stated to be alleged on information and belief, and that as to those matters, I believe it to be true.  I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: February 19, 2008

_____
Jonathan E. Gaines

Sworn to me this
19th day of February,
2008

_____
Notary Public.

JESSICA KERR
NOTARY PUBLIC, State of New York
No. 01KE6172378
Qualified in Queens County
Commission Expires Aug. 6, 2011

1

Goldman, Sachs & Co. | 85 Broad Street | New York, New York 10004
Tel: 212-902-1000

Goldman
Sachs

**PERSONAL AND CONFIDENTIAL**

September 9, 1999

Centre Life Insurance Company
One Chase Manhattan Plaza
35th Floor
New York, NY 10005

Attention:    Mr. Joel Klaassen
              Senior Vice President

Gentleman:

    In connection with your consideration of a possible transaction with The Equitable Life Assurance Society of the United States (the "Company") in respect of its Disability Income Business (the "Transaction"), you have requested and will have access to certain information. As a condition to your being furnished such information by us or representatives of our financial, legal, accounting or other advisors (collectively, "our Representatives"), you agree to treat any information concerning the Company which is furnished to you in accordance with the following and to take or abstain from taking certain other actions herein set forth (it being understood that you are also agreeing to cause your affiliates and representatives of your financial, legal, accounting and other advisors (such affiliates and representatives collectively, "your Representatives") to comply with the provisions hereof).

    As used herein, the term "Evaluation Material" refers to any and all information, whether in documentary, database, electronic media or any other form, concerning the Company including, without limitation, information about and/or identifying customers, actual or prospective, of the Disability Income Business, together with any and all additional financial, technical, commercial or other information related to the Disability Income Business as has been or may hereafter be provided to you by us and our Representatives and any analyses, compilations, computer records, studies, documents or other material prepared by you or your Representatives during the review of such information by you and your Representatives which contain, otherwise reflect or are based upon such information.

    The term "Evaluation Material" does not include any information that (a) at the time of disclosure or thereafter is generally available to and known by the public (other than as a result of a disclosure directly or indirectly by you or your Representatives), (b) was available to you on a non-

9/10/99 10:30a

CONFIDENTIAL

CTR-A 018429

SEP.10.1999 10:31AM    ZC HEALTHCARE MGMT. CO.                    NO.893    P.3/5
                                                                 NO.589    P.3

Centre Life Insurance Company
September 9, 1999
Page Two

confidential basis form a source other than a source that is subject to any confidentiality obligation to any person with respect to such information or (c) has been independently acquired or developed by you without violating any of your obligations under this Agreement. The term "person" as used in this Agreement shall be interpreted broadly to include, without limitation, any corporation, company, partnership or individual. You agree that the Evaluation Material will be used solely for the purpose of evaluating the Transaction . You agree that the Evaluation Material will be kept confidential by you and that you will not disclose any Evaluation Material to any person, except that you may disclose the Evaluation Material or portions thereof to those of your officers and employees and your Representatives who need to know such information for the purpose of evaluating the Transaction (it being understood that, before disclosing the Evaluation Material or any portion thereof to your Representatives, you will inform them of the confidential nature of the Evaluation Material and obtain their agreement to be bound by the terms of this Agreement and not to disclose such information to any other person). You agree that you will not duplicate or distribute any Evaluation Material to anyone other than your Representatives without our prior written authorization and that you will be fully responsible for any breach of this Agreement by your Representatives.

You hereby agree to indemnify us and hold us harmless from any damage, loss, cost, or liability (including reasonable legal fees and the cost of enforcing this indemnity) in respect of third party action arising out of or resulting from any unauthorized use or disclosure by you or your Representatives of the Evaluation Material in violation of the Agreement.

In the event that you or any of your Representatives become legally compelled (by deposition, interrogatory, request for documents, subpoenas, civil investigative demand or other legal or judicial process) to disclose any of the Evaluation Material, you shall promptly inform us of the circumstances and provide us with prior written notice of such requirements so that we may seek a protective order or other appropriate remedy and/or waive compliance with the terms of this Agreement. You also agree to fully cooperate with any legally permissible steps we may determine to take to obtain a protective order or otherwise to limit such disclosure, provided, however that any costs associated with obtaining such protective order shall be borne by us. In the event that such protective order or other remedy is not obtained, or that we waive compliance with the provisions hereof, you agree to furnish only that portion of the Evaluation Material which you are advised by written opinion of counsel is legally required and to exercise best efforts to obtain assurance that confidential treatment will be accorded such Evaluation Material.

If you determine not to proceed with the Transaction, you will promptly inform us of that decision and, in that case, or at any time upon our request, you will promptly return to us any and all Evaluation Material in your possession or in the possession of your Representatives without retaining any copy thereof, and you will promptly destroy all copies of any analyses, compilations, computer records, studies, documents or other material prepared by you or your Representatives which

9/10/99 10:30a

**CONFIDENTIAL**                                        CTR-A 018430

SEP.10.1999 10:31AM   ZC HEALTHCARE MGHT   NO.893   P.4/5
NO.589   P.4

Centre Life Insurance Company
September 9, 1999
Page Three

contains or reflects any Evaluation Material and confirm such destruction in writing to us provided that you shall be entitled to retain that portion of the Evaluation Material for legal, regulatory or internal compliance purposes, which will continue to be treated as confidential on the terms hereof ,

Without our prior written consent, you will not, and will direct your Representatives not to, disclose to any person (a) the fact that any investigations, discussions or negotiations are taking place concerning a possible Transaction between us and you, (b) that you have requested or received Evaluation Material from us or (c) any of the terms, conditions or other facts with respect to any such possible Transaction, including the status thereof.

You agree that you will not, as a result of knowledge or information directly obtained during your discussions and investigations relating to the transaction, or from the Evaluation Material, without our prior written consent, hire or solicit for employment any of our officers having the title of Vice President or higher, or any similar title, or directors for a period of one year from the date hereof. Notwithstanding the foregoing, the following shall be permitted hereunder: (i) general newspaper advertisements and other general circulation material, (ii) engagement of a search firm to conduct a broad based search or other means of general solicitation, and (iii) the hiring by you of any person who contacts you on his or her own initiative or as a result of any solicitation permitted pursuant to this Agreement.

Although you understand that we have endeavored to include in the Evaluation Material information known to us which we believe to be relevant for purpose of your investigation of the Transaction, you further understand and acknowledge that neither we nor any of our Representatives are making any representation or warranty, express or implied, as to the accuracy or completeness of the Evaluation Material. You agree to the fullest extent permitted by law, that neither we nor any of our Representatives will have any liability to you or any other person on any basis resulting from your or your Representative's use of or reliance upon the Evaluation Material. Only those representations and warranties that are made in a definitive agreement relating to a Transaction, when and if it is executed, and subject to such limitations and restrictions as may be specified in such agreement, shall have any legal effect.

You acknowledge and agree that (a) we and our Representatives are free to conduct the process leading up to a possible Transaction as we and our Representatives, in our sole discretion, determine and (b) we reserve the right, in our sole discretion, to change the procedures relating to our consideration of the Transaction at any time without prior notice to you or any other person, to reject any and all proposals made by you or your Representatives with regard to the Transaction, and to terminate discussions and negotiations with you at any time and for any reason.

9/10/99 10:30a

CONFIDENTIAL

CTR-A 018431

SEP.10.1999 10:32AM  ZC HEALTHCARE MGMT                    NO.693   P.5/5
                                                           NO.589   P.5

Centre Life Insurance Company
September 9, 1999
Page Four

        You agree that, in the event of any breach of any provision of this Agreement, we shall be
entitled to seek equitable relief, including relief in the form of injunctions and orders for specific
performance, in addition to all other remedies available to us at law or in equity.

        You hereby acknowledge that you are aware, and that you will advise such directors, officers,
employees and Representatives who are informed as to the matters which are the subject of this
letter, that the United States securities laws prohibit any person who has received from an issuer
material, non-public information concerning the matters which are the subject of this letter from
purchasing or selling securities of such issuer or from communicating such information to any other
person under circumstances in which it is reasonably foreseeable that such person is likely to
purchase or sell such securities in reliance upon such information.

        If any provision hereof shall be determined to be void or unenforceable in any jurisdiction, the
validity and effectiveness of the remaining provisions shall not be affected.

        This Agreement is for our benefit and will be governed by and construed in accordance with
the laws of the State of New York and shall terminate one year from the date upon which you destroy
or return the Evaluation Material to us, as the case may be.

The Equitable Life Assurance Society of the United States

By:  _Goldman, Sachs + Co._
     Goldman, Sachs & Co.
     on behalf of The Equitable Life Assurance Society of the United States

Confirmed and Agreed to:

Centre Life Insurance Company

By:  _Eileen C_
     Name: Eileen M. Sweeney
     Title: President
Date:  9/10/99

                                                      9/10/99 10:30a

CONFIDENTIAL                                  CTR-A 018432

2

# CENTRE

May 18, 2000

Mr. Stanley B. Tulin
Vice Chairman of the Board
 and Chief Financial Officer
The Equitable Life Assurance Society
 of the United States
1290 Avenue of the Americas
New York, New York  10104


Re:    Letter of Intent

Dear Stan:

We wish to affirm the mutual interest of The Equitable Life Assurance Society of the United States ("Equitable") on the one hand, and Centre Life Insurance Company ("Centre") on the other hand, in moving forward with the transaction described in this letter (the "Transaction") for the reinsurance of Equitable's block of Individual Disability Income insurance business (the "IDI Business").

This letter ("Letter of Intent") is conditioned upon your returning the countersigned copy of this Letter of Intent to us (by FAX to the number we provide) by no later than close of business on May 18, 2000.  If we have not received the countersigned copy of this Letter of Intent by such time, this Letter of Intent shall be deemed to have expired and shall be of no force or effect ab initio.

person/LOIblkzcgf.doc

A member of the Ⓩ Zurich Financial Service Group

CENTRE

Stanley B. Tulin
May 18, 2000
Page 2

This Letter of Intent does not contain all terms upon which agreement must be reached in order for Definitive Agreements (as defined herein) to be entered into and the Transaction to be consummated and is not meant to be exhaustive with respect to the terms and conditions needed to consummate the Transaction. A binding agreement with respect to the Transaction will result only from the execution and delivery of the Definitive Agreements by Centre and Equitable. We would expect that certain of such terms set forth in this Letter of Intent may be amended or eliminated, and other terms, some of which may be material, could be added, in the course of our further due diligence and discussions or in the course of our further internal evaluation of the proposed Transaction. The parties hereto agree that no oral communications made by either party before, on or after the date hereof shall be relied upon or be binding for any purpose in any matter relating in any way to the Transaction. Centre hereby represents and warrants that all corporate actions, if any, required to enter into this Letter of Intent and in good faith negotiate the Definitive Agreements as contemplated hereby, have been taken.

The following terms of this Letter of Intent are binding on you and Centre upon your acceptance of this Letter of Intent prior to this Letter of Intent's expiration.

1.      General Conditions Precedent to Closing.  The consummation of the Transaction by each of the parties hereto shall be conditioned upon the fulfillment of such conditions precedent by the other party as are customary in transactions similar in size and nature to the Transaction, or otherwise appropriate for the Transaction or otherwise set forth in the Definitive Agreements or requested by Centre, Equitable or the other parties to the Definitive Agreements.   Such conditions shall include without limitation:

        (a)      execution and delivery of Definitive Agreements by the parties thereto, negotiated in good faith containing terms acceptable to Centre and Equitable each in their reasonable discretion, including without limitation, the parties' satisfaction as to the structure and legal aspects of the Transaction -- such Definitive Agreements to include, at a minimum, (i) a reinsurance agreement between Equitable and Centre, (ii) a transition services agreement among Equitable, Centre, and Disability Management Services, Inc. (Centre's designated third party administrator, hereinafter, "DMS"), which shall among other things provide $(x)$ Centre with the right, in order to facilitate the transition contemplated by such transition services agreement, to require that Equitable take all reasonable actions, including reasonable specified actions as directed by Centre and which Equitable is

entitled to take under or pursuant to the provisions of its administration agreement with UnumProvident, with which Equitable presently has an agreement for the administration of IDI claims which are the subject of the Transaction (the "UP TPA Agreement"), relating to the provision of certain transition services upon termination of the UP TPA Agreement, including without limitation enforcement of those provisions, (y) Equitable with the right to consult with DMS and Centre regarding claims administration matters, and Centre and DMS shall use their commercially reasonable efforts to provide such claims administration advice as much as is practicable, and (z) in the event (I) Equitable fails for any reason to seek such enforcement or fails to take the reasonably specified actions, or (II) UnumProvident for any reason is in breach of the UP TPA Agreement with respect to providing the transition services contemplated, Centre may offset any and all damages, loss (other than consequential damages or loss), costs, and expenses Centre or DMS may incur as a result thereof against all sums otherwise owed by Centre to Equitable under any of the Definitive Agreements or otherwise), except that in the event of Clause (z)II, only the damages actually collected in litigation or other proceedings (including, but not limited to, any settlements of such litigation or other proceedings) against UnumProvident may be offset, (iii) a claims administration agreement among Equitable, Centre and DMS, (iv) a technical services agreement between Equitable, Centre and DMS (as Centre's designated administrator) to ensure access by DMS to Equitable's computer systems and software required by DMS to perform the services contemplated under the claims administration agreement during an agreed upon transition period following the Closing, and (v) a Credit Support agreement as described below;

(b)    [intentionally omitted]

(c)    the receipt of all consents, approvals, authorizations, licenses and orders of any applicable regulatory authority necessary or advisable in connection with the execution and delivery of the Definitive Agreements or the consummation of the Transaction (the "Regulatory Approvals");

(d)    agreement between Equitable, Centre, and DMS on the appropriate transition plan from the management of the IDI business as it is performed today in connection with the transition services agreement;

**CENTRE**

Stanley B. Tulin
May 18, 2000
Page 4

(e)      the absence of any Material Adverse Change (as defined below) subsequent to the date hereof and prior to the execution of Definitive Agreements; and

(f)      a determination by Equitable, with written notice thereof to Centre no later than the close of the second full business day immediately following delivery by Centre of the description of the Credit Support, that such Credit Support is satisfactory to Equitable.

"Credit Support" for the purpose of this Section 1 and Section 3 means a form of credit support for Centre's obligations under the Definitive Agreements that is satisfactory to Equitable in its sole discretion. The Credit Support shall be described by Centre to Equitable in writing, together with any supporting materials sufficient for Equitable to fully assess the Credit Support proposal, on or before May 24, 2000.

"Data Verification" for the purpose of this agreement shall mean the completion of the procedures described in Exhibit A. Centre and Equitable agree to the following with respect to Data Verification:

(a)      Not later than June 6, 2000 (the "Delivery Date"), Centre shall give Equitable written notice of one of the following:

(i)      that the Cash Flow Adjustment (as defined below) is 1.00 because either (A) Centre believes in good faith that the Cash Flow Adjustment (after giving effect to all data corrections of which Centre is then actually aware) would be equal to or greater than 0.97 and less than or equal to 1.01 or (B) Centre has elected not to complete the procedures or any component thereof described in Exhibit A and, based on any and all procedures done as of such date, has not developed sufficient reason to believe that the adjustment is less than 0.97; or

(ii)     that Centre is terminating this Letter of Intent pursuant to Section 3(b) of this Letter, or

(iii)    that the Cash Flow Adjustment is not equal to 1.00, which notice with respect to this clause (iii) shall be accompanied by (A) all data inaccuracies or problems discovered (whether favorable or unfavorable to Centre), if any, resulting from data issues uncovered

CENTRE

Stanley B. Tulin
May 18, 2000
Page 5

by the Exhibit A procedures and Centre's proposed data correction(s), and (B) all supporting workpapers evidencing such data inaccuracies or problems and Centre's proposed corrections in a format reasonably sufficient for Equitable to reasonably understand and respond. No data corrections not included in a notice referred to in this clause (a)(iii) or derived directly therefrom shall be raised by Centre after the Delivery Date. Centre may give more than one notice pursuant to this clause (a)(iii).

(b)   Within five business days following receipt of a notice and accompanying workpapers described in the foregoing clause (a)(iii), Equitable will notify Centre (the "Equitable Response") of its agreement, counterproposal or disagreement with such proposed corrections. The parties in good faith will work to resolve any disagreements throughout the Data Verification process (including, but not limited to, such five business day period). During no more than the four business days after the Equitable Response, the parties will continue to work to resolve any disagreements, failing which they shall disclose to each other their final and last best Proposal (hereinafter defined) no later than the end of such four business day period. For purposes hereof, a "Proposal" of a party shall comprise the data corrections and the related actuarial techniques (as are necessary or appropriate) proposed by such party, and the information supporting the data corrections. If no resolution of disagreements is reached on or prior to the business day next following such four business days, the parties will on such next following business day, submit their final and last best Proposal (previously disclosed to the other party as provided above) to "baseball arbitration" by an independent firm of accountants and actuaries, the identity of which shall be mutually agreed, and the parties will abide by the result of such arbitration, which arbitration process shall require the arbitrator to select one of the two final and last best Proposals.

(c)   Unless the parties agree otherwise, all corrected data combined with such actuarial techniques as are necessary or appropriate (as such data or techniques may be mutually agreed or established pursuant to the baseball arbitration) will be converted to cash flow projections utilizing the TAS system and actuarial assumptions consistent with the

CENTRE

Stanley B. Tulin
May 18, 2000
Page 6

projections in Exhibit B. Neither party will submit any Proposal to the arbitrators to the extent such Proposal was not previously provided to the other party as described above in paragraph (b).

"Material Adverse Change" for the purpose of this Section 1 shall mean the occurrence of any of the following events:

    (x)    a Cash Flow Adjustment (as defined herein) greater than 105%;

    (y)    a downgrade in Equitable's or Centre's (as the case may be) credit rating issued by Standard & Poor's or any nationally recognized rating agency by more than two levels from such rating assigned to Equitable and Centre, respectively, as of May 8, 2000; and/or

    (z)    if either (i) termination by UnumProvident of the UP TPA Agreement, or (ii) a material change after the date of this Letter in UnumProvident's performance of its obligations under the UP TPA Agreement, is reasonably expected to materially adversely affect the economic results of the Transaction.

2.    Access to Records. Equitable agrees while this Letter of Intent is in effect to continue to afford Centre and its Representatives access at reasonable times and places to such information, books, records and personnel of Equitable (or within its control) as Centre may request; however, Centre will conclude its Data Verification in good faith within the times set forth above, and any such access shall be limited to the purposes of Data Verification or to such preparation as Centre may wish to make for implementation of the Transaction.

3.    Termination. This Letter of Intent will terminate (the "Termination Date") on the earliest to occur of:

    (a)    the date upon which Centre and Equitable agree in writing to terminate this Letter of Intent;

    (b)    five business days following the date on which Centre provides written notice to Equitable that, as evidenced by all supporting workpapers, the data subject to the Data Verification is so incomplete or inaccurate that no reasonably accurate Cash Flow Adjustment can be calculated, provided that Equitable has not cured the problem during such five business day period.

pierson/LODblkzcgf.doc

CENTRE

Stanley B. Tulin
May 18, 2000
Page 7

(c)    (i) the date that Centre provides written notice to Equitable of the occurrence of a Material Adverse Change under clauses (x), (y) (with respect to a downgrade of Equitable) or (z) of the definition thereof; or (ii) the date that Equitable provides written notice to Centre of the occurrence of a Material Adverse Change under clause (y) of the definition thereof (with respect to a downgrade of Centre);

(d)    the date upon which either party notifies the other (based upon circumstances known or reasonably believed by the party providing notice) that it is highly likely that the Regulatory Approvals may not or cannot, without an unreasonable expenditure of time, money and other resources, be secured;

(e)    July 1, 2000, or such other later date as may be mutually agreed by Centre and Equitable, if the Definitive Agreements have not theretofore been executed and delivered by Centre, Equitable and the other parties thereto;

(f)    Centre has not obtained Board authorization in writing by May 24, 2000; and

(g)    Centre has not provided the Credit Support satisfactory to Equitable as described in Section 1 above and Equitable has delivered in writing a notice to Centre, on the second full business date immediately following delivery of a description of such Credit Support, that it is terminating this Letter of Intent pursuant to this clause (g).

Upon any such termination, the agreements contained in this Letter of Intent shall be void and of no further force or effect, except for the provisions of Sections 5, 6, and 8 of this Letter of Intent, which shall remain in full force and effect and shall survive termination of this Letter of Intent.

4.    Exclusivity.  In consideration of Centre's effort and expense in evaluating the Transaction, Equitable agrees that for a period from the date that Equitable executes and delivers this Letter of Intent to July 1, 2000 (the "Restricted Period"), Equitable will not, and will not permit any of its officers, directors, employees, Representatives or agents or any of its affiliates to, directly or indirectly, solicit, initiate or encourage the submission of any Proposal (as defined below), enter into any agreement with respect to any Proposal, or initiate or participate in any discussions or negotiations regarding, or furnish to any person or entity any information or assistance with respect to, or take any action to facilitate any inquiries or the making of any proposals that constitute, or may reasonably be

piersun/LOlblkzegf.doc

expected to lead to, a Proposal. For purposes hereof "Proposal" means any reinsurance or insurance proposal, offer or arrangement (other than a proposal or offer made by Centre, or any arrangement pursuant to which Centre would be the provider of at least 50% of such reinsurance or insurance) involving Equitable or any of Equitable's affiliates as respects a transaction involving Equitable's IDI business similar to the Transaction. During the Restricted Period, Equitable and its principals, advisors, agents and Representatives will keep Centre informed on an ongoing basis with respect to any Proposals received by them.

5.    Transaction Expenses.    (a) In the event that Equitable does not complete the Transaction, Equitable will reimburse Centre for its Transaction Expenses as defined below, not to exceed $3.5 million. However, no such reimbursement is required in circumstances in which (*i*) Centre or DMS has been unreasonable in negotiating the Definitive Agreements, (*ii*) Centre has suffered a Material Adverse Change under clause (*y*) of Section 1, (*iii*) this Letter of Intent terminates pursuant to clause (f) or (g) of Section 3 hereof; or (*iv*) Centre or any other party to the Credit Support (other than Equitable or its affiliates) fail to get the necessary regulatory approval to effect the Credit Support (after notice and a reasonable opportunity to cure).

(b) For the purpose of clause (a) immediately preceding, "Transaction Expenses" shall mean all actual third party (DMS being considered a "third party" with respect to costs and expenses that are billed to Centre by DMS when DMS has been retained by Centre in lieu of a third party) costs and expenses reasonably incurred by Centre (including without limitation in connection with reasonable acquisitions of space and dedicated employees) or DMS (including without limitation in connection with reasonable acquisition of space and employees), or any other member of the Centre Group of Companies, between the signing of this Letter of Intent by Equitable and the Termination Date, in connection with its evaluation, negotiation, documenting and consummating or reasonably preparing to consummate the Transaction including without limitation attorneys' fees and other legal costs; due diligence expenses; fees and costs of third parties involved in the Transaction; and accountants' and consultants' fees and expenses. For the purposes of this section, "incurred" expenses shall include a reasonable provision for the orderly disposition or unwinding or reversal of actions taken by or on behalf of Centre and/or DMS in reasonable preparation for consummating this Transaction or performing obligations thereunder, even if such disposition, reversal or unwinding takes place after the Termination Date. Centre shall provide Equitable with prior notice, if practicable, of the expected expense for the acquisition or leasing of space or facilities, but failure to provide

pierson/LOIblklexgf.doc

CENTRE

such notice shall not affect whether or not such expense is a Transaction Expense hereunder.

6.    Indemnification.  (a) Subject to the conditions described below, (I) Equitable hereby agrees to indemnify and hold harmless Centre and its affiliates and DMS (as a third party beneficiary) and its affiliates, and their and its officers, directors, employees, stockholders, agents, advisers or other representatives, including, without limitation, attorneys, accountants, actuaries and other professionals in each case in their capacity as such ("Representatives") (collectively "Centre Persons"), and (II) Centre hereby agrees to indemnify and hold harmless Equitable and its affiliates, and their and its Representatives (collectively "Equitable Persons"), from, with respect to both (I) and (II), any and all monetary damages, liability or loss (other than consequential damages or loss), cost, expenses, suit, claims, fines, fees, penalties, including punitive or exemplary damages, interest obligations, deficiencies, (including without limitation, reasonable expenses of investigation and defense fees and disbursements of counsel and other professionals, such costs to be paid on an as incurred basis) (collectively, with respect to Centre Persons, "Centre Damages" and collectively with respect to Equitable Persons, "Equitable Damages", and Centre Damages and Equitable Damages, in the aggregate herein referred to as "Damages") resulting from, arising out of, or relating to any action or omission of or on behalf of a Centre Person (or actions or omissions of or on behalf of an Equitable Person to the extent such actions or omission were done or omitted by such Equitable Person at the specific written direction of Centre), that results or is alleged to result in a breach or alleged breach of any provision of the UP TPA Agreement or related or successor agreement involving Equitable (or any affiliate thereof) and UnumProvident (or any affiliate thereof), including without limitation, any Damages asserted or proved in any suit, proceeding or legal action commenced by any third party against any Centre Person or Equitable Person.  The duties, obligations and liabilities of Equitable and Centre under this Section shall survive the termination or expiration of this Letter of Intent.

(b) The indemnification described above is subject to the following terms and conditions.

(i) The indemnification does not apply to Damages resulting from or arising out of actions or omissions of or on behalf of any Centre Person or Equitable Person after the Termination Date of this Letter of Intent unless such actions or omissions arise from or are in connection with the orderly disposition or unwinding of or reversing of actions or omissions taken or occurring by or on

Stanley B. Tulin
May 18, 2000
Page 10

behalf of Centre Persons or Equitable Persons prior to the
Termination Date.

(ii) Equitable shall pay and be responsible for 50 % of all Damages
and Centre shall be responsible for the remaining 50% of all
Damages (in each case their "Share of Damages"). Equitable and
Centre shall each pay their own Damages as incurred provided that
Centre and Equitable, as the case may be, shall pay to or receive
from (as the case may be) the other, monthly, subject to reasonable
documentary evidence of such Damages, the excess, if any, over
their respective Share of Damages, such that, after such payment,
neither Centre nor Equitable will have paid at any time more than
their respective Share of Damages.

(iii) Centre and Equitable shall notify each other promptly of any
claim for which indemnification shall be made, but any delay in
giving such notice shall excuse Equitable or Centre, as the case
may be, only to the extent that it was prejudiced thereby.
Equitable will select counsel subject to Centre's approval (which
shall not be unreasonably withheld) as respects any judicial,
administrative, arbitral, or other proceeding covered hereby;
however, (I) Centre shall have the right to participate in such
proceedings by its own counsel (any expense thereby being
deemed part of Damages), and (II) solely with respect to any
defense as to which Centre and Equitable have conflicting
interests, Centre's retained counsel expense will be deemed part of
Damages and Centre shall have the right to control all aspects of
such defense.

(iv) Centre shall not present any defense, or settle, concede or
otherwise cease to defend any claim if such act could reasonably
be expected to have an adverse effect on Equitable without
providing Equitable with the opportunity to review and comment
on such defense, settlement or concession. In such event the
parties agree to act in good faith to resolve any such conflicting
interests, and to mitigate any potential damages arising from such
conflicting interests.

(v) Equitable shall not present any defense, or settle, concede or
otherwise cease to defend any claim if such act could reasonably
be expected to have an adverse effect on Centre without providing
Centre with the opportunity to review and comment on such
defense, settlement or concession. In such event the parties agree
to act in good faith to resolve any such conflicting interests, and to

**CENTRE**

Stanley B. Tulin
May 18, 2000
Page 11

mitigate any potential damages arising from such conflicting interests.

(e) In the event that Definitive Agreements are executed between the parties, it is expected that provisions relating to the indemnification of the parties as are customary in transactions similar in size and nature to the Transaction, or otherwise appropriate for the Transaction, or requested by Centre, Equitable or the other parties to the Definitive Agreements (including without limitation the Indemnification provided in this Section 6) shall be set forth in the Definitive Agreements.

7.    Significant Terms and Conditions of the Reinsurance Agreement. Any reinsurance agreement entered into pursuant to this Letter of Intent shall be consistent with the following terms and conditions:

(a)    the reinsurance will be 100% coinsurance of the book of IDI Business issued by Equitable prior to June 30, 1994 (referred to in documents given to Centre by Equitable as the "Existing" book plus the "Transition" book), including any coverage required to be issued subsequently pursuant to the terms of such policies (the "Reinsured Policies"). Such coverage shall be limited to Equitable's net liability only, i.e., Centre will be responsible for all Policy Benefits (as such term will be defined in the Definitive Agreements) under the Reinsured Policies except to the extent such benefits are covered by Inuring Reinsurance as described below). For the purposes of this coverage, all third party reinsurance agreements in force as of January 1, 1999 shall be deemed to remain in place and collectible, whether or not such inuring reinsurance is in fact collectible or not ("Inuring Reinsurance");

(b)    the reinsurance will reimburse Equitable for its actual expenses relating to the policies, such as, but not limited to, agent commissions and service fees, taxes and expenses (including those incurred by DMS) incurred with respect to the administration of the Reinsured Policies and the administration of claims including the costs of defending any claim (including, reasonable outside attorneys' fees, costs of expert investigation, and other related defense costs – "Defense Costs"), except to the extent such administrative and Defense Costs are the direct obligation of Centre or DMS under the administration agreements (collectively, the "Policy Related Expenses"), plus the transition expenses included in the Initial Reinsurance Premium;

CENTRE

Stanley B. Tulin
May 18, 2000
Page 12

(c)    (i) (x) no coverage of policy benefits shall be provided for (I) any claim in litigation on December 31, 1998 for which no reserve was held on December 31, 1998 and (II) any claim in litigation before December 31, 1998 for which no reserve was held on December 31, 1998 if such claim involves an open dispute as of December 31, 1998, related to the claim in such prior litigation and (y) a provision shall be made by mutual agreement amongst the parties as respects coverage of claims for which no reserve was held on December 31, 1998 and for which litigation has been commenced between December 31, 1998 through to Closing Date; (ii) Equitable will be responsible for extra-contractual losses as a result of acts or omissions prior to the effective date of reinsurance, and reinsurer will be responsible for extra-contractual losses as a result of acts or omissions after the effective date of the reinsurance except to the extent such loss results from an affirmative exercise by Equitable of its ultimate responsibility under the administration agreement for claim determinations or policy administration, and except as provided in the next following sentence.  Except to the extent that Equitable has followed the advice of Centre and/or DMS with respect to claim decisions as contemplated by the transition services agreement described in Section 1(a)(ii)(y), Equitable will be responsible to the extent of its acts and omissions, and those of UnumProvident pursuant to the UP TPA Agreement, during the transition period provided under the UP TPA Agreement.  Extra-contractual losses include those arising from or related to any alleged or actual act, error or omission, negligent or reckless conduct, bad faith, unfair dealing and/or misconduct in connection with the issuance, delivery, cancellation, administration, or defense (including, without limitation, handling of claims) of any of the Reinsured Policies in excess of policy limits and any Defense Costs associated with any of the forgoing;

(d)    the "Initial Reinsurance Premium" shall be due and payable upon the execution of the Definitive Agreements as therein provided, calculated as the sum of the following:

(i)     the Base Reinsurance Premium, plus
(ii)    the Post March Cash Flow, plus
(iii)   the Post March Investment Income, plus
(iv)    certain transition expenses not exceeding $[11] million.

(e)    For the purpose of clause (d) immediately preceding, the following terms shall have the meanings ascribed below:

CENTRE

Stanley B. Tulin
May 18, 2000
Page 13

(i)    "Base Reinsurance Premium" shall be an amount
equal to US$1.365 billion plus the roll-forward from December
31, 1998 to March 31, 2000 (to be mutually agreed) times the
Yield Adjustment times the Cash Flow Adjustment;

(ii)    "Yield Adjustment" shall be equal to 1.00 plus 10
times the difference of (x) 6.76% minus (y) the yield on the 5
year U.S. Treasury strip as published in the Wall Street Journal
on the Closing Date (the "Benchmark Security").
Notwithstanding the foregoing, the Yield Adjustment shall be
1.00 if the calculation in the preceding sentence results in a
value between 0.99 and 1.01.

(iii)    "Cash Flow Adjustment" shall be equal to the ratio of
(x) the sum of the net cash flows, discounted at 7.0% to
3/31/00, resulting from the Data Verification divided by (y) the
sum of the net cash flows, discounted at 7.0% to 3/31/00,
presented to Centre by Equitable as set forth in Exhibit B (the
"Equitable Cash Flows"). Notwithstanding the foregoing, the
Cash Flow Adjustment shall be 1.00 if the calculation in the
preceding sentence results in a value between 0.95 and 1.01,
and under circumstances described in the definition of Data
Verification in Section 1.

(iv)    "Post March Cash Flow", if any, shall be equal to the
sum of the (x) Net Premiums (as defined in the Reinsurance
Agreement) received less (y) the benefit payments paid less (z)
the Policy Related Expenses either received or paid, as the case
may be, by Equitable on or after April 1, 2000 and prior to the
Closing Date of the Transaction. Provision will be made for
expenses that are currently due and payable or receivable but
have not yet been paid or received as of the Closing Date.

(v)    "Post March Investment Income" shall be equal to "R"
times sum of Base Reinsurance Premium plus the (1/2) times
the Post March Cash Flow, where R is equal to 7.0% times the
ratio of (x) the number of days between March 31, 2000 and
the Closing Date, both days inclusive divided by (y) 365.

(f)    To the extent that any element of the Initial Reinsurance
Premium is determined based on an estimated value, the parties
agree that no later than thirty (30) days subsequent to the Closing
Date, such elements will be replaced by their actual values in the

CENTRE

Stanley B. Tulin
May 18, 2000
Page 14

calculation of Reinsurance Premium and an appropriate cash payment to or from Centre will be made. The Definitive Agreements shall provide a mechanism for resolution of any dispute relative to the adjustment of such valuations.

(g)    Subsequent to the Closing Date, on a monthly basis, additional Reinsurance Premium shall be due and payable under the reinsurance agreement.

8.    Miscellaneous.

(a)    Governing Law; Waiver of Jury Trial; Consent to Jurisdiction. This Letter of Intent shall be governed by and construed in accordance with the laws of the State of New York, without giving effect to conflict of laws principles applied in New York. EACH PARTY WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION, SUIT, INVESTIGATION, LITIGATION, ARBITRATION OR OTHER PROCEEDING ("ACTION"), TO ENFORCE OR DEFEND ANY RIGHT UNDER THIS LETTER OF INTENT AND AGREES THAT ANY ACTION WILL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY. Any Action with respect to this Letter of Intent may be brought only in the courts of the State of New York or of the United States of America for the Southern District of New York, and each of the parties hereby accepts the jurisdiction of these courts. Each of the parties hereby irrevocably waives any objection, including, without limitation, any objection to the laying of venue or based on the grounds of forum non conveniens, which it may now or hereafter have to the bringing of any Action in those jurisdictions.

(b)    Amendments.    This Letter of Intent shall not be amended except by a written instrument executed by both of the parties hereto.

(c)    Confidentiality.    The Confidentiality Agreement previously signed between Centre and Equitable shall remain in full force and effect (including but not limited to the existence of this Letter of Intent and its terms and conditions) notwithstanding the execution and delivery of the Letter of Intent, except as provided in clause (e) to the extent disclosure is necessary or desirable to effect the retrocession contemplated thereby.

(d)    Entirety.    This Letter of Intent contains and constitutes the entire agreement of the parties with respect to the subject matter hereof and supersedes all prior negotiations, agreements and understandings, whether written or oral, of the parties hereto. This Letter of Intent may

pierson/LOIblkzegf.doc

CENTRE

Stanley B. Tulin
May 18, 2000
Page 15

be signed in two or more counterparts, each of which shall be deemed an original.

(e)    Reinsurance. Equitable hereby acknowledges and agrees that Centre may seek to arrange for retrocession of the risks contemplated in the Transaction, provided that no such retrocession shall adversely affect Equitable's statutory accounting credit for reinsurance ceded under this Transaction. Centre shall be free, during the term of this Letter of Intent (and thereafter if the parties have executed Definitive Agreements) to investigate the availability of retrocessional coverage, have discussions with interested parties regarding same, and negotiate the placement of such retrocessional coverage, as Centre, in its discretion, may deem appropriate. In the course of such investigations and discussions, Centre may disclose confidential information provided that Centre informs such persons that Centre is the subject of a Confidentiality Agreement and obtains the written agreement of such persons that they will be subject to obligations of confidentiality in the Confidentiality Agreement between Centre Life and Equitable for the benefit of Centre and Equitable and agree to be bound by the terms thereof.

(f)    Non-solicit, Non-hire. Equitable agrees that neither Equitable nor any affiliate will solicit, interview, hire or discuss employment prospects with any employee or agent of DMS disclosed to Equitable in writing on or before May 22, 2000, without Centre's prior written consent during the term of this Letter Agreement and for a period of 9 months after the Termination Date. For the avoidance of doubt the foregoing limitation shall not apply to actions taken by or on behalf of UnumProvident, unless Equitable discloses to UnumProvident the identity of such employees or agents of DMS referred to in the preceding sentence without first having received the prior written approval of Centre and DMS regarding such disclosure with respect to any such employee or agent.

[REMAINDER OF PAGE INTENTIONALLY BLANK]

CENTRE

Stanley B. Tulin
May 18, 2000
Page 16

If the terms of this Letter of Intent are acceptable to you, please sign and return the enclosed counterpart to us.

Sincerely,

CENTRE LIFE INSURANCE COMPANY

By: _____
Name: Frank D. Pierson
Title:   Chief Executive Officer

Accepted and agreed by the undersigned on May ___, 2000

THE EQUITABLE LIFE ASSURANCE SOCIETY
OF THE UNITED STATES

By: _____
Name: Stanley B. Tulin
Title:   Vice Chairman of the Board and Chief Financial Officer

pierson/LOIblkzgf.doc

CENTRE

Stanley B. Tulin
May 18, 2000
Page 17

## Exhibit A

### Integrity of Claim File:

- Do a few quick tests to determine if there are any data inconsistencies within Claim File (Example: given birth-date, date of disability and benefit period (BP), check that no paid-to date exceeds maximum BP)
- Check control totals from the Claim File to any report or annual statement information (# claims, total reserves, etc.) to make sure the Claim File is all inclusive regarding claimants
- Check for consistency of data between the Claim File and Policy File (electronic analysis, make sure policy has same benefit period on both claim file and policy file write programs)
- Possibly Check for consistency between the Claim File and paper claim records (pull files)  Initial number of files to be 50 or less, but could ask for more if problems are found

### Integrity of Policy File:

- Check any problem areas found in the Claim File verification, if any problems found in the checking of the Integrity of the Claim File
- Check 200 (or so) random Underwriting Files, check for accuracy of coding

### Integrity of Active Life Model

- Check amount of business assigned to cells (using the Policy File) to ensure appropriateness of cell composition

pierson/LOIblkzcgf.doc

# Present Value of Cash Outflows

## Scenario 1 - Baseline

Exhibit B

RESTATED

| Period | Active Lives Cash Flows (a) | | | Assumptions (Baseline / Baseline / Baseline) | | Disabled Lives Cash Flows | Baseline | Total |
|---|---|---|---|---|---|---|---|---|
| 1999 | 107,367,701 | 6,428,198 | 9,099,211 | (86,900,024) | 109,807,082 | 7,137,493 | 116,945,074 | 30,037,090 |
| 2000 | 94,791,345 | 20,483,030 | 10,711,609 | (64,655,651) | 95,884,290 | 8,219,479 | 101,800,778 | 37,248,227 |
| 2001 | 92,008,042 | -29,834,449 | 11,225,007 | (46,332,794) | 90,654,435 | 5,608,638 | 95,759,973 | 48,427,179 |
| 2002 | 85,708,655 | 39,232,148 | 11,868,603 | (33,507,608) | 87,054,303 | 5,668,590 | 92,712,832 | 59,205,224 |
| 2003 | 80,420,897 | 45,940,773 | 12,089,231 | (22,382,775) | 83,386,773 | 5,420,140 | 86,905,913 | 66,976,310 |
| 2004 | 71,664,897 | 53,186,010 | 12,227,780 | (4,857,009) | 80,232,357 | 5,215,100 | 85,447,911 | 80,083,365 |
| 2005 | 65,422,788 | 57,780,285 | 12,168,284 | 5,817,630 | 77,313,014 | 5,008,346 | 82,338,360 | 86,155,990 |
| 2006 | 59,428,153 | 62,305,619 | 12,120,747 | 18,174,023 | 74,844,020 | 4,884,861 | 79,726,882 | 95,682,908 |
| 2007 | 54,631,233 | 55,534,111 | 12,126,013 | 23,911,971 | 72,152,703 | 4,599,932 | 76,842,725 | 100,764,696 |
| 2008 | 49,650,780 | 59,637,077 | 12,139,287 | 32,000,760 | 69,235,138 | 4,500,264 | 73,735,420 | 106,638,200 |
| 2009 | 45,883,704 | 73,433,601 | 11,998,893 | 40,797,069 | 66,679,252 | 4,334,151 | 71,013,404 | 111,781,403 |
| 2010 | 40,064,148 | 77,205,449 | 11,700,058 | 49,640,783 | 64,315,420 | 4,160,323 | 68,483,806 | 116,134,698 |
| 2011 | 35,906,658 | 76,850,016 | 11,375,170 | 54,827,378 | 61,994,530 | 4,028,096 | 66,013,946 | 120,840,923 |
| 2012 | 32,774,171 | 80,680,992 | 947,124 | 59,698,848 | 59,301,330 | 3,854,698 | 63,165,916 | 122,854,622 |
| 2013 | 29,797,968 | 80,980,549 | 588,982 | 64,683,711 | 58,450,281 | 3,669,286 | 60,119,517 | 124,603,228 |
| 2014 | 22,789,068 | 80,435,771 | 449,907 | 69,146,249 | 53,797,371 | 3,404,492 | 57,282,463 | 128,507,702 |
| 2015 | 18,281,496 | 74,333,621 | 380,761 | 65,498,282 | 51,114,376 | 3,324,384 | 54,488,760 | 119,808,258 |
| 2016 | 15,302,815 | 70,623,987 | 301,606 | 64,383,903 | 48,226,781 | 3,134,800 | 51,361,581 | 116,226,654 |
| 2017 | 13,104,328 | 67,864,840 | 262,122 | 62,147,016 | 45,403,972 | 2,981,382 | 48,385,354 | 112,891,632 |
| 2018 | 10,609,398 | 63,680,355 | 206,141 | 60,921,695 | 42,727,783 | 2,777,306 | 45,505,089 | 109,426,884 |
| 2019 | 8,872,484 | 60,983,339 | 174,834 | 68,447,639 | 39,961,077 | 2,597,470 | 42,558,547 | 101,006,188 |
| 2020 | 7,311,410 | 58,408,272 | 144,134 | 67,574,142 | 37,143,228 | 2,414,310 | 39,857,538 | 97,135,678 |
| 2021 | 6,442,226 | 55,035,040 | 127,022 | 65,935,396 | 34,397,717 | 2,228,702 | 36,616,419 | 92,161,614 |
| 2022 | 5,609,811 | 53,111,280 | 114,349 | 65,570,187 | 31,859,494 | 2,054,411 | 33,922,587 | 87,847,197 |
| 2023 | 5,174,744 | 52,070,488 | 103,018 | 65,242,889 | 29,003,591 | 1,878,735 | 30,782,325 | 83,523,489 |
| 2024 | 2,874,571 | 48,166,671 | 66,997 | 49,928,715 | 26,274,290 | 1,707,829 | 27,982,119 | 77,910,834 |
| 2025 | 1,857,733 | 41,000,233 | 36,825 | 44,002,685 | 23,561,633 | 1,631,826 | 25,003,459 | 69,050,924 |
| 2026 | 1,221,771 | 37,877,377 | 24,086 | 40,186,200 | 21,111,895 | 1,372,260 | 22,483,955 | 62,850,185 |
| 2027 | 815,571 | 34,333,741 | 18,049 | 38,551,619 | 19,908,075 | 1,229,025 | 20,137,100 | 55,888,712 |
| 2028 | 302,907 | 30,048,009 | 5,973 | 37,728,847 | 82,497,253 | 5,099,763 | 87,567,147 | 120,047,789 |
| 2029 | 4,053 | 192,249,891 | 80 | 154,000,749 | 154,000,749 | 0 | 0 | 154,000,749 |
| **PV at 12/98 at 8.0%** | 682,690,216 | 616,228,139 | 131,397,512 | 91,841,254 | 838,025,307 | 54,449,616 | 892,474,923 | 984,416,177 |
| **PV at 12/98 at 7.5%** | 679,235,283 | 651,535,335 | 129,280,175 | 115,921,788 | 867,730,513 | 59,379,894 | 924,107,407 | 1,040,026,195 |
| **PV at 12/98 at 7.0%** | 696,604,679 | 690,842,069 | 17,728,028 131,463,110 | 142,428,328 | 899,616,399 | 88,438,823 | 987,995,222 | 1,100,383,550 |

Less 12/98 Statutory Reserve Ceded on Excess Coverage and Transition Reinsurance    45,356,854

12/98 Present Value of DI Block at 7.5% Net of Reinsurance    994,670,641

**Notes:**
(a) Includes terminal reserve of 125,516,046   in year 2029
(b) Includes terminal reserve of 85,651,175   in year 2028

Disability Premium Waiver Benefits, and claims incurred but Not Reported (IBNR) as of 12/31/1998

Disabled Lives cash flows include the effect of Accrued Benefits as of 12/31/1998,
Disabled Lives cash flows include the effect of Accrued Benefits as of 12/31/1998

(9)

3

100% Quota Share Reinsurance Agreement
("Agreement")

by and between

The Equitable Life Assurance Society
of the United States
("Company")


and


Centre Life Insurance Company
("Reinsurer")

# TABLE OF CONTENTS

| | | Page |
|---|---|---|
| ARTICLE I | DEFINITIONS | 1 |
| ARTICLE II | COVERAGE | 4 |
| ARTICLE III | REINSURED POLICIES | 4 |
| ARTICLE IV | ULTIMATE NET LOSS | 6 |
| ARTICLE V | TERMINATION | 7 |
| ARTICLE VI | REINSURANCE PREMIUM | 8 |
| ARTICLE VII | POLICYHOLDER DIVIDENDS | 8 |
| ARTICLE VIII | RECAPTURE | 9 |
| ARTICLE IX | RESERVES; CREDIT FOR REINSURANCE | 11 |
| ARTICLE X | POLICY AND CLAIMS ADMINISTRATION | 12 |
| ARTICLE XI | REPRESENTATIONS AND WARRANTIES | 13 |
| ARTICLE XII | OFFSET | 14 |
| ARTICLE XIII | NO ASSIGNMENT | 15 |
| ARTICLE XIV | REPORTS AND REMITTANCES | 15 |
| ARTICLE XV | GOVERNING LAW | 17 |
| ARTICLE XVI | ACCESS TO RECORDS | 17 |
| ARTICLE XVII | NO THIRD PARTY RIGHTS | 18 |
| ARTICLE XVIII | AMENDMENTS AND ALTERATIONS | 18 |
| ARTICLE XIX | CURRENCY | 18 |
| ARTICLE XX | INSOLVENCY | 18 |
| ARTICLE XXI | CLAIM AUTHORITY | 19 |

Page

ARTICLE XXII        SUBROGATION AND RECOVERIES ........................................... 20

ARTICLE XXIII       ARBITRATION .................................................................. 20

ARTICLE XXIV        TAXES .............................................................................. 22

ARTICLE XXV         ERRORS AND OMISSIONS ............................................ 23

ARTICLE XXVI        INTEGRATION .................................................................. 23

ARTICLE XXVII       NO WAIVER ...................................................................... 24

ARTICLE XXVIII      INSOLVENCY FUNDS EXCLUSION ............................. 24

ARTICLE XXIX        COOPERATION BETWEEN COMPANY AND
                    REINSURER .......................................................................... 25

ARTICLE XXX         MISCELLANEOUS PROVISIONS ................................. 25

ARTICLE XXXI        DAC TAX ........................................................................... 26

ARTICLE XXXII       PROGRAM OF INTERNAL REPLACEMENT .............. 27

ARTICLE XXXIII      REINSURANCE ................................................................. 28

Schedules:

Schedule A     Initial Reinsurance Premium
Schedule B     Non-Excluded States
Schedule C     Reinsured Policies
Schedule D     Net Cash Flows
Schedule E     Reports of Accounting and Settlement

# WITNESSETH:

This 100% Quota Share Reinsurance Agreement is made as of the Inception Date (as defined herein) by and between the Company and the Reinsurer.

WHEREAS, the Company has agreed to cede, and the Reinsurer has agreed to reinsure, on a 100% quota share basis, certain portions of the Company's individual disability income insurance book of business, on the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the mutual and several promises and undertakings herein contained, and for other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the Company and the Reinsurer agree as follows:

## ARTICLE I
## DEFINITIONS

"Agreement" shall mean this Reinsurance Agreement.

"Administrative Services Agreement" shall mean the policy and claims administration agreement, dated as of the date hereof or as subsequently amended or replaced, among the Company, the Reinsurer and the Third Party Administrator.

"Ancillary Agreements" means the Credit Support Agreement, the Administrative Services Agreement, the Reserve Trust Agreement and the Security Trust Agreement.

"Claims Administration Practices" shall have the meaning specified in the Administrative Services Agreement.

"Claims Revolving Account" shall have the meaning specified in Article XIV.

"Closing Date" means the date of execution and delivery of this Agreement and the Ancillary Agreements by the Company and the Reinsurer.

"Code" shall mean the Internal Revenue Code of 1986, as amended.

"Commutation Amount" shall have the meaning specified in Article VIII.

"Company" shall mean The Equitable Life Assurance Society of the United States.

-2-

"Confidentiality Agreement" shall mean the Confidentiality Agreement, dated September 9, 1999, between the Company and the Reinsurer.

"Controlled" shall have the meaning specified in the Administrative Services Agreement.

"Credit Support Agreement" shall mean the credit support agreement between the Company and Reinsurer, dated as of the date hereof.

"Defense Costs" shall mean the costs of defending or prosecuting any claim for Policy Benefits or defending or prosecuting any claim for Extra Contractual Losses as the case may be under, or otherwise arising out of, the Reinsured Policies (including reasonable outside attorneys' fees, costs of expert investigation, and other related defense costs).

"Delinquency Proceeding" shall mean a proceeding initiated by the insurance regulatory authority of the state of domicile of the Reinsurer to place the Reinsurer in conservation, liquidation, rehabilitation or administrative supervision or otherwise to take control of Reinsurer on the basis of solvency concerns. For the purpose of this definition, the term "solvency" shall encompass the inability to pay obligations as they become due.

"DMS" shall have the meaning specified in Article X.

"Due Diligence Date" shall mean May 18, 2000.

"Existing Book" shall mean the Reinsured Policies other than the Transition Book.

"Extra Contractual Losses" shall mean losses arising from or related to any alleged or actual act, error or omission, negligent or reckless conduct, bad faith, unfair dealing and/or misconduct in connection with the issuance, delivery, cancellation, administration, or defense (including, without limitation, handling of claims) of any of the Reinsured Policies in excess of Policy Benefits.

"Inception Date" shall mean July 1, 2000.

"Insolvency" and "Insolvent" shall have the meanings specified in Article XX.

"Insolvency Fund" shall have the meaning specified in Article XXVIII.

"Inuring Reinsurance" shall have the meaning specified in Article XXXIII.

"LIBOR" shall have the meaning specified in the Credit Support Agreement.

-3-

"Monthly Report" shall have the meaning specified in Article XIV, Section 4.

"Net Premiums" shall mean premiums collected in respect of the Reinsured Policies (excluding waived premiums) less any return premiums paid under the Reinsured Policies and less any premiums paid for Inuring Reinsurance.

"Policies" or "Policy" shall include any insurance, policy, binder, cover note, endorsement, supplementary benefit and/or rider, and any reinstatement or renewals thereof, including without limitation any additional coverage required to be issued pursuant to the provisions of any Policy.

"Policy Benefits" shall mean items (i) and (ii) of Ultimate Net Loss.

"Program of Internal Replacement" shall have the meaning specified in Article XXXII.

"Reinsured Policies" shall mean those Policies, in the form of and exclusively comprised by the Policy forms and riders included in the series listed on Schedule C hereto, issued by the Company which provide individual disability income insurance and which were issued by or on behalf of the Company on applications received prior to December 31, 1994 (referred to between the Company and Reinsurer, as the "Existing Book" and the "Transition Book").

"Reinsurer" shall mean Centre Life Insurance Company.

"Reserve Amount" shall have the meaning specified in the Reserve Trust Agreement.

"Reserve Trust" shall mean the trust established pursuant to the Reserve Trust Agreement of even date herewith among the Company, the Reinsurer and The Bank of New York, as Trustee, as contemplated by the Credit Support Agreement.

"Security Trust" shall mean the trust established pursuant to the Security Trust Agreement of even date herewith among the Company, the Reinsurer and The Bank of New York, as Trustee, as contemplated by the Credit Support Agreement.

"Third Party Administrator" shall mean the initial third party administrator or any one or more third party administrators or replacements thereof appointed pursuant to Article X.

"Transition Book" shall mean the Reinsured Policies with Policy numbers beginning with the following numbers:  9375 and 9475.

-4-

"Transition Expenses" shall mean expenses, not to exceed $9 million in the aggregate, to be incurred by the Company after the Closing Date in connection with any payment due to UP arising out of both (a) the termination of the UP TPA Agreement and (b) the implementation of the Transition Services Agreement.

"Transition Services Agreement" shall mean Schedules A and B of the Administrative Services Agreement.

"Ultimate Net Loss" has the meaning specified in Article IV.

"Umpire" shall mean an impartial third arbitrator in an arbitration proceeding.

"Underwriting and Administrative Guidelines" shall mean the Company's written underwriting and administrative guidelines as provided to the Reinsurer (by delivery to the Reinsurer's counsel) prior to the Closing Date, and the Company's practices in force at the Inception Date, as may be modified from time to time subject to the consent of the Reinsurer, which consent shall not be unreasonably withheld.

"UP" shall mean UnumProvident.

"UP TPA Agreements" shall mean the administration agreements for the Existing Business and the Transition Book, dated January 1, 1999 and June 18, 1993, respectively, between the Company and UP (as successor) as in force on and provided to the Reinsurer prior to the Inception Date.

ARTICLE II
COVERAGE

Subject to the terms, conditions, exclusions and limitations of this Agreement, the Company cedes to the Reinsurer on a 100% quota share basis, and the Reinsurer assumes on a 100% quota share basis and indemnifies the Company for, all Ultimate Net Loss incurred by the Company under the Reinsured Policies and paid on or after the Inception Date. Such coverage shall continue in force until terminated as provided under Article V hereof.

ARTICLE III
REINSURED POLICIES

All reinsurance for which the Reinsurer will be obligated to indemnify the Company under this Agreement shall be subject to the same terms, conditions, limitations, exclu-

-5-

sions, waivers, modifications, alterations, and cancellations as contained in the Reinsured Poli-cies, subject to the terms, conditions, exclusions and limitations of this Agreement (including, without limitation, the provisions of this Article, and Articles XII and XXI hereof). Reinsurer shall follow the fortunes of the Company for all matters covered by this Agreement, and Rein-surer shall be bound, without limitation, by all payments and settlements entered into in good faith by the Company or the Third Party Administrator, in accordance with the Company's Un-derwriting and Administrative Guidelines or the Claims Administration Practices or as imposed by any court or regulatory action. No material change, if made on or after the Due Diligence Date, in the terms, conditions, limitations or exclusions in any of the Reinsured Policies shall be covered hereunder without the prior written approval of each such change by the Reinsurer, except any such change that is explicitly provided for by the terms and conditions contained in the Reinsured Policies or required by applicable law or insurance regulation or contemplated by the Underwriting and Administrative Guidelines or the Claims Administration Practices. For the purposes of this provision, the Reinsurer shall be the arbiter of what constitutes a "material" change in any of the Reinsured Policies but shall not act unreasonably. If (a) the Company has effected any prohibited material change, or (b)(i) the Company has affirmatively exercised its ultimate responsibility specified in Section 4(b) of the Administrative Services Agreement, and (ii) the Third Party Administrator has effected any prohibited material change at the direction or upon the omission of the Company, to any of the Reinsured Policies without first securing the Reinsurer's approval, the reinsurance provided under this Agreement, and the Reinsurer's liability with respect thereto, will cover Ultimate Net Loss arising from such Rein-sured Policies as if the non-approved change had not been made.

        If the Company's liability under any of the Reinsured Policies is increased or de-creased because of a misstatement of age or sex or any misstatement of or omission of other material fact, the Reinsurer's liability will accordingly be increased or decreased. If the cover-age under any Reinsured Policy has been reduced, terminated, or lapsed subsequent to the In-ception Date and is later reinstated while the Reinsurer's liability under this Agreement remains in force, the reinsurance for such Reinsured Policy shall be reinstated automatically to the rein-stated amount. Notwithstanding the foregoing, in effecting the reinstatement of any Reinsured Policy, the Company hereby covenants and agrees that it shall comply strictly with the Under-writing and Administrative Guidelines in determining any such insured's eligibility for rein-statement. If (a) the Company has effected any change, or (b)(i) the Company has affirma-tively exercised its ultimate responsibility specified in Section 4(b) of the Administrative Serv-ices Agreement, and (ii) the Third Party Administrator has effected any change at the direction or upon the omission of the Company, to any of the Underwriting and Administrative Guide-lines without first securing the Reinsurer's approval, the reinsurance provided under this Agreement, and the Reinsurer's liability with respect thereto, will cover Ultimate Net Loss arising from such Reinsured Policies as if the non-approved change had not been made.

-6-

## ARTICLE IV
## ULTIMATE NET LOSS

"Ultimate Net Loss" shall mean:

(i)    the actual benefit payments (excluding waiver of premium benefits) and/or claim settlements paid by the Company under the Reinsured Policies, on its net retained liability (i.e., after deduction for reinsurance other than the reinsurance ceded under this Agreement, whether collectible or not as provided in Article XXXIII), plus

(ii)    policyholder dividends paid or payable by the Company in accordance with Article VII, Policyholder Dividends, of this Agreement, plus

(iii)    Transition Expenses, plus

(iv)    actual expenses incurred by the Company relating to the Reinsured Policies, such as, but not limited to, agent commissions and service fees, premium taxes and expenses (including, without limitation, those payable to the Third Party Administrator) directly arising out of the administration of the Reinsured Policies and the administration and adjudication of claims thereunder, including Defense Costs, except to the extent such administrative and Defense Costs have been paid by Reinsurer or the Third Party Administrator or are the direct obligation of Reinsurer or the Third Party Administrator under the administration agreements and excluding general corporate overhead of the Company; provided however, that with respect to the Transition Business, this element of Ultimate Net Loss shall include only 20% of actual expenses as enumerated above incurred by the Company relating to the Reinsured Policies directly arising out of the administration of the Reinsured Policies and the administration and adjudication of claims thereunder, plus

(v)    Extra Contractual Losses and associated Defense Costs (except to the extent such Defense Costs have been paid by Reinsurer or the Third Party Administrator or are the direct obligation of Reinsurer or the Third Party Administrator under the administration agreements and excluding general corporate overhead of the Company) as a result of acts or omissions of the Reinsurer or any Third Party Administrator .

"Ultimate Net Loss" does not include (a) elements (i), (ii), (v), and agent commissions incurred in (iv) above as respects (I) any claim in litigation on December 31, 1998 for

-7-

which no reserve was held on December 31, 1998, (II) any claim in litigation before December 31, 1998 for which no reserve was held on December 31, 1998 if such claim involves an open dispute as of December 31, 1998 related to the claim in such prior litigation or (III) any claim for which no reserve was held on December 31, 1998 with respect to which litigation has been commenced between December 31, 1998 and the Inception Date, or (b) Extra Contractual Losses and associated Defense Costs as a result of acts or omissions (X) by the Company and/or UP prior to the Closing Date, or (Y) after the Closing Date to the extent such loss results from an affirmative exercise by the Company of its ultimate responsibility as specified in Section 4(b) of the Administrative Services Agreement (including acts or omissions of the Third Party Administrator) or to the extent such loss results from the acts or omissions of UP under the UP TPA Agreements, except, in either case in this clause (Y) to the extent that the Company has followed the specific written advice of Reinsurer and/or the Third Party Administrator (or any substitute Third Party Administrator) with respect to claim decisions as contemplated by the Transition Services Agreement. In any situation where (i) the Reinsurer would be responsible for Policy Benefits and (ii) the Company would be responsible for Extra Contractual Losses, and (iii) absent either (x) a judicial or underlying arbitral determination effecting a precise allocation between the amount of Policy Benefits and Extra Contractual Losses, or (y) an allocation of such amounts agreed to by the parties, then the apportionment of the total amount to be paid for Policy Benefits, Extra Contractual Losses and Defense Costs shall be subject to arbitration in accordance with Article XXIII hereof. In any situation where (i) the Reinsurer would be responsible for Policy Benefits and (ii) the Company would be responsible for Extra Contractual Losses, and (iii) apportionment of Policy Benefits and Extra Contractual Loss, but not Defense Costs, has been reached either (x) by agreement between the Reinsurer and the Company or (y) by judicial or underlying arbitral determination, then the apportionment of the Defense Costs shall be allocated either by agreement between the Reinsurer and the Company or through arbitration in accordance with Article XXIII hereof. After the Closing Date where allegations have been made involving acts, errors or omissions both of Company and/or UP under the UP TPA Agreement and of the Third Party Administrator under the Administrative Services Agreement when the acts, errors or omissions of the Third Party Administrator were not Controlled by the Company, then there shall be no presumption as to the apportionment of liability with respect to any such act, error or omission. The Reinsurer shall have no obligation to pay Transition Expenses unless and until the Reinsurer has received premiums in respect of such Transition Expenses from the Company.

### ARTICLE V
### TERMINATION

The Reinsurer's liability with respect to the Reinsured Policies will terminate on the earlier of:

-8-

1) the date the Company's liability with respect to any and all obligations under or arising out of the Reinsured Policies is fully and finally extinguished; or

2) the date the Reinsured Policies are recaptured in accordance with Article VIII, Recapture.

## ARTICLE VI
## REINSURANCE PREMIUM

In consideration of the reinsurance coverage provided hereunder, the Company shall pay to the Reinsurer (by deposit into the Reserve Trust, the Security Trust, or Claims Revolving Account, as applicable) premiums equal to the following:

1) the Initial Reinsurance Premium calculated as set forth in Schedule A hereto (which shall be due and payable in accordance with Article XIV, Reports and Remittances), plus

2) all Net Premiums received by or on behalf of the Company on or after the Inception Date in connection with the Reinsured Policies, which shall be payable to the Reinsurer in accordance with Article XIV, Reports and Remittances.

To the extent that the Initial Reinsurance Premium is determined, in part, based upon an estimated or assumed value for any component as set forth in Schedule A hereto (other than Transition Expenses and Transition Book Adjustment), no later than thirty (30) days (or five (5) days with respect to the Yield Adjustment) after the Closing Date, the Initial Reinsurance Premium shall be recalculated based upon the actual value of such component(s), with an appropriate cash payment to or from Reinsurer. The Transition Expenses component shall be recalculated based on the actual amount of such Transition Expenses, with an appropriate cash payment to or from Reinsurer, on the date such expense is paid. Any dispute shall be resolved in accordance with Article XXIII, Arbitration.

## ARTICLE VII
## POLICYHOLDER DIVIDENDS

Pursuant to the terms and conditions of this Agreement, the Reinsurer shall indemnify the Company for policyholder dividends declared by the Company on the Reinsured Policies in the normal course of business and consistent with applicable law, the Company's

-9-

Underwriting and Administrative Guidelines and the Company's past practices with respect to the Reinsured Policies since 1985; provided, however, that the Reinsurer shall not be required to reimburse the Company for any dividend payments, credits granted, or any other amount or portion thereof paid or distributed solely in connection with any recapitalization of the Company. Under no circumstances shall the Reinsurer be responsible for any extraordinary dividends arising out of the Company's Plan of Reorganization effective July 22, 1992 or any future reorganization of the Company.

## ARTICLE VIII
## RECAPTURE

A.    In the event of an Adverse Change of Control (as that term is defined in the Credit Support Agreement) in respect of the Reinsurer or its successor (pursuant to any assignment permitted hereunder), or a written notice to the Company of an impending Adverse Change of Control, the Company may within sixty (60) days from the date of learning that an Adverse Change of Control has occurred, or of receiving such notice, as the case may be, elect to recapture the Reinsured Policies by delivering written notice to the Reinsurer within such sixty (60) day period of the Company's desire to effect such recapture (the "Control Recapture Notice"). In such case, upon the date specified by the Control Recapture Notice (the "Control Recapture Date"), but no sooner than the thirtieth day subsequent to the delivery of the Control Recapture Notice, the Company shall be entitled (unless the Adverse Change of Control has been and remains cured) to immediately withdraw from the Reserve Trust and Security Trust the lesser of (a) all funds contained therein or (b) the Commutation Amount.

B.    In the event of initiation of a Delinquency Proceeding in respect of the Reinsurer or its successor (pursuant to any assignment permitted hereunder) and for as long as such Delinquency Proceeding has not been cured, the Company may elect to recapture the Reinsured Policies by delivering written notice to the Reinsurer of the Company's desire to effect such recapture (the "Recapture Notice"). In such case, upon the date specified by the Recapture Notice (the "Recapture Date"), the Company shall be entitled (unless the Delinquency Proceeding has been and remains cured) to immediately withdraw from the Reserve Trust and Security Trust the lesser of (a) all funds contained therein or (b) the Commutation Amount (or a reasonable estimate thereof); provided, however, that if the Delinquency Proceeding is cured within twenty (20) business days after the date of the Recapture Notice, the Company agrees that it will reverse the recapture transaction, and restore the parties to the position they would have been in had the Company not exercised its rights hereunder.

C.    In the event that funds are withdrawn from the Reserve Trust and/or Security Trust pursuant to paragraph A or B above, to the extent that the funds in the Reserve Trust and Security Trust are less than the Commutation Amount, the Reinsurer shall pay the

difference to the Company, which amount shall be adjusted for any amounts previously due to be paid to the Company or Reinsurer hereunder and which remain unpaid on the date of recapture. To the extent that the funds in the Reserve Trust and Security Trust exceed the Commutation Amount, the Reinsurer shall be entitled to withdraw the excess, and the Company shall cooperate by providing such notice as may be required to the Trustee in order to effect any such withdrawal, which amount shall be adjusted for any amounts previously due to be paid to the Company or Reinsurer hereunder and which remain unpaid on the date of recapture. Reinsurer shall have no further obligation to deposit any funds into either the Reserve Trust or the Security Trust upon payment of the Commutation Amount.

D. Except as respects obligations described in paragraphs A-C above, upon the election by the Company of recapture as provided herein, all liabilities under this Agreement in respect of the Reinsured Policies shall be commuted, the Company and the Reinsurer shall be fully discharged from their obligations to one another hereunder, and all obligations under or pursuant to the Ancillary Agreements, and all of the Ancillary Agreements as between the Company and the Reinsurer shall terminate (except as to provisions that expressly survive termination); excluding those Extra Contractual Losses included within subsection (v) of Article IV, Ultimate Net Loss, for which Reinsurer shall continue to be obligated to indemnify the Company hereunder, and shall at its option, continue to handle the administration of any such Claims and related litigation.

E. "Commutation Amount" shall be equal to the product of:

(i)  an amount equal to the sum of the future net cash flows, discounted at the yield on a duration appropriate risk free rate as such term is commonly accepted on the date of recapture plus 50 basis points to the date of recapture (or the nearest convenient date), such future net cash flows being calculated consistent with the methodology used to generate the net cash flows as set forth in Schedule D of this Agreement, adjusted for the effect of Inuring Reinsurance; and

(ii)  the Recapture Factor (as defined below).

The Recapture Factor initially shall be equal to the ratio of the Initial Reinsurance Premium divided by the Reserve Amount on the Inception Date, and every July 1 thereafter until July 1, 2004 shall decrease linearly to a level of 1.20. Starting on July 1, 2005, and every July 1 thereafter, the Recapture Factor shall decrease by .01. In no event, however, shall the Recapture Factor be less than 1.05. Any dispute with respect to the determination of the Commutation Amount shall be resolved in accordance with Article XXIII, Arbitration.

F. Any amounts withdrawn by the Company under paragraph (A) or (B) above shall be deposited into a segregated asset account created in the same manner as under

-11-

New York Insurance Regulation 102 in the name of the Company and shall be maintained in such account until the Control Recapture Date or the Recapture Date, as applicable. In the event there shall be any dispute between any of the parties as to the Commutation Amount, the Company shall be entitled to withdraw only the undisputed amount of the Commutation Amount. Any amounts in dispute shall remain in such account until such dispute is resolved.

## ARTICLE IX
### RESERVES; CREDIT FOR REINSURANCE

The Reinsurer shall establish and maintain adequate reserves with respect to the Reinsured Policies and shall, at its own expense, take such other steps as may be necessary to enable the Company to take, in every jurisdiction in which the Company is licensed, full credit for the reinsurance provided by this Agreement on its statutory balance sheet filed with the insurance departments of all states in which the Company files its annual statement, including, but not limited to, establishing and maintaining reserves and making such reports as are necessary to enable the Company to comply with § 125.5(b) of the New York Insurance Regulations.

In the event that an insurance regulatory authority in any jurisdiction in which the Company is licensed does not allow the Company to take full credit for the reinsurance provided by this Agreement on its statutory balance sheet, then Reinsurer shall immediately take such steps as are necessary to assure that the Company will comply with § 125.5 of the New York Insurance Regulations, including, providing for the transfer of the Assets in the Reserve Trust to be held in a trust that complies with New York Insurance Regulation 114 (11 NYCRR Part 126) (a "Regulation 114 Trust") or similar regulation in force in New York or in another jurisdiction that has denied the Company credit for reinsurance. In the event that any or all of the assets in the Reserve Trust are transferred to a Regulation 114 Trust, this Agreement shall be deemed to have been amended and reformed to incorporate the provisions required by 11 NYCRR §126.5 then in effect as may have been amended at such time and the parties shall execute any further amendments to this Agreement in order to permit the Company statutory credit for reinsurance ceded hereunder.

Except as required by applicable laws and regulations, the Company covenants and agrees that it shall not, nor shall it authorize the Third Party Administrator to, strengthen its statutory reserves for the Reinsured Policies in a manner that would increase the Reinsurer's obligations under this Article, unless the Company has received the prior written approval of the Reinsurer to each and every such change. If in the event that the Company has effected any such change to its statutory reserves without first securing the Reinsurer's approval, the Reinsurer's obligation under this Article IX to establish and maintain reserves with respect to the Reinsured Policies shall be as if the non-approved changes were not made.

-12-

## ARTICLE X
## POLICY AND CLAIMS ADMINISTRATION

As of the Closing Date, the Reinsurer has appointed Disability Management Services, Inc. with its principal business address at 1391 Main Street, Springfield, Massachusetts ("DMS") as the Third Party Administrator as provided in the Administrative Services Agreement, and the Company has consented to such appointment; provided, however, following the Inception Date, the Company may, directly and through UP, administer the Transition Book. Notwithstanding the foregoing, the Company shall take all actions commercially reasonable and permitted by the UP TPA Agreement to transfer the administration of the Transition Book to the Third Party Administrator, including without limitation enforcement of the Company's rights thereunder. Any action that would cause termination of Inuring Reinsurance shall not be deemed to be commercially reasonable.

Subject to Article XXI, the Third Party Administrator shall administer the Reinsured Policies, perform all accounting procedures and settle all claims arising under the Reinsured Policies. If DMS or any other Third Party Administrator ceases to act as such, the Reinsurer shall select and appoint a replacement Third Party Administrator to perform such duties, subject to approval by the Company, which approval shall not be unreasonably withheld. The Reinsurer agrees to indemnify and hold the Company harmless against any reasonable and actual costs or expenses incurred by the Company resulting from or arising out of Reinsurer's selection and appointment (including any delay in effecting such appointment, except any delay caused by the Company) of a replacement Third Party Administrator appointed by the Reinsurer.

So long as the Company has delegated Policy and Claims Administration to Reinsurer or a Third Party Administrator appointed by the Reinsurer, and the Company has delegated to such Third Party Administrator complete responsibility for the duties described in paragraphs 1 and 2 below in accordance with the Administrative Services Agreement (and the Company has taken no action or omitted to take action that materially interferes with the performance of such duties), the Company shall not be responsible for the following duties or the consequences of the actions described herein:

1)    submission of reports in accordance with the provisions of Article XIV, Reports and Remittances, of this Agreement (other than paragraph 1 thereof, for which Company is responsible); and

2)    non-payment of Reinsurance Premiums so long as the Company agrees under the terms of its appointment of the Third Party Administrator that the Third Party Administrator shall remit such Reinsurance Premiums directly to the Reinsurer, by depositing same in the Reserve Trust or the

-13-

Security Trust, or as applicable, the Claims Revolving Account as contemplated by Article XIV of this Agreement and the terms and conditions of the Administrative Services Agreement.

Any premiums in respect of the Reinsured Policies misdirected to the Company shall be delivered by the Company promptly to the Third Party Administrator. The Company agrees that the Reinsurer shall pay the Third Party Administrator its fees directly as provided for under the Administrative Services Agreement.

The Company, directly or through the Third Party Administrator, shall maintain its underwriting and administrative procedures and practices consistent with the Company's Underwriting and Administrative Guidelines in place on the Inception Date and its claims handling procedures and practices in accordance with the best practices of professional claims management administrators and personnel with respect to all claims by claimants. Except as required by changes in applicable laws and regulations, the Company agrees that it shall not, nor shall it authorize the Third Party Administrator to, change its underwriting or claims handling procedures and practices in any manner from those in effect at the Inception Date that would materially adversely affect the liability or obligations of the Reinsurer hereunder, unless the Company has received the prior written approval of the Reinsurer to each and every such change. For the purposes of this provision, the Reinsurer shall be the arbiter of what constitutes a "material adverse effect" but shall not act unreasonably. If in the event that the Company has effected any such change (or upon the Company's affirmative exercise of its ultimate responsibility specified in Section 4(b) of the Administrative Services Agreement, any Third Party Administrator at the direction or upon the omission of the Company has effected any such change) to any of the underwriting or claims handling procedures and practices without first securing the Reinsurer's approval, the reinsurance provided under this Agreement, and the Reinsurer's liability with respect thereto, will cover Ultimate Net Loss arising from such Reinsured Policies as if the non-approved changes were not made. In no event shall a breach of this covenant by the Company or the Third Party Administrator give the Reinsurer the right to terminate this Agreement.

## ARTICLE XI
## REPRESENTATIONS AND WARRANTIES

A.       The performance of obligations under or related to this Agreement shall be undertaken by both parties in utmost good faith and fair dealing.

B.       Further, the Company represents and warrants as follows:

-14-

(a)    all of the Policy forms and riders included in the series listed on Schedule C are in material compliance with all applicable regulations and laws;

(b)    each of the Reinsured Policies was written on a Policy form that complied with regulatory requirements in the state of issue;

(c)    any and all information provided to the Reinsurer in writing prior to the Closing Date regarding the Company's dividend practices and related factual circumstances is accurate and complete in all material respects;

(d)    the Company has provided a listing prior to the Closing Date of all market conduct examinations conducted within the last ten (10) years by any regulatory authority having jurisdiction over the Company, and copies of Reports thereon.  No material limitation or restriction has been imposed upon the Company's operations arising out of or related to any policy administration or claims handling practices; provided, however, that the Company is making no representations with respect to matters identified on the aforementioned list or Reports.

The Company agrees to indemnify and hold harmless the Reinsurer for any losses and expenses (including reasonable attorneys fees) resulting from each and every material breach of the representations and warranties set forth above, provided that with respect to the representations set forth in clauses (a)-(d) above, (i) the Reinsurer shall not be entitled to indemnification hereunder unless and until its losses and expenses arising out of a breach of such clauses aggregate in excess of $1,000,000 and (ii) the Reinsurer shall be entitled only to receive money damages for any breach thereof.  The Company shall be obligated to indemnify the Reinsurer hereunder only if the Reinsurer notifies the Company of its claim for indemnification (i) within 18 months after the date hereof with respect to any breach of clause (a) above and (ii) no later than 12 months after the Reinsurer becomes aware, or reasonably should have become aware, of a breach of clause (b), (c) or (d) above.

## ARTICLE XII
### OFFSET

Any debts or credits, matured or unmatured, liquidated or unliquidated, regardless of when they arose or were incurred, in favor of or against either the Company or the Reinsurer with respect to this Agreement, the Reserve Trust Agreement, the Security Trust Agreement, the Credit Support Agreement and/or the Administrative Services Agreement, are deemed mutual debts or credits, as the case may be, and shall be set off, and only the net balance shall be allowed or paid.  This provision shall not be affected by the insolvency of either

-15-

party to this Agreement. Notwithstanding the foregoing, Reinsurer may not set off with respect to any breach by UP of the UP TPA Agreement amounts in excess of damages actually collected by the Company in litigation or other proceedings (including but not limited to, any settlements of such litigation or other proceedings) against UP. For purposes of this Agreement, any debts or credits between the Third Party Administrator appointed by the Reinsurer and the Reinsurer shall not be taken into account in determining offsetting amounts between the Reinsurer and the Company under this Agreement.

## ARTICLE XIII
## NO ASSIGNMENT

This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors, assigns and legal representatives. Neither this Agreement, nor any right hereunder, may be assigned by any party (except by the Reinsurer to a member of the Zurich Financial Services Group by way of novation, subject to regulatory approval and the Company's consent, which shall not be unreasonably withheld) without the written consent of the other party hereto.

## ARTICLE XIV
## REPORTS AND REMITTANCES

1.      A report shall be provided by the Company to the Reinsurer on the Closing Date providing the information necessary to calculate the estimated Initial Reinsurance Premium, as determined in accordance with Article VI, Reinsurance Premium. The estimated Initial Reinsurance Premium (an estimate of the sum of (i), (ii), (iii) and (iv) only on Schedule A attached hereto) shall be due and payable on the Closing Date. Item (v) set forth on Schedule A of the Initial Reinsurance Premium shall be due no later than the date when paid up to. Item (vi) set forth on Schedule A of the Initial Reinsurance Premium shall be due when the decision whether or not to transfer the administration of the Transition Book to the Third Party Administrator is made. Such decision will be made no later than January 1, 2001 and, if no such decision is made by such date, then the decision shall be deemed made to not appoint the Third Party Administrator.

2.      Subject to Article X, Policy and Claims Administration, on at least a weekly basis, (i) Net Premiums collected by or on behalf of the Company shall be paid to the Reinsurer, and (ii) all Ultimate Net Loss Payments under this Agreement shall be paid either through an interest bearing revolving account (the "Claims Revolving Account") administered by the Third Party Administrator, the interest on which shall be for the benefit of the Reinsurer,

-16-

or directly by the Reinsurer. The amount of the Claims Revolving Account shall be determined from time to time by the Reinsurer (upon the advice of the Third Party Administrator, if one is in place) with the consent of the Company, which consent shall not be unreasonably withheld subject to the terms and limitations of the Reserve Trust Agreement.

3.    During an initial period of time before administrative functions have transitioned to the Third Party Administrator and the Company is collecting premiums and/or paying claims directly, premium amounts due from the Company to Reinsurer and Ultimate Net Loss payments due from Reinsurer to the Company, shall be paid weekly on an estimated basis and reconciled monthly as provided in paragraph 4, below.

4.    The reconciliation of the amounts in paragraphs 2 and 3 immediately preceding, as well as such amounts as are due between the Reinsurer and the Company under other provisions of this Agreement or the Administrative Services Agreement, shall take place in delivery of the monthly accounting and settlement reports described below. The net amount due shall be payable no later than ten (10) business days after delivery and receipt of the monthly accounting and settlement reports. Any late payment of any amount required to be remitted by the Reinsurer to the Company or by the Company to the Reinsurer shall bear interest from and including the date such payment is due, but excluding the date of payment, at a rate equal to the LIBOR rate (on the date the payment was due) plus 200 basis points.

5.    The obligation to provide reports as set forth in this Article except as respects paragraph 1 shall be the obligation of the Reinsurer; provided, however, that such responsibility may be delegated to a Third Party Administrator, and provided further, however, that to the extent the Company has reassumed responsibility for any functions that cause the Company to have the original records of information needed to prepare reports, the Company shall provide that information to Reinsurer, or, if such information predominates in the preparation of the report, the Company shall provide the report with any necessary additional information provided by the Reinsurer.

6.    Within five (5) business days following the end of each month, the party responsible therefor shall provide the other party with the accounting and settlement reports required by paragraph 4 of this Article. All such reports shall be in the format shown in Schedule E, unless otherwise mutually agreed by the parties.

7.    Each responsible party shall prepare such additional reports as are needed by either party in connection with the Reinsured Policies to enable either party to comply with all federal, state and local laws or regulations and contractual obligations to third party reinsurers, including without limitation all statutory, GAAP and tax reporting requirements including, but not limited to, supporting information, analysis and documentation to enable the Company and Reinsurer to meet Appointed Actuary requirements, in form and substance satisfactory to Reinsurer and the Company. Reports shall be prepared on a timely basis

-17-

in order for either party to comply with any filing deadlines required by law or contractual obligations to third party reinsurers. All such reports shall include such information as may reasonably be required by either party.

8.    In preparing all reports required in this Agreement, the Company or the Reinsurer, as applicable, shall use its best efforts to supply the actual data. If the actual data cannot be supplied with the appropriate report, the Company or the Reinsurer, as applicable, shall produce best estimates and make any required payments based on such estimates. Amended reports based on actual data shall be provided by the Company or the Reinsurer, as applicable, no more than ten (10) business days after the actual data becomes available, and any required payments based on such actual data shall be made by the appropriate party so that the parties are placed in the same economic position they would have been if the payments had been based on the actual data in the first instance.

9.    Except as otherwise provided by this Agreement, cash settlements shall be effected on the basis of the form of the schedule attached hereto as Schedule E, as the same may be amended from time to time as reasonably required. In the event that there is any inconsistency between Schedule E and this Agreement, the terms of this Agreement shall govern.

ARTICLE XV
GOVERNING LAW

This Agreement shall be interpreted and governed by the laws of the State of New York without regard to its rules with respect to conflicts of law.

ARTICLE XVI
ACCESS TO RECORDS

The Reinsurer or the Company or its respective duly appointed representatives shall each have access to (including the right to copy) the relevant books, records and papers of the other party, the Third Party Administrator, if any, or its agents at all reasonable times during the continuance of this Agreement or any liability hereunder, for the purpose of obtaining information concerning this Agreement or the subject matter thereof upon reasonable notice during business hours at the requesting party's own cost and expense, unless agreed to in the Administrative Services Agreement or otherwise agreed to in writing by the parties hereto.

The Reinsurer shall cause, to the extent that it is within its authority or power to reasonably direct, the Third Party Administrator to provide to the Company or its duly appointed representatives access to the books, records and papers of any Third Party Adminis-

-18-

trator as respects the Reinsured Policies in accordance with the Administrative Services Agreement.

## ARTICLE XVII
## NO THIRD PARTY RIGHTS

This Agreement is solely between the Company and the Reinsurer, and in no instance shall any other party have any rights under this Agreement except as expressly provided otherwise in Article XX, Insolvency.

## ARTICLE XVIII
## AMENDMENTS AND ALTERATIONS

This Agreement may be changed, altered or amended as the parties may agree, provided such change, alteration or amendment is evidenced in writing executed by the Company and the Reinsurer. If the New York State Insurance Department raises an objection to any provision of this Agreement, or any of the Ancillary Agreements which will lead it to refuse to approve the Agreement, the parties shall use their best efforts to agree upon an alternative provision acceptable to such Department, with the intent to maintain the relevant economics of the parties hereto.

## ARTICLE XIX
## CURRENCY

Whenever the word "dollars" or the "$" sign appear in this Agreement, they shall be construed to mean United States Dollars, and all transactions under this Agreement shall be in United States Dollars.

## ARTICLE XX
## INSOLVENCY

In the event of the initiation of any proceedings for insolvency, receivership, rehabilitation, liquidation, conservation, bankruptcy, dissolution, or general assignment for the benefit of creditors (hereinafter "Insolvency", or when referring to an entity which is the subject of an Insolvency, hereinafter "Insolvent") of the Company, all reinsurance made, ceded,

-19-

renewed or otherwise becoming effective under this Agreement shall be payable by the Reinsurer directly to the Company or to its liquidator, receiver, or statutory successor on the basis of the liability of the Company under the contract or contracts reinsured without diminution because of the Insolvency of the Company.  It is understood, however, that in the event of the Insolvency of the Company, the liquidator or receiver or statutory successor of the Insolvent Company shall give written notice of the pendency of a claim against the Insolvent Company on the Reinsured Policy within a reasonable time after such claim is filed in the Insolvency and that during the pendency of such claim the Reinsurer may investigate such claim and interpose, at its own expense, in the proceeding where such claim is to be adjudicated any defense or defenses which it may deem available to the Company or its liquidator or receiver or statutory successor.  The expense thus incurred by the Reinsurer shall be chargeable, subject to court approval, against the Insolvent Company as part of the expense of the Insolvency to the extent of a proportionate share of the benefit which may accrue to the Company solely as a result of the defense undertaken by the Reinsurer.

When two or more reinsurers are involved in the same claim and a majority in interest elect to interpose defense to such claim, the expenses shall be apportioned in accordance with the terms of this Agreement as though such expense had been incurred by the insolvent Company.  Should any party hereto be placed in rehabilitation or liquidation or should a rehabilitator, liquidator, receiver, conservator or other person or entity of similar capacity be appointed as respects such party, all amounts due any of the parties hereto whether by reason of premiums, losses or otherwise under this Agreement shall at all times be subject to the right of offset at any time and from time to time, and upon the exercise of same, only the net balance shall be due and payable in accordance with Section 7427 of the Insurance Law of the State of New York.

ARTICLE XXI
CLAIM AUTHORITY

Unless otherwise required by regulatory authorities or a court having jurisdiction over the Company pursuant to a final determination of either of them, or unless the Third Party Administrator has materially breached the Administrative Services Agreement and such agreement has been terminated in accordance with its terms and the Reinsurer has not designated a replacement Third Party Administrator and except to the extent that the Company is providing claims management for the Transition Book as provided herein, all claim management in the ordinary course shall be delegated to the Third Party Administrator.  Subject to the terms, conditions, exclusions and limitations of this Agreement, all benefit payments or claim settlements made by the Company, directly or through the Third Party Administrator, if any, shall be binding upon the Reinsurer; provided, however, as respects Claims determinations by the Company, or upon the Company's affirmative exercise of its ultimate responsibility in ac-

-20-

cordance with Section 4(b) of the Administrative Services Agreement to control the actions of the Third Party Administrator, that such benefit payments or claim settlements are within the terms, conditions, exclusions and limitations of the Reinsured Policies and within the terms, conditions, exclusions and limitations of this Agreement (in each case, as determined in accordance with the best practices of professional claims management administrators and personnel). The Company shall retain ultimate responsibility as respects claims administration and settlements as specified in Section 4(b) of the Administration Agreement. ·

In addition, the parties acknowledge and agree that the Company shall continue to be responsible, directly or through UP, to defend, prosecute and settle those litigated matters for which suit has commenced after the Inception Date, that UP is obligated to defend pursuant to the UP TPA Agreement. The Company shall consult and cooperate with the Reinsurer and/or its representatives about such litigation in order to determine whether the Reinsurer intends to assume control thereof. Reinsurer may, at its option, assume control of any of such litigated matters upon written notice to the Company to that effect and by agreeing to indemnify the Company that amount of Extra Contractual Loss, if any, that UP would have been obligated to pay the Company under the UP TPA Agreement (as such agreement was in effect on the Inception Date) had such litigated matter remained under UP's administration under the UP TPA Agreement.

## ARTICLE XXII
## SUBROGATION AND RECOVERIES

The Company shall pay to or credit the Reinsurer, and the Reinsurer shall benefit proportionately in, all recoveries, net of expenses incurred in its efforts to obtain any such recovery, including but not limited to, subrogation effected by or on behalf of the Company and for which the Company has collected and received the benefit in accordance with the Reinsured Policies. Nothing contained in this provision shall be construed to mean (i) that losses under this Agreement are not recoverable until the Ultimate Net Loss has been ascertained, or (ii) to avoid double counting, that the Reinsurer shall benefit additionally hereby to the extent that such recoveries and subrogation have otherwise been excluded from Ultimate Net Loss.

## ARTICLE XXIII
## ARBITRATION

Any dispute or claim arising out of or relating to this Agreement shall be referred to arbitration. Arbitration shall be initiated by the delivery, by mail, facsimile or other

-21-

reliable means, of a written demand for arbitration by one party to the other.  The arbitration shall be held in New York City or such other place as the parties may mutually agree.

Arbitration shall be conducted before a three-person Arbitration Panel appointed as follows.  Each party shall appoint one arbitrator, and the two arbitrators so appointed shall then appoint an impartial umpire ("Umpire") before proceeding.  If either party fails to appoint an arbitrator within thirty (30) days after it receives a written request by the other party to do so, the other party may appoint an arbitrator for it.  Should the two party-appointed arbitrators fail to choose an Umpire within thirty (30) days of the appointment of the second arbitrator, the Umpire shall be appointed by ARIAS-US or, failing such appointment, by the Supreme Court of the State of New York.

In any dispute concerning the subject matter of Articles XXIV or XXXI, the arbitrators and Umpire shall be present or former executives or officers of a nationally recognized accounting firm. In any dispute concerning the subject matter of Articles VI and VIII, the arbitrators and Umpire shall be present or former executives or partners or officers of a nationally recognized actuarial firm, accounting firm, or from present or former executives or officers (with accounting and/or actuarial expertise) of life, health and/or disability insurance or reinsurance companies not affiliated with the parties.  In all other matters, the arbitrators and Umpire shall be present or former executives or officers of life, health and/or disability insurance or reinsurance companies not affiliated with the parties or shall be arbitrators certified by ARIAS-US.  The arbitrators and Umpire shall have no financial interest in the outcome of the arbitration.

In any dispute concerning the subject matter of apportionment of Policy Benefits, Extra Contractual Loss and Defense Costs between the Reinsurer and the Company relating to the parties' respective responsibilities for Policy Benefits and Extra Contractual Loss described in Article IV, Ultimate Net Loss, the following procedures for the arbitration shall apply: The parties will work in good faith to resolve any disagreement relating to such apportionment.  If no agreement can be had between the parties within four (4) business days after they first discuss the subject of each parties' responsibility for such Defense Costs, the parties will continue to work to resolve the disagreement.  Failing to reach any agreement within two (2) business days thereafter, they shall disclose to each other their final and last best proposal ("Proposal" hereinafter defined) no later than the end of such subsequent two business day period.  For purposes hereof, a "Proposal" of a party shall consist of apportionment of the amounts being arbitrated and related information supporting their position relative to the appropriate apportionment.  If no resolution of disagreements is reached on or prior to the business day following such subsequent two business day period, the parties will on such next following business day submit their final and last best Proposal (previously disclosed to the other party as provided above) to "baseball arbitration" before an arbitration panel selected as provided above, which arbitration process shall require the arbitrators and Umpire to select one of

-22-

the two final and last Proposals. The arbitrators and Umpire in any dispute regarding the subject matter of apportionment of Policy Benefits, Extra Contractual Loss and Defense Costs between the Reinsurer and the Company relating to the parties' respective responsibilities for Policy Benefits and Extra Contractual Loss described in Article IV, Ultimate Net Loss, shall be present or former litigation attorneys having expertise in the area of litigation of individual disability income insurance policies.

In all other matters, procedures for the arbitration shall be determined by the arbitrators. In case of any doubt, the arbitrators shall apply rules of ARIAS-US, or, if no such rule applies, the arbitration shall proceed under the Federal Arbitration Act or the New York Civil Practice Law and Rules. In any dispute concerning the subject matter of Articles XXIV or XXXI, the arbitrators and Umpire shall consider only those items or amounts in the Reinsurer's calculation and the Company's response as to which the Company and the Reinsurer have disagreed, and all other matters affected by such disputed amounts.

The decision of a majority of the Arbitration Panel shall be final and binding, except to the extent otherwise provided in the Federal Arbitration Act or New York's Civil Practice Law and Rules. The Arbitration Panel shall render its award in writing. Judgment upon the award may be entered in any court having jurisdiction, pursuant to the Federal Arbitration Act or New York's Civil Practice Law and Rules. Unless the Arbitration Panel orders otherwise, each party shall pay: (1) the fees and expenses of its own arbitrator, and (2) an equal share of the fees and expenses of the Umpire and of the other expenses of the arbitration.

In connection with compelling arbitration and/or the enforcement of any award, any court action may be brought in, and the parties hereby consent to the jurisdiction of, the United States District Court for the Southern District of New York or, absent subject matter jurisdiction in such court, the Supreme Court of the State of New York, New York County. The parties each hereby waive, to the fullest extent permitted by law, any objection which it may now or hereafter have to the laying of such venue of any such proceeding brought in such court and any claim that any such proceeding brought in such a court has been brought in an inconvenient forum. **THE COMPANY AND THE REINSURER HEREBY IRREVOCABLY WAIVE ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.**

ARTICLE XXIV
TAXES

(a)    The Company shall be responsible for all premium taxes (for purposes of this Agreement such term includes any excise, franchise or other taxes to the extent meas-

-23-

ured by premiums) imposed on and paid by it with respect to the Reinsured Policies; it being understood that such premium taxes will be reimbursed by the Reinsurer pursuant to the terms of clause (iv) of Article IV, Ultimate Net Loss.

(b)    The Reinsurer shall be responsible for premium taxes, if any, imposed upon Reinsurer directly related to the reinsurance premiums ceded to the Reinsurer as respects the Reinsured Policies.

(c)    Each of the Company and the Reinsurer shall be responsible for all other taxes (including, without limitation, excise or franchise taxes measured by income, profits or capital gains) imposed directly on it.

## ARTICLE XXV
## ERRORS AND OMISSIONS

If any delay, omission, error or failure to pay amounts due or to perform any other act required by this Agreement is unintentional and caused by misunderstanding or over-sight, the Company and the Reinsurer will adjust the situation to what it would have been had the misunderstanding or oversight not occurred. The party first discovering such misunder-standing or oversight, or an act resulting from such misunderstanding or oversight, will notify the other party in writing promptly upon discovery thereof, and the parties shall act to correct such misunderstanding or oversight within twenty (20) business days of such other party's re-ceipt of such notice. However, this Article shall not be construed as a waiver by either party of its right to enforce strictly the terms of this Agreement.

## ARTICLE XXVI
## INTEGRATION

This Agreement and attached schedules and the Ancillary Agreements consti-tute the entire agreement between the parties hereto relating to the subject matter hereof and supersede all prior agreements, understandings, negotiations and discussions, whether oral or written, of the parties, except the Confidentiality Agreement. This Agreement is the result of arm's-length negotiations between the parties hereto and has been prepared jointly by the par-ties. In applying and interpreting the provisions of this Agreement, there shall be no presump-tion that this Agreement was prepared by one party or that this Agreement shall be construed in favor of or against any one party.

-24-

## ARTICLE XXVII
## NO WAIVER

No consent or waiver, express or implied, by any party to or of any breach or default by any other party in the performance by such other party of its obligations hereunder shall be deemed or construed to be a consent or waiver to or of any other breach or default in the performance of obligations hereunder by such other party hereunder. Failure on the part of any party to complain of any act or failure to act of any other party or to declare any other party in default, irrespective of how long such failure continues, shall not constitute a waiver by such first party of its rights hereunder.

## ARTICLE XXVIII
## INSOLVENCY FUNDS EXCLUSION

This Agreement excludes all liability arising by contract, operation of law, or otherwise from the Company's participation or membership, whether voluntary or involuntary, in any Insolvency Fund ("Insolvency Fund Assessment"), except any such liability which shall arise as respects the Reinsured Policies in the nine (9) States identified in Schedule B. With respect to any assessments payable pursuant to the immediately preceding sentence the Reinsurer shall pay fifty percent (50%) of the amount of such Insolvency Fund Assessment. If amounts paid by the Reinsurer for Insolvency Fund Assessment arising in the states of New York and Florida cumulatively exceed $1.5 million, the Reinsurer will be entitled to receive 50% of the recoveries received by or allowed the Company from those states, as such recoveries are received or allowed. The Company hereby covenants and agrees, to the extent permitted under applicable law, that it shall pursue all such opportunities to offset or recoup against any such Insolvency Fund assessments for which the Reinsurer would be entitled to share in the recovery. For the purpose of this Agreement "Insolvency Fund" includes any guarantee fund, insolvency fund, plan, pool, association, fund or other arrangement, howsoever denominated, established or governed, which provides for any assessment of or payment or assumption by the Company of part or all of any claim, debt, charge, fee or other obligation of an insurer or reinsurer, or its successors or assigns, which has been declared by any competent authority to be insolvent, or which is otherwise deemed unable to meet any claim, debt, charge, fee or other obligation in whole or in part.

-25-

## ARTICLE XXIX
## COOPERATION BETWEEN COMPANY AND REINSURER

Each party hereto shall cooperate fully with the other in all reasonable respects in order to accomplish the objectives of this Reinsurance Agreement. The duty of cooperation shall apply, but not be limited, to policy and claims administration, regulatory matters and to litigation matters involving third parties.

## ARTICLE XXX
## MISCELLANEOUS PROVISIONS

Headings used herein are not a part of this Agreement and shall not affect the terms hereof. The attached Schedules are a part of this Agreement.

This Agreement may be executed by the parties hereto in any number of counterparts, and by each of the parties hereto in separate counterparts, each of which counterparts, when so executed and delivered, shall be deemed to be an original, but all such counterparts shall together constitute but one and the same instrument.

All notices and communications hereunder shall be in writing and shall become effective when received. Any written notice shall be by either certified or registered mail, return receipt requested, or overnight delivery service (providing for delivery receipt) or delivered by hand, or in such circumstances as may from time to time be agreed by the parties, by e-mail or facsimile. All notices or communications under this Agreement shall be addressed as follows:

If to the Company:

       The Equitable Life Assurance Society of the United States
       1290 Avenue of the Americas
       New York, NY 10019
       Attention: Chief Actuary

with a copy to:

       The Equitable Life Assurance Society of the United States
       1290 Avenue of the Americas
       New York, NY 10019
       Attention: General Counsel

-26-

If to the Reinsurer:

      Centre Life Insurance Company
      One Chase Manhattan Plaza
      New York, New York  10005
      Attention:  President

with a copy to:

      Zurich Centre Group LLC
      One Chase Manhattan Plaza
      New York, New York  10005
      Attention:  General Counsel

## ARTICLE XXXI
## DAC TAX

The Company and the Reinsurer hereby agree to the following pursuant to Section 1.848-2(g)(8) of the Income Tax Regulations (the "Regulation") issued under Section 848 of the Internal Revenue Code of 1986, as amended (the "Code").

1.      The term "party" as used in this Article will refer to either the Company or the Reinsurer, as appropriate.

2.      The terms used in this Article are defined by reference to Regulation Section 1.848-2 in effect at the date hereof.  The term "net consideration" as used in this Article will refer to net consideration as defined in Regulation Section 1.848-2(f) in effect at the date hereof.

3.      Each party shall attach a schedule to its federal income tax return that identifies this Agreement as a reinsurance agreement for which the joint election under Regulation Section 1.848-2(g)(8) has been made, and shall file its respective federal income tax returns in a manner consistent with the provisions of Regulation Section 1.848-2 in effect on the date hereof.  The party with net positive consideration under this Agreement for each Taxable year shall capitalize specified policy acquisition expenses with respect to this Agreement without regard to the general deductions limitation of Section 848(c)(1) of the Code.

4.      Each party agrees to exchange information pertaining to the amount of net consideration under this Agreement each year to ensure consistency, and as otherwise may be required by the Internal Revenue Service.

-27-

5.    The Reinsurer shall provide the Company by March 1 of each year its reasonable estimated calculation of the net consideration for the preceding calendar year, and shall thereafter, as soon as practicable but no later than July 1, provide its final calculation of the net consideration.  The final calculation of the net consideration will be accompanied by a statement signed by an officer of Reinsurer stating that the Reinsurer will report such net consideration in its tax return for the preceding calendar year.

6.    The Company may contest such calculation by providing an alternative calculation to the Reinsurer in writing no later than thirty (30) days subsequent to receipt of the Reinsurer's final calculation.  If the Company does not so notify the Reinsurer within such thirty day's time, the Company shall report the net consideration as determined by the Reinsurer in the Company's tax return for the preceding calendar year.

7.    If the Company contests the Reinsurer calculation of the net consideration, the parties will act in good faith to reach an agreement on the correct amount within thirty (30) days of the date the Company submits its alternative calculation.  If the Company and the Reinsurer reach agreement on an amount of the net consideration, each party shall report such amount in their respective tax returns for the previous calendar year.  If the Company and the Reinsurer fail to reach an agreement on the correct amount of the net consideration, any dispute shall be resolved in accordance with Article XXIII, Arbitration; provided, however, that, in addition to the requirements set forth in Article XXIII, the parties agree to use their reasonable best efforts to select arbitrators and take all necessary actions so that the final arbitrators' report can be delivered to the parties no later than 30 days before the day on which the relevant tax return is due to be filed (determined with regard to any extensions of time for filing).

8.    This election shall be effective for the taxable year of each party that includes the Closing Date, and for all subsequent years during which this Agreement remains in effect.


## ARTICLE XXXII
## PROGRAM OF INTERNAL REPLACEMENT


Should the Company, its affiliates, successors or assigns initiate a Program of Internal Replacement (hereinafter defined) that would include any of the Reinsured Policies herein, the Company will immediately notify the Reinsurer.  For each Reinsured Policy hereunder that has been replaced under a Program of Internal Replacement, the Reinsurer shall have the option, at its sole discretion, of either treating the Reinsured Policies as recaptured or continuing reinsurance on the new policy under this Agreement.

-28-

The term "Program of Internal Replacement" shall mean any program offered to a class of owners of Reinsured Policies in which a Reinsured Policy is exchanged for another policy, not reinsured under this Agreement, which is written by the Company, its affiliates, successors or assigns. For purposes of this paragraph, a Program of Internal Replacement includes new policies made or issued either:

a)    in compliance with the terms of the original Reinsured Policy or

b)    without the same new underwriting information that the Company would obtain in the absence of the original Reinsured Policy, without a suicide Exclusion period or contestable period of equal duration as those contained in newly issued policies by the Company, or without the payment of the same commissions in the first policy year that the Company would have paid in the absence of the original Reinsured Policy.

## ARTICLE XXXIII
## REINSURANCE

Subsequent to the Due Diligence Date, the Company has not and shall not commute, change, alter or amend any reinsurance arrangements that were in place on the Due Diligence Date with respect to the Reinsured Policies (the "Inuring Reinsurance") without the prior written consent of the Reinsurer, and, absent such consent, this Agreement shall apply only as if all such reinsurance arrangements are deemed to remain in place and to be collectible in accordance with their terms, whether or not such reinsurance is collectible or not. Reinsurer hereby consents to termination by the Company of the 80% quota share reinsurance ceded to UP as respects the Transition Book; provided, however, that (i) the Company provides written notice to Reinsurer of such termination no later than the effective date thereof, and (ii) the Company agrees that upon termination it will be deemed to have stepped into the shoes of UP under such reinsurance, and this Agreement will apply as if such termination did not take place and such Inuring Reinsurance continued in force, i.e., any such termination shall be net to the Company and shall not result in any increase to any cessions under this Agreement.

Subsequent to the Inception Date, the Company shall not enter into any reinsurance arrangements that were not in place on the Due Diligence Date with respect to the Reinsured Policies without the prior written consent of the Reinsurer.

-30-

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed, in duplicate,

Executed this 20th day of July, 2000

The Equitable Life Assurance Society of the United States

By:  _____
      Name:
      Title:

Executed this ___ day of _____, 2000

Centre Life Insurance Company

By:  _____
      Name:
      Title:

-30-

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed, in duplicate,

Executed this 20th day of July, 2000

The Equitable Life Assurance Society of the United States

By: _____
    Name:
    Title:

Executed this 20 day of July, 2000

Centre Life Insurance Company

By: _____
    Name: Frank D Pierson
    Title: CEO

# SCHEDULE A

The "Initial Reinsurance Premium" shall be the sum of the following:

    (i)   the Base Reinsurance Premium, plus

    (ii)   the Post March Cash Flow, plus

    (iii)   the Post March Investment Income, plus

    (iv)   the Post Inception Investment Income, plus

    (v)   Transition Expenses, plus

    (vi)   Transition Book Adjustment

For the purpose of immediately preceding, the following terms shall have the meanings ascribed below:

    (i)   "Base Reinsurance Premium" shall be an amount equal to US$1,427,982,000 times the Yield Adjustment;

    (ii)   "Yield Adjustment" shall be equal to 1.00 plus 10 times the difference of (x) 6.76% minus (y) the yield on the 5 year U.S. Treasury strip due July 2005 as published in the Wall Street Journal on the Closing Date (the "Benchmark Security"). Notwithstanding the foregoing, the Yield Adjustment shall be 1.00 if the calculation in the preceding sentence results in a value between 0.99 and 1.01.

    (iii)   "Post March Cash Flow", if any, shall be equal to the sum of the (x) Net Premiums received less (y) the Benefit Payments paid less (z) the amounts in item (iv) of the definition of Ultimate Net Loss in Article IV, Ultimate Net Loss, paid by Equitable, on or after April 1, 2000 and prior to the Inception Date of the Agreement. Provision will be made for expenses that are currently due and payable or receivable but have not yet been paid or received as of the Inception Date.

    (iv)   "Post March Investment Income" shall be equal to "R" times sum of Base Reinsurance Premium plus the (1/2) times the Post March Cash Flow, where R is equal to 7.0% times the ratio of (x) the number of days be-

A-1

tween April 1, 2000 and the Inception Date, both days inclusive, divided by (y) 365.

(v)   "Post Inception Investment Income" shall be equal to Base Reinsurance Premium times 7.0% times the ratio of (x) the number of days between the Inception Date and the date the Initial Reinsurance Premium is received by the Reinsurer, both days inclusive, divided by (y) 365.

(vi)  "Transition Book Adjustment" shall be equal to $2.75 million with interest from the Closing Date at 7.00% per annum, unless DMS is appointed the third party administrator of the Transition Book in which case, the Transition Book Adjustment shall be equal to zero $(0).

A-2

SCHEDULE B
List of States not Excluded
From Insolvency Funds Exclusion

| | |
|---|---|
| Alaska | Maryland |
| California | New Mexico |
| Colorado | New York |
| Florida | West Virginia |
| Maine | |

B-1

# SCHEDULE C

## Reinsured Policies

The following policies are reinsured:

Policies and Riders included in Series 102
Policies and Riders included in Series 105
Policies and Riders included in Series 110
Policies and Riders included in Series 110A
Policies and Riders included in Series 112
Policies and Riders included in Series 112A
Policies and Riders included in Series 114
Policies and Riders included in Series 118
Policies and Riders included in Series 119
Policies and Riders included in Series 121
Policies and Riders included in Series 123
Policies and Riders included in Series 124
Policies and Riders included in Series 125
Policies and Riders included in Series 126
Policies and Riders included in Series 127
Policies and Riders included in Series 128
Policies and Riders included in Series 129
Policies and Riders included in Series 131
Policies and Riders included in Series 133

C-1

SCHEDULE D

**Net Cash Flows**

E-1

# Present Value of Cash Outflows

## Scenario 1 - Baseline

RESTATED

| Period | | Actual Loss Cash Flows | | Assumptions | | Disabled Lives Cash Flows | | Total |
|---|---|---|---|---|---|---|---|---|
| | PV | TR | RI | Baseline | Baseline | Baseline | TDR | Total |
| 1999 | 107,567,701 | 8,426,168 | 4,074,268 | 9,009,211 | (86,908,024) | 108,807,582 | 7,137,403 | 118,045,074 | 50,007,050 |
| 2000 | 90,791,345 | 20,814,920 | 2,940,166 | 10,711,698 | (84,685,551) | 96,684,299 | 6,216,479 | 101,903,778 | 37,248,227 |
| 2001 | 92,009,642 | 29,057,440 | 2,319,668 | 11,225,057 | (84,332,794) | 90,864,435 | 6,908,538 | 96,769,973 | 49,427,179 |
| 2002 | 85,708,655 | 36,202,146 | 2,201,966 | 11,606,903 | (83,307,508) | 87,004,393 | 5,556,530 | 92,712,832 | 59,205,224 |
| 2003 | 80,043,367 | 43,540,803 | 1,773,000 | 11,806,231 | (83,133,173) | 85,886,173 | 5,216,103 | 83,806,913 | 69,063,316 |
| 2004 | 71,864,097 | 53,156,019 | 1,424,002 | 12,227,789 | (18,653,906) | 80,232,587 | 5,547,461 | 85,447,461 | 80,590,385 |
| 2005 | 65,428,768 | 57,760,265 | 1,297,879 | 12,168,284 | 5,817,693 | 82,023,346 | 82,333,360 | 84,185,990 | |
| 2006 | 64,428,163 | 62,308,819 | 1,176,810 | 12,120,747 | 16,174,023 | 79,794,461 | 82,333,360 | 82,165,990 | |
| 2007 | 64,831,233 | 66,534,111 | 1,063,080 | 12,139,013 | 23,911,971 | 72,183,783 | 4,888,001 | 78,642,762 | 95,982,943 |
| 2008 | 48,696,760 | 68,627,077 | 889,819 | 12,139,287 | 32,800,780 | 89,258,136 | 4,900,284 | 73,735,420 | 100,506,290 |
| 2009 | 35,908,666 | 72,453,601 | 794,804 | 11,998,283 | 40,787,969 | 68,679,282 | 4,334,181 | 73,013,404 | 108,530,209 |
| 2010 | 40,006,149 | 77,806,449 | 708,424 | 11,700,058 | 49,840,783 | 64,310,432 | 4,160,373 | 68,493,805 | 111,781,403 |
| 2011 | 34,301,328 | 78,820,015 | 1,072,600 | 11,375,170 | 54,887,379 | 61,984,550 | 4,023,090 | 120,840,223 | 116,134,568 |
| 2012 | 32,274,171 | 80,060,982 | 647,124 | 11,700,088 | 54,887,379 | 81,984,550 | 66,013,545 | 120,840,223 | |
| 2013 | 28,797,988 | 83,980,840 | 598,362 | 12,199,841 | 60,301,330 | 58,854,098 | 63,155,916 | 122,854,762 | |
| 2014 | 22,769,096 | 80,426,771 | 448,307 | 10,938,237 | 84,146,249 | 53,787,649 | 57,282,453 | 124,800,712 | |
| 2015 | 18,291,496 | 74,333,621 | 360,781 | 9,068,496 | 65,492,262 | 51,144,371 | 73,464,662 | 119,936,042 | |
| 2016 | 15,302,816 | 70,823,567 | 301,808 | 8,439,966 | 64,363,023 | 51,305,631 | 54,466,760 | 115,723,654 | |
| 2017 | 13,251,328 | 67,384,580 | 262,122 | 7,911,641 | 62,147,016 | 49,403,877 | 48,358,124 | 108,426,584 | |
| 2018 | 10,609,396 | 63,960,365 | 209,141 | 7,371,765 | 60,921,666 | 46,403,872 | 45,505,089 | 101,006,196 | |
| 2019 | 8,872,424 | 60,363,339 | 174,634 | 6,781,860 | 58,447,509 | 42,727,783 | 42,659,647 | 91,135,578 | |
| 2020 | 7,311,410 | 56,408,272 | 144,134 | 6,339,148 | 57,578,142 | 39,061,077 | 40,557,538 | 97,135,678 | |
| 2021 | 6,309,611 | 54,111,360 | 117,022 | 5,925,560 | 55,644,196 | 34,287,717 | 36,816,410 | 83,523,469 | |
| 2022 | 5,174,241 | 52,070,464 | 114,640 | 6,570,197 | 53,868,464 | 31,800,536 | 33,680,737 | 87,647,191 | |
| 2023 | 2,874,671 | 46,160,971 | 102,616 | 5,345,165 | 52,741,144 | 30,762,226 | 30,762,226 | 62,181,814 | |
| 2024 | 1,867,733 | 41,900,205 | 58,697 | 4,579,846 | 49,052,161 | 28,274,320 | 27,982,119 | 77,910,834 | |
| 2025 | 1,221,771 | 37,677,377 | 36,625 | 3,823,332 | 44,002,465 | 26,591,533 | 27,003,469 | 63,523,469 | |
| 2026 | 915,571 | 34,333,741 | 24,086 | 3,466,500 | 40,166,200 | 23,561,933 | 25,003,469 | 69,066,924 | |
| 2027 | 302,907 | 30,046,009 | 18,049 | 3,116,400 | 30,551,819 | 21,111,066 | 21,463,955 | 82,650,165 | |
| 2028 | | 30,048,009 | 6,973 | 2,733,547 | 33,000,822 | 18,908,075 | 20,137,100 | 55,666,719 | |
| 2029+ | 4,083 | 152,248,561 | 60 | 2,356,161 | 154,500,740 | 82,467,363 | 5,696,763 | 120,647,769 | 154,500,740 |

| | 8.0% | | | | | | | | |
| PV at 7.5% | 642,690,216 | 616,228,139 | 17,005,810 | 121,397,512 | 91,641,264 | 838,025,307 | 54,449,616 | 892,474,923 | 884,416,177 |
| PV at 7.0% | 670,235,283 | 651,538,325 | 17,358,571 | 126,280,176 | 115,921,788 | 867,730,513 | 56,376,894 | 924,107,407 | 1,040,029,195 |
| PV at 7.5% | 699,004,879 | 689,442,088 | 17,729,028 | 131,483,510 | 142,428,328 | 899,916,399 | 58,438,823 | 957,955,222 | 1,100,303,550 |

Less 12/98 Statutory Reserve Ceded on Excess Coverage and Transition Reinsurance — 48,338,954
12/98 Present Value of DI Block at 7.5% Net of Reinsurance — 904,570,641

Notes:
(a) Includes terminal reserve of 126,516,048 in year 2028
(b) Includes terminal reserve of 65,551,175 in year 2028
Disability Premium Waiver Benefits, and claims incurred but Not Reported (IBNR) as of 12/31/1998

Disabled Lives cash flows include the effect of Accrued Benefits as of 12/31/1998.

## SCHEDULE E

**Reports of Accounting and Settlement**

F-1

SCHEDULE E

Reinsurance Settlement between Equitable and Centre
Month ending  XX/XX/XX
Existing Book only

| Line # | | Existing Book |
|---|---|---|
| 1 | Cash premiums, net of refunds | |
| 2 | Plus:  Recoveries and other amounts collected by Equitable and due Centre | |
| 3 | Less:  Cash premiums for inuring reinsurance | |
| 4 | Less:  Cash premiums, net of refunds, paid to Centre or TPA | |
| 5 | A  Subtotal - Net cash premiums and recoveries = (1)+(2)-(3)-(4) | A |
| 6 | Benefit and settlement payments (including extra contractual-losses) | |
| 7 | Less:  Benefits due and payable under inuring reinsurance | |
| 8 | Less:  Benefit and settlement payments made by Centre or TPA | |
| 9 | Less:  Benefit and settlement payments for claims excluded from definition of ultimate net loss (net of associated premiums) | |
| 10 | Less: Extra contractual losses of Equitable and paid by Centre or TPA | |
| 11 | B  Subtotal - Net benefit and settlement payments = (6)-(7)-(8)-(9)-(10) | B |
| 12 | C  Commissions and service fees | C |
| 13 | D  Premium taxes | D |
| 14 | E  Administration expenses not paid by Centre or TPA | E |
| 15 | F  Other amounts collected by Centre or TPA and  due to Equitable | F |
| 16 | G  Other amounts collected by Equitable and  due to Centre | G |
| 17 | H  Amounts due Equitable under Transition Services Agreement | H |
| 18 | I  Guaranty Fund reimbursements from Centre (9states only) | I |
| 19 | J  Guaranty Fund recoveries due Centre (if applicable) | J |
| 20 | Net due Centre / (Equitable)  A-B-C-D-E-F+G-H-I+J | |

Balance Sheet and other required accounting items:
Premiums paid in advance (included in cash premiums above)
Uncollected premiums (excluded from cash premiums above)
Premium waivers (excluded from cash premiums above)
Statutory reserves
GAAP reserves

SCHEDULE E

**Reinsurance Settlement between Equitable and Centre**
**Month ending  XX/XX/XX**
**Transition Book only**

| Line # | | 100% share | | Centre's share |
|---|---|---|---|---|
| 1 | Cash premiums, net of refunds | | | |
| 2 | Plus:  Recoveries and other amounts collected by Equitable and due Centre | | | |
| 3 | Less:  Cash premiums for inuring reinsurance other than UP Coinsurance (80/20 reinsurance), if any | | | |
| 4 | Net premium under 80/20 = (1)+(2)-(3) | | x20% | |
| 5 | Less:  Cash premiums, net of refunds, paid to Centre or TPA | N/A | | |
| 6 | A  Subtotal – Net cash premiums and recoveries = (4)-(5) | N/A | | A |
| | | | | |
| 7 | Benefit and settlement payments (including extra contractual-losses) | | | |
| 8 | Less:  Benefits due and payable under inuring reinsurance other than UP Coinsurance (80/20 reinsurance), if any | | | |
| 9 | Net benefits and settlements under 80/20 = (7)-(8) | | x20% | |
| 10 | Less: Benefit and settlement payments made by Centre or TPA | N/A | | |
| 11 | Less:  Benefit and settlement payments for claims excluded from definition of ultimate net loss (net of associated premiums) | N/A | | |
| 12 | Less: Extra contractual losses of Equitable and paid by Centre or TPA | N/A | | |
| 13 | B  Subtotal – Net benefit and settlement payments = (9)-(10)-(11)-(12) | | | B |
| | | | | |
| 12 | C  Commissions and service fees | | x20% | C |
| | | | | |
| 13 | D  Premium taxes | | x20% | D |
| | | | | |
| 14 | E  Administration expenses not paid by Centre or TPA | | x20% | E |
| | | | | |
| 15 | F  Other amounts collected by Centre or TPA and  due to Equitable | | x80% | F |
| | | | | |
| 16 | G  Other amounts collected by Equitable and  due to Centre | | x20% | G |
| | | | | |
| 17 | H  Amounts due Equitable under Transition Services Agreement | | x20% | H |
| | | | | |
| 18 | I  Guaranty Fund reimbursements from Centre (9states only) | | x20% | I |
| | | | | |
| 19 | J  Guaranty Fund recoveries due Centre (if applicable) | | x20% | J |
| | | | | |
| 20 | Net due Centre / (Equitable)  A-B-C-D-E-F+G-H-I+J | N/A | | |

**Balance Sheet and other required accounting items:**
Premiums paid in advance (included in cash premiums above)
Uncollected premiums (excluded from cash premiums above)
Premium waivers (excluded from cash premiums above)
Statutory reserves
GAAP reserves

4

# CREDIT SUPPORT AGREEMENT

### by and between

### THE EQUITABLE LIFE ASSURANCE SOCIETY
### OF THE UNITED STATES

### AND

### CENTRE LIFE INSURANCE COMPANY

**Dated as of July 1, 2000**

# CREDIT SUPPORT AGREEMENT

This Credit Support Agreement (the "Credit Support Agreement"), dated as of July 1, 2000 (the "Inception Date"), by and between The Equitable Life Assurance Society of the United States, a stock life insurance company organized under the laws of New York ("Equitable") and Centre Life Insurance Company ("CLIC"), a stock life insurance company organized under the laws of Massachusetts.

## WITNESSETH:

WHEREAS, Equitable desires to cede, and CLIC desires to assume, on a 100% quota share basis, liabilities of Equitable under certain individual disability income insurance policies under that certain indemnity reinsurance agreement, of even date herewith, by and between Equitable and CLIC (the "CLIC Reinsurance Agreement");

WHEREAS, CLIC desires to provide Equitable with credit support that is intended to ensure that CLIC will be able to perform its obligations under the CLIC Reinsurance Agreement; and

WHEREAS, CLIC and Equitable executed that certain Memorandum of Understanding, dated June 8, 2000 (the "Credit Support Memorandum," a copy of which is attached hereto as Exhibit A), setting forth the understanding of the parties with respect to credit support.

NOW THEREFORE, in consideration of the mutual promises set forth herein, and other good and valuable consideration, the parties hereto agree as follows:

ARTICLE I

Definitions

For purposes of this Agreement, the following terms shall have the following meanings:

"Ancillary Agreements" shall have the meaning set forth in the CLIC Reinsurance Agreement.

"Business Days" shall have the meaning set forth in the Reserve Trust Agreement.

"CLIC Reinsurance Agreement" shall have the meaning set forth in the first recital hereof.

"Company Action Level Event" shall have the meaning set forth in the Risk Based Capital rules in the Code of Massachusetts Regulations, 211 CMR 20.03.

"Credit for Reinsurance Notice" shall have the meaning set forth in Section 5.5 hereof.

"Credit Support Memorandum" shall have the meaning set forth in the third recital hereof.

"Credit Support Report" shall have the meaning set forth in Section 7.6 hereof.

"DAC Tax Amount" shall have the meaning set forth in the Security Trust Agreement.

"Delinquency Proceeding" shall have the meaning set forth in the CLIC Reinsurance Agreement.

"Event of Default" shall have the meaning set forth in the Credit Support Memorandum.

"Installment Payments" shall have the meaning set forth in Section 7.8 hereof.

"LIBOR" shall mean the rate per annum equal to the 6-month LIBOR (rounded upward, if necessary, to the nearest one-hundredth (1/100th) of one percent) reported on the Bloomberg Financial Markets Services Display Screen for London interbank deposits as of 11:00 a.m. (London time), on the Business Day prior to the day on which an interest rate is first applicable

-2-

(provided that in the event no such rate is available, the rate shall be the rate equal to the arithmetic mean of the six-month rates shown on the LIBOR page of Reuters Money Service at approximately 11:00a.m. (London time) as of such date).

"Obligations" shall have the meaning set forth in the Reserve Trust Agreement.

"Reinsured Policies" shall have the meaning set forth in the CLIC Reinsurance Agreement.

"Reserve" and "Reserve Amount" shall have the meaning set forth in Section 7.7 hereof.

"Reserve Trust Account" shall have the meaning set forth in the Reserve Trust Agreement.

"Reserve Trust Agreement" shall mean that certain Reserve Trust Agreement by and among CLIC, as grantor, Equitable, as Beneficiary, and The Bank of New York, as trustee, of even date herewith, as may be amended by its terms from time to time.

"Retrocession Agreement" shall mean that certain reinsurance agreement by and between CLIC and Zurich Insurance Company, Bermuda Branch, dated June 30, 2000, as may be amended by its terms from time to time, pursuant to which CLIC currently cedes up to an 85% quota share of all business written or reinsured by it.

"Security Trust Agreement" shall mean that certain Security Trust Agreement by and among CLIC, as grantor, Equitable, as Beneficiary, and The Bank of New York, as trustee, of even date herewith, as may be amended by its terms from time to time.

"Special Trust Account" shall have the meaning set forth in Section 5.5 hereof.

"Special Withdrawal Notice" shall have the meaning set forth in the Reserve Trust Agreement.

"Termination Date" shall have the meaning set forth in the Reserve Trust Agreement.

-3-

"Termination Notice" shall have the meaning set forth in the Reserve Trust Agreement.

"Transaction" shall have the meaning set forth in the forepart of the Credit Support Memorandum.

## ARTICLE III

### Credit Support

Section 2.1    CLIC and Equitable hereby incorporate the Credit Support Memorandum into this Agreement by reference, and mutually agree to abide by the terms thereof.  The parties hereby adopt and restate, as of the date of this Credit Support Agreement,  any and all of the representations and agreements set forth in the Credit Support Memorandum.

Section 2.2    By virtue of this Credit Support Agreement, any provision of the Credit Support Memorandum by which the parties "will agree" or "shall agree" shall be affirmative agreements hereunder; provided, however, if any term of this Agreement or the Credit Support Memorandum is inconsistent with the CLIC Reinsurance Agreement, the Reserve Trust Agreement or the Security Trust Agreement, the terms and conditions of such other agreements shall control.

Section 2.3    (a)    The parties hereto acknowledge and agree that if pursuant to the provisions of Part A, Section 1.d.(iv)(c) of the Credit Support Memorandum Equitable is entitled to draw down such letter of credit, the parties will instruct the letter of credit issuer to effect such draw and deposit such funds in accordance with the terms of the Security Trust Agreement and,

-4-

subject to three (3) Business Day's notice to CLIC and the issuer, that such drawdown is reasonably required to pay, or reimburse Equitable for, any CLIC Obligations.

Section 2.4     (a)     CLIC represents and warrants that the Retrocession Agreement cannot be terminated, changed or recaptured without CLIC's consent.

(b)     CLIC represents and warrants that as of the date hereof, the net worth of Zurich Insurance Company, Bermuda Branch, is the net worth of Zurich Insurance Company of Zurich, Switzerland, CLIC's indirect parent corporation.

## ARTICLE III

### Minimum Net Worth

Section 3.1     It is understood that for purposes of Part A, Section 1.d.(i)(b) of the Credit Support Memorandum (minimum net worth of a Qualified Surety Bond Provider), and Part C, Section 1.a. of the Credit Support Memorandum (minimum consolidated net worth of a Qualified Surety Bond Provider), required minimum net worth amounts shall be adjusted for annual increases in the Consumer Price Index-All Urban Consumers Current Series , commencing on July 1, 2001.

## ARTICLE IV

### Cure Rights

Section 4.1     Upon the occurrence of an Event of Default described in Part B, Section 1 of the Credit Support Memorandum, determined as set forth in Section 5.4(a) hereof, the Event of

-5-

Default will be deemed to have been cured on the day on which CLIC provides Equitable with certification reasonably acceptable to Equitable that CLIC meets the requirements of Part B, Section 1 of the Credit Support Memorandum.

Section 4.2    If CLIC has become subject to a Delinquency Proceeding, such delinquency shall be deemed to have been cured in the event that the court or other governmental body having jurisdiction over such Delinquency Proceeding issues a final, non-appealable order discharging CLIC from such proceeding, and CLIC meets all other requirements of this Agreement and the CLIC Reinsurance Agreement.

Section 4.3    If CLIC permits the amendment, termination or recapture of the Retrocession Agreement except as permitted under the terms of Part A, Section 1.f. of the Credit Support Memorandum, such breach of this Credit Support Agreement shall be deemed to have been cured upon the reinstatement of the Retrocession Agreement under its original terms with respect to (i) business of CLIC outstanding on the Inception Date, and (ii) the Reinsured Policies.

## ARTICLE V

### Agreements Regarding Trusts

Section 5.1    (a)    In the event that Equitable withdraws amounts from the Reserve Trust in excess of amounts contemplated by Part D, section 1.c. of the Credit Support Memorandum, such amounts shall be maintained in a segregated asset account, similar to an account established pursuant to New York Insurance Department Regulation 102.

(b)    Equitable agrees that it shall as promptly as practicable return to the Reserve Trust Account any amount withdrawn from the Reserve Trust Account, plus investment income earned thereon, in excess of the amounts contemplated by Part D, Section 1.c. of the Credit Support Memorandum.

(c)    · Pending return of such assets, plus investment income earned thereon, to the Reserve Trust Account in accordance with Section 5.1(b), CLIC at its request shall have the right to manage the investment of the assets contained in the segregated asset account, in accordance with the requirements of the New York Insurance Law (it being understood that such investments will be made under investment guidelines that are no more restrictive than investment guidelines otherwise used by Equitable for its investments).  The investment results of the segregated asset account will be credited or charged to CLIC.  Unless such assets have been withdrawn in good faith error, until such assets are returned to the Reserve Trust Account, Equitable shall pay a fee equal to 200 basis points per annum on the assets held in the segregated asset account.

(d)    The relative rights and obligations of CLIC and Equitable under the Reserve Trust Agreement shall apply to any segregated asset account established pursuant to this section 5.1.

Section 5.2    In the event that amounts or assets are withdrawn from the Reserve Trust Account by Equitable, Equitable acknowledges and agrees that, to the extent such assets, plus investment income earned thereon, have not been returned to the Reserve Trust Account, the Obligations of CLIC under the CLIC Reinsurance Agreement shall be reduced dollar for dollar.

Section 5.3    Notwithstanding the foregoing, in the event that Equitable has received a Termination Notice pursuant to Section 9 of the Reserve Trust Agreement, and any part of

-7-

CLIC's Obligations remain undischarged ten days prior to the Termination Date, Equitable shall be authorized to withdraw assets equal to such Obligations and (i) retain such assets to the extent that it is entitled to reimbursement for any claims or expenses paid by it with respect to Reinsured Policies, and (ii) deposit the balance of such amounts in a segregated asset account, similar to an account established pursuant to New York Insurance Department Regulation 102, in the name of Equitable, in any United States bank or trust company, apart from its other assets, in trust for the use permitted in Part D, Section 1.c. of the Credit Support Memorandum until such time as the Obligations are discharged by CLIC.  The relative rights and obligations of CLIC and Equitable under the Reserve Trust Agreement shall apply to any segregated asset account established pursuant to this Section 5.3.

Section 5.4    (a)    For purposes of Part B, Section 1 of the Credit Support Memorandum, CLIC shall notify the Company when it reasonably believes that a Company Action Level Event will occur, but in no event shall such notice be given later than the day on which such Company Action Level Event actually occurs.  The first sentence of Part B, Section 1 of the Credit Support Memorandum is hereby deleted in its entirety, and replaced with the following:  "The occurrence of a Company Action Level Event shall constitute an Event of Default."

(b)    As long as the Event of Default described in Part B, Section 1 of the Credit Support Memorandum remains uncured and if Equitable has not elected any right it may have under the CLIC Reinsurance Agreement to recapture the Reinsured Policies, at the end of the calendar quarter that includes the anniversary of the date on which such Event of Default

-8-

occurred, if the assets in the Security Trust are less than ME(t) (as defined in the Credit Support Formula), CLIC shall add assets to the Security Trust so that the amount in the Trust on such date is at least equal to ME(t).  In the event that assets in the Security Trust exceed ME(t) on such date, CLIC will be permitted to withdraw assets under the procedures set out in Section 2(d) of the Security Trust Agreement for a Grantor's Withdrawal Notice.

Section 5.5    (a)    CLIC will provide Equitable with notice, as early as practicable, of any event of which CLIC has actual knowledge regarding CLIC that will result in Equitable not being able to take credit for the CLIC Reinsurance Agreement on any statutory financial statement filed by Equitable.

(b)    If Equitable is not able to (or has received notice that it may not be able to) because of applicable law, rule or regulation, or action of a regulatory authority, take credit on any statutory financial statements required to be filed by Equitable for the reinsurance provided by CLIC Reinsurance Agreement, Equitable will provide CLIC with notice (the "Credit for Reinsurance Notice") that it can not, or reasonably believes it will not be able to, take credit for reinsurance on any statutory financial statement; such Notice will set forth the basis of Equitable's position, and will include any supporting documentation.

(c)    Promptly after the Credit for Reinsurance Notice is given, the parties will cooperate in attempting to resolve any issues raised by such Notice, in order to restore Equitable's statutory financial statement credit.

(d)    No more than ten (10) Business Days prior to the end of the calendar quarter for which, or on such earlier date on which, Equitable will not be able to take credit on any financial

statement for the CLIC Reinsurance, Equitable shall have the right to provide the Trustee with a Special Withdrawal Notice.

(e)    If, and at such time as, Equitable's statutory financial statement credit for reinsurance is restored, Equitable will promptly provide notice to the Trustee and CLIC that the operative provisions of the Reserve Trust Agreement in effect prior to the time Equitable gave the Special Withdrawal Notice shall be reinstated.

(f)    In the event that any insurance regulatory authority imposes credit for reinsurance requirements on Equitable that do not require conversion of the entire Reserve Trust Account under section 2(g) of the Reserve Trust Agreement, Equitable will specify in the Special Withdrawal Notice an amount or assets required to meet any such requirement, in which event the Trustee shall be authorized to hold such amounts or assets in a dedicated account (the "Special Trust Account"), for the benefit of Equitable, which Special Trust Account shall be subject to the operative provisions applicable to a Statutory Trust, subject to any specific requirements imposed by such regulator.

(g)    The conversion of the Reserve Trust Account or other acts required under Section 2(g) of the Reserve Trust Agreement shall be at CLIC's expense; provided, however, Equitable will hold CLIC harmless from any reasonable expenses or losses (including reasonable attorney's fee) incurred by CLIC in the event that Equitable had no reasonable basis for submitting a Special Withdrawal Notice.

(h)    Equitable may give Notice of Intention, as that term is used in Section 9(a) of the Reserve Trust Agreement, only at such time as (i) it has elected any right it may have under

-10-

Article VIII (Recapture) of the CLIC Reinsurance Agreement, in which case the amount

remaining in the Reserve Trust Account shall be offset against CLIC's Obligation to pay a

Commutation Amount (as that term is used in the CLIC Reinsurance Agreement), or (ii)

reasonably believes that CLIC has no further obligations under the CLIC Reinsurance Agreement

in all material respects.

Section 5.6     Each party's rights of offset shall be maintained, and nothing in this Credit

Support Agreement or the Ancillary Agreements shall in any way limit or restrict such rights.

## ARTICLE VI

### Survival

Section 6.1     The representations, covenants and agreements of the parties provided in

this Credit Support Agreement and the parties' obligations hereunder shall survive the execution

and delivery and shall survive until all Obligations of CLIC under the CLIC Reinsurance

Agreement shall have been satisfied.

## ARTICLE VII

### Miscellaneous

Section 7.1     Except as set forth above, any disputes arising under this Credit Support

Agreement shall be resolved by arbitration, in accordance with the procedures set forth in Article

XXIII of the CLIC Reinsurance Agreement.

Section 7.2     The provisions of this Credit Support Agreement shall be governed by the laws of the State of New York, without giving effect to the conflict of laws provisions thereof.

Section 7.3   This Credit Support Agreement may be amended, changed or altered as the parties may agree, if such change, amendment or alteration is evidenced in writing executed by the parties hereto.

Section 7.4     Notwithstanding any agreements with respect to arbitration, and in addition to any other remedy to which they are entitled in law or equity, the parties shall have the right to injunctive or other equitable relief to prevent breaches and to enforce specifically the terms and provisions of this Credit Support Agreement in any court in the State of New York, or any court of the United States located in the State of New York, it being understood that the rights hereunder are not in derogation of any arbitration rights under the CLIC Reinsurance Agreement or the Ancillary Agreements.

Section 7.5     In order for a surety bond provider to be a Qualified Surety Bond Provider (as that term is defined in the Credit Support Memorandum), any such provider will agree to be bound by the provisions of Part B, Section 2 and Part E, Section 1 of the Credit Support Memorandum.

Section 7.6     Within ten (10) Business Days following the end of each calendar quarter, CLIC will provide a report to Equitable showing the amounts of the items in the Credit Support Formula (the "Credit Support Report"). The Credit Support Report may be included in the quarterly Reserve Amount Statement pursuant to Section 1(d) of the Reserve Trust Agreement.

-12-

Section 7.7    For purposes of this Credit Support Agreement and the Credit Support Memorandum, the term "Reserves" shall have the same meaning as the term "Reserve Amount" in the Reserve Trust Agreement.

Section 7.8    Each DAC Tax Amount withdrawn from the Security Trust Account will be repayable by the Grantor to the Security Trust Account in five (5) equal annual installments in the amount of 0.24389 times the relevant DAC Tax Amount (the "Installment Payments"). The Installment Payments will be payable on the first five anniversary dates following the date on which the relevant DAC Tax Amount was withdrawn.

-13-

Case 1:08-cv-01661-AKH     Document 5-3     Filed 02/26/2008     Page 16 of 68

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be

executed this 20th day of July, 2000.

CENTRE LIFE INSURANCE COMPANY

By: _____

Name: Frank D Mefron

Title: CEO

THE EQUITABLE LIFE ASSURANCE SOCIETY
OF THE UNITED STATES

By: _____

Name: _____

Title: _____

NYB 461862.11 24050 00026

-13-

FROM                                                        (WED) 7. 19 00 22:06/ST. 22:06/NO. 4860102529 P  1

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be

executed this 20th day of July, 2000.

CENTRE LIFE INSURANCE COMPANY

By: _____
    Name:
    Title:

THE EQUITABLE LIFE ASSURANCE SOCIETY
OF THE UNITED STATES

By: _____
    Name:
    Title:

NYH 4418621I 24050 0052G

-13-

## MEMORANDUM OF UNDERSTANDING

This Memorandum of Understanding (the "Memorandum"), dated June 8, 2000, sets forth the understanding of The Equitable Life Assurance Society of the United States ("Equitable") and Centre Life Insurance Company ("CLIC") with respect to credit support ("Credit Support") described in section 1(f) of the Letter of Intent (the "Letter of Intent") dated May 18, 2000 between Equitable and CLIC relating to an individual disability income reinsurance transaction (the "Transaction"). Pursuant to agreements between the parties, this Memorandum is timely delivered as required by section 3(g) of the Letter of Intent.

A.   Credit Support Formula

1.   CLIC will provide Credit Support consisting of its own net worth and the Reserve Trust. In addition, as of the effective date of the Transaction, CLIC will provide the other components of the Credit Support, which shall be the Security Trust, the Surety Bonds, the retrocession agreement between CLIC and Zurich Insurance Company, Bermuda Branch ("ZIBB"), and at CLIC's option, the AE Treaty (as defined below), as described below. After the effective date of the Transaction, some or all of the components of the Credit Support (other than the Reserve Trust which shall always be maintained during this Transaction, and CLIC's net worth whatever it may be at the time) shall be maintained as may be required or permitted below, as the case may be in the description of such other Credit Support. In any event, the components of the Credit Support, whatever they may be at the time, shall be such as to satisfy the Credit Support Formula (attached as Exhibit A) at all times during the term of the Transaction.

a.   A "Reserve Trust," which will at all times during the term of the Transaction hold assets at market value equal to or in excess of the CLIC reserves (the "Reserves") attributable to the reinsured disability income business, computed quarterly on a U.S. GAAP basis. For the avoidance of doubt, such assets may include LOCs (as defined below) to the extent required to make up any shortfall in funding in the Reserve Trust (after any permitted transfers from the Security Trust to the Reserve Trust) so long as such LOCs are included as part of the Reserve Trust and the following conditions are met:

(i)    such LOC's must be replaced by cash or appropriate investments within 60 days after being placed in the Reserve Trust, and

(ii)   the amount of such LOC's included as part of the Reserve Trust shall not exceed 5% of the Reserves.

b.  A "Security Trust," which at inception will hold an amount equal to the excess of the total consideration paid by Equitable, minus an amount for certain transaction-related expenses, over the Reserves.  Over time, the amount held in the Security Trust will vary according to the Credit Support Formula set forth in Part A, Section 2 of this Memorandum.

c.  At the discretion of CLIC, an aggregate excess of loss reinsurance treaty (the "AE Treaty") issued by a reinsurer and otherwise satisfying the requirements set forth in Part E, Section 2 of this Memorandum.

d.  Surety agreements or other forms of credit enhancement effectively guaranteeing that CLIC will have a positive net worth and the liquidity to pay its obligations as they become due that are substantially in the form of the Surety Agreement provided by CLIC to Equitable on May 24, 2000 or other form of credit enhancement reasonably acceptable to Equitable ("Surety Bonds") that, at the time of determination, are issued by entities that are "Qualified Surety Bond Providers" (defined below) at such time.

(i)    A "Qualified Surety Bond Provider" is a member (i.e., wholly owned direct or indirect subsidiary) of the Zurich Financial Services Group that satisfies all of the following five criteria:

(a)   It is on the then most recent list of Qualified Surety Bond Providers provided from time to time by CLIC (the "List"); a company will be put on the list when CLIC intends that it be counted as a Qualified Surety Bond Provider for the

purposes of providing credit support in respect of the Transaction. The List may be amended, by adding names of new Qualified Surety Bond Providers and/or by deleting names of prior Surety Bond Providers, at any time by notice to Equitable from CLIC, which amendment shall be effective on the fifth business day after receipt of such notice, together with supporting documentation with respect to newly listed Qualified Surety Bond Providers (most recently available audited and, if prepared, unaudited financial statements of the Qualified Surety Bond Provider, the most recent rating agency report, executed copy of the Surety Bond, and a favorable legal opinion as to the due authorization, execution and delivery thereof and the legal, valid, binding and enforceable obligation, subject to customary qualifications and exceptions).

(b)    It has an audited net worth of at least $300 million as of the date its name first appears on the List, and maintains an audited net worth of at least $200 million thereafter during the term of this Transaction, on a current basis (i.e., the parties will negotiate a reasonable inflation multiplier).

(c)    The financial statements of such entity are audited by a "Big 5" accounting firm (or successor firm) or Zurich Insurance Group's current auditor.

(d)  It has a financial strength rating of at least "A".

(e)  It is not subject to any bankruptcy, insolvency or similar proceeding.

(ii)  If a Surety Bond Provider issues a Surety Bond and thereafter ceases to meet the five criteria set forth above, and thus ceases to be a Qualified Surety Bond Provider, such Surety Bond Provider's audited net worth will not be counted for the purposes of determining compliance with the Credit Support Formula.

(iii)  At the inception of the Transaction, the Qualified Surety Bond Providers will be CSUS and CRUS, which have ratings of "AA", and a combined net worth in excess of $1.3 billion.

(iv)  As an alternative, or in addition, to Surety Bonds, CLIC may provide irrevocable standby letters of credit ("LOCs") guarantying CLIC's obligations to Equitable.  Any such LOCs must be issued by a major national or international commercial bank with a senior unsecured debt rating of "A+/A1" or better and Tier 1 Capital (common stockholders equity, plus qualifying, non-cumulative, perpetual preferred stock, plus minority interests in equity accounts of consolidated subsidiaries) of at least five (5) times the amount of the LOC obtained from such bank.  Draws under LOCs will be permitted as follows:

(a)  If the LOC is included in the Reserve Trust, the LOC may be drawn down under substantially the same conditions that apply to withdrawal of assets from the Reserve Trust.

(b)  If the LOC is included in the Security Trust, the LOC may be drawn down under substantially the same conditions that apply

to withdrawal of assets from the Security Trust.

(c)  If the LOC is held outside of either Trust, the LOC may be drawn down under substantially the same conditions that apply to withdrawal of assets from the Security Trust. Any amount drawn down will be deposited in the Reserve Trust or the Security Trust, as appropriate.

(d)  If the Reserve Trust has been converted to a Reg. 114 trust, and the LOC is included in the Reserve Trust or is otherwise needed to provide credit for reinsurance, the LOC shall comply with Reg. 133.

e.  The capital of CLIC.

f.  A retrocession agreement between CLIC and ZIBB (which currently has net worth equal to that of Zurich Insurance Company) with respect to CLIC's outstanding business (as of the effective date of the Transaction) and the reinsurance reinsured in the Transaction. CLIC will agree that during the term of the Transaction, it will not consent to the termination, change or recapture of such outstanding retrocession agreement except as specifically provided below, and shall notify ZIBB accordingly, with a copy to Equitable and evidence satisfactory to Equitable of its receipt by ZIBB. The requirements herein regarding the retrocession agreement shall survive any Change of Control, as defined below.

(i)  Any termination, change or recapture of or to the retrocession agreement with CLIC, solely in respect of business retroceded as of the date of the Transaction and the reinsurance reinsured in the Transaction, will be subject to Equitable's consent, which consent shall not be unreasonably withheld. For the avoidance of doubt, Equitable's consent will not be withheld if the termination, recapture

or change to the retrocession agreement would have no material, adverse impact on Equitable's risk in this Transaction.

    (ii)  In addition to any other remedies available to Equitable, if CLIC recaptures or changes the retrocession agreement with ZIBB other than as set forth in Part A, Section 1(f)(i), Equitable shall have the same remedy as set forth in Part C, Section 1(b).

2.  The Credit Support Formula is annexed hereto as Exhibit A.  At all times, CLIC must satisfy the Credit Support Formula. Capitalized terms used herein and not otherwise defined shall have the meaning provided in the Credit Support Formula.

3.  CLIC will have and retain perpetual cure rights with respect to the occurrence of any Event of Default, Adverse Change of Control, Delinquency, requirements regarding retrocession with ZIBB, or any breach of any covenants hereunder.  The foregoing will not estop, and Equitable from enforcing its rights upon the occurrence of any of the foregoing, prior to such cure.

B.  <u>Covenants and Events of Default</u>

1.  CLIC's failure to maintain its capital and surplus at the amount necessary to meet or exceed the "Company Action Level" for Massachusetts Risk Based Capital purposes shall constitute an "Event of Default." Subject to reasonable notice, upon the occurrence of such an Event of Default, and thereafter, for as long as the Event of Default has not been cured, CLIC will be required to fund the Security Trust as follows:

a.  CLIC must fund the Security Trust with an amount equal to "ME(t)", as defined in the Credit Support Formula, (but not less than $0 on the initial funding date).  The parties will agree on a procedure for annual adjustment of such funding level to reflect changes in Reserves.

b.  For each quarter, and as long as the Event of Default has not been cured, CLIC must maintain the Security Trust as set forth above.

NYB 461883.1 24050 00526
7/17/00 6:26 PM
-6-

      c.    The parties acknowledge that the obligation of CLIC to fund either Trust is an obligation that is supported by the Surety Bonds.

2.    Prior to the payment of any dividend to its shareholder(s), any Qualified Surety Bond Provider will provide Equitable with a statement certifying that upon payment of such dividend, the Total Credit Support ("K(t)", as defined in the Credit Support Formula) requirement will continue to be met; provided, however, that such certification shall be required only if the payment of such dividend (i) requires the approval of any regulatory authority with jurisdiction over the Qualified Surety Bond Provider, and (ii) would cause the total value of all credit support at the time of the dividend payment to fall below 110% of the Total Credit Support.

      a.    If any Qualified Surety Bond Provider is required to provide such notice and fails to do so (a "Dividend Notice Failure"), the Total Credit Support for the 90 days following the Dividend Notice Failure shall be increased to 115% of the Total Credit Support immediately prior to such failure.

      b.    At the close of such 90-day period for which Total Credit Support was raised as set forth immediately above, the Total Credit Support shall revert to the level required immediately prior to the Dividend Notice Failure.

C.    <u>Change of Control; Insolvency</u>

1.    In the event Zurich Insurance Company ("ZIC") ceases owning, directly or indirectly, at least 50% of the shares and assets of each of CLIC and the Qualified Surety Bond Providers (a "Change of Control"), the parties shall have the following rights:

      a.    If the controlling party has been assigned ratings by major rating agencies substantially similar to those assigned to ZIC and has net worth on a current, consolidated basis of at least $10 billion, the Change of Control will be a "Non-Adverse Change of Control." In the case of a Non-Adverse Change of Control, all agreements

contemplated herein shall remain in force without modification.

b.  In the event of a Change of Control other than a Non-Adverse Change of Control (herein an "Adverse Change of Control"), all agreements contemplated herein shall remain in force, except that the Total Credit Support immediately upon the Change of Control shall be raised to a percentage of the Total Credit Support applicable immediately preceding the Change of Control. Such percentage shall be 130% with respect to any Change of Control occurring before the first anniversary of the effective date of the Transaction and shall decline over ten years in equal amounts of 1.5% every twelve months thereafter to 115%.

c.  An Adverse Change of Control may be cured (in which event the Total Credit Support required shall be reduced to the Total Credit Support applicable as if such Adverse Change of Control had not occurred) in at least the following ways:

(i)   the new controlling person subsequently satisfies the requirements to make the change in control a Non-Adverse Change of Control,

(ii)  the assets or stock, as the case may be, of the entity subject to the Change in Control is acquired back directly or indirectly by ZIC or an affiliate of ZIC, or

(iii) new Qualified Surety Bond Providers not subject to the Adverse Change of Control replace those that were subject to the Adverse Change of Control.

2.  In the event that CLIC is subject to a Delinquency proceeding under the Insurance Law of Massachusetts, Equitable shall have the rights set forth in Part B, Section 1.

3.  The parties agree in the course of negotiating definitive Transaction documents that they will use commercially reasonable efforts to agree on a provision giving Equitable the right, at

Equitable's sole option, to recapture the reinsured business upon the occurrence of an Adverse Change of Control or the initiation of a Delinquency proceeding involving CLIC or its successor, as the case may be (pursuant to any assignment permitted hereunder), taking into account Equitable's reasonable concerns for security, and CLIC's reasonable profit expectations.

D. <u>Agreements Regarding Trusts</u>

1. The Reserve Trust agreement will provide the following:

   a. Future net premiums (as defined in the Reinsurance Agreement to be entered into in the Transaction) will be paid into the Reserve Trust.

   b. Equitable has the unconditional right to draw assets from the Reserve Trust account upon providing notice to the trustee of withdrawal, with a copy to CLIC.

   c. Equitable and CLIC will agree by contract to draw such assets only for purposes of paying or reimbursing payment of then current claims and claims expenses under the reinsured business.

   d. Equitable will agree by contract that if it breaches its covenant and withdraws funds from the Reserve Trust in excess of amounts required for the payment of current claims or claims expenses, or if Equitable withdraws funds from the Reserve Trust in error, such excess amounts shall be maintained in a segregated asset account as required by New York Reg. 102 until returned by Equitable to the Reserve Trust (which it shall be contractually obligated to do).

   e. Equitable will agree by contract to credit CLIC with the return on the assets held in such segregated asset account at the fixed rate of LIBOR, plus an additional amount to be negotiated in good faith.

   f. Each party's right of offset shall be maintained.

g.    The Reserve Trust will be converted to a
      trust that qualifies under New York Reg. 114
      or other relevant law for credit for
      reinsurance purposes in the event that:

   (i)    Equitable is not able to take credit
          for such reinsurance on any statutory
          financial statement;

   (ii)   CLIC has not provided an alternative
          form of security sufficient to obtain
          statutory credit; and

   (iii)  For avoidance of doubt, the parties
          acknowledge that in this case, the
          Reserve Trust will be funded by CLIC
          based on Equitable's statutory
          reserves.

2.  The Security Trust agreement will provide the
    following:

   a.    Withdrawals from the Security Trust will be
         permitted monthly to fund a claims paying
         account and will be permitted at any time to
         fund the Reserve Trust.  In addition, the
         premium for the AE Treaty and appropriate
         trust expenses will be withdrawn from the
         Security Trust.

   b.    Assets in excess of those required in the
         Reserve Trust will flow automatically to the
         Security Trust.

   c.    Beginning in the first calendar quarter of
         2006, assets held in the Security Trust may
         be withdrawn by CLIC so long as after such
         withdrawal:

      (i)    Total assets in the Reserve Trust and
             the Security Trust combined, divided
             by the Reserves, is no less than the
             minimum "Q(t)," as defined in the
             Credit Support Formula; and

      (ii)   The Credit Support Formula is complied
             with.

   d.    If, during the period 2006 through 2014,
         total assets in the Reserve Trust and the
         Security Trust combined, divided by the
         Reserves, is less than the minimum "Q(t)",
         and there has been a discretionary withdrawal

from the Security Trust within the then current and the previous six (6) calendar quarters, then CLIC will be required to pay into the Security Trust an amount equal to the lesser of:

(i)    the amount needed to satisfy "Q(t)", or

(ii)   the amounts withdrawn during the then current or such previous six (6) calendar quarters with interest at 7%.

e.    Equitable will make withdrawals of Security Trust assets only in the case CLIC fails to pay any reinsurance obligations (as defined in the reinsurance agreement), and will provide the trustee with a certificate from designated officers specifying the reason for the withdrawal.  Such withdrawals will be deposited in the Reserve Trust.

f.    Notwithstanding anything to the contrary herein, if Equitable draws down an LOC posted by CLIC but does not use all of the funds so drawn to pay current claims and claims expenses, CLIC may withdraw the excess LOC funds deposited in the Security Trust by Equitable pursuant to Part A, Section 1(d)(iv)(c), above, from the Security Trust at any time after the effective date of the Transaction, provided that CLIC first posts a LOC to replace the LOC drawn down by Equitable or otherwise provides Credit Support so that the Credit Support Formula is satisfied.

3.    Both agreements will provide the following:

a.    Both the Security Trust and Reserve Trust agreements will provide Equitable with a perfected security interest in Trust assets for the benefit of Equitable.

b.    Any withdrawal of Trust assets by Equitable will be credited against CLIC liabilities on a dollar for dollar basis.

c.    Subject to Part D, Section 1(g), above, Trust assets will be invested at CLIC's direction pursuant to an agreed investment policy, including reasonable provisions regarding

determinability of market value, concentration and similar matters.

E. __Other Agreements__

1. CLIC will not object to or interfere with Equitable's obtaining third-party beneficiary rights to enforce the Surety Bonds against CRUS or CSUS, or any other Surety Bond provider. As a condition to Equitable's going forward with this Transaction, such third party beneficiary rights shall permit Equitable to step into the shoes of CLIC for purposes of enforcing the Surety Bonds. Equitable will assume any risk of New York State tax liability and fines attributable solely to this provision.

2. The AE Treaty will either name Equitable as ceding insurer or will be novated by CLIC and Reinsurer so that Equitable replaces CLIC under the AE Treaty. In either case, Equitable shall assume any reinsurer credit risk and the AE Treaty shall be inuring reinsurance for purposes of the Transaction regardless of whether the reinsurer performs or the AE Treaty continues to be in place, without amendment, in the form negotiated by CLIC. Prior to inception of the AE Treaty, Equitable shall be satisfied that the AE Treaty is enforceable according to its terms, provides Equitable with direct rights, is noncancellable, otherwise provides the coverage expected of such reinsurance, and is provided by a reinsurer having a financial strength rating of "AA" and net worth reasonable in relation to the risk reinsured.

3. At any time during the term of the Transaction, CLIC shall be permitted to assign the reinsurance agreement with Equitable to another member of the Zurich Financial Services Group by way of novation, subject to regulatory approval and Equitable's consent, which shall not be unreasonably withheld.

This Memorandum will apply to successors and assigns as permitted.

/s/   Frank D. Pierson
BY:

CENTRE LIFE INSURANCE
COMPANY

/s/   Stanley Tulin
BY:

THE EQUITABLE LIFE ASSURANCE
SOCIETY OF THE UNITED STATES

# Exhibit A
## Credit Support Formula

CLIC has satisfied the Credit Support Formula so long as:

$$Equity(t) \geq max[C(t), Z(t) - LC(t) - T(t)]$$

It is understood that when applying these formulas, there will be no double counting of assets and capital.

Where:

$R(t) =$     GAAP audited reserve (disabled life + active life, net of inuring re including XOLRe) at time t
$F(t) =$     Reserve coverage ratio at time t, as shown in Exhibit A1
$D(t) =$     Asset discount factor at time t, as calculated below
$M(t) =$     Maximum trigger amount at time t, as shown in Exhibit A1
$LC(t) =$   Letter of credit with Equitable as beneficiary
$X(t) =$     Excess of loss reinsurance ("XOLRe") credit at time t
$T(t) =$     Total amount in Trust Funds - R(t) at time t
$Z(t) =$     The amounts as shown in Exhibit A1
$Q(t) =$     The amounts as shown in Exhibit A1

$$C(t) = [max\{min\{R(t)(F(t)+1),M(t)\} - R(t),0) - T(t) - X(t) - LC(t)]D(t)$$

$$K(t) = C(t) + T(t) + LC(t) + X(t), \text{ "Total Credit Support"}$$

$$ME(t) = max[C(t)/D(t), Z(t) - LC(t) - T(t)]$$

$$Equity(t) = sum \ of \ N(t,i) + VOBA(t) \ (of \ this \ transaction) - T(t) \ [to \ the \ extent \ to \ avoid \ any \ double \ counting]$$

$$X(t) = min\{min[R(t)(1+F(t)),M(t)] - B(t), L(t)\}$$

Where:
$L(t) =$ limit of XOLRe – ceded incurred losses under XOLRe
$B(t) =$ remaining XOLRe retention, i.e., "Retention Account" Balance (sections A+B), at time t

$$D(t) = sum \ of \ d(t,i)N(t,i)/sum \ of \ N(t,i)$$

Where:

$N(t,i) =$ net worth of CLIC and Qualified Surety Bond Provider at time t
$d(t,i) =$ the discount factor for CLIC and Qualified Surety Bond Provider based on its S&P Financial Strength Rating as follows:

| | |
|---|---|
| AA/AA- | 1.8 |
| A+ | 2.5 |
| A | 8.0 |

EXHIBIT A1

| EOY | M(t) ($millions) | Q(t) | F(t) | Z(t) ($millions) |
|------|------|------|------|------|
| 2000 | 2,500 | N/A | 0.800 | 500 |
| 2001 | 2,500 | N/A | 0.800 | 500 |
| 2002 | 2,500 | N/A | 0.770 | 500 |
| 2003 | 2,500 | N/A | 0.740 | 500 |
| 2004 | 2,500 | N/A | 0.710 | 500 |
| 2005 | 2,500 | N/A | 0.680 | 500 |
| 2006 | 2,450 | 125% | 0.650 | 500 |
| 2007 | 2,400 | 120% | 0.620 | 500 |
| 2008 | 2,350 | 115% | 0.590 | 500 |
| 2009 | 2,250 | 113% | 0.560 | 500 |
| 2010 | 2,150 | 110% | 0.530 | 500 |
| 2011 | 2,050 | 108% | 0.500 | 500 |
| 2012 | 1,950 | 106% | 0.500 | 500 |
| 2013 | 1,900 | 104% | 0.500 | 500 |
| 2014 | 1,800 | 102% | 0.500 | 500 |
| 2015 | 1,650 | 100% | 0.500 | 500 |
| 2016 | 1,550 | 100% | 0.500 | 500 |
| 2017 | 1,450 | 100% | 0.480 | 500 |
| 2018 | 1,350 | 100% | 0.460 | 500 |
| 2019 | 1,200 | 100% | 0.440 | 500 |
| 2020 | 1,100 | 100% | 0.420 | 500 |
| 2021 | 1,000 | 100% | 0.400 | 500 |
| 2022 | 900 | 100% | 0.380 | 500 |
| 2023 | 800 | 100% | 0.360 | 500 |
| 2024 | 700 | 100% | 0.340 | 500 |
| 2025 | 600 | 100% | 0.320 | 500 |
| 2026 | 550 | 100% | 0.300 | 500 |
| 2027 | 450 | 100% | 0.280 | 500 |
| 2028 | 400 | 100% | 0.260 | 500 |
| 2029 | 200 | 100% | 0.240 | 500 |
| 2030 | 200 | 100% | 0.220 | 500 |
| 2031 | N/A | 100% | 0.200 | - |
| 2032 | N/A | 100% | 0.200 | - |
| 2033 | N/A | 100% | 0.200 | - |
| 2034 | N/A | 100% | 0.200 | - |
| 2035 | N/A | 100% | 0.200 | - |
| 2036 | N/A | 100% | 0.200 | - |
| 2037 | N/A | 100% | 0.200 | - |
| 2038 | N/A | 100% | 0.200 | - |
| 2039 | N/A | 100% | 0.200 | - |
| 2040 | N/A | 100% | 0.200 | - |

5

# RESERVE TRUST AGREEMENT

Dated as of

July 1, 2000

by and among

Centre Life Insurance Company

as Grantor

and

The Equitable Life Assurance Society of the United States

as Beneficiary

and

The Bank of New York

as Trustee

# TABLE OF CONTENTS

Page

| | | |
|---|---|---|
| Section 1. | Deposit of Assets to the Reserve Trust Account. | 2 |
| Section 2. | Withdrawal of Assets from the Reserve Trust Account. | 5 |
| Section 3. | Redemption, Investment and Substitution of Assets. | 7 |
| Section 4. | The Income Account. | 10 |
| Section 5. | Right to Vote Assets. | 10 |
| Section 6. | Additional Rights and Duties of the Trustee. | 11 |
| Section 7. | The Trustee's Compensation, Expenses and Indemnification. | 14 |
| Section 8. | Resignation of the Trustee. | 15 |
| Section 9. | Termination of the Reserve Trust Account. | 16 |
| Section 10. | Definitions. | 16 |
| Section 11. | Governing Law. | 19 |
| Section 12. | Successors and Assigns. | 19 |
| Section 13. | Severability. | 20 |
| Section 14. | Entire Agreement. | 20 |
| Section 15. | Amendments. | 20 |
| Section 16. | Notices, etc. | 20 |
| Section 17. | Headings. | 21 |
| Section 18. | Counterparts. | 22 |

## EXHIBITS

A - Investment Policies
B - Claims Notice

# RESERVE TRUST AGREEMENT

RESERVE TRUST AGREEMENT, dated as of July 1, 2000 (the "Agreement"), by and among Centre Life Insurance Company, an incorporated insurance company organized and existing under the laws of and domiciled in the Commonwealth of Massachusetts (hereinafter the "Grantor"), The Equitable Life Assurance Society of the United States, a stock insurance company organized and existing under the laws of and domiciled in the State of New York (such insurer and its successors by operation of law, including, without limitation, any liquidator, rehabilitator, receiver or conservator thereof, being hereinafter referred to as the "Beneficiary"), and The Bank of New York, a New York banking corporation as trustee and as secured party, for the benefit of the Beneficiary (such bank, in its capacity as trustee, as secured party and as securities intermediary, being referred to as the "Trustee").

## W I T N E S S E T H:

WHEREAS, the Grantor and the Beneficiary have entered into a certain reinsurance agreement, dated as of July 1, 2000, whereby the Grantor, as reinsurer, has agreed to reinsure a certain book of the individual disability income insurance business of the Beneficiary as cedant (hereinafter referred to as the "CLIC Reinsurance Agreement");

WHEREAS, the Beneficiary desires the Grantor to secure and provide for payments by the Grantor to the Beneficiary of all amounts at any time and from time to time owing under or in connection with the CLIC Reinsurance Agreement up to an amount equal to the Reserve Amount;

WHEREAS, the Grantor desires to establish with the Trustee a trust account (the "Reserve Trust Account") and transfer to the Trustee for deposit in the Reserve Trust Account Assets (as hereinafter defined) in order to secure and to fund payments under or in connection with the CLIC Reinsurance Agreement up to an amount equal to the Reserve Amount;

WHEREAS, the Trustee has agreed to act as Trustee hereunder and, in accordance with the terms hereof, to hold such Assets in trust in the Reserve Trust Account on the terms herein set forth;

NOW, THEREFORE, for and in consideration of the premises and for other good and valuable consideration, the receipt of which is hereby acknowledged, the Parties hereby agree as follows:

**Section 1.**    <u>Deposit of Assets to the Reserve Trust Account.</u>

(a)    Concurrently with the execution and delivery of this Agreement, the Grantor hereby establishes a Reserve Trust Account and the Trustee hereby accepts the Reserve Trust Account herein created and declared upon the terms provided herein and shall administer the Reserve Trust Account as Trustee, and with respect to the security interest granted in Section 1(f) hereof, as secured party for the exclusive benefit of the Beneficiary. The Grantor shall establish and the Trustee shall maintain the Reserve Account as a securities account at The Bank of New York, which shall act as securities intermediary (the "Securities Intermediary") with regard to the Reserve Trust Account. The creation of the Reserve Trust Account as a securities account does not and is not intended to in any way limit the Grantor's ability hereunder to deposit into the Reserve Trust Account any Eligible Securities. The Reserve Trust Account shall be subject to withdrawal by the Beneficiary and upon request of the Grantor as provided herein. The Trustee and its lawfully appointed successors are authorized and shall have power to receive such cash, securities and property as from time to time may be transferred or remitted to or vested in the Trustee or placed under the Trustee's possession and control, and to hold, invest, reinvest, manage and dispose of the same for the uses and purposes and in the manner and according to the provisions hereinafter set forth. All such trusteed assets at all times shall be maintained as a trust account, separate and distinct from all other assets of the Trustee, and shall be continuously maintained by the Trustee.

(b)    The Grantor or the Beneficiary shall transfer to the Trustee, for deposit to the Reserve Trust Account, on the date hereof, cash and shall transfer to the Trustee, for deposit to the Reserve Trust Account, such other assets as it may from time to time be required to deposit by this Agreement or otherwise (all such assets actually received in the Reserve Trust Account and proceeds thereof as well as amounts transferred under Section 4(a) and reinvestments thereof are herein referred to individually as an "Asset" and collectively as the "Assets").

(c)    The Grantor hereby represents, warrants and covenants (i) that any Assets transferred by the Grantor to the Trustee for deposit to the Reserve Trust Account will be in such form that the Beneficiary may, upon satisfaction of the conditions set forth in Section 2, and the Trustee, upon written direction by the Beneficiary may, negotiate any such Assets without consent or signature from the Grantor or any Person other than a Depository (as such term is hereinafter defined) in accordance with the terms of this Agreement; and (ii) that all Assets transferred by the Grantor to the Trustee for deposit to the Reserve Trust will consist only of cash (United States legal tender) and Eligible Securities (as hereinafter defined).

(d)    Five Business Days after the end of each calendar quarter the Grantor shall provide the Trustee and the Beneficiary with a statement setting forth the Reserve Amount for the end of the quarter just ended (the "Reserve Amount Statement"). At year end

-2-

valuation dates, the Reserve Amount shall be subject to an audit as to reserve adequacy by the Grantor's independent accounting firm. At interim quarter end dates, the Reserve Amount Statement shall include either: (i) a representation from the Grantor that there have been no material changes to the actuarial assumptions (*e.g.*, morbidity, mortality, lapse, interest etc.) or methodology used in calculating the aggregate Reserve Amount since the prior year-end audit or (ii) a statement from the Grantor's independent accounting firm, which may be based on a limited scope review, that following such changes, made in accordance with generally accepted standards of actuarial practice, the reserves under the new reserve basis or methodology remain adequate. If at the end of any calendar quarter the current fair market value of the Assets in the Reserve Trust Account shown on the Trustee's Valuation Report for the end of that quarter is less than the Reserve Amount shown in the Reserve Amount Statement for the end of that quarter, the Grantor shall within ten (10) Business Days after the delivery of the Valuation Report deposit or cause to be deposited additional Assets into the Reserve Trust Account such that the fair market value of the Assets at the end of the calendar quarter, after giving effect to such additional deposit, is at least equal to the Reserve Amount. The Grantor shall provide to the Trustee and the Beneficiary certification, signed by a designated officer of the Grantor, of the Grantor's good faith belief that following the deposit of Assets under this Section 1(d), the requirements of this Section 1(d) shall have been met.

(e)    All Assets in the Reserve Trust Account shall be valued at their current fair market value in U.S. dollars as determined by the Trustee in its sole discretion exercised in a reasonable manner as described below. Within 10 Business Days after the end of each month the Trustee shall send to the Beneficiary and the Grantor a written report regarding the valuation of the Assets at the end of such month (the "Valuation Report"). Each report shall include a fair market value valuation of all Assets in the Trust Account in accordance with the asset prices provided by the market makers or such other appropriate independent sources of valuation as recommended in writing to the Trustee by the Grantor's investment manager or, in their absence, by an independent nationally recognized pricing service to which the Trustee subscribes in the normal conduct of its business (*e.g.*, Interactive Data, Merrill Lynch, Bloomberg, etc.). The Trustee shall not be liable for incorrect fair market value of Assets caused by the use of inaccurate or erroneous prices provided by such pricing services or sources. If the price is not available as set forth above, the Trustee can obtain the price by retaining, at the expense of the Grantor and pursuant to the written recommendation of the Grantor's investment manager, a major independent securities valuation firm to appraise the value of such Assets. If the Grantor or the Beneficiary disputes the fair market value of the Assets in the Reserve Trust Account as set forth in the Valuation Report, then within ten Business Days following receipt of the Valuation Report, the Grantor or the Beneficiary, as the case may be, will notify the other party of its dispute regarding the valuation (the "Valuation Dispute Notice"). The Valuation Dispute Notice shall contain sufficient information to support the disputing party's valuation. The Trustee shall not be a party to any dispute between the Grantor and Beneficiary

-3-

relating to the valuation of Assets set forth in the Valuation Report, but shall be provided with a copy of any Valuation Dispute Notice delivered by the Grantor or Beneficiary under this provision. The non-disputing party has five Business Days from the receipt of the Valuation Dispute Notice to agree with the disputing party's valuation or provide its own reasonable valuation of the specific Assets in dispute (the "Asset Response"). During no more than four Business Days after the Asset Response, the parties to the dispute will continue to work to resolve the disagreement, failing which they shall disclose to each other their final and last best proposal ("Proposal" hereinafter defined) no later than the end of such four Business Day period. For purposes hereof, a "Proposal" of a party to the dispute shall consist of the valuation correction and related information supporting the valuation correction. If no resolution of disagreements is reached on or prior to the Business Day following such four Business Days, the parties to the dispute will on such next following Business Day submit their final and last best Proposal (previously disclosed to the other party as provided above) to arbitration by a major independent securities valuation firm, the identity of which shall be mutually agreed, and the parties to the dispute will abide by the result of such arbitration, which arbitration process shall require the arbitrator to select one of the two final and last best Proposals and to render its opinion regarding the reasonableness of the parties' actions for purposes of the next sentence. The cost of such arbitration shall be borne by the party who delivered the Valuation Dispute Notice if it rejects a reasonable Asset Response and otherwise the cost shall be shared equally by the Beneficiary and the Grantor. To the extent feasible, and at the joint written direction of the Grantor and the Beneficiary the Trustee shall adopt the valuation methodology underlying the valuation adopted in arbitration or agreed to by the Beneficiary and the Grantor.

Pending resolution of any dispute with respect to valuation of Assets, the Grantor and Beneficiary will continue to follow the requirements of this Agreement based on the Trustee's Valuation Report as submitted. Upon resolution of any dispute regarding the valuation, the Grantor will deposit into the Reserve Trust Account any additional Assets as may be required, and the Trustee will take the action hereunder that it would otherwise have been required to take, if any.

(f)    In order to secure the timely and complete payment and performance of each and all of the Grantor's Obligations, the Grantor hereby grants to the Trustee, as agent of and as secured party for the exclusive benefit of the Beneficiary, a security interest in the Grantor's right, title and interest in and to the Reserve Trust Account and the Assets. The Trustee, as entitlement holder for the benefit of the Beneficiary of all rights associated with the Assets and the Reserve Trust Account, shall have control of the Assets and the Reserve Trust Account for the purpose of perfecting the interest granted hereby. The Grantor hereby authorizes the Beneficiary to file or to instruct the Trustee to file UCC-1 Financing Statements with respect to the Reserve Trust Account and the Assets for which such a financing statement is appropriate, and hereby appoints the Beneficiary as attorney-in-fact for the purpose of sign-

ing Grantor's name on any such financing statements.  The Trustee shall at the written direction of the Beneficiary, file the completed UCC-1 Financing Statements delivered to the Trustee by the Beneficiary with respect to the Reserve Trust Account and the Assets.

**Section 2.**    **Withdrawal of Assets from the Reserve Trust Account.**

(a)    The Beneficiary shall have the right, at any time and from time to time, without Grantor's consent, to withdraw from the Reserve Trust Account by providing notice to the Trustee of such withdrawal (the "Withdrawal Notice"), with a copy to the Grantor, such amounts as are specified in such Withdrawal Notice.  The Withdrawal Notice may designate a third party (the "Designee") to whom amounts specified therein shall be delivered.  The Beneficiary need present no statement or document in addition to a Withdrawal Notice in order to withdraw any Assets; nor is such right of withdrawal or any other provision of this Agreement subject to any conditions or qualifications.

(b)    The Grantor shall have the right, from time to time but no more than five times per calendar week, to request withdrawal of such Assets or amounts from the Reserve Trust as are reasonably necessary to pay Obligations under the CLIC Reinsurance Agreement and deposit such amounts in a Claims Paying Account designated in the Claims Notice.  The Grantor shall give the Beneficiary and the Trustee notice of such withdrawal request (the "Claims Notice") in the form annexed hereto as <u>Exhibit B</u>.  If the amount requested by the Grantor (the "Requested Claim Amount") is equal to or less than the Maximum Withdrawal Amount set forth on the Claims Notice (and calculated as specified in the Claims Notice), the Beneficiary shall be deemed to have approved such request on the date the Claims Notice is submitted by or on behalf of the Grantor to the Trustee and the Trustee shall honor the Claims Notice without further act.  In addition, the Grantor may, at any time and from time to time within a calendar quarter, request one or more withdrawals of amounts or Assets not to exceed on a cumulative quarterly basis a "special claims amount" (which at the inception of this Agreement shall be $20 million, or such other amount as may thereafter be agreed in writing by the Grantor and the Beneficiary); such notice shall be delivered to the Beneficiary and the Trustee and shall state the amount and the reason for such withdrawal (the "Special Claims Notice"), which request shall be deemed to have been approved, unless the Beneficiary shall indicate in writing to the Grantor and the Trustee its disapproval of such request within five (5) Business Days following receipt by the Beneficiary of the Special Claims Notice setting forth such request.  The Beneficiary agrees that the Grantor shall deliver to the Trustee written notice of such written approval if no such disapproval is received by the Grantor within such five Business Day period.  Upon receipt of a Claims Notice or Special Claims Notice approved by the Beneficiary, or deemed approved under this Section 2(b), the Trustee shall deliver such Assets or the proceeds thereof to a Claims Paying Account designated in such notice.

(c)    Following receipt from the Beneficiary or the Grantor (as the case may be) of a Withdrawal Notice or a Claims Notice, Excess Notice or a Special Claims Notice for which the Grantor has delivered to the Trustee a notice of approval by the Beneficiary as set forth above, and in accordance with Section 2(a), (b) or (d) the Trustee shall promptly take any and all steps necessary to transfer, absolutely and unequivocally, all right, title and interest to the Assets or amounts specified in such Withdrawal Notice, Claims Notice, Excess Notice or Special Claims Notice and shall deliver such Assets or amounts as specified in such Withdrawal Notice or Claims Notice, Excess Notice or Special Claims Notice. The Trustee shall be protected in relying conclusively upon any written demand, instruction, direction, acknowledgment, statement, notice, resolution, request, consent, order, certificate, report, appraisal, opinion, telegram, cablegram, facsimile, radiogram, letter, or other communication (collectively, "Communications") of the Beneficiary or the Grantor for any such withdrawal that on its face conforms to the requirements of this Agreement. The Beneficiary or the Grantor, as the case may be, shall execute a receipt evidencing the delivery of Assets or amounts when required in the normal and customary transaction of the business of banking.

(d)    If at the end of any calendar quarter the current fair market value of the Assets in the Reserve Trust Account as shown on the Trustee's Valuation Report as of the month just ended is more than the Reserve Amount as shown in the Reserve Amount Statement for the quarter just ended (such excess amount is the "Excess"), upon receipt of written notice from the Grantor, with a copy to the Beneficiary from time to time during the quarter in which the Valuation Report is delivered ("Excess Notice"), the Trustee shall deposit the amount specified in such Excess Notice into the Security Trust Account in the manner directed by the Excess Notice, so long as the cumulative amount requested during the quarter including the current amount does not exceed the Excess for the quarter just ended. The Trustee shall promptly take any and all steps necessary to deliver such excess amounts and shall so deliver such amounts at the end of the fifth Business Day after receipt of each Excess Notice.

(e)    The Trustee shall allow no substitutions or withdrawals of any Asset from the Reserve Trust Account, except as set forth in Sections 2 and 3 of this Agreement or in accordance with Section 9 hereof.

(f)    Without limiting any other provision of this Agreement, the Trustee shall have no responsibility whatsoever to determine that any Assets withdrawn from the Reserve Trust Account pursuant to this Section 2 will be used and applied in the manner contemplated by this Agreement.

(g)    Upon receipt of a notice from the Beneficiary (the "Special Withdrawal Notice"), the Reserve Trust Account and this Agreement shall automatically be amended and reformed to incorporate the provisions required by New York Insurance Department Regulation 114 (11 NYCRR Part 126.5) then in effect as may have been amended from time to time,

-6-

or similar regulation in effect in such other state as is identified in the Special Withdrawal Notice, and the Grantor, Beneficiary and Trustee agree to execute any further amendments in order to permit the Beneficiary to take credit for the CLIC Reinsurance Agreement (such amended and reformed Reserve Trust Agreement being the "Statutory Trust"); *provided, however*, that if the credit for reinsurance requirements of the state identified in the Special Withdrawal Notice can be satisfied by funding the Statutory Trust with less than all of the Assets in the Reserve Trust Account, the Trustee shall create a separate trust account (the "Special Trust Account") that shall be funded to the extent set forth in the Special Withdrawal Notice, and such Special Trust Account shall be subject to the provisions applicable to a Statutory Trust as well as other provisions of this Agreement to the extent not in conflict with such statutory requirements.  The Grantor shall, within 10 Business Days after receipt of the Special Withdrawal Notice, deposit such additional amounts as may be necessary so that the current fair market value of the Assets on deposit on the date the Statutory Trust is created is at least equal to the Beneficiary's reported statutory reserves calculated as required by New York insurance law and regulations thereunder (unless a lesser amount is required to be held in a Special Trust Account in order to comply with the credit for reinsurance rules of another state identified in the Special Withdrawal Notice).

(h)    Subject to the terms of this Agreement, at the time any amount becomes payable or Asset becomes transferable by the Trustee from the Reserve Trust Account, such payment or transfer shall be effected in accordance with the Grantor's written instructions contained in a Claims Notice or Special Claims Notice or, if no such instructions are received by the Trustee at least 24 hours prior to the time set for such payment or transfer or a Withdrawal Notice is received from the Beneficiary, as follows:  (i) first from any cash in the Reserve Trust Account; (ii) then, from the proceeds of the sale by the Trustee of any or all of the debt obligations in the Reserve Trust Account (commencing with those obligations closest in maturity to the date in question); (iii) then, from any other Assets in the Reserve Trust Account.

**Section 3.    <u>Redemption, Investment and Substitution of Assets</u>.**

(a)    The Trustee shall surrender for payment all maturing Assets and all Assets called for redemption and deposit the proceeds of any such payment to the Reserve Trust Account.

(b)    For purposes of this paragraph (i) "Substitute Assets" means Eligible Securities owned by the Grantor or held by the Trustee under the Security Trust Agreement and identified in a Substitution notice; (ii) "Current Assets" means Assets identified in the same Substitution notice that are held by the Trustee in the Reserve Trust Account at the time of a Substitution; (iii) "Substitution" means the act of simultaneously (that is, on the same day and by the same Substitution notice) depositing Substitute Assets and withdrawing Current Assets;

(iv) "Substitution Notice" means a request for Substitution that identifies specific Substitute Assets and Current Assets to be Substituted, warrants that the current fair market value of the Substitute Assets is not less than the current fair market value of the Current Assets, and sets forth the status of the proposed Substitution under each of the Approval Triggers as defined in paragraph (1) below; (v) "Substitution Dispute" means a dispute between the Grantor and the Beneficiary as to whether a proposed Substitution qualifies under any one or more of the criteria specified below that is initiated by notice from the Beneficiary to the Grantor and the Trustee; and (vi) "Substitution Dispute Notice" means the Beneficiary's notice of Substitution Dispute delivered to the Trustee and Grantor.

From time to time, so long as no Substitution Dispute is awaiting resolution with respect to either the Reserve Trust Account or the Security Trust Account, the Grantor may deliver a Substitution Notice to the Trustee and the Beneficiary to request a Substitution, subject to the following procedures:

(i)     The following procedures apply to Substitutions not involving Substitute Assets that are held by the Trustee under the Security Trust Agreement:

The "Approval Triggers" for each proposed Substitution are as follows, based on the fair market value of Current Assets as reported in the last Valuation Report, and for triggers (II) and (III) cumulatively for Substitutions in both the Reserve Trust Account and the Security Trust Account:  (I) $50 million in a single proposed Substitution, (II) $75 million aggregate in all proposed Substitutions pending on the day a Substitution Notice is delivered, and (III) $150 million aggregate in completed and pending Substitutions in each calendar quarter; pending means a Substitution Notice was delivered but the Substitution has either not yet been effected or it has been effected subject to reversal, and is inclusive of the current proposed Substitution.

(A)     If a proposed substitution is for an amount that does not exceed any of the Approval Triggers, the Trustee shall effect the proposed Substitution unless there is a currently pending Substitution Dispute.  If, within five (5) Business Days following receipt of a Substitution Notice proposing such a Substitution, the Beneficiary delivers a Substitution Dispute Notice, the amount withdrawn that is in dispute shall be redeposited (or if the Substitution has not yet been effected it shall not be effected).

(B)     If a proposed Substitution exceeds Approval Trigger (I) or (II) but does not exceed Approval Trigger (III), then the Substitution shall be effected by the Trustee on the sixth Business Day after receipt of the Substitution Notice unless the Beneficiary, prior thereto, has delivered a Substitution Dis-

pute Notice, in which case the Substitution shall be limited to the amount not in dispute.

      (C)    If a proposed Substitution is for an amount that exceeds Approval Trigger (III), it shall not be effected unless the Beneficiary determines, in its reasonable discretion, that the current fair market value of the Substitute Assets is not less than the current fair market value of the Current Assets. The Beneficiary will use its best efforts to make such determination expeditiously, depending on the availability of information about the investments, and promptly to notify the Grantor of the time involved.

      (D)    For situations in which valuation information is difficult to obtain from independent sources, the Beneficiary shall promptly provide the Grantor notice of the additional time the Beneficiary needs to review a requested Substitution, and the Grantor will not be unreasonable in extending any applicable response period.

      (ii)    For Substitutions involving Substitute Assets owned by the Trustee under the Security Trust Agreement, only the procedures set forth in clauses (i)(1)(C) and (i)(1)(D) above shall apply, regardless of the value of the Current Assets, and no more than one such Substitution shall be effected in any month.

      (iii)    In connection with a Substitution hereunder, if the Beneficiary's failure to timely object to such Substitution is a deemed approval of such Substitution, then the Beneficiary agrees that, upon the expiration of the period within which it may object, the Grantor shall deliver to the Trustee written notice of the Beneficiary's approval if no required written disapproval is received by the Grantor prior to the expiration of such period.

      (iv)    A Substitution Dispute shall be resolved by the arbitration mechanism in Section 1(e).

      (v)    Except as set forth in Section 1(e), the Trustee shall have no responsibility whatsoever to determine the value of Current Assets or Substitute Assets, or that Substitute Assets constitute Eligible Securities or to determine if any proposed Substitution is for an amount in excess of any applicable Approval Trigger.

      (c)    From time to time the Grantor may direct the Trustee in writing (an "Investment Order") to invest or reinvest cash or Eligible Securities held in the Reserve Trust Account in accordance with the Investment Policies set forth in Exhibit A. The Grantor agrees that all investments and substitutions of securities referred to in this paragraph or paragraph (b)

of this Section 3 shall be and remain in compliance with the relevant limitations of the applicable insurance laws and the Investment Policies set forth in Exhibit A. The Trustee shall have no responsibility whatsoever to determine that any Assets in the Reserve Trust Account are or continue to be Eligible Securities. The Trustee, based upon Investment Orders from the Grantor or its designee, shall execute Investment Orders and settle securities transactions by itself or by means of an agent or broker retained by the Grantor. The Trustee shall not be responsible for any act, error or omission, or for the solvency, of any investment manager, agent or broker unless such act, error or omission is the result, in whole or in part, of the Trustee's gross negligence, willful misconduct or lack of good faith. The Trustee shall not be responsible for any Loss (as herein defined) suffered by the Beneficiary or the Grantor due to the insolvency of the investment manager, agent or broker.

(d)     The Trustee shall not be liable for any loss, liability, claim or damage paid or incurred ("Loss") by the Reserve Trust Account from any investment, reinvestment, liquidation or substitution pursuant to the terms of this Agreement other than a Loss due to the Trustee's own gross negligence, willful misconduct or lack of good faith. Without limiting any other provision herein, the Trustee shall not be liable for any Loss due to changes in market rates or penalties for early redemption or any other fees, taxes or charges.

**Section 4.     The Income Account.**

(a)     All payments of interest and dividends in respect to Assets in the Trust Account shall be deposited by the Trustee in a separate custody ledger income account (the "Income Account") within the Reserve Trust Account established by the Grantor and maintained by the Trustee at an office of the Trustee in New York City. Any interest, dividend or other income automatically credited on the payment date to the Income Account which is not subsequently received by the Trustee shall be reimbursed by the Grantor to the Trustee and the Trustee may debit the Income Account for this purpose. Pursuant to Section 7(a), the Trustee shall have the right to deduct its compensation and expenses from the Income Account, to the extent due and owing. Any Amounts contained in the Income Account are part of the Assets of the Reserve Trust Account and, as such, are subject to the terms and conditions of this Agreement with respect to the Assets.

**Section 5.     Right to Vote Assets.**

The Trustee will transmit to the Grantor and or its designee upon receipt, and will instruct any entities authorized to hold Assets in accordance with the terms hereof to transmit to the Grantor upon receipt, all financial reports, stockholder communications, notices, proxies and proxy soliciting materials received from issuers of Assets, and all information relating to exchange or tender offers received from offerors with respect to such Assets. The Grantor and/or its designee shall have the full unqualified right to vote and execute consents

-10-

and to exercise any and all proprietary rights not inconsistent with this Agreement with respect to any securities or other property forming a part of the Reserve Trust Account.

**Section 6.** <u>**Additional Rights and Duties of the Trustee.**</u>

(a) The Trustee shall, concurrent with delivery of each monthly Valuation Report, deliver a summary of account activity for the month just ended to the Grantor and Beneficiary.

(b) Before accepting any Asset for deposit to the Reserve Trust Account, the Trustee shall determine that such Asset is in such form that the Beneficiary whenever necessary may, or the Trustee upon written direction by the Beneficiary may, negotiate such Asset without consent or signature from the Grantor or any other Person, other than a Depository and the Trustee in accordance with the terms of this Agreement.

(c) The Trustee may deposit any Assets in the Reserve Trust Account in a book-entry account maintained at a Federal Reserve Bank or in depositories such as The Depository Trust Company, the Participants Trust Company, Cedel, and Euroclear (the Federal Reserve Bank and such other depositories being referred to herein as "Depositories"). Assets may be held in the name of a nominee maintained by the Trustee or by any such Depositories.

(d) The Trustee shall accept and may open all mail directed to the Grantor or the Beneficiary in care of the Trustee. The Trustee shall forward all mail to the addressee whether or not opened.

(e) The Trustee shall keep full and complete records of the administration of the Reserve Trust Account. Upon the reasonable written request of the Grantor or the Beneficiary, the Trustee shall promptly permit the Grantor or the Beneficiary, their respective agents, employees or independent auditors to examine, audit, excerpt, transcribe and copy, at their own expense, during the Trustee's normal business hours any books, documents, papers and records relating to the Reserve Trust Account or the Assets.

(f) The Trustee is authorized to follow and rely conclusively upon all Communications (including, without limitation, Investment Orders, Withdrawal Notices and Termination Notices) given by officers, agents and/or employees named in letters and incumbency certificates furnished to the Trustee from time to time by the Grantor or the Beneficiary and by attorneys-in-fact acting under written authority furnished to the Trustee by the Grantor or the Beneficiary (collectively "Instructions"), including Instructions given by letter, facsimile transmission or electronic media, if the Trustee reasonably believes such Instructions to be genuine and to have been signed, sent or presented by the proper party or parties. The Trustee shall not incur any liability to anyone resulting from actions taken by the Trustee in reliance in good

-11-

faith on such Instructions.  The Trustee shall not incur any liability in executing Instructions prior to receipt by it of (i) notice of the revocation of the written authority of the individual(s) named therein or (ii) notice from any officer, agent or employee of the Grantor or the Beneficiary named in a letter or incumbency certificate delivered hereunder prior to receipt by it of a more current certificate.

(g)    The duties and obligations of the Trustee shall only be such as are specifically set forth in this Agreement, as it may from time to time be amended in accordance with the terms hereof, and no implied duties or obligations shall be read into this Agreement against the Trustee.  The Trustee shall be liable only for its own gross negligence, willful misconduct or bad faith.  In no event shall the Trustee be liable (i) for acting in accordance with or relying upon any instruction, notice, demand, certificate or document contemplated by and given in accordance with this Agreement from the Grantor or the Beneficiary, (ii) for any consequential, punitive or special damages, (iii) for the acts or omissions of its nominees, unless the Trustee chose such person without due care, or (iv) for an amount in excess of the value of the Assets, valued as of the most recent valuation report.

(h)    No provision of this Agreement shall require the Trustee to take any action which, in the Trustee's reasonable judgment, would result in any violation of this Agreement or any provision of law.

(i)    The Trustee may confer with counsel of its selection in relation to matters arising under this Agreement and shall, upon demand, be indemnified and held harmless from and against any and all Losses by the Grantor hereunder for any actions taken, omitted or suffered by it in connection with this Agreement or under any transaction contemplated hereby in good faith without gross negligence or willful misconduct and in accordance with opinion of such counsel.  The opinion of such law firm shall be full and complete authority and protection for the Trustee with respect to any action taken, suffered or omitted by it in good faith and in accordance with the opinion of such law firm.

(j)    Subject to the requirement of good faith, reasonableness and the lack of gross negligence or willful misconduct, the Trustee shall be protected in acting upon any Communications (including, without limitation, any Investment Order or Instructions) reasonably believed by the Trustee to be genuine and to have been signed, sent or presented by the proper party or parties.  All notices to the Trustee (unless otherwise provided therein) shall be deemed to be effective when actually received by a responsible officer of the Trustee.

(k)    Whenever, in the administration of the Reserve Trust Account created by this Agreement, the Trustee shall reasonably deem it necessary or desirable that a matter be proved or established prior to taking, suffering or omitting any action thereunder, subject to the requirement of reasonableness, good faith and lack of gross negligence and willful miscon-

-12-

duct, such matter (unless other evidence in respect thereof be herein specifically prescribed) may be deemed to be conclusively proved and established by a statement or certificate signed by or on behalf of the Grantor and/or the Beneficiary and delivered to the Trustee and such certificate shall be full warrant to the Trustee for any action taken, suffered or omitted by it on reliance thereon, subject to this paragraph, but in its discretion exercised in a reasonable manner, the Trustee may in lieu thereof accept other evidence of the fact or matter or may require such other or additional evidence as it may deem reasonable.

(l)    Except when otherwise expressly provided in this Agreement and subject to the requirement of reasonableness, good faith and lack of gross negligence or willful misconduct, any Communications (including, without limitation, any Investment Order or Instructions) to be delivered or furnished by the Grantor or the Beneficiary shall be sufficient to be delivered or furnished in the name of the Grantor or the Beneficiary by such officer or officers of the Grantor or the Beneficiary as may be designated in a certificate, resolution or letter of advice by such party. Written notice of such designation by the Grantor shall be filed with the Trustee. The Trustee shall be protected in acting upon any Communications (including, without limitation, any Investment Order or Instruction) made by such officer or agent of the Grantor or the Beneficiary with respect to the authority conferred on it.

(m)    Notwithstanding anything to the contrary provided herein, the Trustee is not responsible for any Losses resulting from reasons or causes beyond its control, including without limitation, nationalization, expropriation, currency restrictions, acts of war, terrorism, insurrection, revolution, civil unrest, riots or strikes, nuclear fusion or fission or acts of God.

(n)    The Parties acknowledge that nothing in this Agreement shall obligate the Trustee to extend credit, grant financial accommodation or otherwise advance moneys for the purpose of making any payments or part thereof or otherwise carrying out any Instructions, including, without limitation, any Investment Order.

(o)    In the event of any reasonable ambiguity or uncertainty hereunder or in any notice, instruction or other communication received by the Trustee hereunder, the Trustee may, in its reasonable discretion, refrain from taking any action other than retain possession of the Assets, unless the Trustee receives written instructions, signed by the Grantor and the Beneficiary, which eliminate such ambiguity or uncertainty. In the event of any dispute between or conflicting claims by or among the Grantor and the Beneficiary and/or any other person or entity with respect to any Assets, the Trustee shall be entitled, in its reasonable discretion, to refuse to comply with any and all claims, demands or instructions with respect to such Assets, other than a "Withdrawal Notice," so long as such dispute or conflict shall continue, and the Trustee shall not be or become liable in any way for such failure or refusal to comply with such conflicting claims, demands or instructions. The Trustee shall be entitled to refuse to act until, in its reasonable discretion, either (i) such conflicting or adverse claims or demands

-13-

shall have been determined by a final order, judgment or decree of a court of competent juris-diction, which order, judgment or decree is not subject to appeal, or settled by agreement be-tween the conflicting parties as evidenced in a writing satisfactory to the Trustee or (ii) the Trustee shall have received security or an indemnity satisfactory to it sufficient to hold it harmless from and against any and all Losses which it may incur by reason of so acting. The Trustee may, in addition, elect, in its reasonable discretion, to commence an interpleader action or seek other judicial relief or orders as it may deem, in its sole discretion, if necessary. The costs and expenses (including reasonable attorney's fees and expenses) incurred in connection with such proceeding shall be paid by, and shall be deemed an obligation of, the Grantor.

(p)    The Trustee may execute any of the trusts or powers hereunder or per-form any duties hereunder either directly or by or through agents or attorneys, provided that the Trustee shall not be responsible for any misconduct or negligence on the part of any agent or attorney appointed with due care by it hereunder.

(q)    The Securities Intermediary agrees (as set forth in Section 2(a) hereof) that the Beneficiary need present no statement or document in addition to a Withdrawal Notice in order to withdraw Assets, nor is such a right of withdrawal subject to any conditions, quali-fications or further consents.

(r)    The Securities Intermediary hereby waives any right of counterclaim, bankers lien, liens or perfection rights as securities intermediary with respect to the Assets, the proceeds thereof and the Reserve Trust Account.

Section 7.    **The Trustee's Compensation, Expenses and Indemnification.**

(a)    The Grantor, upon receipt of an invoice from the Trustee to the Grantor and without offset to the Beneficiary's interest, (i) shall pay the Trustee, as compensation for its services under this Agreement, a fee computed at rates determined by the Trustee from time to time and communicated in writing to the Grantor and (ii) shall pay or reimburse the Trustee for all of the Trustee's expenses and disbursements in connection with its duties under this Agreement (including reasonable attorneys' fees and expenses and reasonable accounting and consulting fees and expenses), except any such expense or disbursement as may arise from the Trustee's negligence, willful misconduct or lack of good faith. The Trustee shall be entitled to deduct its compensation and expenses from payments of dividends and interest in respect of the Assets held in the Income Account as provided in Section 4 of this Agreement.

(b)    The Grantor hereby indemnifies the Trustee for, and holds it harmless against, any Losses (including reasonable attorneys' fees and expenses and reasonable consult-ing and accountants' fees and expenses) incurred or paid (other than as a result of the Trustee's gross negligence, willful misconduct or lack of good faith), arising out of or in connection with

-14-

the performance of its duties and obligations under this Agreement, including without limitation any Loss arising out of or in connection with the status of the Trustee in connection with the performance of its duties and any nominee as the holder of record of any of all of the Assets. The Grantor hereby acknowledges that the foregoing indemnities shall survive the resignation of the Trustee or the termination of this Agreement.

(c)    No Assets shall be withdrawn from the Reserve Trust Account or used in any manner for paying compensation to, or reimbursement or indemnification of, the Trustee except as set forth in Section 4.

(d)    The Trustee hereby waives any and all rights of offset, counterclaim and recoupment against the Beneficiary and Reserve Trust Account, and waives any lien (statutory or otherwise) that it may assert against the Reserve Trust Account.

## Section 8.    Resignation of the Trustee.

(a)    The Trustee may resign at any time by giving not less than 90 days' written notice thereof to the Beneficiary and to the Grantor, such resignation to become effective on the acceptance of appointment by a successor trustee and the transfer to such successor trustee of all Assets in the Reserve Trust Account in accordance with paragraph (b) of this Section 8. The Grantor and the Beneficiary jointly also may remove the Trustee at any time, without assigning any reason therefore, on fifteen (15) days' prior written notice thereof to the Trustee.

(b)    Upon receipt of the Trustee's notice of resignation or notice to the trustee of removal, the Grantor and the Beneficiary shall promptly appoint a successor trustee. Any successor trustee shall be a bank that is a member of the Federal Reserve System or chartered in the State of New York and shall not be a parent, a subsidiary or an affiliate of the Grantor or any Beneficiary. If a successor Trustee has not accepted such appointment within 30 days after the notice of resignation or removal, the Trustee may, in its sole discretion, apply at the expense of the Grantor to a court of competent jurisdiction for the appointment of a successor Trustee or for other appropriate relief. The costs and expenses (including reasonable attorney's fees and expenses) incurred by the Trustee in connection with such proceeding shall be paid by, and be deemed an obligation of, the Grantor. Upon the acceptance of the appointment as trustee hereunder by a successor trustee, such successor trustee shall succeed to and become vested with all the rights, powers, privileges and duties of the Trustee, and the Trustee shall be discharged from any future duties and obligations under this Agreement, but the Trustee shall continue after its resignation to be entitled to the benefits of the indemnities provided herein for a Trustee.

-15-

Section 9.      <u>Termination of the Reserve Trust Account.</u>

(a)   The Reserve Trust Account and this Agreement, except for the indemnities provided herein, which shall survive termination, may be terminated, other than pursuant to an order of a court having jurisdiction, only after (i) the Beneficiary has given the Trustee written notice of its intention to terminate the Reserve Trust Account (the "Notice of Intention"), and (ii) the Trustee has given the Grantor the written notice specified in paragraph (b) of this Section 9.  The Notice of Intention shall specify the date on which the notifying Party intends the Reserve Trust Account to terminate (the "Proposed Date").

(b)   Within ten (10) Business Days following receipt by the Trustee of the Notice of Intention, the Trustee shall give written notification (the "Termination Notice") to the Beneficiary and the Grantor of the date (the "Termination Date") on which the Reserve Trust Account shall terminate.  The Termination Date shall be (a) the Proposed Date (or if not a Business Day, the next Business Day thereafter), if the Proposed Date is at least 30 days but no more than 45 days subsequent to the date the Termination Notice is given; (b) 30 days subsequent to the date the Termination Notice is given (or if not a Business Day, the next Business Day thereafter), if the Proposed Date is less than 30 days subsequent to the date the Termination Notice is given; or (c) 45 days subsequent to the date the Termination Notice is given (or if not a Business Day, the next Business Day thereafter), if the Proposed Date is more than 45 days subsequent to the date the Termination Notice is given.

(c)   On the Termination Date, after satisfaction of any outstanding Withdrawal Notices, or deduction of amounts required to satisfy any outstanding disputed Withdrawal Notice, and upon receipt of written certification of the Beneficiary that no Obligations of the Grantor remain unsatisfied, the Trustee shall transfer any Assets remaining in the Reserve Trust Account to the Grantor, at which time all duties and obligations of the Trustee with respect to such Assets shall cease.

Section 10.   <u>Definitions.</u>

Except as the context shall otherwise require, the following terms shall have the following meanings for all purposes of this Agreement (the definitions to be applicable to both the singular and the plural forms of each term defined if both such forms of such term are used in this Agreement):

The term "Agreement" shall mean the Reserve Trust Agreement by and among Centre Life Insurance Company and The Equitable Life Assurance Society of the United States and The Bank of New York.

The term "Asset Response" shall have the meaning specified in Section 1(e).

-16-

The term "Assets" shall have the meaning specified in Section 1(b).

The term "Beneficiary" shall mean The Equitable Life Assurance Society of the United States.

The term "Business Day" shall mean any day on which the offices of the Trustee in New York are open for business and shall refer to a full business day.

The term "Claims Notice" shall have the meaning specified in Section 2(b).

The term "Claims Paying Account" shall mean the "Claims Revolving Account" as defined in the CLIC Reinsurance Agreement or any other account agreed to by the Beneficiary and the Grantor.

The term "CLIC Reinsurance Agreement" shall mean the reinsurance agreement, dated as of July 1, 2000, by and between the Grantor and the Beneficiary, whereby the Grantor, as reinsurer, has agreed to reinsure a certain book of the individual disability income insurance business of the Beneficiary as cedant.

The term "Communications" shall have the meaning specified in Section 2(c).

The term "Credit Support Agreement" shall mean the credit support agreement between the Grantor and the Beneficiary, dated as of the date hereof.

The term "Current Asset" shall have the meaning specified in Section 3(b).

The term "Depositories" shall have the meaning specified in Section 6(c).

The term "Designee" shall have the meaning specified in Section 2(a).

The term "Eligible Securities" shall mean and include any and all securities (including entitlements in and to such securities) and other investments that are permitted under applicable New York insurance law as admitted assets in the preparation of the annual statement filed by the Grantor, other than real estate and foreign investments, and permitted pursuant to the Investment Policies attached hereto as Exhibit A. Eligible Securities may include (i) to the extent the Grantor must deposit amounts pursuant to Section 1(d), Letters of Credit for a period of no longer than 60 days and up to an aggregate amount equal to no more than 5% of the Reserve Amount and (ii) to the extent the Grantor must deposit or maintain additional amounts pursuant to Section 2(g), Letters of Credit in an amount equal to such additional amount.

The term "Excess" shall have the meaning specified in Section 2(d)

The term "Grantor" shall mean Centre Life Insurance Company.

The term "Income Account" shall have the meaning specified in Section 4.

The term "Instructions" shall have the meaning specified in Section 6(f).

The term "Letters of Credit" shall mean one or more irrevocable standby letters of credit guaranteeing the Grantor's obligations to the Beneficiary under the CLIC Reinsurance Agreement which is issued by a major national or international commercial bank with a senior unsecured debt rating of "A+ / A1" or better and Tier 1 Capital (common stockholders equity, plus qualifying, noncumulative, perpetual preferred stock, plus minority interests in equity accounts) at least five (5) times the amount of the letters of credit obtained from such bank.

The term "Loss" shall have the meaning specified in Section 3(d).

The term "Net Premiums" shall have the meaning ascribed thereto in the CLIC Reinsurance Agreement.

The term "Notice of Intention" shall have the meaning specified in Section 9(a).

The term "Obligations" shall mean, with respect to the CLIC Reinsurance Agreement, any and all amounts due and payable to the Beneficiary as defined and explicitly set forth in the CLIC Reinsurance Agreement.

The term "Person" shall mean and include an individual, a corporation, a limited liability company, a partnership, an association, a trust, an unincorporated organization or a government or political subdivision thereof.

The term "Proposal" shall have the meaning specified in Section 1(e).

The term "Proposed Date" shall have the meaning specified in Section 9(a).

The term "Reserve Amount" shall mean the amount of gross reserves and other liabilities or contra assets attributable to the liabilities of the Grantor under the CLIC Reinsurance Agreement, calculated each calendar quarter in accordance with generally accepted accounting principles in the United States as reflected in CLIC's financial statements.

The term "Reserve Amount Statement" shall have the meaning specified in Section 1(d).

The term "Reserve Trust Account" shall mean the trust account established pursuant to this Agreement.

-18-

The term "Security Trust Account" shall mean the account established pursuant to the Security Trust Agreement, dated the date hereof, by and among the Grantor, the Beneficiary and the Trustee.

The term "Special Claims Notice" shall have the meaning specified in Section 2(b).

The term "Special Withdrawal Notice" shall have the meaning specified in Section 2(g).

The term "Statutory Trust" shall have the meaning specified in Section 2(g).

The term "Substitute Assets" shall have the meaning specified in Section 3(b).

The term "Substitution" shall have the meaning specified in Section 3(b).

The term "Substitution Dispute" shall have the meaning specified in Section 3(b).

The term "Termination Date" shall have the meaning specified in Section 9(b).

The term "Termination Notice" shall have the meaning specified in Section 9(b).

The term "Trustee" shall mean The Bank of New York.

The term "Valuation Dispute Notice" shall have the meaning specified in Section 1(e).

The term "Valuation Report" shall have the meaning specified in Section 1(e).

The term "Withdrawal Notice" shall have the meaning specified in Section 2(a).

Section 11.    **Governing Law.**

This Agreement and the Reserve Trust Account shall be governed by and construed in accordance with the internal laws of the State of New York.

Section 12.    **Successors and Assigns.**

No Party may assign this Agreement or any of its obligations hereunder without the prior written consent of the other Parties; *provided, however*, that this Agreement shall inure to the benefit of and bind those who, by operation of law, become successors to the Par-

-19-

ties, including, without limitation, any liquidator, rehabilitator, receiver or conservator and any successor, merged or consolidated entity; and *provided, further*, that, in the case of the Trustee, the successor trustee is eligible to be a trustee under the terms hereof.

**Section 13.    Severability.**

   In the event that any provision of this Agreement shall be declared invalid or unenforceable by a court having jurisdiction, such invalidity or unenforceability shall not effect the validity or enforceability of the remaining portions of this Agreement.

**Section 14.    Entire Agreement.**

   This Agreement constitutes the entire agreement among the Parties, and there are no understandings or agreements, conditions or qualifications regarding the rights and obligations of the Trustee which are not fully expressed in this Agreement.

**Section 15.    Amendments.**

   This Agreement may be modified or otherwise amended, and the observance of any term of this Agreement may be waived, only if such modification, amendment or waiver is in writing and signed by all of the Parties.

**Section 16.    Notices, etc.**

   Unless otherwise provided in this Agreement, all Communications (including, without limitation, any Investment Orders or Instructions) required or permitted to be given or made under the terms hereof shall be in writing and shall be deemed to have been duly given or made (a) (i) when delivered personally, (ii) when made or given by telecopier, or (iii) in the case of International Priority Mail (Federal Express), upon the expiration of three days after any Communication shall have been deposited in International Priority Mail (Federal Express) for transmission or upon receipt thereof, whichever shall first occur and (b) when addressed as follows:

   To the Grantor:
        Centre Life Insurance Company
        One Chase Manhattan Plaza
        New York, NY 10005
        Attention: President

with a copy to:
        Zurich Centre Group
        One Chase Manhattan Plaza
        New York, NY  10005
        Attention:  General Counsel

To the Beneficiary:
        The Equitable Life Assurance Society
         of the United States
        1290 Avenue of the Americas
        New York, NY  10019
        Attention:  Chief Actuary

with a copy to:
        The Equitable Life Assurance Society
         of the United States
        1290 Avenue of the Americas
        New York, NY  10019
        Attention:  General Counsel

If to the Trustee:
        The Bank of New York
        101 Barclay Street, Floor 21 West
        New York, NY  10286
        Attn:  Insurance Trust and Escrow Unit

Each Party may from time to time designate a different address for Communications (including, without limitation, Investment Orders) by giving written notice of such change to the other Parties.  All Communications relating to the Beneficiary's approval of the Grantor's authorization to substitute Assets and to the termination of the Reserve Trust Account shall be in writing.

**Section 17.**  <u>**Headings**</u>.

The headings of the sections and the Table of Contents have been inserted for convenience of reference only, and shall not be deemed to constitute a part of this Agreement.

-21-

**Section 18.** <u>Counterparts</u>.

This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall constitute an original, but such counterparts together shall constitute one and the same agreement.

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed and delivered by their respective officers thereunto duly authorized as of the date first above written.

THE EQUITABLE LIFE ASSURANCE
SOCIETY OF THE UNITED STATES

By _____
    Name:
    Title:


CENTRE LIFE INSURANCE COMPANY

By _____
    Name:
    Title:


THE BANK OF NEW YORK, AS TRUSTEE

By _____
    Name:
    Title:


THE BANK OF NEW YORK, AS
SECURITIES INTERMEDIARY

By: _____
    Name:
    Title:


-24-

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed and delivered by their respective officers thereunto duly authorized as of the date first above written.

THE EQUITABLE LIFE ASSURANCE
SOCIETY OF THE UNITED STATES

By:  _____
Name:
Title:

CENTRE LIFE INSURANCE COMPANY

By:  _____
Name: Frank O Pierson
Title: CE O

THE BANK OF NEW YORK, AS TRUSTEE

By:  _____
Name:
Title:

THE BANK OF NEW YORK, AS
SECURITIES INTERMEDIARY

By:  _____
Name:
Title:

-24-

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed and delivered by their respective officers thereunto duly authorized as of the date first above written.

EQUITABLE LIFE ASSURANCE SOCIETY
OF THE UNITED STATES

By: _____
    Name:
    Title:

CENTRE LIFE INSURANCE COMPANY

By: _____
    Name:
    Title:

THE BANK OF NEW YORK, AS TRUSTEE

By: _____
    Name: STEPHEN M. BRUCE
    Title: ASSISTANT VICE PRESIDENT

THE BANK OF NEW YORK, AS
SECURITIES INTERMEDIARY

By: _____
    Name: STEPHEN M. BRUCE
    Title: ASSISTANT VICE PRESIDENT

-24-

**EXHIBIT A**

Investment policies

[See attached]

# CENTRE

## *Summary Of Fixed Income Investment Guidelines – ELAS Trust*

|  | Govt/Agncy | AAA | AA | A | BBB | <BBB |
|---|---|---|---|---|---|---|
| Single Issuer | 100%/25% | 5% | 5% | 2.5% | 2% | 1% |
| Overall | 100%/50% | 100% | 100% | 80% | 15% | 5% |
| Industry (b) | 100%/50% | 20% | 20% | 15% | 5% | 1% |
| Maturity (d) | 30 | 30 | 30 | 30 | 30 | 10 |
| Accept Tranches |  |  |  |  |  |  |
| - Senior | Y | Y | Y | Y | Y | Y |
| - Junior | Y | Y | Y | Y | Y | (a) Y |
| Market Makers (*) | 2 | 2 | 2 | 2 | 2 | 2 |

(*) Minimum number of market makers to be queried for month-end pricing when appropriate and when available.

CENTRE

# CENTRE

## *Summary Of Equity Investment Guidelines - ELAS Trust*

|  | AAA | AA | A | BBB |
|---|---|---|---|---|
| Single Issuer (c) (1) | 5% | 5% | 3% | 2% |
| Overall | (c) | (c) | (c) | (c) |
| Industry (b) | (c) | 20% | (c) | (c) |
| Preferred | Y | Y | Y | Y |
| Acceptable | Y | Y | Y | N |

(1) Single Issuer Limits by Credit Quality apply only if market capitalization is less than 1 billion USD.

Notes:

(a) Only when senior debt is highly rated
(b) For industry spread among multiple ratings, the limit is the weighted average
(c) Combined limit for Equities and Fixed Income

# CENTRE

# CENTRE

## Summary Of Investment Guidelines

- The Investment objectives is to maximize total rate of return and maintain a duration target of the fixed income investments in the Reserve Trust, ("liability assets") are within 2 years of the liabilities subject to practical limits.

- All investments will be "Eligible Securities."

- At least 90% of the Trust assets will be "Acceptable" investments, as set forth in the table. "Acceptable" investments will include:

  A. Publicly-traded debt obligations, subject to the credit quality and allocation restrictions, issued by the following or of the following nature:

    - government issues or agency instruments unconditionally guaranteed by such;
    - state or municipal government issues;
    - issues of supranational organizations in which the United States is a member;
    - corporations, commercial paper, and 144A issues;
    - mortgage-backed pass-through and collateralized mortgage obligations;
    - asset-backed securities, including collateralized bond, debt, and loan obligations;
    - and, commercial mortgage-backed securities.

  B. Publicly traded equity listed on a major exchange, inclusive of preferred equity, subject to the credit quality and allocation restrictions and a maximum invested amount not to exceed (twenty percent of the value of the Trust assets.

- A basket of 10% of the Trust assets can be instruments that don't meet the above "Acceptable" investments, (including unrated securities, private placements, preferred stocks below investment grade, and other alternative investments), but are subject to the definition of "Eligible Securities" as defined in the Trust Agreements.

- All investments will be in US$ or swapped into US$.

- Each publicly traded investment must be capable of being liquidated without significantly affecting its market price.

- Swaps, Options, and Derivatives to facilitate Asset-Liability Management may be employed subject to appropriate regulatory filings and required approvals, including but not limited to a Derivatives Use Plan that may be required by any regulatory authority having jurisdiction over the Reinsurer.

# CENTRE

# CENTRE

**INVESTMENT GUIDELINES:**

**Name:** Derivative Program for ALM

**Business Exposure Definition:** The adverse impact of movements in interest rates, currency exchange rates on the balance sheet and income statements as realized due to mismatches in duration, convexity, credit, etc.

**Primary Program Purpose:**

(I) Protect the value of the Portfolios from movements in interest rates and currency exchange rates.

(II) To achieve (I), CENTRE manages its Portfolios so that they are (within defined limits) duration and currency matched against the corresponding liabilities.

(III) It is not always practical, possible or cost effective to achieve matching without using interest rate or currency derivatives.

(IV) Derivative use will be guided by goal to reduce CENTRE net risk positions of or to better match the Portfolios with the corresponding liabilities.

CENTRE

**CENTRE**

INVESTMENT GUIDELINES:

Derivative Program for ALM

Exposure Measurement Methodology
and Horizon:

Effectiveness measured by reduction in volatility of the NPV of the
assets less liabilities. Interest Rate and Currency Risk exposure will
be measured by the net effective exposure. Credit Risk exposure will
be measured by maximum future expected exposures.

Applied to following Portfolios:

The portfolios of assets invested to meet policyholder obligations. (the
"Portfolios").

Authorized Derivative Products:

Swaps, Forwards, Options, and Futures.

Valuation:

Mark to market values to be provided by at least two swap dealers.
Mark to market frequency will be consistent with Reserve and
Security Trust Agreements

Counterparties:

As set forth in Zurich Risk Policies, counterparties to be restricted
to those of high credit quality, i.e .A or higher.

**CENTRE**

## EXHIBIT B

### Form of Claims Notice

A = Average Weekly Disbursements from Claims Paying Account for the past eight weeks

B = Average Weekly Disbursements from Claims Paying Account for the most recent fiscal quarter

C = Current Claims Paying Account Balance

D = 1.5 x A

E = 2.5 x B

F = greater of zero and (D - C)

G = greater of zero and (E - C)

H = lesser of F & G = Maximum Withdrawal Amount

Requested Claim Amount (Not to Exceed H)

Claims Paying Account # : _____

6

# SECURITY TRUST AGREEMENT

Dated as of

July 1, 2000

by and among

Centre Life Insurance Company

as Grantor

and

The Equitable Life Assurance Society of the United States

as Beneficiary

and

The Bank of New York

as Trustee

# TABLE OF CONTENTS

Page

Section 1.   Deposit of Assets to the Security Trust Account. ................................................. 1

Section 2.   Withdrawal of Assets from the Security Trust Account. ...................................... 4

Section 3.   Redemption, Investment and Substitution of Assets............................................ 6

Section 4.   The Income Account............................................................................................. 8

Section 5.   Right to Vote Assets. ........................................................................................... 9

Section 6.   Additional Rights and Duties of the Trustee. ..................................................... 9

Section 7.   The Trustee's Compensation, Expenses and Indemnification. ........................... 12

Section 8.   Resignation of the Trustee.................................................................................. 13

Section 9.   Termination of the Security Trust Account........................................................ 13

Section 10.  Definitions. ......................................................................................................... 14

Section 11.  Governing Law. .................................................................................................. 17

Section 12.  Successors and Assigns....................................................................................... 17

Section 13.  Severability. ........................................................................................................ 17

Section 14.  Entire Agreement. ............................................................................................... 17

Section 15.  Amendments. ....................................................................................................... 18

Section 16.  Notices, etc.......................................................................................................... 18

Section 17.  Headings.............................................................................................................. 19

Section 18.  Counterparts. ....................................................................................................... 19

## EXHIBITS

A - Investment Policies
B - Authorized Signatories of Beneficiary

## SECURITY TRUST AGREEMENT

SECURITY TRUST AGREEMENT, dated as of July 1, 2000 (the "Agreement"), by and among Centre Life Insurance Company, an incorporated insurance company organized and existing under the laws of and domiciled in the Commonwealth of Massachusetts (hereinafter the "Grantor"), The Equitable Life Assurance Society of the United States, a stock insurance company organized and existing under the laws of and domiciled in the State of New York (such insurer and its successors by operation of law, including, without limitation, any liquidator, rehabilitator, receiver or conservator thereof, being hereinafter referred to as the "Beneficiary"), and The Bank of New York, a New York banking corporation as trustee and as secured party, for the benefit of the Beneficiary (such bank, in its capacity as trustee, as secured party and as securities intermediary, being referred to as the "Trustee").

### WITNESSETH:

WHEREAS, the Grantor and the Beneficiary have entered into a certain reinsurance agreement, dated as of July 1, 2000, whereby the Grantor, as reinsurer, has agreed to reinsure a certain book of the individual disability income insurance business of the Beneficiary as cedant (hereinafter referred to as the "CLIC Reinsurance Agreement"); and

WHEREAS, the Beneficiary desires the Grantor to secure and provide for payments by the Grantor to the Beneficiary of all amounts at any time and from time to time owing under or in connection with the CLIC Reinsurance Agreement up to an amount equal to the Security Amount; and

WHEREAS, the Grantor desires to establish with the Trustee a trust account (the "Security Trust Account") and transfer to the Trustee for deposit in the Security Trust Account Assets (as hereinafter defined) in order to secure and to fund payments under or in connection with the CLIC Reinsurance Agreement up to an amount equal to the Security Amount; and

WHEREAS, the Trustee has agreed to act as Trustee hereunder and, in accordance with the terms hereof, to hold such Assets in trust in the Security Trust Account on the terms herein set forth.

NOW, THEREFORE, for and in consideration of the premises and for other good and valuable consideration, the receipt of which is hereby acknowledged, the parties hereby agree as follows:

Section 1.    Deposit of Assets to the Security Trust Account.

(a) Concurrently with the execution and delivery of this Agreement, the Grantor hereby establishes a Security Trust Account and the Trustee hereby accepts the Security Trust Account herein created and declared upon the terms provided herein and shall administer

the Security Trust Account as Trustee, and with respect to the security interest granted in Section 1(f) hereof, as secured party for the exclusive benefit of the Beneficiary. The Grantor shall establish and the Trustee shall maintain the Security Trust Account as a securities account at The Bank of New York, which shall act as securities intermediary (the "Securities Intermediary") with regard to the Security Trust Account. The creation of the Security Trust Account as a securities account does not and is not intended to in any way limit the Grantor's ability hereunder to deposit into the Security Trust Account any Eligible Securities. The Security Trust Account shall be subject to withdrawal by the Beneficiary and upon the request of the Grantor as provided herein. The Trustee and its lawfully appointed successors are authorized and shall have power to receive such cash, securities and property as the Grantor from time to time may be transferred or remitted to or vested in the Trustee or placed under the Trustee's possession and control, and to hold, invest, reinvest, manage and dispose of the same for the uses and purposes and in the manner and according to the provisions hereinafter set forth. All such trusteed assets at all times shall be maintained as a trust account, separate and distinct from all other assets of the Trustee, and shall be continuously maintained by the Trustee.

(b) The Grantor or the Beneficiary shall transfer to the Trustee, for deposit to the Security Trust Account, on the date hereof, cash and shall transfer to the Trustee, for deposit to the Security Trust Account, such other assets as it may from time to time be required to deposit by this Agreement or otherwise (all such assets actually received in the Security Trust Account and proceeds thereof as well as amounts transferred under Section 4(a) and reinvestments thereof are herein referred to individually as an "Asset" and collectively as the "Assets").

(c) The Grantor hereby represents, warrants and covenants (i) that any Assets transferred by the Grantor to the Trustee for deposit to the Security Trust Account will be in such form that the Beneficiary may, upon satisfaction of the conditions set forth in Section 2, and the Trustee, upon written direction by the Beneficiary may, negotiate any such Assets without consent or signature from the Grantor or any Person other than a Depository (as such term is hereinafter defined) in accordance with the terms of this Agreement; and (ii) that all Assets transferred by the Grantor to the Trustee for deposit to the Security Trust Account will consist only of cash (United States legal tender) and Eligible Securities (as hereinafter defined).

(d) All Assets in the Security Trust Account shall be valued at their current fair market value in U.S. dollars as determined by the Trustee in its sole discretion exercised in a reasonable manner as described below. Within 10 Business Days after the end of each month the Trustee shall send to the Beneficiary and the Grantor a written report regarding the valuation of the Assets at the end of such month (the "Valuation Report"). Each report shall include a fair market value valuation of all Assets in the Security Trust Account in accordance with the asset prices provided by the market makers or such other appropriate independent sources of valuation as recommended in writing to the Trustee by the Grantor's investment manager or, in their absence, by an independent nationally recognized pricing service to which the Trustee subscribes in the normal conduct of its business (e.g., Interactive Data, Merrill Lynch, Bloomberg, etc.). The Trustee shall not be liable for incorrect fair market value of Assets caused by

-2-

the use of inaccurate or erroneous prices provided by such pricing services or sources. If the price is not available as set forth above, the Trustee can obtain the price by retaining, at the expense of the Grantor and pursuant to the written recommendation of the Grantor's investment manager, a major independent securities valuation firm to appraise the value of such Assets. If the Grantor or the Beneficiary disputes the fair market value of the Assets in the Security Trust Account as set forth in the Valuation Report, then within ten Business Days following receipt of the Valuation Report, the Grantor or the Beneficiary, as the case may be, will notify the other party of its dispute regarding the valuation (the "Valuation Dispute Notice"). The Valuation Dispute Notice shall contain sufficient information to support the disputing party's valuation. The Trustee shall not be a party to any dispute between the Grantor and Beneficiary relating to the valuation of Assets set forth in the Valuation Report, but shall be provided with a copy of any Valuation Dispute Notice delivered by the Grantor or Beneficiary under this provision. The non-disputing party has five Business Days from the receipt of the Valuation Dispute Notice to agree with the disputing party's valuation or provide its own reasonable valuation of the specific Assets in dispute (the "Asset Response"). During no more than four Business Days after the Asset Response, the parties to the dispute will continue to work to resolve the disagreement, failing which they shall disclose to each other their final and last best proposal ("Proposal" as hereinafter defined) no later than the end of such four Business Day period. For purposes hereof, a "Proposal" of a party to the dispute shall consist of the valuation correction and related information supporting the valuation correction. If no resolution of disagreements is reached on or prior to the Business Day following such four Business Days, the parties to the dispute will on such next following Business Day submit their final and last best Proposal (previously disclosed to the other party as provided above) to arbitration by a major independent securities valuation firm, the identity of which shall be mutually agreed, and the parties to the dispute will abide by the result of such arbitration, which arbitration process shall require the arbitrator to select one of the two final and last best Proposals and to render its opinion regarding the reasonableness of the parties' actions for purposes of the next sentence. The cost of such arbitration shall be borne by the party who delivered the Valuation Dispute Notice if it rejects a reasonable Asset Response and otherwise the cost shall be shared equally by the Beneficiary and Grantor. To the extent feasible, and at the joint written direction of the Grantor and the Beneficiary, the Trustee shall adopt the valuation methodology underlying the valuation adopted in arbitration or agreed to by the Beneficiary and the Grantor.

Pending resolution of any dispute with respect to valuation of Assets, the Grantor and Beneficiary will continue to follow the requirements of this Agreement based on the Trustee's Valuation Report as submitted. Upon resolution of any dispute regarding the valuation, the Trustee will take the action hereunder that it would otherwise have been required to take, if any.

(e) In order to secure the timely and complete payment and performance of each and all of the Grantor's Obligations, the Grantor hereby grants to the Trustee as agent of and as secured party for the exclusive benefit of the Beneficiary, a security interest in the Grantor's right, title and interest in the Security Trust Account and the Assets. The Trustee, as

entitlement holder for the benefit of the Beneficiary of all rights associated with the Assets and the Security Trust Account, shall have control of the Assets and Security Trust Account for the purpose of perfecting the interest granted hereby and shall issue entitlement orders to the Securities Intermediary as instructed by the Grantor and the Beneficiary in accordance with the terms of this Agreement. The Grantor hereby authorizes the Beneficiary to file or to instruct the Trustee to file UCC-1 Financing Statements with respect to the Security Trust Account and the Assets for which such a financing statement is appropriate, and hereby appoints the Beneficiary as attorney-in-fact for the purpose of signing Grantor's name on any such financing statements. The Trustee shall, at the written direction of the Beneficiary, file the completed UCC-1 Financing Statements delivered to the Trustee by the Beneficiary with respect to the Security Trust Account and the Assets.

**Section 2.    Withdrawal of Assets from the Security Trust Account.**

(a) The Beneficiary shall have the right to withdraw from the Security Trust Account an amount not to exceed Obligations which the Grantor has failed to pay when due under the CLIC Reinsurance Agreement, by providing a notice (the "Withdrawal Notice") to the Trustee, with a copy to the Grantor, (i) specifying the amount or Assets to be withdrawn, and (ii) stating that such withdrawal is reasonably necessary to pay, or reimburse Beneficiary for payment of, amounts that constitute Obligations under the CLIC Reinsurance Agreement which the Grantor has failed to pay when due. The Withdrawal Notice shall be signed by an authorized signatory of the Beneficiary as specified on Exhibit B hereto. Such Withdrawal Notice shall be effective, and shall be honored by the Trustee, on the tenth (10th) Business Day after receipt by the Trustee.

(b) The Grantor shall have the right following three (3) Business Days written notice to the Beneficiary and Trustee (a "Claims Notice") to request withdrawal of such Assets or amounts from the Security Trust Account (i) at any time to be transferred to the Reserve Trust Account, (ii) to pay the premium due with respect to the AE Treaty, (iii) at any time to pay expenses related to the Security Trust Account and the Reserve Trust Account and (iv) to make payments when due of the DAC Tax Amount. The Claims Notice shall specify the purpose for which the withdrawal is being made. The Trustee shall treat each Claims Notice as a direction of the Beneficiary to withdraw the amount of Assets indicated thereby from the Security Trust Account. The Trustee shall deliver such amount or Assets or the proceeds thereof, to the Reserve Trust Account in the case of withdrawals under clause (i), to a reinsurer under the AE Treaty, as designated by Grantor, or to pay expenses of the Trustee, in the case of withdrawals under clause (iv).

(c) Additionally, at any time and from time to time on or after January 1, 2006 the Grantor shall have the right to request withdrawals from the Security Trust Account by providing written notice to the Trustee of such request (an "Excess Withdrawal Notice"), with a copy to the Beneficiary, of such Assets or amounts as are specified in such Excess Withdrawal Notice so long as after such withdrawal (1) the amount equal to (A) the sum of (x) the total assets in the Reserve Trust Account as set forth on the most recent Valuation Report

-4-

thereof plus (y) the total Assets in the Security Trust Account as set forth on the most recent Valuation Report thereof divided by (B) the Reserve Amount for the most recent calendar quarter, is not less than the minimum Q(t) (as defined in the Credit Support Formula) and (2) the Grantor is otherwise in compliance with the Credit Support Formula as set forth in the most recent Credit Support Report. The Excess Withdrawal Notice shall include Grantor's representation that after such withdrawal the Grantor is in compliance with the requirements of the Credit Support Formula as set forth in the preceding sentence. The Excess Withdrawal Notice shall be deemed to have been approved, unless the Beneficiary shall indicate in writing to the Grantor and the Trustee that it desires to contest the Grantor's statement as to compliance with the Credit Support Formula within ten (10) Business Days following the receipt by the Beneficiary of the Excess Withdrawal Notice setting forth Grantor's request. The Beneficiary agrees that the Grantor shall deliver to the Trustee written notice of such approval if no such disapproval shall have been received by the Grantor and the Trustee within such ten Business Day period. In addition, if excess Letter of Credit proceeds are deposited into the Security Trust Account and the Grantor is entitled to withdraw such excess in accordance with the Credit Support Memorandum, the Beneficiary shall deliver to the Trustee written notice of the Grantor's right to withdraw and the Grantor may withdraw such excess by delivering written notice to the Trustee ("Excess LOC Withdrawal Notice").

(d) Following receipt from the Beneficiary or the Grantor (as the case may be) of a Withdrawal Notice, a Claims Notice, an Excess Withdrawal Notice or an Excess LOC Withdrawal Notice, and in accordance with Section 2(a), (b) or (c) as applicable, the Trustee shall promptly take any and all steps necessary to transfer, absolutely and unequivocally, all right, title and interest to the Assets or amounts specified in such Withdrawal Notice, Claims Notice, Excess Withdrawal Notice or Excess LOC Withdrawal Notice and shall deliver such Assets or amounts as specified in such Withdrawal Notice, Claims Notice, Excess Withdrawal Notice or Excess LOC Withdrawal Notice. The Trustee shall be protected in relying conclusively upon any written demand, instruction, direction, acknowledgment, statement, notice, resolution, request, consent, order, certificate, report, appraisal, opinion, telegram, cablegram, facsimile, radiogram, letter, or other communication (collectively, "Communications") of the Beneficiary or the Grantor for any such withdrawal that on its face conforms to requirements of this Agreement. The Beneficiary or the Grantor, as the case may be, shall execute a receipt evidencing the delivery of Assets or amounts when required in the normal and customary transaction of the business of banking.

(e) Any amounts withdrawn by the Beneficiary from the Security Trust Account shall be deposited directly into the Reserve Trust Account.

(f) Subject to Sections 2(a), 2(b), 2(c), 2(h) and 3 of this Agreement, in the absence of a Withdrawal Notice, Claims Notice, Excess Withdrawal Notice or Excess LOC Withdrawal Notice, the Trustee shall allow no substitutions or withdrawals of any Asset from the Security Trust Account.

(g)  Without limiting any other provision of this Agreement, the Trustee shall have no responsibility whatsoever to determine that any Assets withdrawn from the Security Trust Account pursuant to this Section 2 will be used and applied in the manner contemplated by this Agreement.

(h)  Subject to the terms of this Agreement, at the time any amount becomes payable or Asset becomes transferable by the Trustee from the Security Trust Account, such payment or transfer shall be effected in accordance with the Grantor's written instructions contained in a Claims Notice, Excess Withdrawal Notice or Excess LOC Withdrawal Notice, or if no such instructions are received by the Trustee at least 24 hours prior to the time set for such payment or transfer or a Withdrawal Notice is received from the Beneficiary, as follows: (i) first from any cash in the Security Trust Account; (ii) then, from the proceeds of the sale by the Trustee of any or all of the debt obligations in the Security Trust Account (commencing with those obligations closest in maturity to the date in question); (iii) then, from any other Assets in the Security Trust Account.

## Section 3.    Redemption, Investment and Substitution of Assets.

(a)  The Trustee shall surrender for payment all maturing Assets and all Assets called for redemption and deposit the proceeds of any such payment to the Security Trust Account.

(b)  For purposes of this paragraph (i) "Substitute Assets" means Eligible Securities owned by the Grantor or held by the Trustee under the Reserve Trust Account and identified in a Substitution notice; (ii) "Current Assets" means Assets identified in the same Substitution notice that are held by the Trustee in the Security Trust Account at the time of a Substitution; (iii) "Substitution" means the act of simultaneously (that is, on the same day and by the same Substitution notice) depositing Substitute Assets and withdrawing Current Assets; (iv) "Substitution Notice" means a request for Substitution that identifies specific Substitute and Current Assets to be Substituted, warrants that the current fair market value of the Substitute Assets is not less than the current fair market value of the Current Assets, and sets forth the status of the proposed Substitution under each of the Approval Triggers as defined in paragraph (1) below; (v) "Substitution Dispute" means a dispute between the Grantor and the Beneficiary as to whether a proposed Substitution qualifies under any one or more of the criteria specified below that is initiated by notice from the Beneficiary to the Grantor and the Trustee; and (vi) "Substitution Dispute Notice" means the Beneficiary's notice of Substitution Dispute delivered to the Trustee and Grantor.

From time to time, so long as no Substitution Dispute is awaiting resolution with respect to either the Reserve Trust Account or the Security Trust Account, the Grantor may deliver a Substitution Notice to the Trustee and the Beneficiary to request a Substitution, subject to the following procedures:

(i)    The following procedures apply to Substitutions not involving Substitute Assets that are held by the Trustee under the Reserve Trust Agreement:

The "Approval Triggers" for each proposed Substitution are as follows, based on the fair market value of Current Assets as reported in the last Valuation Report, and for triggers (II) and (III) cumulatively for Substitutions in both the Reserve Trust Account and the Security Trust Account:  (I) $50 million in a single proposed Substitution, (II) $75 million aggregate in all proposed Substitutions pending on the day a Substitution Notice is delivered, and (III) $150 million aggregate in completed and pending Substitutions in each calendar quarter; pending means a Substitution Notice was delivered but the Substitution has either not yet been effected or it has been effected subject to reversal, and is inclusive of the current proposed Substitution.

(A)    If a proposed substitution is for an amount that does not exceed any of the Approval Triggers, the Trustee shall effect the proposed Substitution unless there is a currently pending Substitution Dispute.  If, within five (5) Business Days following receipt of a Substitution Notice proposing such a Substitution, the Beneficiary delivers a Substitution Dispute Notice, the amount withdrawn that is in dispute shall be redeposited (or if the Substitution has not yet been effected it shall not be effected).

(B)    If a proposed Substitution exceeds Approval Trigger (I) or (II) but does not exceed Approval Trigger (III), then the Substitution shall be effected by the Trustee on the sixth Business Day after receipt of the Substitution Notice unless the Beneficiary, prior thereto, has delivered a Substitution Dispute Notice, in which case the Substitution shall be limited to the amount not in dispute.

(C)    If a proposed Substitution is for an amount that exceeds Approval Trigger (III), it shall not be effected unless the Beneficiary determines, in its reasonable discretion, that the current fair market value of the Substitute Assets is not less than the current fair market value of the Current Assets.  The Beneficiary will use its best efforts to make such determination expeditiously, depending on the availability of information about the investments, and promptly to notify the Grantor of the time involved.

(D)    For situations in which valuation information is difficult to obtain from independent sources, the Beneficiary shall promptly provide the Grantor notice of the additional time the Beneficiary needs to review a requested Substitution, and the Grantor will not be unreasonable in extending any applicable response period.

(ii)    For Substitutions involving Substitute Assets held by the Trustee under this Security Trust Agreement, only the procedures set forth in clauses (i)(1)(C) and (i)(1)(D) above shall apply, regardless of the value of the Current Assets, and no more than one such Substitution shall be effected in any month.

-7-

(iii)    In connection with a Substitution hereunder, if the Beneficiary's failure to timely object to such Substitution is a deemed approval of such Substitution, then the Beneficiary agrees that, upon the expiration of the period within which it may object, the Grantor shall deliver to the Trustee written notice of the Beneficiary's approval if no required written disapproval is received by the Grantor prior to the expiration of such period.

(iv)    A Substitution Dispute shall be resolved by the arbitration mechanism in Section 1(e).

(v)    Except as set forth in Section 1(e), the Trustee shall have no responsibility whatsoever to determine the value of Current Assets or Substitute Assets, or that Substitute Assets constitute Eligible Securities, or to determine if any proposed Substitution is for an amount in excess of any applicable Approval Trigger.

(c)    From time to time the Grantor may direct the Trustee in writing (an "Investment Order") to invest or reinvest cash or Eligible Securities held in the Security Trust Account in accordance with the Investment Policies set forth in Exhibit A. The Grantor agrees that all investments and substitutions of securities referred to in this paragraph and paragraph (b) of this Section 3 shall be and remain in compliance with the relevant limitations of the applicable insurance laws and the Investment Policies set forth in Exhibit A. The Trustee shall have no responsibility whatsoever to determine that any Assets in the Security Trust Account are or continue to be Eligible Securities. The Trustee, based upon Investment Orders from the Grantor or its designee, shall execute Investment Orders and settle securities transactions by itself or by means of an agent or broker retained by the Grantor. The Trustee shall not be responsible for any act, error or omission, or for the solvency, of any investment manager, agent or broker unless such act, error or omission is the result, in whole or in part, of the Trustee's gross negligence, willful misconduct or lack of good faith. The Trustee shall not be responsible for any Loss (as herein defined) suffered by the Beneficiary or the Grantor due to the insolvency of the investment manager, agent or broker.

(d)    The Trustee shall not be liable for any loss, liability, claim or damage paid or incurred ("Loss") by the Security Trust Account from any investment, reinvestment, liquidation or substitution pursuant to the terms of this Agreement other than a Loss due to the Trustee's own gross negligence, willful misconduct or lack of good faith. Without limiting any other provision herein, the Trustee shall not be liable for any Loss due to changes in market rates or penalties for early redemption or any other fees, taxes or changes.

Section 4.    **The Income Account.**

All payments of interest and dividends in respect to Assets in the Security Trust Account shall be deposited by the Trustee in a separate custody ledger income account (the "Income Account") within the Security Trust Account established by the Grantor and maintained by the Trustee at an office of the Trustee in New York City. Any interest, dividend or

other income automatically credited on the payment date to the Income Account which is not subsequently received by the Trustee shall be reimbursed by the Grantor to the Trustee and the Trustee may debit the Income Account for this purpose. Pursuant to Section 7(a), the Trustee shall have the right to deduct its compensation and expenses from the Income Account, to the extent due and owing. Any Amounts contained in the Income Account are part of the Assets of the Security Trust Account and, as such, are subject to the terms and conditions of this Agreement with respect to the Assets.

Section 5.    **Right to Vote Assets.**

The Trustee will transmit to the Grantor and or its designee upon receipt, and will instruct any entities authorized to hold Assets in accordance with the terms hereof to transmit to the Grantor upon receipt, all financial reports, stockholder communications, notices, proxies and proxy soliciting materials received from issuers of Assets, and all information relating to exchange or tender offers received from offerors with respect to such Assets. The Grantor and/or its designee shall have the full unqualified right to vote and execute consents and to exercise any and all proprietary rights not inconsistent with this Agreement with respect to any securities or other property forming a part of the Security Trust Account.

Section 6.    **Additional Rights and Duties of the Trustee.**

(a)  The Trustee shall, concurrent with delivery of each monthly Valuation Report, deliver a summary of account activity for the month just ended to the Grantor and the Beneficiary.

(b)  Before accepting any Asset for deposit to the Security Trust Account, the Trustee shall determine that such Asset is in such form that the Beneficiary whenever necessary may, or the Trustee upon written direction by the Beneficiary may, negotiate such Asset without consent or signature from the Grantor or any other Person, other than a Depository and the Trustee in accordance with the terms of this Agreement.

(c)  The Trustee may deposit any Assets in the Security Trust Account in a book-entry account maintained at a Federal Reserve Bank or in depositories such as The Depository Trust Company, the Participants Trust Company, Cedel, and Euroclear (the Federal Reserve Bank and such other depositories being referred to herein as "Depositories"). Assets may be held in the name of a nominee maintained by the Trustee or by any such Depositories.

(d)  The Trustee shall accept and may open all mail directed to the Grantor or the Beneficiary in care of the Trustee. The Trustee shall forward all mail to the addressee whether or not opened.

(e)  The Trustee shall keep full and complete records of the administration of the Security Trust Account. Upon the reasonable written request of the Grantor or the Beneficiary, the Trustee shall promptly permit the Grantor or the Beneficiary, their respective agents, employees or independent auditors to examine, audit, excerpt, transcribe and copy, at their

-9-

own expense, during the Trustee's normal business hours any books, documents, papers and records relating to the Security Trust Account or the Assets.

(f) The Trustee is authorized to follow and rely conclusively upon all Communications (including, without limitation, Investment Orders, Claims Notices, Withdrawal Notices and Termination Notices), given by officers, agents and/or employees named in letters and incumbency certificates furnished to the Trustee from time to time by the Grantor or the Beneficiary and by attorneys-in-fact acting under written authority furnished to the Trustee by the Grantor or the Beneficiary (collectively "Instructions") including Instructions given by letter or facsimile transmission or electronic media, if the Trustee reasonably believes such Instructions to be genuine and to have been signed, sent or presented by the proper party or parties. The Trustee shall not incur any liability to anyone resulting from actions taken by the Trustee in reliance in good faith on such Instructions. The Trustee shall not incur any liability in executing Instructions prior to receipt by it of (i) notice of the revocation of the written authority of the individual(s) named therein or (ii) notice from any officer, agent or employee of the Grantor or the Beneficiary named in a letter or incumbency certificate delivered hereunder prior to receipt by it of a more current certificate.

(g) The duties and obligations of the Trustee shall only be such as are specifically set forth in this Agreement, as it may from time to time be amended in accordance with the terms hereof, and no implied duties or obligations shall be read into this Agreement against the Trustee. The Trustee shall be liable only for its own gross negligence, willful misconduct or bad faith. In no event shall the Trustee be liable (i) for acting in accordance with or relying upon any instruction, notice, demand, certificate or document contemplated by and given in accordance with this Agreement from the Grantor or the Beneficiary, (ii) for any consequential, punitive or special damages, (iii) for the acts or omissions of its nominees, unless the Trustee chose such person without due care, or (iv) for an amount in excess of the value of the Assets, valued as of the most recent valuation report.

(h) No provision of this Agreement shall require the Trustee to take any action which, in the Trustee's reasonable judgment, would result in any violation of this Agreement or any provision of law.

(i) The Trustee may confer with counsel of its selection in relation to matters arising under this Agreement and shall, upon demand, be indemnified and held harmless from and against any and all Losses by the Grantor hereunder for any actions taken, omitted or suffered by it in connection with this Agreement or under any transaction contemplated hereby in good faith without gross negligence or willful misconduct and in accordance with opinion of such counsel. The opinion of such law firm shall be full and complete authority and protection for the Trustee with respect to any action taken, suffered or omitted by it in good faith and in accordance with the opinion of such law firm.

(j) Subject to the requirement of good faith, reasonableness and the lack of gross negligence or willful misconduct, the Trustee shall be protected in acting upon any

-10-

Communications (including, without limitation, any Investment Order or Instructions) reasonably believed by the Trustee to be genuine and to have been signed, sent or presented by the proper party or parties. All notices to the Trustee (unless otherwise provided therein) shall be deemed to be effective when actually received by a responsible officer of the Trustee.

(k) Whenever, in the administration of the Security Trust Account created by this Agreement, the Trustee shall reasonably deem it necessary or desirable that a matter be proved or established prior to taking, suffering or omitting any action thereunder, subject to the requirement of reasonableness, good faith and lack of gross negligence and willful misconduct, such matter (unless other evidence in respect thereof be herein specifically prescribed) may be deemed to be conclusively proved and established by a statement or certificate signed by or on behalf of the Grantor and/or the Beneficiary and delivered to the Trustee and such certificate shall be full warrant to the Trustee for any action taken, suffered or omitted by it on reliance thereon, subject to this paragraph, but in its discretion exercised in a reasonable manner, the Trustee may in lieu thereof accept other evidence of the fact or matter or may require such other or additional evidence as it may deem reasonable.

(l) Except when otherwise expressly provided in this Agreement and subject to the requirement of reasonableness, good faith and lack of negligence or willful misconduct, any Communications (including, without limitation, any Investment Order or Instructions) to be delivered or furnished by the Grantor or the Beneficiary shall be sufficient to be delivered or furnished in the name of the Grantor or the Beneficiary by such officer or officers of the Grantor or the Beneficiary as may be designated in a certificate, resolution or letter of advice by such party. Written notice of such designation by the Grantor or the Beneficiary shall be filed with the Trustee. The Trustee shall be protected in acting upon any Communications (including, without limitation, any Investment Order or Instruction) made by such officer or agent of the Grantor or the Beneficiary with respect to the authority conferred on it.

(m) Notwithstanding anything to the contrary provided herein, the Trustee is not responsible for any Losses resulting from reasons or causes beyond its control, including without limitation, nationalization, expropriation, currency restrictions, acts of war, terrorism, insurrection, revolution, civil unrest, riots or strikes, nuclear fusion or fission or acts of God.

(n) The Parties acknowledge that nothing in this Agreement shall obligate the Trustee to extend credit, grant financial accommodation or otherwise advance moneys for the purpose of making any payments or part thereof or otherwise carrying out any Instructions, including, without limitation, any Investment Order.

(o) In the event of any reasonable ambiguity or uncertainty hereunder or in any notice, instruction or other communication received by the Trustee hereunder, the Trustee may, in its reasonable discretion, refrain from taking any action other than retain possession of the Assets, unless the Trustee receives written instructions, signed by the Grantor and the Beneficiary, which eliminate such ambiguity or uncertainty. In the event of any dispute between or conflicting claims by or among the Grantor and the Beneficiary and/or any other per-

-11-

son or entity with respect to any Assets, the Trustee shall be entitled, in its reasonable discretion, to refuse to comply with any and all claims, demands or instructions with respect to such Assets, so long as such dispute or conflict shall continue, and the Trustee shall not be or become liable in any way for such failure or refusal to comply with such conflicting claims, demands or instructions. The Trustee shall be entitled to refuse to act until, in its reasonable discretion, either (i) such conflicting or adverse claims or demands shall have been determined by a final order, judgment or decree of a court of competent jurisdiction, which order, judgment or decree is not subject to appeal, or settled by agreement between the conflicting parties as evidenced in a writing satisfactory to the Trustee or (ii) the Trustee shall have received security or an indemnity satisfactory to it sufficient to hold it harmless from and against any and all Losses which it may incur by reason of so acting. The Trustee may, in addition, elect, in its reasonable discretion, to commence an interpleader action or seek other judicial relief or orders as it may deem, in its sole discretion, if necessary. The costs and expenses (including reasonable attorney's fees and expenses) incurred in connection with such proceeding shall be paid by, and shall be deemed an obligation of, the Grantor.

(p)  The Trustee may execute any of the trusts or powers hereunder or perform any duties hereunder either directly or by or through agents or attorneys, provided that the Trustee shall not be responsible for any misconduct or negligence on the part of any agent or attorney appointed with due care by it hereunder.

(q)  The Securities Intermediary agrees that it will comply with entitlement orders issued by the Trustee in accordance with the terms of this Agreement, and that such compliance is not subject to any conditions, qualifications or further consents.

(r)  The Securities Intermediary hereby waives any right of counterclaim, bankers lien, liens or perfection rights as securities intermediary with respect to the Assets, the proceeds thereof and the Reserve Trust Account.

**Section 7.    The Trustee's Compensation, Expenses and Indemnification.**

(a)  The Grantor, upon receipt of an invoice from the Trustee to the Grantor and without offset to the Beneficiary's interest, (i) shall pay the Trustee, as compensation for its services under this Agreement, a fee computed at rates determined by the Trustee from time to time and communicated in writing to the Grantor and (ii) shall pay or reimburse the Trustee for all of the Trustee's expenses and disbursements in connection with its duties under this Agreement (including reasonable attorneys' fees and expenses and reasonable accounting and consulting fees and expenses), except any such expense or disbursement as may arise from the Trustee's negligence, willful misconduct or lack of good faith. The Trustee shall be entitled to deduct its compensation and expenses from payments of dividends and interest in respect of the Assets held in the Income Account as provided in Section 4 of this Agreement.

(b)  The Grantor hereby indemnifies the Trustee for, and holds it harmless against, any Losses (including reasonable attorneys' fees and expenses and reasonable consult-

ing and accountants' fees and expenses) incurred or paid (other than as a result of the Trustee's gross negligence, willful misconduct or lack of good faith), arising out of or in connection with the performance of its duties and obligations under this Agreement, including without limitation any Loss arising out of or in connection with the status of the Trustee in connection with the performance of its duties and any nominee as the holder of record of any or all of the Assets. The Grantor hereby acknowledges that the foregoing indemnities shall survive the resignation of the Trustee or the termination of this Agreement.

(c)  No Assets shall be withdrawn from the Security Trust Account or used in any manner for paying compensation to, or reimbursement or indemnification of, the Trustee.

(d)  The Trustee hereby waives any and all rights of offset, counterclaim and recoupment against the Beneficiary and Security Trust Account, and waives any lien (statutory or otherwise) that it may assert against the Security Trust Account.

**Section 8.**     <u>Resignation of the Trustee.</u>

(a)  The Trustee may resign at any time by giving not less than 90 days' written notice thereof to the Beneficiary and to the Grantor, such resignation to become effective on the acceptance of appointment by a successor trustee and the transfer to such successor trustee of all Assets in the Security Trust Account in accordance with paragraph (b) of this Section 8. The Grantor and the Beneficiary jointly also may remove the Trustee at any time, without assigning any reason therefore, on fifteen (15) days' prior written notice thereof to the Trustee.

(b)  Upon receipt of the Trustee's notice of resignation or notice to the Trustee of removal, the Grantor and the Beneficiary shall promptly appoint a successor trustee. Any successor trustee shall be a bank that is a member of the Federal Reserve System or chartered in the State of New York and shall not be a parent, a subsidiary or an affiliate of the Grantor or the Beneficiary. If a successor Trustee has not accepted such appointment within 30 days after the notice of resignation or removal, the Trustee may, in its sole discretion, apply at the expense of the Grantor to a court of competent jurisdiction for the appointment of a successor Trustee or for other appropriate relief. The costs and expenses (including reasonable attorney's fees and expenses) incurred by the Trustee in connection with such proceeding shall be paid by, and be deemed an obligation of, the Grantor. Upon the acceptance of the appointment as trustee hereunder by a successor trustee, such successor trustee shall succeed to and become vested with all the rights, powers, privileges and duties of the Trustee, and the Trustee shall be discharged from any future duties and obligations under this Agreement, but the Trustee shall continue after its resignation to be entitled to the benefits of the indemnities provided herein for a Trustee.

**Section 9.**     <u>Termination of the Security Trust Account.</u>

(a)  The Security Trust Account and this Agreement, except for the indemnities provided herein, which shall survive termination, may be terminated, other than pursuant to an

-13-

order of a court having jurisdiction, only after (i) the Grantor has given the Trustee written notice of its intention to terminate the Security Trust Account (the "Notice of Intention"), and (ii) the Trustee has given the Beneficiary the written notice specified in paragraph (b) of this Section 9. The Notice of Intention shall specify the date on which the notifying party intends the Security Trust Account to terminate (the "Proposed Date").

(b)  Within ten (10) Business Days following receipt by the Trustee of the Notice of Intention, the Trustee shall give written notification (the "Termination Notice") to the Beneficiary and the Grantor of the date (the "Termination Date") on which the Security Trust Account shall terminate. The Termination Date shall be (a) the Proposed Date (or if not a Business Day, the next Business Day thereafter), if the Proposed Date is at least 30 days but no more than 45 days subsequent to the date the Termination Notice is given; (b) 30 days subsequent to the date the Termination Notice is given (or if not a Business Day, the next Business Day thereafter), if the Proposed Date is less than 30 days subsequent to the date the Termination Notice is given; or (c) 45 days subsequent to the date the Termination Notice is given (or if not a Business Day, the next Business Day thereafter), if the Proposed Date is more than 45 days subsequent to the date the Termination Notice is given.

(c)  On the Termination Date, after satisfaction of any outstanding Withdrawal Notices, or deduction of amounts required to satisfy any outstanding disputed Withdrawal Notices, and upon receipt of certification of the Grantor that the Grantor has no further obligation to maintain the Security Trust Account the Trustee shall transfer any Assets remaining in the Security Trust Account to the Grantor, at which time all duties and obligations of the Trustee with respect to such Assets shall cease.

**Section 10.**     **Definitions.**

Except as the context shall otherwise require, the following terms shall have the following meanings for all purposes of this Agreement (the definitions to be applicable to both the singular and the plural forms of each term defined if both such forms of such term are used in this Agreement):

The term "AE Treaty" shall have the meaning specified in the Credit Support Memorandum (as defined in the Credit Support Agreement).

The term "Agreement" shall mean this Security Trust Agreement by and among Centre Life Insurance Company and Equitable Life Assurance Society of the United States and the Bank of New York.

The term "Asset Response" shall have the meaning specified in Section 1(e).

The term "Assets" shall have the meaning specified in Section 1(b).

The term "Beneficiary" shall mean The Equitable Life Assurance Society of the United States.

-14-

The term "Business Day" shall mean any day on which the offices of the Trustee in New York are open for business and shall refer to a full business day.

The term "Claims Notice" shall have the meaning specified in Section 2(b).

The term "CLIC Reinsurance Agreement" shall mean the reinsurance agreement, dated as of July 1, 2000, by and between the Grantor and the Beneficiary, whereby the Grantor, as reinsurer, has agreed to reinsure a certain book of the individual disability income insurance business of the Beneficiary as cedant.

The term "Communications" shall have the meaning specified in Section 2(c).

The term "Credit Support Agreement" shall mean the credit support agreement between the Grantor and the Beneficiary dated the date hereof.

The "Credit Support Formula" shall mean the formula set forth in Exhibit A to the Credit Support Memorandum (which is attached as Exhibit A to the Credit Support Agreement).

"Credit Support Report" shall have the meaning specified in the Credit Support Agreement.

The term "DAC Tax Amount" shall mean the amount equal to Grantor's increase in federal income tax liability for taxable year 2000 which is solely attributable to the treatment of the Initial Reinsurance Premium (as that term is defined in the CLIC Reinsurance Agreement) as "Net Positive Consideration" pursuant to Section 848 of the Internal Revenue Code of 1986, as amended, and regulations thereunder.

The term "Depositories" shall have the meaning specified in Section 6(c).

The term "Eligible Securities" shall mean and include any and all securities and other investments that are permitted under applicable New York insurance law as admitted assets in the preparation of the annual statement filed by the Grantor, other than real estate and foreign investments, and permitted pursuant to the Investment Policies attached hereto as Exhibit A.

"Excess LOC Withdrawal Notice" shall have the meaning specified in Section 2(c).

"Excess Withdrawal Notice" shall have the meaning specified in Section 2(c).

The term "Grantor" shall mean Centre Life Insurance Company.

The term "Income Account" shall have the meaning specified in Section 4(a).

The term "Instructions" shall have the meaning specified in Section 6(f).

-15-

The term "Investment Orders" shall have the meaning specified in Section 3(b).

The term "Letters of Credit" shall mean one or more irrevocable standby letters of credit guaranteeing the Grantor's obligations to the Beneficiary under the CLIC Reinsurance Agreement which is issued by a major national or international commercial bank with a senior unsecured debt rating of "A+ / A1" or better and Tier 1 Capital (common stockholders equity, plus qualifying, noncumulative, perpetual preferred stock, plus minority interests in equity accounts) at least five (5) times the amount of the letters of credit obtained from such bank.

The term "Loss" shall have the meaning specified in Section 3(d).

The term "Net Premiums" shall have the meaning ascribed thereto in the CLIC Reinsurance Agreement.

The term "Notice of Intention" shall have the meaning specified in Section 9(a).

The term "Obligations" shall mean, with respect to the CLIC Reinsurance Agreement, any and all amounts due and payable to the Beneficiary as defined and explicitly set forth in the CLIC Reinsurance Agreement.

The term "Person" shall mean and include an individual, a corporation, a limited liability company, a partnership, an association, a trust, an unincorporated organization or a government or political subdivision thereof.

The term "Proposal" shall have the meaning specified in Section 1(e).

The term "Proposed Date" shall have the meaning specified in Section 9(a).

The term "Reserve Amount" shall mean the amount of gross reserves and other liabilities or contra assets attributable to the liabilities of the Grantor under the CLIC Reinsurance Agreement, calculated each calendar quarter in accordance with generally accepted accounting principles in the United States as reflected in CLIC's financial statements.

The term "Reserve Trust Account" shall mean the trust account established pursuant to the Reserve Trust Agreement.

The term "Reserve Trust Agreement" shall mean the Reserve Trust Agreement, dated the date hereof by and among the Grantor, the Beneficiary and The Bank of New York, as Trustee.

The term "Security Trust Account" shall mean the trust account established pursuant to this Agreement.

The term "Substitute Assets" shall have the meaning specified in Section 3(b).

The term "Substitution" shall have the meaning specified in Section 3(b).

The term "Substitution Dispute" shall have the meaning specified in Section 3(b).

The term "Termination Date" shall have the meaning specified in Section 9(b).

The term "Termination Notice" shall have the meaning specified in Section 9(b).

The term "Trustee" shall mean The Bank of New York.

The term "Valuation Dispute Notice" shall have the meaning specified in Section 1(e).

The term "Valuation Report" shall have the meaning specified in Section 1(d).

The term "Withdrawal Notice" shall have the meaning specified in Section 2(a).

**Section 11.    <u>Governing Law</u>.**

This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York.

**Section 12.    <u>Successors and Assigns</u>.**

No Party may assign this Agreement or any of its obligations hereunder without the prior written consent of the other Parties; <u>provided</u>, <u>however</u>, that this Agreement shall inure to the benefit of and bind those who, by operation of law, become successors to the Parties, including, without limitation, any liquidator, rehabilitator, receiver or conservator and any successor, merged or consolidated entity; and <u>provided</u>, <u>further</u>, that, in the case of the Trustee, the successor trustee is eligible to be a trustee under the terms hereof.

**Section 13.    <u>Severability</u>.**

In the event that any provision of this Agreement shall be declared invalid or unenforceable by a court having jurisdiction, such invalidity or unenforceability shall not affect the validity or enforceability of the remaining portions of this Agreement.

**Section 14.    <u>Entire Agreement</u>.**

This Agreement constitutes the entire agreement among the Parties, and there are no understandings or agreements, conditions or qualifications regarding the obligations of the Trustee which are not fully expressed in this Agreement.

Section 15.    <u>Amendments</u>.

This Agreement may be modified or otherwise amended, and the observance of any term of this Agreement may be waived, only if such modification, amendment or waiver is in writing and signed by all of the Parties.

Section 16.    <u>Notices, etc</u>.

Unless otherwise provided in this Agreement, all Communications (including, without limitation, any Investment Orders or Instructions) required or permitted to be given or made under the terms hereof shall be in writing and shall be deemed to have been duly given or made (a) (i) when delivered personally, (ii) when made or given by telecopier, or (iii) in the case of International Priority Mail (Federal Express), upon the expiration of three days after any Communication shall have been deposited in International Priority Mail (Federal Express) for transmission or upon receipt thereof, whichever shall first occur and (b) when addressed as follows:

> To the Grantor:
> > Centre Life Insurance Company
> > One Chase Manhattan Plaza
> > New York, NY  10005
> > Attention:  President
>
> with a copy to:
> > Zurich Centre Group
> > One Chase Manhattan Plaza
> > New York, NY  10005
> > Attention:  General Counsel
>
> To the Beneficiary:
> > The Equitable Life Assurance Society of the United States
> > 1290 Avenue of the Americas
> > New York, NY  10019
> > Attention:  Chief Actuary
>
> with a copy to:
> > The Equitable Life Assurance Society of the United States
> > 1290 Avenue of the Americas
> > New York, NY  10019
> > Attention:  General Counsel

-18-

If to the Trustee:
    The Bank of New York
    101 Barclay Street, Floor 21 West
    New York, NY 10286
    Attention: Insurance Trust and Escrow Unit

Each party may from time to time designate a different address for Communications (including, without limitation, Investment Orders) by giving written notice of such change to the other parties. All Communications relating to the Beneficiary's approval of the Grantor's authorization to substitute Assets and to the termination of the Security Trust Account shall be in writing.

**Section 17.    Headings.**

The headings of the sections and the Table of Contents have been inserted for convenience of reference only, and shall not be deemed to constitute a part of this Agreement.

**Section 18.    Counterparts.**

This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall constitute an original, but such counterparts together shall constitute one and the same Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed and delivered by their respective officers thereunto duly authorized as of the date first above written.

THE EQUITABLE LIFE ASSURANCE
SOCIETY OF THE UNITED STATES

By _____
    Name:
    Title:

CENTRE LIFE INSURANCE COMPANY

By: _____
    Name:
    Title:

THE BANK OF NEW YORK, AS TRUSTEE

By _____
    Name:
    Title:

THE BANK OF NEW YORK, AS
SECURITIES INTERMEDIARY

By: _____
    Name:
    Title:

-20-

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed and delivered by their respective officers thereunto duly authorized as of the date first above written.

THE EQUITABLE LIFE ASSURANCE
SOCIETY OF THE UNITED STATES

By _____
     Name:
     Title:

CENTRE LIFE INSURANCE COMPANY

By: _____
     Name: Frank D Pierson
     Title: CEO

THE BANK OF NEW YORK, AS TRUSTEE

By _____
     Name:
     Title:

THE BANK OF NEW YORK, AS
SECURITIES INTERMEDIARY

By: _____
     Name:
     Title:

-20-

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed and delivered by their respective officers thereunto duly authorized as of the date first above written.

EQUITABLE LIFE ASSURANCE SOCIETY
OF THE UNITED STATES

By: _____
    Name:
    Title:

CENTRE LIFE INSURANCE COMPANY

By: _____
    Name:
    Title:

THE BANK OF NEW YORK, AS TRUSTEE

By: _____
    Name: STEPHEN M. BRUCE
    Title: ASSISTANT VICE PRESIDENT

THE BANK OF NEW YORK, AS
SECURITIES INTERMEDIARY

By: _____
    Name: STEPHEN M. BRUCE
    Title: ASSISTANT VICE PRESIDENT

-20-

# EXHIBIT A

## Investment Policies

[See Attached]

# CENTRE

*Summary Of Fixed Income Investment Guidelines - ELAS Trust*

|  | Govt/Agncy | AAA | AA | A | BBB | <BBB |
|---|---|---|---|---|---|---|
| Single Issuer | 100%/25% | 5% | 5% | 2.5% | 2% | 1% |
| Overall | 100%/50% | 100% | 100% | 80% | 15% | 5% |
| Industry (b) | 100%/50% | 20% | 20% | 15% | 5% | 1% |
| Maturity (d) | 30 | 30 | 30 | 30 | 30 | 10 |
| Accept Tranches |  |  |  |  |  |  |
| - Senior | Y | Y | Y | Y | Y | Y |
| - Junior | Y | Y | Y | Y | Y | (a) Y |
| Market Makers (*) | 2 | 2 | 2 | 2 | 2 | 2 |

(*) Minimum number of market makers to be queried for month-end pricing when appropriate and when available.

CENTRE

# CENTRE

## *Summary Of Equity Investment Guidelines - ELAS Trust*

|  | AAA | AA | A | BBB |
|---|---|---|---|---|
| Single Issuer (c) (1) | 5% | 5% | 3% | 2% |
| Overall | (c) | (c) | (c) | (c) |
| Industry (b) | (c) | 20% | (c) | (c) |
| Preferred | Y | Y | Y | Y |
| Acceptable | Y | Y | Y | N |

(1) Single Issuer Limits by Credit Quality apply only if market capitalization is less than 1 billion USD.

Notes:
    (a) Only when senior debt is highly rated
    (b) For industry spread among multiple ratings, the limit is the weighted average
    (c) Combined limit for Equities and Fixed Income

CENTRE

# CENTRE

## Summary Of Investment Guidelines

- The Investment objectives is to maximize total rate of return and maintain a duration target of the fixed income investments in the Reserve Trust, ("liability assets") are within 2 years of the liabilities subject to practical limits.

- All Investments will be "Eligible Securities."

- At least 90% of the Trust assets will be "Acceptable" investments, as set forth in the table. "Acceptable" investments will include:

  A. Publicly-traded debt obligations, subject to the credit quality and allocation restrictions, issued by the following or of the following nature:

    - government issues or agency instruments unconditionally guaranteed by such;
    - state or municipal government issues;
    - issues of supranational organizations in which the United States is a member;
    - corporations, commercial paper, and 144A issues;
    - mortgage-backed pass-through and collateralized mortgage obligations;
    - asset-backed securities, including collateralized bond, debt, and loan obligations; and, commercial mortgage-backed securities.

  B. Publicly traded equity listed on a major exchange, inclusive of preferred equity, subject to the credit quality and allocation restrictions and a maximum invested amount not to exceed twenty percent of the value of the Trust assets.

- A basket of 10% of the Trust assets can be instruments that don't meet the above "Acceptable" investments, (including unrated securities, private placements, preferred stocks below investment grade, and other alternative investments), but are subject to the definition of "Eligible Securities" as defined in the Trust Agreements.

- All investments will be in US$ or swapped into US$.

- Each publicly traded investment must be capable of being liquidated without significantly affecting its market price.

- Swaps, Options, and Derivatives to facilitate Asset-Liability Management may be employed subject to appropriate regulatory filings and required approvals, including but not limited to a Derivatives Use Plan that maybe required by any regulatory authority having jurisdiction over the Reinsurer.

## CENTRE

# CENTRE

**INVESTMENT GUIDELINES:**

**Name:** Derivative Program for ALM

**Business Exposure Definition:** Derivatives used as hedges for Asset Liability Management.

The adverse impact of movements in interest rates, currency exchange rates on the balance sheet and income statements as realized due to mismatches in duration, convexity, credit, etc.

**Primary Program Purpose:**

(I)   Protect the value of the Portfolios from movements in interest rates and currency exchange rates.

(II)  To achieve (I), CENTRE manages its Portfolios so that they are (within defined limits) duration and currency matched against the corresponding liabilities.

(III) It is not always practical, possible or cost effective to achieve matching without using interest rate or currency derivatives.

(IV) Derivative use will be guided by goal to reduce CENTRE net risk positions of or to better match the Portfolios with the corresponding liabilities.

CENTRE

# CENTRE

| | |
|---|---|
| **INVESTMENT GUIDELINES:** | Derivative Program for ALM |
| Exposure Measurement Methodology and Horizon: | Effectiveness measured by reduction in volatility of the NPV of the assets less liabilities. Interest Rate and Currency Risk exposure will be measured by the net effective exposure. Credit Risk exposure will be measured by maximum future expected exposures. |
| Applied to following Portfolios: | The portfolios of assets invested to meet policyholder obligations. (the "Portfolios"). |
| Authorized Derivative Products: | Swaps, Forwards, Options, and Futures. |
| Valuation: | Mark to market values to be provided by at least two swap dealers. Mark to market frequency will be consistent with Reserve and Security Trust Agreements |
| Counterparties: | As set forth in Zurich Risk Policies, counterparties to be restricted to those of high credit quality, i.e .A or higher. |

CENTRE

**EXHIBIT B**

Authorized Signatories of Beneficiary

Kevin Byrne

7

## Uniform Commercial Code - FINANCING STATEMENT - Form UCC - 1
### IMPORTANT - Read instructions before filling out form

| This Financing Statement is presented to a Filing Officer for filing pursuant to the Uniform Commercial Code. | No. of Additional Sheets Presented: | 3. ☐ The debtor is a transmitting utility. | |
|---|---|---|---|
| 1. Debtor(s) (Last Name First) and Address(es):<br><br>Centre Life Insurance Company<br>One Chase Manhattan Plaza<br>New York, New York 10005 | 2 Secured Party(ies) Name(s) and Address(es):<br><br>The Bank of New York, as Agent for Equitable Life Assurance Society of the United States<br>Insurance Trust & Escrow Unit<br>101 Barclay Street<br>New York, New York 10286 | 4. For Filing Officer: | |
| 5. This Financing Statement covers the following types (or items) of property:<br><br>See rider attached hereto as Exhibit A<br><br><br>☒ Products of the Collateral are also covered. | | 6. Assignee(s) of Secured Party and Address(es): | |
| 7. ☐ The described crops are growing or to be grown on:*<br> ☐ The described goods are or are to be affixed to:*<br> ☐ The lumber to be cut or minerals or the like (including oil and gas) is on:*<br><br> * (Describe Real Estate Below) | | 9. Name of Record Owner:<br>The Bank of New York | |

8. Describe Real Estate Here.                    ☐ This statement is to be indexed in the Real Estate Records

| No. & Street | Town or City | County | Section | Block | Lot |
|---|---|---|---|---|---|
| | | | | | |

10. This statement is filed without the debtor's signature to perfect a security interest in collateral (check appropriate box)
  ☒ under a security agreement signed by debtor authorizing secured party to file this statement, or
  ☐ which is proceeds of the original collateral described above in which a security interest was perfected, or
  ☐ acquired after a change of name, identity or corporate structure of the debtor, or ☐ as to which the filing has
    lapsed, or already subject to a security interest in another jurisdiction:
      ☐ when the collateral was brought into the state, or ☐ when the debtor's location was changed to this state.

CENTRE LIFE INSURANCE COMPANY: Equitable Life Assurance      Equitable Life Assurance Company
Society, as attorney-in-fact for Centre Life Insurance Company

By _____      By _____  S. VP + Chief Actuary
Title:  Signature(s) of Debtor(s)      Signature(s) of Secured Party(ies)  Title:

VICE PRESIDENT

STANDARD FORM - FORM UCC-1 - Approved by Secretary of State of New York

4/30/97

MY1UCC1 - 12/29/99 C T System Online

Rider to CLIC / Equitable UCC-1

The securities account maintained with the Bank of New York, as securities intermediary, and designated as the SecurityTrust Account pursuant to the SecurityTrust Agreement dated July  , 2000, by and among Centre Life Insurance Company, as grantor and debtor, The Bank of New York, as Trustee and as secured party for the benefit and on behalf of Equitable Life Assurance Society, as beneficiary, and Equitable Life Assurance Society, as beneficiary; any and all investment property and financial assets credited to the above-described securities account, including, but not limited to, all entitlement rights therein and thereto; and all proceeds and products of the aforementioned collateral.

8

**SURETY BOND,** dated as of January 1, 2000, issued by Centre Solutions (U.S.) Limited, a company organized under the laws of Bermuda (together with its successors and permitted assigns, "Surety"), in favor of Centre Life Insurance Company, a company organized under the laws of the State of Massachusetts ("CLIC").

Surety is an Affiliate (capitalized terms are defined in Section 1 below) of CLIC. CLIC intends to enter into and become obligated under Covered Products. Surety and CLIC desire to maintain the financial condition of CLIC and to assist CLIC in meeting its payment obligations to Counterparties under Covered Products as set forth in this Surety Bond in order to facilitate CLIC's entering into Covered Products.

Accordingly, in consideration of $100.00, receipt of which is hereby acknowledged by Surety, and the benefits accruing to Surety from CLIC's entering into and becoming obligated under Covered Products, the mutual promises contained in this Surety Bond and other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Surety and CLIC hereby unconditionally and irrevocably, but subject to the terms of this Surety Bond, agree as follows:

1. Definitions.

The following terms shall have the following meanings:

"Affiliate" with respect to a Person, means any other Person controlling, controlled by, or under common control with such Person.

"Counterparty" means any Person that is party to, or is entitled to payment or performance by CLIC under, any Covered Product, other than CLIC.

"Covered Product" means any of the following if issued or executed and delivered on or after January 1, 2000: any insurance, reinsurance, surety or derivative contract; any obligation to purchase, repurchase, deliver or sell securities; any obligation to post margin or collateral; any obligation to provide liquidity or otherwise provide funds to any other Person; any other product or instrument similar to any of the foregoing; and any other product or instrument identified as a "Covered Product" in a certificate executed by an authorized officer of Surety.

"Net Worth" means (1) the stockholders' equity determined in accordance with United States generally accepted accounting principles, less (2) goodwill, organizational expenses, non-compete agreements, licenses, patents and other like intangibles.

"Person" means any individual, partnership, limited liability company, corporation, trust, joint stock company, unincorporated organization, joint venture, association, company, business trust or any government or agency or political subdivision of a government.

2. Representation and Warranties. Surety represents and warrants that this Surety Bond has been duly authorized, executed and delivered by Surety and that this Surety Bond constitutes a valid and legally binding obligation of Surety enforceable against Surety in accordance with its terms, subject, as to enforcement, to bankruptcy, insolvency, reorganization and other laws of general applicability relating to or affecting creditors' rights and to general equity principles.

nwo/Surclicsus.doc

3. <u>Net Worth</u>. If at any time the net worth of CLIC is less than the greater of (a) one million United States dollars (US$1,000,000) or (b) the minimum Net Worth required in accordance with applicable insurance law and regulations, Surety will provide to CLIC on a timely basis sufficient funds to make up such shortfall. CLIC obligates itself to notify Surety when either (a) or (b) occur.

4. <u>Liquidity Provision</u>. If CLIC shall have insufficient funds to make any payment required under the terms of any Covered Product, Surety will provide on a timely basis the amount of funds that CLIC needs in order to meet such payment obligation. CLIC obligates itself to notify Surety when it has insufficient funds to make any such payment and the amount of such insufficiency.

5. <u>Waiver of Subrogation</u>. Except as otherwise provided in this Paragraph 5,

(a) Surety waives any and all rights that Surety may have against CLIC as a result of making any payment under this Surety Bond, including, without limitation, any right of subrogation, set off or counterclaim, and

(b) Surety understands and agrees that CLIC shall have no obligations to it as a result of any payment made by Surety to CLIC under this Surety Bond.

Notwithstanding the foregoing provisions of this Paragraph 5,

(i) CLIC shall not (1) pay any dividends respecting any of its equity interests, or (2) purchase, redeem or otherwise acquire for value, any of its equity interests, unless and until, in either case (1) or (2), it shall have paid in full all amounts received by CLIC from Surety pursuant to Paragraph 3 above, plus preferred dividends on such amounts equal to 6% per annum, compounded quarterly, based on a year of 365 days and the actual number of days elapsed;

(ii) CLIC shall pay to Surety an amount equal to all amounts received by it from Surety pursuant to Paragraph 4 above, plus interest on such amounts equal to 6% per annum, compounded quarterly, based on a year of 365 days and the actual number of days elapsed; provided, however, that the obligations of CLIC under this clause (ii) ("Subordinated Obligations") shall be subordinated to any and all other obligations (including insurance obligations) of CLIC ("Other Obligations") heretofore or hereafter existing, and no Subordinated Obligations shall be paid unless (x) all Other Obligations then due and payable shall have been paid and (y) no default or event of default under any Other Obligations shall have occurred and be then continuing; and

(iii) CLIC shall not make any payments under clause (i) of this Paragraph 5 unless and until it shall have paid all amounts referred to in clause (ii) of this Paragraph 5.

To the extent the creation or payment of any payment obligation under this Paragraph 5 requires the approval of or a filing with any governmental or regulatory authority, such payment obligation shall not come into force and no such payment shall be made unless and until such approval or filing shall have been obtained or made, as the case may be, and be in full force and

Received Time Jul.19.  5:11PM

effect. The payment obligations of CLIC to Surety under this Paragraph 5 shall survive termination of this Surety Bond.

6. <u>Non-Performance; Waivers</u>. The failure by CLIC to perform its obligations under this Surety Bond, any Covered Product or any other agreement or instrument to which it is a party or by which it is bound shall not affect Surety's obligations under this Surety Bond. Surety waives any rights or defenses it may have as a result of any failure or delay on the part of CLIC in asserting or enforcing any of its rights or making any claims or demands under this Surety Bond.

7. <u>Rights of Counterparties</u>. Upon failure by CLIC to meet its payment obligations to any Counterparty in respect of any Covered Product, CLIC agrees, for the benefit of such Counterparty, that CLIC will enforce its rights against Surety under this Surety Bond, including but not limited to, Paragraphs 3 and 4 hereof. Promptly following receipt by CLIC from Surety of notice of any assignment by Surety under Paragraph 11, and of the counterpart of this Surety Bond referred to in such Paragraph, CLIC shall notify each Counterparty of such assignment and the identity, net worth and financial strength or debt rating of the assignee and deliver to each Counterparty a photocopy of such counterpart. CLIC acknowledges and agrees that each Counterparty shall be entitled, in addition to any other remedies that may be available to Counterparty, to seek damages, specific performance and injunctive or other equitable relief against CLIC as a remedy for any breach by CLIC of its agreements set forth in the first and second sentences of this Paragraph 7. To the extent of the rights of Counterparties against CLIC under this Paragraph 7, each Counterparty is an express third-party beneficiary of this Surety Bond with respect to such rights. Other than Counterparties with respect to their rights against CLIC set forth in this Paragraph 7 and other than the parties hereto, no Person shall have any rights, directly or indirectly, under or pursuant to this Surety Bond.

8. <u>Nature of Obligations</u>. Surety warrants and agrees that the payment obligations of Surety that may arise under this Surety Bond constitute unsecured and unsubordinated obligations of Surety and rank <u>pari passu</u> with all other unsecured and unsubordinated obligations of Surety.

9. <u>Termination; Amendment; Certificate</u>. This Surety Bond may be amended or terminated at any time by written amendment or agreement signed by the parties executing this Surety Bond; <u>provided, however</u>, that no such amendment shall be effective with respect to any Covered Product involving any Counterparty that did not receive notice of such amendment prior to the date of execution and delivery of such Covered Product by the parties thereto; and <u>provided further</u> that no such termination shall be effective with respect to any Covered Product involving any Counterparty that did not receive notice of such termination prior to the date of execution and delivery of such Covered Product by the parties thereto. At the request of CLIC, Surety shall deliver a certificate executed by its authorized officer stating or certifying that this Surety Bond has not been terminated as of the date of such certificate and that attached thereto is a true and correct copy of this Surety Bond as amended through the date of such certificate. Execution and delivery by Surety of any such certificate shall be conclusive evidence as to the accuracy of the statements and certifications made therein. Prior to this Surety Bond being terminated, CLIC shall notify in writing the Insurance Department of the State of Massachusetts.

10. <u>Notices</u>. All notices required or permitted to be given pursuant to this Surety Bond shall be given in writing in the English language, shall be transmitted by personal delivery, by

international courier, by registered or certified mail, return receipt requested, postage prepaid, or by telecopier or other electronic means (confirmed by telephone) and shall be addressed as follows:

|  |  |
|---|---|
| If to Surety: | Centre Solutions (U.S.) Limited |
|  | The Zurich Centre |
|  | 90 Pitts Bay Road |
|  | Pembroke HM 08, Bermuda |
|  | Tel:     441 295-8501 |
|  | Fax:    441 295-3705 |
|  | Attention:  President |
| If to CLIC: | Centre Life Insurance Company |
|  | One Chase Manhattan Plaza |
|  | New York, New York 10005 |
|  | Tel:     212-898-5353 |
|  | Fax:    212-898-5453 |
|  | Attention:  President |

If to the Counterparty:  to its address as set forth in the agreement or instrument constituting the Covered Product.

Any party may designate a new address to which notices required or permitted to be given pursuant to this Surety Bond shall thereafter be transmitted by giving written notice to that effect to the other.  Each notice transmitted in the manner described in this Paragraph shall be deemed to have been given, received or become effective for all purposes at the time it shall have been delivered to the addressee (if transmitted by mail or courier), at the time indicated in the affidavit of the messenger (if transmitted by personal delivery) or at the time of receipt of the telephonic confirmation (if transmitted by telecopier or other electronic means).

11.  <u>Assignment</u>.  Surety's rights and/or obligations hereunder may not be assigned to any other Person, except as follows:  Surety's rights and obligations hereunder may be assigned in whole and not in part by Surety without the consent of CLIC or any Counterparty (or any other Person) (a) to any buyer of (i) at least 50% of the equity interests of Surety or (ii) all or substantially all of the assets of Surety, or (b) to any Affiliate of any such buyer, or (c) to any Person who is an Affiliate of Surety at the time of such assignment, if in the foregoing cases (a), (b) and (c) such buyer or Affiliate, as the case may be, has a Net Worth, and a financial strength or debt rating (from each national statistical rating organization that at the time of such assignment then rates Surety), not less than that of Surety at the time of such assignment.  Upon such assignment, and upon notice to CLIC specifying the identity, Net Worth and financial strength or debt rating of the assignee and upon the assignee's execution and delivery to CLIC of a counterpart of this Surety Bond pursuant to which such assignee assumes all of Surety's rights and obligations under this Surety Bond and agrees to be bound by the terms hereof, Surety shall be released automatically from all obligations or liabilities hereunder.  Any assignment by CLIC of any rights or obligations of CLIC hereunder without the prior written consent of Surety and each Counterparty shall be null and void and of no force or effect.

12. <u>GOVERNING LAW; Counterparts.</u> THIS SURETY BOND SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK, EXCEPT INSOFAR AS SUCH LAWS INCLUDE SECTION 6905 OF THE NEW YORK INSURANCE LAW OR REGULATIONS ISSUED PURSUANT THERETO. This instrument may be executed in counterparts and the executed counterparts shall together constitute one instrument.

CENTRE SOLUTIONS (U.S.) LIMITED

By _____

Name: RICHARD WEECH
Title: VP


CENTRE LIFE INSURANCE COMPANY

By _____

Name: LYNN SNKOL
Title: VICE PRESIDENT

5

9

**AMENDED AND RESTATED SURETY BOND**, dated as of January 1, 2000, issued by Centre Reinsurance (U.S.) Limited, a company organized under the laws of Bermuda (together with its successors and permitted assigns, "Surety"), in favor of Centre Life Insurance Company, a company organized under the laws of the State of Massachusetts ("CLIC").

Surety is an Affiliate (capitalized terms are defined in Section 1 below) of CLIC. CLIC intends to enter into and become obligated under Covered Products. Surety and CLIC desire to maintain the financial condition of CLIC and to assist CLIC in meeting its payment obligations to Counterparties under Covered Products as set forth in this Surety Bond in order to facilitate CLIC's entering into Covered Products.

Accordingly, in consideration of the premium paid pursuant to Paragraph 12 below and other benefits accruing to Surety from CLIC's entering into and becoming obligated under Covered Products, the mutual promises contained in this Surety Bond and other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Surety and CLIC hereby unconditionally and irrevocably, but subject to the terms of this Surety Bond, agree as follows:

1. <u>Definitions</u>.

The following terms shall have the following meanings:

"Affiliate" with respect to a Person, means any other Person controlling, controlled by, or under common control with such Person.

"Counterparty" means any Person that is party to, or is entitled to payment or performance by CLIC under, any Covered Product, other than CLIC.

"Covered Product" means any of the following if issued or executed and delivered on or after January 1, 2000: any insurance, reinsurance, surety or derivative contract; any obligation to purchase, repurchase, deliver or sell securities; any obligation to post margin or collateral; any obligation to provide liquidity or otherwise provide funds to any other Person; any other product or instrument similar to any of the foregoing; and any other product or instrument identified as a "Covered Product" in a certificate executed by an authorized officer of Surety.

"Net Worth" means (1) the stockholders' equity determined in accordance with United States generally accepted accounting principles, less (2) goodwill, organizational expenses, non-compete agreements, licenses, patents and other like intangibles.

"Person" means any individual, partnership, limited liability company, corporation, trust, joint stock company, unincorporated organization, joint venture, association, company, business trust or any government or agency or political subdivision of a government.

2. <u>Representation and Warranties</u>. Surety represents and warrants that this Surety Bond has been duly authorized, executed and delivered by Surety and that this Surety Bond constitutes a valid and legally binding obligation of Surety enforceable against Surety in accordance with its terms, subject, as to enforcement, to bankruptcy, insolvency, reorganization and other laws of

nwo/surcliicrus2.doc

general applicability relating to or affecting creditors' rights and to general equity principles.

3. Net Worth. If at any time the net worth of CLIC is less than the greater of (a) one million United States dollars (US$1,000,000) or (b) the minimum Net Worth required in accordance with applicable insurance law and regulations, Surety will provide to CLIC on a timely basis sufficient funds to make up such shortfall. CLIC obligates itself to notify Surety when either (a) or (b) occur.

4. Liquidity Provision. If CLIC shall have insufficient funds to make any payment required under the terms of any Covered Product, Surety will provide on a timely basis the amount of funds that CLIC needs in order to meet such payment obligation. CLIC obligates itself to notify Surety when it has insufficient funds to make any such payment and the amount of such insufficiency.

5. Waiver of Subrogation. Except as otherwise provided in this Paragraph 5,

(a) Surety waives any and all rights that Surety may have against CLIC as a result of making any payment under this Surety Bond, including, without limitation, any right of subrogation, set off or counterclaim, and

(b) Surety understands and agrees that CLIC shall have no obligations to it as a result of any payment made by Surety to CLIC under this Surety Bond.

Notwithstanding the foregoing provisions of this Paragraph 5,

(i) CLIC shall not (1) pay any dividends respecting any of its equity interests, or (2) purchase, redeem or otherwise acquire for value, any of its equity interests, unless and until, in either case (1) or (2), it shall have paid in full all amounts received by CLIC from Surety pursuant to Paragraph 3 above, plus preferred dividends on such amounts equal to 6% per annum, compounded quarterly, based on a year of 365 days and the actual number of days elapsed;

(ii) CLIC shall pay to Surety an amount equal to all amounts received by it from Surety pursuant to Paragraph 4 above, plus interest on such amounts equal to 6% per annum, compounded quarterly, based on a year of 365 days and the actual number of days elapsed; provided, however, that the obligations of CLIC under this clause (ii) ("Subordinated Obligations") shall be subordinated to any and all other obligations (including insurance obligations) of CLIC ("Other Obligations") heretofore or hereafter existing, and no Subordinated Obligations shall be paid unless (x) all Other Obligations then due and payable shall have been paid and (y) no default or event of default under any Other Obligations shall have occurred and be then continuing; and

(iii) CLIC shall not make any payments under clause (i) of this Paragraph 5 unless and until it shall have paid all amounts referred to in clause (ii) of this Paragraph 5.

To the extent the creation or payment of any payment obligation under this Paragraph 5 requires the approval of or a filing with any governmental or regulatory authority, such payment obligation shall not come into force and no such payment shall be made unless and until such

approval or filing shall have been obtained or made, as the case may be, and be in full force and effect. The payment obligations of CLIC to Surety under this Paragraph 5 shall survive termination of this Surety Bond.

6. <u>Non-Performance; Waivers</u>. The failure by CLIC to perform its obligations under this Surety Bond, any Covered Product or any other agreement or instrument to which it is a party or by which it is bound shall not affect Surety's obligations under this Surety Bond. Surety waives any rights or defenses it may have as a result of any failure or delay on the part of CLIC in asserting or enforcing any of its rights or making any claims or demands under this Surety Bond.

7. <u>Rights of Counterparties</u>. Upon failure by CLIC to meet its payment obligations to any Counterparty in respect of any Covered Product, CLIC agrees, for the benefit of such Counterparty, that CLIC will enforce its rights against Surety under this Surety Bond, including but not limited to, Paragraphs 3 and 4 hereof. Promptly following receipt by CLIC from Surety of notice of any assignment by Surety under Paragraph 11, and of the counterpart of this Surety Bond referred to in such Paragraph, CLIC shall notify each Counterparty of such assignment and the identity, net worth and financial strength or debt rating of the assignee and deliver to each Counterparty a photocopy of such counterpart. CLIC acknowledges and agrees that each Counterparty shall be entitled, in addition to any other remedies that may be available to Counterparty, to seek damages, specific performance and injunctive or other equitable relief against CLIC as a remedy for any breach by CLIC of its agreements set forth in the first and second sentences of this Paragraph 7. To the extent of the rights of Counterparties against CLIC under this Paragraph 7, each Counterparty is an express third-party beneficiary of this Surety Bond with respect to such rights. Other than Counterparties with respect to their rights against CLIC set forth in this Paragraph 7 and other than the parties hereto, no Person shall have any rights, directly or indirectly, under or pursuant to this Surety Bond.

8. <u>Nature of Obligations</u>. Surety warrants and agrees that the payment obligations of Surety that may arise under this Surety Bond constitute unsecured and unsubordinated obligations of Surety and rank <u>pari passu</u> with all other unsecured and unsubordinated obligations of Surety. Surety shall have no liability hereunder to the extent that, after giving effect to the receipt by CLIC of any amounts from any Affiliate of Surety pursuant to any surety bond, guaranty or other instrument received at or prior to such time, (i) the net worth of CLIC is at least the greater of (a) one million United States dollars (US$1,000,000) or (b) the minimum Net Worth required in accordance with applicable insurance law and regulations, and (ii) CLIC shall have sufficient funds to make any payment required under the terms of any Covered Product.

9. <u>Termination; Amendment; Certificate</u>. This Surety Bond may be amended or terminated at any time by written amendment or agreement signed by the parties executing this Surety Bond; <u>provided, however</u>, that no such amendment shall be effective with respect to any Covered Product involving any Counterparty that did not receive notice of such amendment prior to the date of execution and delivery of such Covered Product by the parties thereto; and <u>provided further</u> that no such termination shall be effective with respect to any Covered Product involving any Counterparty that did not receive notice of such termination prior to the date of execution and delivery of such Covered Product by the parties thereto. This Surety Bond shall be effective and in full force and effect with respect to all Covered Products executed and delivered prior to the date of any termination pursuant to the terms hereof until such time as all such

Covered Products shall either no longer be outstanding or be satisfied in full. At the request of CLIC, Surety shall deliver a certificate executed by its authorized officer stating or certifying that this Surety Bond has not been terminated as of the date of such certificate and that attached thereto is a true and correct copy of this Surety Bond as amended through the date of such certificate. Execution and delivery by Surety of any such certificate shall be conclusive evidence as to the accuracy of the statements and certifications made therein. Prior to this Surety Bond being terminated, CLIC shall notify in writing the Insurance Department of the State of Massachusetts.

10. Notices. All notices required or permitted to be given pursuant to this Surety Bond shall be given in writing in the English language, shall be transmitted by personal delivery, by international courier, by registered or certified mail, return receipt requested, postage prepaid, or by telecopier or other electronic means (confirmed by telephone) and shall be addressed as follows:

    If to Surety:        Centre Reinsurance (U.S.) Limited
                         The Zurich Centre
                         90 Pitts Bay Road
                         Pembroke HM 08, Bermuda
                         Tel:   441 295-8501
                         Fax:   441 295-3705
                         Attention: President

    If to CLIC:          Centre Life Insurance Company
                         One Chase Manhattan Plaza
                         New York, NY 10005
                         Tel:   212-898-5353
                         Fax:   212-898-5453
                         Attention: President

    If to the Counterparty: to its address as set forth in the agreement or instrument
                            constituting the Covered Product.

Any party may designate a new address to which notices required or permitted to be given pursuant to this Surety Bond shall thereafter be transmitted by giving written notice to that effect to the other. Each notice transmitted in the manner described in this Paragraph shall be deemed to have been given, received or become effective for all purposes at the time it shall have been delivered to the addressee (if transmitted by mail or courier), at the time indicated in the affidavit of the messenger (if transmitted by personal delivery) or at the time of receipt of the telephonic confirmation (if transmitted by telecopier or other electronic means).

11. Assignment. Surety's rights and/or obligations hereunder may not be assigned to any other Person, except as follows: Surety's rights and obligations hereunder may be assigned in whole and not in part by Surety without the consent of CLIC or any Counterparty (or any other Person) (a) to any buyer of (i) at least 50% of the equity interests of CLIC or (ii) all or substantially all of the assets of CLIC, or (b) to any Affiliate of any such buyer, or (c) to any Person who is an Affiliate of CLIC at the time of such assignment, if in the foregoing cases (a), (b) and (c) such buyer or Affiliate, as the case may be, has a Net Worth, and a financial strength

or debt rating (from each national statistical rating organization that at the time of such assignment then rates Surety), not less than that of Surety at the time of such assignment. Upon such assignment, and upon notice to CLIC specifying the identity, Net Worth and financial strength or debt rating of the assignee and upon the assignee's execution and delivery to CLIC of a counterpart of this Surety Bond pursuant to which such assignee assumes all of Surety's rights and obligations under this Surety Bond and agrees to be bound by the terms hereof, Surety shall be released automatically from all obligations or liabilities hereunder. Any assignment by CLIC of any rights or obligations of CLIC hereunder without the prior written consent of Surety and each Counterparty shall be null and void and of no force or effect.

12. __Premium__. As consideration for Surety's agreements hereunder, CLIC shall pay Surety an Annual Premium ("AP") equal to the sum of (a) the Annual Expense Charge ("EC"), plus (2) the product of the Liquidity Charge ("LC") times the Exposure Amount ("EA"), and (3) the product of the Insurance Charge ("IC"), times the Exposure Base ("EB"), represented by the following formula:

$$\text{Annual Premium} = EC + (LC \times EA) + (IC \times EB)$$

Where:

| Annual Expense Charge | = | for the year 2000 is equal to $35,000.00. Any increase in the Annual Expense Charge, which can occur only once in any calendar year, will be mutually agreed upon by the parties hereto; provided however, that any such annual increase cannot exceed 10% of the prior year's charge. |
|---|---|---|
| Liquidity Charge | = | is equal to the product of the highest loss rate for an "AAA" rated, or its equivalent, corporate bond as published by a NSRO, on the date of determination, times an anticipated recovery rate of 55%. |
| Exposure Amount | = | is equal to the Net Worth of the Surety as of the date of determination reduced by the amount of its investment, if any, in CLIC. |
| Insurance Charge | = | is equal to the product of the highest loss rate for an "A" rated, or its equivalent, corporate bond as published by a NSRO on the date of determination times an anticipated recovery rate of 55%. |
| Exposure Base | = | is equal to the lesser of the Net Worth of the Surety and the Net Amount at Risk ("NAR"), in each case as of the date of determination. The NAR is equal to the Outstanding Limit of all Covered Products covered by this Surety Bond minus any premiums paid or payable in respect of such Covered Products minus any outstanding loss reserves. The Outstanding Limit of Covered Products equals the maximum probable loss which can be sustained by CLIC under Covered Products (determined after taking into account any risks, reserves, losses and/or premiums ceded by CLIC to third parties). If any risk, reserves or losses are |

ceded to Surety or any of its subsidiaries by CLIC, the Net Worth of Surety (for purposes of this Paragraph 12) shall be decreased by the amount so ceded (without duplication).

The Annual Premium for any calendar year (the "Applicable Year") shall be payable on May 1 of the Applicable Year and shall be determined based on the determinants of the Annual Premium as of the December 31 of the year immediately preceding the Applicable Year. As soon as possible, but in no event later than May 1 of the year next following the Applicable Year, CLIC shall give notice to the Surety of the determinants of Annual Premium to the extent reflected in the statutory financial statements for the Applicable Year. The Annual Premium shall be adjusted based on such determinants for the Applicable Year, and a payment of additional premium by, or refund of premium to, CLIC, as the case may be, shall be made (together with interest thereon at the same rate as specified in Section 5(b)(ii) hereof) promptly after such notice of such amount is given by CLIC.

13. GOVERNING LAW; Counterparts. THIS SURETY BOND SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK, EXCEPT INSOFAR AS SUCH LAWS INCLUDE SECTION 6905 OF THE NEW YORK INSURANCE LAW OR REGULATIONS ISSUED PURSUANT THERETO. This instrument may be executed in counterparts and the executed counterparts shall together constitute one instrument.

CENTRE REINSURANCE (U.S.) LIMITED

By _____

Name:  RICHARD WEECH
Title:  VP


CENTRE LIFE INSURANCE COMPANY

By _____

Name:  Frank D. Pierson
Title:  Chief Executive Officer

<u>Amendment No. 1 to Amended and Restated Surety Bond</u>

Reference is hereby made to the Amended and Restated Surety Bond, dated as of January 1, 2000, issued by Centre Reinsurance (U.S.) Limited in favor of Centre Life Insurance Company ("CLIC") (the "Surety Bond").

The Surety Bond is hereby amended by deleting Paragraph 12 in its entirety and replacing it with a new Paragraph 12 as follows:

"12.  As consideration for Surety's agreements hereunder, CLIC shall pay Surety the following premium payments: (a) $332,000, which relates to the period from the date that the Surety Bond was issued to CLIC through the date hereof and would be payable on or prior to December 31, 2004, and (b) $300,000, which relates to all periods after the date hereof and would be payable on or prior to December 31, 2005.  With the exception of the amounts specified in this paragraph, no other premium payments (whether with respect to any prior or future periods) will be payable by CLIC to Surety.  Surety shall have no obligation to refund any premium payments."

This Amendment No. 1 shall be effective as of October 11, 2004. This Amendment No. 1 will be submitted by CLIC to the Massachusetts Department of Insurance (the "MADOI") for review and, if required, approval. The parties agree to amend this Amendment No. 1 to conform to any changes or modifications required by the MADOI, and in the event that the MADOI denies any required approval, this Amendment No. 1 shall be rescinded *ab initio* and the Surety Bond shall continue in effect without giving any effect to this Amendment No. 1.

Centre Life Insurance Company

By: _____
        *president*

Centre Reinsurance (US) Limited

By: _____
        *Philip Thorne*
        *President*

10



**ZURICH**

## GUARANTEE AGREEMENT

Whereas, Centre Reinsurance (U.S.) Limited (the "Subsidiary") is majority owned by Zurich Insurance Company (the "Parent"); and

Whereas, the Parent desires the Subsidiary to be awarded ratings by Standard & Poor's (the "Rating"), enhanced on the basis of this Guarantee Agreement (the "Agreement") and belonging to the 'A+' range or higher; and

Whereas, the corporate interest of the Parent and the Subsidiary will be furthered by entering into this Agreement;

Now, therefore, the Parent agrees as follows:

1. GUARANTEE

   The Parent unconditionally guarantees on behalf of and for the benefit of the Subsidiary, the full and prompt performance of all the Subsidiary's Payment Obligations arising under the terms of all insurance and reinsurance contracts issued by the Subsidiary ("Contracts"). For the avoidance of doubt in no event shall the Parent's liability hereunder exceed the liability of the Subsidiary under the Contracts. As used in this Agreement, "Payment Obligations" mean only those obligations arising under the terms of the Contracts which have been determined to be finally due and payable in accordance with the terms of the Contracts.

   The owners of Contracts ("Contract Owners") are express third party beneficiaries of the rights of the Subsidiary under the terms of this Guarantee Agreement. This Guarantee Agreement is not, and nothing herein contained or done pursuant hereto by the Parent shall be deemed to constitute, a direct or other indirect guarantee by the Parent of the payment of any other debt or obligation, indebtedness or liability, of any kind or character whatsoever, of the Parent or the Subsidiary, except as provided in this article.

2. OBLIGATIONS UNCONDITIONAL

   The obligations of the Parent under this Guarantee are unconditional irrespective of any other circumstance whatsoever which might otherwise constitute a legal or equitable discharge of a surety or guarantor, it being the intent of this Guarantee that the obligations of the Parent hereunder shall be absolute and unconditional under any circumstances and shall not be discharged except by payment.

   The Parent, upon notice or demand in writing from Contract Owners, will promptly remit to the Contract Owner amounts due for payment to the Contract Owner, to the full extent that any such payment from the Subsidiary is finally determined to be due and payable under the Contracts and is not timely made by the Subsidiary. This Guarantee may be enforced by the Contract Owner without first resorting to any right or remedy against the Subsidiary other than the written request described immediately above.

1

As used in this Agreement, "prompt" or "promptly" and "timely" means, without request for extension, within thirty (30) days of Contract Owners demand for payment of amounts finally determined to be due and payable.

Notwithstanding anything to the contrary in the foregoing, it is understood that the Parent shall have no obligation to make any payment hereunder should the Subsidiary have no payment obligation under the terms of any Contract.

3.  REINSTATEMENT

The Guarantee shall be automatically reinstated if and to the extent that for any reason any payment by or on behalf of the Subsidiary is rescinded or must be otherwise restored whether as result of any proceedings in bankruptcy, insolvency, reorganization, other similar laws or otherwise.

4.  SUBROGATION

With respect to any Contract, the Parent hereby unconditionally agrees that until the payment and satisfaction in full of such Contract, it shall not exercise any right or remedy arising by reason of any performance by it of this Guarantee, whether by subrogation or otherwise, against the Subsidiary.  Nothing in this clause or in this Guarantee shall prevent the Parent from exercising any remedies or rights in order to safeguard and/or otherwise preserve and/or maintain any such subrogation or other rights in all or in part.

5.  REMEDIES

The Parent agrees that as to it on the one hand, and Contract Owners on the other hand, the Payment Obligations of the Subsidiary guaranteed hereunder may be declared to be forthwith due and payable as provided in the Contracts notwithstanding any stay provided for by any applicable laws regarding insolvency, bankruptcy, reorganization or similar concept, preventing such declaration as against the Subsidiary and that, in the event of any such declaration, such Payment Obligations shall forthwith become due and payable by the Parent, for purposes of this Guarantee.

6.  PAYMENTS

All payments to be made by the Parent hereunder shall be made in full without deduction and in whatever currency called for in the underlying Contracts.  If the Parent determines in good faith that by reason inter alia, of supervening national or international financial, political or economic conditions, currency availability or exchange control it is impracticable for the Parent to make such payments in the relevant currency (ies) in the ordinary course of business in the international interbank market, then such a payment shall be denominated in Euro.

The Parent shall act in a reasonable manner and in good faith to ensure that the owner of a Contract receives the amount of Euro necessary to purchase the amount of contractual currency due (taking into account the cost of exchanging the Euro into the contractual currency).

## 7. NO WAIVER

No failure on the part of the Parent to exercise, no delay in exercising, and no course of dealing with respect to, any right or remedy hereunder will operate as a waiver thereof, nor will any single or partial exercise of any right or remedy hereunder preclude any other further exercise thereof or the exercise of any other right or remedy.

## 8. CONTINUING EFFECT : ASSIGNMENT

Without prejudice to article 9.2., this Guarantee is a continuing guarantee. It (i) shall apply to all Contracts issued by the Subsidiary, (ii) shall remain in full force and effect until payment in full of the Payment Obligations under Contracts, (iii) shall be binding upon the Guarantor, its successors and assigns, and (iv) shall inure to the benefit of, and be enforceable by the Subsidiary, its successors and assigns, and the Contract Owners, their successors and assigns under the terms of this Guarantee Agreement.

## 9. AMENDMENT, MODIFICATION OR TERMINATION

9.1. The Guarantee may not be amended, modified or terminated without the prior written consent of the parties hereto, except as may be required by applicable law and as to termination, except as provided for by article 9.2.

9.2. Whenever:

(a) the Subsidiary receives a stand–alone Rating from Standard & Poor's in the 'A+' range or higher; or

(b) the Subsidiary receives a Rating from Standard & Poor's in the 'A+' range or higher without the support of the present Agreement; or

(c) the Subsidiary is sold to or integrated into or becomes a part of a group or an entity and as a consequence subsequently receives from Standard & Poor's a Rating in the 'A+' range or higher;

then, in each such case, this Agreement shall terminate automatically and definitively with effect on the date on which one (or more) of the above mentioned situations (a), (b) and (c) arise(s) and the Parent shall be released from all obligations and liabilities (including contingent and un–liquidated obligations) that it would otherwise have had under this Agreement, including those in relation to contractual obligations that were or are assumed by the Subsidiary both before and after such termination date.

For the avoidance of doubt, if the obligations or liability of Subsidiary under any Contract is transferred or assigned to or assumed by a third party under circumstances where Subsidiary no longer has any liability or obligation with respect to such Contract (such as would be the case in the event of a novation), such Contract shall no longer be covered or affected by the terms of this Agreement, which Agreement shall terminate with immediate effect with regard to such Contract upon such transfer, assignment or assumption, as the case may be.

3

## 10. GOVERNING LAW AND JURISDICTION

This Guarantee is a guarantee of payment and not of collection, and shall be governed by and construed in accordance with the laws of the State of New York.

The courts of the State of New York shall have exclusive jurisdiction to hear and decide any dispute under this Guarantee.

## 11. COUNTERPARTS

This Guarantee may be executed in any number of counterparts and each to such counterparts shall for all purposes be deemed to be an original; and all such counterparts shall together constitute but one and the same Guarantee.

## 12. RANK

The obligations of the Parent under the terms of this Guarantee will rank equally with all other senior unsecured indebtedness of the Parent, whether now or hereafter outstanding, that is not contractually subordinated to such obligations.

## 13. RATING

Should Standard & Poor's discontinue its rating activity w.r.t. insurance and/or reinsurance companies, this agreement, and especially article 9.2. would be interpreted based on equivalent ratings awarded by another recognized international rating agency.

## 14. NOTICES

All notices required or permitted to be given pursuant to this Guarantee shall be given in writing in the English language, shall be transmitted by personal delivery, by international courier, by registered or certified mail, return receipt requested, postage prepaid, or by telecopier or other electronic means (confirmed by telephone) or by reputable international overnight courier, and shall be addressed as follows:

|                      |                                  |
|----------------------|----------------------------------|
| If to Parent:        | Zurich Insurance Company         |
|                      | Mytenquai 2                      |
|                      | 8002 Zürich                      |
|                      | Switzerland                      |
|                      | Attention: Rating Agency Manger  |
|                      | Fax: ++ 41 625 3618              |
| With a copy to:      | General Counsel                  |
|                      | Fax: ++ 41 625 3497              |
| If to the Subsidiary: | Centre Reinsurance (U.S.) Limited |
|                      | The Zurich Centre                |
|                      | 90 Pitts Bay Road                |
|                      | Pembroke HM 08, Bermuda          |
|                      | Tel:    441 295-8501             |
|                      | Fax:    441 295-3705             |
|                      | Attention: President             |

4

With a copy to:     Centre Group Holdings (U.S.) Limited
105 East 17th Street
New York, NY 10003
Attention: General Counsel
Tel: 212-871-1500
Telecopy: 212-871-1588

If to the Contract Owners:     to its address as set forth in the Contract.

Any party may designate a new address to which notices required or permitted to be given pursuant to this Guarantee shall thereafter be transmitted by giving written notice to that effect to the other. Each notice transmitted in the manner described in this Article 14 shall be deemed to have been given, received or become effective for all purposes at the time it shall have been actually received.

15. WAIVER OF JURY TRIAL

EACH OF THE PARTIES AND EACH CONTRACT OWNER HEREBY WAIVES ITS RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING IN ANY WAY RELATED TO THIS GUARANTEE OR THE SUBJECT MATTER HEREOF.

CENTRE REINSURANCE (U.S.) LIMITED

By _____

Name: Richard Price

Title:

ZURICH INSURANCE COMPANY

By _____     _____

Name: James J. Schiro           Patrick O'Sullivan

Title: Chief Executive Officer       Group Finance Director

5

11

## GUARANTY RIGHTS AGREEMENT

This Guaranty Rights Agreement (this "Guaranty Rights Agreement" or this "Agreement") is effective as of December 29, 2004 by and among Centre Reinsurance (U.S.) Limited ("CRUS"), Zurich Insurance Company ("ZIC") and AXA Equitable Life Insurance Company ("Equitable").

WHEREAS, Equitable and Centre Life Insurance Company ("CLIC") are parties to that certain Credit Support Agreement, dated as of July 1, 2000, in connection with which CRUS is a surety bond provider for CLIC;

WHEREAS, CRUS and CLIC are parties to that certain Amended and Restated Surety Bond, dated as of January 1, 2000 as amended by Amendment No. 1 thereto (as amended, the "CLIC Net Worth Surety Bond");

WHEREAS, ZIC and CRUS are parties to that certain Guarantee Agreement, a copy of which is attached hereto (the "Guarantee"), pursuant to which ZIC unconditionally guarantees the full and prompt performance of all of CRUS's Payment Obligations under the Contracts (as such capitalized terms are defined in the Guarantee);

WHEREAS, Equitable is willing to count ZIC's net worth as the net worth of CRUS for purposes of the Credit Support Agreement on the basis of the Guarantee and the benefits, rights and remedies with respect thereto that are granted to Equitable by this Agreement.

NOW THEREFORE, in consideration of the foregoing and other valuable consideration, the receipt of which is hereby acknowledged, the parties hereto agree as follows:

1.  ZIC and CRUS hereby acknowledge that Equitable is a Contract Owner under the Guarantee and has the right, on a non-exclusive basis, (i) to issue the notice or demand referred to in the first sentence of the second paragraph of Article 2 of the Guarantee and (ii) to enforce directly against ZIC the rights of a Contract Owner under the Guarantee with respect to defaults by CRUS in performing its obligations under the CLIC Net Worth Surety Bond. Notwithstanding the foregoing, it is understood and agreed by the parties hereto that any payments that ZIC is obligated to make as a result of any such enforcement by Equitable shall be paid to either CLIC or to Equitable, as determined by ZIC in its sole and absolute discretion. Any such payments made by ZIC to Equitable shall discharge pro tanto any obligation that ZIC has to CLIC relating to such payment.

2.  With respect to the second paragraph of Article 2 of the Guarantee, ZIC confirms its understanding that to the extent that any payment

**CONFIDENTIAL**                                                      **CTR-A 012213**

from CRUS is in fact due and payable under the CLIC Net Worth Surety Bond and is not timely made by CRUS ("timely" for this purpose having the meaning ascribed to it in the Guarantee), the Guarantee may be enforced by Equitable with respect to such payment without first resorting to any right or remedy against CRUS other than the written request described in the first sentence of the second paragraph of Article 2 of the Guarantee.

3. ZIC and CRUS agree that no amendment of the Guarantee will be effective against Equitable if such amendment adversely affects Equitable's rights and benefits under the Guarantee, unless Equitable consents such consent not to be unreasonably withheld or delayed.

4. ZIC and CRUS agree to cause the Guarantee not to terminate with respect to obligations and liabilities of CRUS that benefit, directly or indirectly, Equitable and that arise out of or in connection with the CLIC Net Worth Surety Bond; provided, however, that the Guarantee may terminate with respect to all other obligations or liabilities of CRUS (the foregoing agreement of ZIC and CRUS hereinafter referred to as the "Guarantee Maintenance Covenant"). Unless reinstated as provided below, the Guarantee Maintenance Covenant shall expire and be of no further force or effect on the earlier of (the earlier of (I) and (II) below each hereinafter referred to as a "Cut-Off Date"):

(I) the later of (i) the date that the Credit Support Formula is satisfied pursuant to the provisions of the Credit Support Agreement (whether by provision of a letter of credit, additional Qualified Surety Bond Providers, or otherwise), without taking into account the net worth of ZIC, and (ii) six months following notice by CRUS to Equitable stating that it has determined that the condition described in the preceding clause (i) has been satisfied and describing in reasonable detail the information CRUS relied on in arriving at such determination, and

(II) the later of (a) six months following notice by CRUS to Equitable stating that the Guarantee will terminate and specifying the date of termination, and (b) December 31, 2014.

The Guarantee Maintenance Covenant shall automatically be reinstated and be in full force and effect after a Cut-Off Date, as though it had never terminated, if all of the following three conditions are satisfied: (x) the Credit Support Formula is not satisfied, or ceases to be satisfied, on any date (a "Non-Compliance Date") occurring on or prior to the fourth anniversary of any Cut-Off Date, and (y) Equitable delivers a notice to that effect to CLIC at any time on or

CONFIDENTIAL                                     CTR-A 012214

prior to such fourth anniversary describing in reasonable detail the basis (whether derived from information provided in CRUS'S notice or from other information) for Equitable's conclusion that the Credit Support Formula is not satisfied, or has ceased to be satisfied, and (z) the Non-Compliance Date occurs on or prior to December 31, 2014. If such reinstatement of the Guarantee Maintenance Covenant shall occur, it shall be effective as of such Non-Compliance Date, and the provisions of Section 4 above (including, but not limited to, clause (I) and (II) thereof) shall thereafter continue to apply without prejudice in any respect to the possibility of a Cut-Off Date occurring after the Non-Compliance Date. For the avoidance of doubt, no Cut-Off Date occurring pursuant to clause I above shall be deemed to have occurred unless CLIC is in compliance with the Credit Support Agreement on that date.

5.  While the Guarantee and the Guarantee Maintenance Covenant are in full force and effect, Equitable will deem the net worth of CRUS to be the net worth of ZIC for purposes of compliance with the credit support formula under the Credit Support Agreement. CRUS shall deliver quarterly and annual financial statements of Zurich Financial Services to Equitable promptly upon release to the public.

6.  This Agreement shall terminate on the last Cut-Off Date after which reinstatement of the Guarantee Maintenance Covenant as described in Section 4 is no longer possible, except that any claim for breach of any provision of this Agreement shall survive such termination if such breach occurs on or prior to such last Cut-Off Date. For the avoidance of doubt, this Agreement (including but not limited to the Guarantee Maintenance Covenant) shall in all events terminate on the later of (a) six months following notice by CRUS to Equitable stating that the Guarantee will terminate and specifying the date of termination, and (b) December 31, 2014, except that any claim for breach of any provision of this Agreement shall survive such termination if such breach occurs on or prior to such date of termination.

7.  This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York.

8.  This Agreement may be executed in any number of counterparts and each of such counterparts shall for all purposes be deemed to be an original, and all such counterparts shall together constitute but one and the same Agreement.

9.  EACH OF THE PARTIES HEREBY WAIVES ITS RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING IN ANY

CONFIDENTIAL                                    CTR-A 012215

WAY RELATED TO THE AGREEMENT OR THE SUBJECT
MATTER THEREOF.

10. All notices required or permitted to be given pursuant to this
Agreement shall be given in writing in the English language, shall be
transmitted by personal delivery, by international courier, by registered
or certified mail, return receipt requested, postage prepaid, or by
reputable international overnight courier, and shall be addressed as
follows:

If to ZIC:          Zurich Insurance Company
                    Mytenquai 2
                    8002 Zurich
                    Switzerland
                    Attention: General Counsel

If to CRUS:         Centre Reinsurance (U.S.) Limited
                    The Zurich Centre
                    90 Pitts Bay Road
                    Pembroke HM 08, Bermuda
                    Attention: President

With a copy to:

                    Centre Group Holdings (U.S.) Limited
                    105 East 17th Street
                    New York, NY 10003
                    Attention: General Counsel

If to Equitable:    AXA Equitable Life Insurance Company
                    1290 Avenue of the Americas
                    New York, NY 10019
                    Attention: Chief Financial Officer

Each party hereto may from time to time designate a different address for
communications by giving written notice of such change to the other parties.
Equitable is a third party beneficiary of this Agreement.

4

CONFIDENTIAL                                      CTR-A 012216

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Agreement as of February 25, 2005, effective as of the 29th day of December, 2004.

ZURICH INSURANCE COMPANY

By _____    _____
Name: Marianne Stuck    Name: Yannick Hausmann
Title:  Corporate Legal Adviser    Title:  Corporate Legal Adviser

CENTRE REINSURANCE (U.S.) LIMITED

By: _____
Name:
Title:

AXA EQUITABLE LIFE INSURANCE COMPANY

By: _____
Name: KEVIN R. BYRNE
Title: SENIOR VICE PRESIDENT and Treasurer

5

CONFIDENTIAL

CTR-A 012217

MAR-07-2005  17:20    CENTRE SOLUTIONS                                P.06

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Agreement as of February 25, 2005, effective as of the 29th day of December, 2004.

ZURICH INSURANCE COMPANY


By_____
Name:                      Name:
Title:                     Title:


CENTRE REINSURANCE (U.S.) LIMITED

By:_____
Name:    Philip A. Thorne
Title:   President / CEO


AXA EQUITABLE LIFE INSURANCE COMPANY


By:_____
Name:_____
Title:_____


5

**CONFIDENTIAL**                                        **CTR-A 012218**

12

THE BANK OF NEW YORK

CENTRE LIFE/EQUITABLE LIFE - RESERVE A/C
ACCOUNT # 056668
SUMMARY OF ASSETS HELD
DECEMBER 31, 2007

| | SHARES/PAR VALUE | ACCRUED INCOME EST ANN INCOME | MARKET VALUE BOOK COST GAIN OR LOSS | YLD-MKT YLD-BK % A/C |
|---|---|---|---|---|
| FIXED INCOME INVESTMENTS | 2,600,000 | 33,150.00 198,900.00 | 2,982,798.00 3,273,426.00 290,628.00- | 6.67 6.66 .19 |
| CORPORATE BONDS | 768,628,000 | 10,972,441.37 43,160,107.35 | 730,370,124.51 631,135,346.72 99,234,777.79 | 5.90 6.83 46.92 |
| GOVERNMENT BONDS | 725,913,152 | 2,324,203.48 8,204,918.74 | 467,186,331.12 332,834,402.71 134,351,928.41 | 1.75 2.46 30.01 |
| OTHER BONDS | 499,301,552 | 2,417,093.68 16,008,018.26 | 356,599,543.14 299,546,244.75 55,053,298.39 | 4.51 5.34 22.78 |
| OTHER ASSETS | 1 | .00 .00 | 1.00 1.00 .00 | |
| SHORT-TERM INVESTMENTS | 1,205,977.89 | 59,334.12 .00 | 1,205,977.89 1,205,977.89 .00 | 4.92 4.92 .07 |
| CASH | | .00 .00 | .00 .00 .00 | |
| ACCOUNT TOTALS | 1,997,648,682.89 | $15,746,888.53 $67,631,278.47 | $1,556,344,775.66 $1,264,698,398.06 $288,349,377.59 | 4.34% 5.33% 100.00 |

TOTAL MARKET VALUE PLUS TOTAL ACCRUED INCOME           $1,572,091,664.19

00001245

13

00001260

CENTRE LIFE/EQUITABLE LIFE -RESERVE A/C
ACCOUNT # 056968
CASH STATEMENT AND ASSET LIST
SEPTEMBER 30, 2007

0
0
0
3
4

000034 XBC1BN01

THE EQUITABLE LIFE ASSURANCE SOC
CHIEF ACTUARY
1290 AVENUE OF THE AMERICAS
NEW YORK        NY 10104-0101



THE
BANK OF
NEW
YORK

**THE BANK OF NEW YORK**

00001261

CENTRE LIFE/EQUITABLE LIFE -RESERVE A/C
ACCOUNT # 05968
SUMMARY OF ASSETS HELD
SEPTEMBER 30, 2007

PAGE 1 OF 52

| SHARES/PAR VALUE | ACCRUED INCOME / EST ANN INCOME | MARKET VALUE / BOOK COST / GAIN OR LOSS | YLD-MKT / YLD-BK / % A/C |
|---|---|---|---|
| FIXED INCOME INVESTMENTS | | | |
| 2,600,000 | 82,875.00 / 198,900.00 | 2,923,232.00 / 3,273,426.00 / 350,194.00- | 6.80 / 6.07 / .19 |
| CORPORATE BONDS | | | |
| 717,063,000 | 9,837,035.81 / 39,957,427.15 | 671,992,861.87 / 579,431,580.77 / 92,561,281.10 | 5.94 / 6.89 / 43.84 |
| GOVERNMENT BONDS | | | |
| 778,368,152 | 1,684,704.61 / 11,241,312.82 | 504,895,220.29 / 371,820,285.91 / 133,074,934.38 | 2.22 / 3.02 / 32.94 |
| OTHER BONDS | | | |
| 495,601,552 | 2,051,525.05 / 16,324,398.91 | 350,275,565.99 / 302,817,429.20 / 47,458,136.79 | 4.66 / 5.39 / 22.85 |
| OTHER ASSETS | | | |
| 1 | .00 / .00 | .00 / .00 / .00 | .00 / .00 / .00 |
| SHORT-TERM INVESTMENTS | | | |
| 2,672,066.37 | 64,129.59 | 2,672,066.37 / 2,672,066.37 / .00 | 2.39 / 2.39 / .17 |
| CASH | | | |
| | .00 / .00 | .00 / .00 / .00 | |
| ACCOUNT TOTALS | | | |
| 1,996,304,771.37 | $13,656,140.47 / $67,786,168.47 | $1,552,758,946.52 / $1,260,014,788.25 / $272,744,158.27 | 4.42% / 5.37% / 100.00 |

TOTAL MARKET VALUE PLUS TOTAL ACCRUED INCOME    $1,546,415,086.99

14

THE
BANK OF
NEW
YORK

000037 XBC1BN01
AXA EQUITABLE
MIMI BEUNO
1290 AVENUE OF THE AMERICAS
FL 12
NEW YORK                                    NY 10104-0101

0 0 0 0 0 3
                                                        7

CENTRE LIFE/EQUITABLE LIFE - RESERVE A/C
ACCOUNT # 056968
CASH STATEMENT AND ASSET LIST
JUNE 30, 2007

00001355

THE BANK OF NEW YORK

CENTRE LIFE/EQUITABLE LIFE -RESERVE A/C
ACCOUNT # 056968
SUMMARY OF ASSETS HELD
JUNE 30, 2007

| | SHARES/PAR VALUE | ACCRUED INCOME EST ANN INCOME | MARKET VALUE BOOK COST GAIN OR LOSS | YLD-MKT YLD-BK % A/C |
|---|---|---|---|---|
| FIXED INCOME INVESTMENTS | 2,600,000 | 33,150.00 / 198,900.00 | 2,927,808.00 / 3,273,426.00 / 345,618.00- | 6.79 / 6.07 / .19 |
| CORPORATE BONDS | 719,108,000 | 10,572,614.15 / 40,354,345.60 | 666,982,958.74 / 581,096,607.56 / 85,886,881.18 | 6.04 / 6.94 / 44.32 |
| GOVERNMENT BONDS | 789,768,152 | 3,667,838.15 / 11,869,267.97 | 500,471,731.15 / 384,311,354.78 / 116,160,376.37 | 2.37 / 3.08 / 33.26 |
| OTHER BONDS | 481,955,552 | 2,100,878.52 / 15,534,891.67 | 330,828,502.16 / 290,307,561.55 / 40,520,940.61 | 4.69 / 5.35 / 21.98 |
| SHORT-TERM INVESTMENTS | 3,506,507.51 | 2,881.78 / 120,759.18 | 3,488,773.51 / 3,488,525.47 / 248.04 | 3.46 / 3.46 / .23 |
| CASH | | .00 / .00 | .00 / .00 / .00 | |
| ACCOUNT TOTALS | 1,996,938,211.51 | $16,377,362.60 / $68,058,164.42 | $1,505,699,773.56 / $1,262,976,945.36 / $242,222,828.20 | 4.52% / 5.39% / 100.00 |

TOTAL MARKET VALUE PLUS TOTAL ACCRUED INCOME            $1,521,077,136.16

00001336

15

THE
BANK OF
NEW
YORK

000043 XBC1BN01
AXA EQUITABLE
MIMI BEUNO
1290 AVENUE OF THE AMERICAS
FL 12
NEW YORK          NY 10104-0101

0 0 0 0 0
     4 3

CENTRE LIFE/EQUITABLE LIFE -RESERVE A/C
ACCOUNT # 05696B
CASH STATEMENT AND ASSET LIST
MARCH 31, 2007

00001469

THE BANK OF NEW YORK

CENTRE LIFE/EQUITABLE LIFE - RESERVE A/C
ACCOUNT # 056968
SUMMARY OF ASSETS HELD
MARCH 31, 2007

00001490

| | SHARES/PAR VALUE | ACCRUED INCOME EST ANN INCOME | MARKET VALUE BOOK COST GAIN OR LOSS | YLD-MKT YLD-BK % A/C |
|---|---|---|---|---|
| XED INCOME INVESTMENTS | 13,167,000 | 249,510.21 789,041.25 | 13,732,197.52 11,659,339.07 2,072,858.45 | 5.74 6.76 .87 |
| PORATE BONDS | 646,794,000 | 9,162,202.92 39,697,840.05 | 668,898,512.40 561,477,565.38 107,420,947.02 | 5.93 7.07 42.73 |
| ERNMENT BONDS | 792,668,152 | 1,870,195.75 12,045,141.94 | 523,403,951.20 388,680,396.98 134,723,554.22 | 2.30 3.09 33.44 |
| HER BONDS | 524,949,552 | 1,780,789.58 15,519,263.34 | 352,778,333.86 301,079,594.92 51,698,738.94 | 4.39 5.15 22.54 |
| ORT-TERM INVESTMENTS | 6,318,008.68 | 10,295.08 315,284.65 | 6,298,276.44 6,297,036.30 1,240.14 | 5.00 5.00 .40 |
| H | | .00 .00 | .00 .00 .00 | .00 .00 |
| ACCOUNT TOTALS | 1,983,896,712.68 | $13,072,993.54 $68,366,571.23 | $1,565,111,271.42 $1,269,193,932.65 $295,917,338.77 | 100.00 |
| AL MARKET VALUE PLUS TOTAL ACCRUED INCOME | | | $1,578,184,264.96 | |

16

THE
BANK OF
NEW
YORK

000046 XBC1BN01
AXA EQUITABLE
MIMI BEINO
1290 AVENUE OF THE AMERICAS
NEW YORK                FL 12
         NY 10104-0101

0 0 0 6 4

CENTRE LIFE/EQUITABLE LIFE -RESERVE A/C
ACCOUNT # 056568
CASH STATEMENT AND ASSET LIST
DECEMBER 31, 2006



THE BANK OF NEW YORK

CENTRE LIFE/EQUITABLE LIFE - RESERVE A/C
ACCOUNT #05968
SUMMARY OF ASSETS HELD
DECEMBER 31 2006

| | SHARES/PAR VALUE | ACCRUED INCOME EST ANN INCOME | MARKET VALUE BOOK COST GAIN OR LOSS | YLD-MKT YLD-BK % A/C |
|---|---|---|---|---|
| FIXED INCOME INVESTMENTS | 16,167,000 | 169,516.56<br>952,541.25 | 16,543,405.34<br>14,762,719.07<br>1,780,686.27 | 5.75<br>6.45<br>1.05 |
| CORPORATE BONDS | 634,653,000 | 10,136,264.92<br>38,867,296.25 | 662,099,658.30<br>535,336,400.41<br>126,763,257.89 | 5.87<br>7.26<br>42.09 |
| GOVERNMENT BONDS | 801,277,152 | 3,849,757.57<br>12,879,486.63 | 542,332,906.34<br>385,704,310.53<br>156,628,595.81 | 2.37<br>3.33<br>34.47 |
| OTHER BONDS | 511,314,552 | 1,893,188.97<br>14,992,481.13 | 341,489,784.06<br>289,568,854.75<br>51,920,929.31 | 4.39<br>5.77<br>21.70 |
| SHORT-TERM INVESTMENTS | 10,571,432.13 | 8,454.62<br>486,029.45 | 10,537,575.85<br>10,520,784.11<br>16,791.74 | 4.61<br>4.61<br>.66 |
| CASH | | .00<br>.00 | .00<br>.00<br>.00 | .00<br>.00 |
| ACCOUNT TOTALS | 1,973,983,136.13 | $16,057,182.64<br>$68,177,834.71 | $1,573,003,329.89<br>$1,235,893,069.87<br>$337,110,261.02 | 4.53%<br>5.52%<br>100.00 |

TOTAL MARKET VALUE PLUS TOTAL ACCRUED INCOME            $1,589,060,512.53

00001555

17

00001590

THE BANK OF NEW YORK

CENTRE LIFE/EQUITABLE LIFE -RESERVE A/C
ACCOUNT # 05968
CASH STATEMENT AND ASSET LIST
SEPTEMBER 30, 2006

000041 XBC1BH01

AXA EQUITABLE
MIMI BEUNO
1290 AVENUE OF THE AMERICAS
FL 12
NY 10104-0101

NEW YORK

**THE BANK OF NEW YORK**

CENTRE LIFE/EQUITABLE LIFE -RESERVE A/C
ACCOUNT # 056948
SUMMARY OF ASSETS HELD
SEPTEMBER 30, 2006

0001399

| | SHARES/PAR VALUE | ACCRUED INCOME EST ANN INCOME | MARKET VALUE BOOK COST GAIN OR LOSS | YLD-MKT YLD-BK % A/C |
|---|---|---|---|---|
| CORPORATE BONDS | 651,890,000 | 9,354,530.24 40,291,469.75 | 684,543,760.16 561,861,802.38 122,681,957.78 | 5.88 7.17 43.34 |
| GOVERNMENT BONDS | 787,777,152 | 1,882,424.24 12,117,280.76 | 532,014,816.56 372,656,196.87 159,358,619.69 | 2.27 3.25 33.68 |
| OTHER BONDS | 509,119,552 | 1,618,917.32 15,083,452.89 | 341,369,286.69 287,664,133.82 53,705,152.87 | 4.41 5.24 21.61 |
| SHORT-TERM INVESTMENTS | 21,349,061.82 | 6,191.70 841,153.83 | 21,230,174.06 21,227,400.67 2,773.39 | 3.96 3.96 1.34 |
| CASH | | .00 .00 | .00 .00 .00 | .00 .00 .00 |
| ACCOUNT TOTALS | 1,970,135,765.82 | $12,962,063.50 $68,333,357.23 | $1,579,158,037.47 $1,243,409,533.74 $335,748,503.73 | 4.32% 5.17% 100.00 |

TOTAL MARKET VALUE PLUS TOTAL ACCRUED INCOME    $1,592,020,100.97

18

JUNE 2006
TRANSACTIONS



CENTRE LIFE/EQUITABLE LIFE -RESERVE A/C
Account # 055968
June 30, 2006

PAGE    1

SUMMARY OF ASSETS HELD

| | MARKET VALUE | BOOK COST | ACCRUED INCOME | EST ANN INCOME | % A/C |
|---|---|---|---|---|---|
| FIXED INCOME INVESTMENTS | 1,449,895,322.80 | 1,240,611,870.80 | 15,802,752.24 | 66,849,501.71 | 100.00 |
| CASH | .00 | .00 | .00 | .00 | |
| ACCOUNT TOTALS | $1,449,895,322.80 | $1,240,611,870.80 | $15,802,752.24 | $66,849,501.71 | 100.00 |
| TOTAL MARKET VALUE PLUS TOTAL ACCRUED INCOME | $1,465,698,075.04 | | | | |

19

# CENTRE

FAX TO: Chief Actuary

FIRM: AxA Equitable

FAX: 212-314-4456

FROM: Richard Grill

DATE: 1/28/08

PAGES TO FOLLOW: 2

RECEIVED

FEB 01 2008

GERALD J. CARROLL, JR.
V.P. & ASSOCIATE GENERAL COUNSEL

A member of the Zurich Financial Services Group

The information contained in this facsimile message is privileged and confidential information intended only for the use of the individu... entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver ... intended recipient, you are hereby notified that any distribution or copying of this communication is strictly prohibited. If you have rec... communication in error, please notify us immediately by telephone and return the original message to us at the above address by m... you.

# CENTRE

January 25, 2008

<u>VIA FACSIMILE</u>

CENTRE INSURANCE
COMPANY

ZC SPECIALTY
INSURANCE COMPANY

CENTRE LIFE
INSURANCE COMPANY

AXA Equitable Life Insurance Company
1290 Avenue of the Americas
New York, NY 10104
Attention: Chief Actuary
Fax: 212-314-4456

The Bank of New York
101 Barclay Street, Floor 21 West
New York, NY 10286
Attention: Insurance Trust Escrow Unit
Fax: 212-815-5877

One Liberty Plaza
165 Broadway
New York, NY
10006

TEL 212-859-2600
FAX 212-859-2794

Re:  Reserve Amount Statement

To Whom It May Concern:

In accordance with Section 1 (d) of the Reserve Trust Agreement dated as of July 1, 2000 between Centre Life Insurance Company, The Equitable Life Assurance Society of the United States, and the Bank of New York, the Reserve Amount as of December 31, 2007 is as follows:

Total GAAP Reserves          $1,751,546,000

*Richard Grilli*

Richard Grilli
President
Centre Life Insurance Company

Cc: AXA Equitable Life Insurance Company
1290 Avenue of the Americas
New York, NY 10104
Attention: General Counsel
Fax: 212-707-7677

*A member of the Zurich Financial Services Group*

20

# CENTRE

FAX TO: General Counsel

FIRM: AxA Equitable Life Insurance Co

FAX: 42-707-7677

FROM: Richard Grilli    (CLIC)

DATE: 10/5/07

PAGES TO FOLLOW: 1

**RICHARD V. SILVER**
Executive Vice President and General Counsel

OCT 5 - 2007

AXA FINANCIAL, INC.
REFERRED TO: W- Case

D. Hatton

RECEIVED

OCT 0 3 2007

GERALD _____
V.P. & ASSOCIATE GENERAL COUNSEL

A member of the Zurich Financial Services Group

The information contained in this facsimile message is privileged and confidential information intended only for the use of the indiv
entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deli
intended recipient, you are hereby notified that any distribution or copying of this communication is strictly prohibited. If you have
communication in error, please notify us immediately by telephone and return the original message to us at the above address by
you.

OCT-05-07   11:05am   From-ZSF                    12126592795          7-628   P.002/002   F-387

# CENTRE

CENTRE INSURANCE
COMPANY

ZC SPECIALTY
INSURANCE COMPANY

CENTRE LIFE
INSURANCE COMPANY

105 EAST 17TH STREET
NEW YORK NY
10003

TEL: 212-859-2400
FAX: 212-859-2794

ONE EXCHANGE PLACE
SUITE 1000
JERSEY CITY, NJ
07302

TEL: 201-395-4715
FAX: 201-395-4716

October 5, 2007

VIA FACSIMILE

AXA Equitable Life Insurance Company
1290 Avenue of the Americas
New York, NY 10104
Attention: Chief Actuary
Fax: 212-314-4456

The Bank of New York
101 Barclay Street, Floor 21 West
New York, NY 10286
Attention: Insurance Trust Escrow Unit
Fax: 212-815-5707

Re:  Reserve Amount Statement

To Whom It May Concern:

In accordance with Section 1 (d) of the Reserve Trust Agreement dated as
of July 1, 2000 between Centre Life Insurance Company, The Equitable
Life Assurance Society of the United States, and the Bank of New York,
the Reserve Amount as of September 30, 2007 is as follows:

Total GAAP Reserves          $1,588,870,000

There were no material changes in methodology or actuarial assumptions
underlying the reserves as of September 30, 2007 from what was used at
December 31, 2006.

Richard Grilli
President
Centre Life Insurance Company

Cc: AXA Equitable Life Insurance Company
1290 Avenue of the Americas
New York, NY 10104
Attention: General Counsel
Fax: 212-707-7677

A member of the  Zurich Financial Services Group

21



CENTRE

# Fax

| | | | |
|---|---|---|---|
| **TO:** | Chief Actuary | **From:** | Richard Grilli |
| | AXA Equitable Life Insurance Company | | |
| **Fax:** | 212-314-4456 | **Pages:** | 2 |
| | | **Date:** | 04/05/2007 |
| **Re:** | March 31, 2007 Reserves | **CC:** | General Counsel – 212-707-7677 |

RECEIVED

APR 10 2007

V.P. & ASSOCIATE GENERAL COUNSEL

APR - 5 2007

REFERRED

# CENTRE

CENTRE INSURANCE
COMPANY

ZC SPECIALTY
INSURANCE COMPANY

CENTRE LIFE
INSURANCE COMPANY

April 5, 2007

VIA FACSIMILE

AXA Equitable Life Insurance Company
1290 Avenue of the Americas
New York, NY 10104
Attention: Chief Actuary
Fax: 212-314-4456

The Bank of New York
101 Barclay Street, Floor 21 West
New York, NY 10286
Attention: Insurance Trust Escrow Unit
Fax: 212-815-5707

105 EAST 17TH STREET
NEW YORK, NY
10003

TEL: 212-859-2600
FAX: 212-859-2794

Re: Reserve Amount Statement

To Whom It May Concern:

ONE EXCHANGE PLACE
SUITE 1000
JERSEY CITY, NJ
07302

TEL: 201-395-4715
FAX: 201-395-4716

In accordance with Section 1 (d) of the Reserve Trust Agreement dated as of July 1, 2000 between Centre Life Insurance Company, The Equitable Life Assurance Society of the United States, and the Bank of New York, the Reserve Amount as of March 31, 2007 is as follows:

**Total GAAP Reserves        $1,587,711,000**

There were no material changes in methodology or actuarial assumptions underlying the reserves as of March 31, 2007 from what was used at December 31, 2006

*Richard Grilli*

Richard Grilli
President
Centre Life Insurance Company

Cc: AXA Equitable Life Insurance Company
1290 Avenue of the Americas
New York, NY 10104
Attention: General Counsel
Fax: 212-707-7677

A member of the ⊘ Zurich Financial Services Group

22

**Centre Life
Insurance
Company**



| | | | | |
|---|---|---|---|---|
| **TO:** | Mr. William Casill | **From:** | Richard Grilli | |
| **Fax:** | 212-314-4456 | **Pages:** | 3 | |
| | | **Date:** | 01/12/2007 | |
| **Re:** | Credit Support Report | **CC:** | | |

DEC 16 2007

# CENTRE

January 5, 2007

<u>VIA FACSIMILE</u>

CENTRE INSURANCE
COMPANY

ZC SPECIALTY
INSURANCE COMPANY

CENTRE LIFE
INSURANCE COMPANY

AXA Equitable Life Insurance Company
1290 Avenue of the Americas
New York, NY 10104
Attention: Chief Actuary
Fax: 212-314-4456

The Bank of New York
101 Barclay Street, Floor 21 West
New York, NY 10286
Attention: Insurance Trust Escrow Unit
Fax: 212-815-5707

105 EAST 17TH STREET
NEW YORK, NY
10003

TEL: 212-859-2600
FAX: 212-859-2794

Re: Reserve Amount Statement

To Whom It May Concern:

ONE EXCHANGE PLACE
SUITE 1000
JERSEY CITY, NJ
07302

TEL: 201-395-4715
FAX: 201-395-4716

In accordance with Section 1 (d) of the Reserve Trust Agreement dated as of July 1, 2000 between Centre Life Insurance Company, The Equitable Life Assurance Society of the United States, and the Bank of New York, the Reserve Amount as of December 31, 2006 is as follows:

Total GAAP Reserves        $1,592,142,000

There were no material changes in methodology or actuarial assumptions underlying the reserves as of December 31, 2006 from what was used at December 31, 2005.

Richard Grilli

Richard Grilli
President
Centre Life Insurance Company

Cc: AXA Equitable Life Insurance Company
1290 Avenue of the Americas
New York, NY 10104
Attention: General Counsel
Fax: 212-707-7677

WILLIAM CASILL
SENIOR VICE PRESIDENT

DEC 5 2007

REFERRED _____

*A member of the Ⓩ Zurich Financial Services Group*

23



**Centre**

# Fax

| | | | |
|---|---|---|---|
| **TO:** | General Counsel | **From:** | Richard Grill |
| | AXA Equitable Life Insurance Company | | |
| **Fax:** | 212-707-7677 | **Pages:** | 2 |
| | | **Date:** | 10/05/2006 |
| **Re:** | Reserve Amount Statement | **CC:** | 212-707-7677 |
| | | | General Counsel |
| | | | AXA Equitable Life Insurance Company |

OCT - 9 2

RICHARD V. SILVER
EXECUTIVE VICE PRESIDENT
& GENERAL COUNSEL

OCT 6 - 2006

AXA FINANCIAL, INC.
REFERRED TO: Bill Canill ✓
cc: Dave Hattom
Jonathan Gaines

# CENTRE

CENTRE INSURANCE
COMPANY

ZC SPECIALTY
INSURANCE COMPANY

CENTRE LIFE
INSURANCE COMPANY

October 6, 2006

<u>VIA FACSIMILE</u>

AXA Equitable Life Insurance Company
1290 Avenue of the Americas
New York, NY 10104
Attention: Chief Actuary
Fax: 212-314-4456

The Bank of New York
101 Barclay Street, Floor 21 West
New York, NY 10286
Attention: Insurance Trust Escrow Unit
Fax: 212-815-5707

105 EAST 17TH STREET
NEW YORK, NY
10003

TEL.   212-859-2600
FAX.  212-859-2794

Re:  Reserve Amount Statement

To Whom It May Concern:

ONE EXCHANGE PLACE
SUITE 1000
JERSEY CITY, NJ
07302

TEL·   201-395-6715
FAX·  201-395-6716

In accordance with Section 1 (d) of the Reserve Trust Agreement dated as of July 1, 2000 between Centre Life Insurance Company, The Equitable Life Assurance Society of the United States, and the Bank of New York, the Reserve Amount as of September 30, 2006 is as follows:

> **Total GAAP Reserves**        $1,576,402,000

There were no material changes in methodology or actuarial assumptions underlying the reserves as of September 30, 2006 from what was used at December 31, 2005

*Richard Grilli*

Richard Grilli
President
Centre Life Insurance Company

Cc: AXA Equitable Life Insurance Company
1290 Avenue of the Americas
New York, NY 10104
Attention: General Counsel
Fax: 212-707-7677

*A member of the* ⓩ *Zurich Fin* ncial *Services Group*

24

# CENTRE

July 7, 2006

CENTRE INSURANCE
COMPANY

ZC SPECIALTY
INSURANCE COMPANY

CENTRE LIFE
INSURANCE COMPANY

VIA FACSIMILE

AXA Equitable Life Insurance Company
1290 Avenue of the Americas
New York, NY 10104
Attention: Chief Actuary
Fax: (212) 314 4456

The Bank of New York
101 Barclay Street, Floor 21 West
New York, NY 10286
Attention: Insurance Trust and Escrow Unit
Fax: (212) 815 5707

105 EAST 17TH STREET
NEW YORK, NY
10003

TEL:  212-859-2600
FAX:  212-859-2794

Re:  Reserve Amount Statement

To Whom It May Concern:

ONE EXCHANGE PLACE
SUITE 1000
JERSEY CITY, NJ
07302

TEL:  201-395-4715
FAX:  201-395-4716

In accordance with Section 1 (d) of the Reserve Trust Agreement dated as
of July 1, 2000 between Centre Life Insurance Company, The Equitable
Life Assurance Society of the United States, and the Bank of New York,
the Reserve Amount as of June 30, 2006 is as follows:

**Total GAAP Reserves    $1,570,144,000**

There were no material changes in methodology or actuarial assumptions
underlying the reserves as of June 30, 2006 from what was used at
December 31, 2005.

*Richard Grilli*

Richard Grilli
President
Centre Life Insurance Company

Cc: AXA Equitable Life Insurance Company
1290 Avenue of the Americas
New York, NY 10104
Attention: General Counsel
Fax: (212) 707 7677

*A member of the Zurich Financial Services Group*

25

# CENTRE

CENTRE INSURANCE
COMPANY

ZC SPECIALTY
INSURANCE COMPANY

CENTRE LIFE
INSURANCE COMPANY

January 25, 2008

Mr. William Casill
Senior Vice President and Actuary
AXA Equitable Life Insurance Company
1290 Avenue of the Americas
New York, NY 10104

ONE CHASE PLAZA
45 BROADWAY
NEW YORK  NY
10006

TEL  212 859 2600
FAX  212 859 2703

By Fax: 212-314-4456

Re: Credit Support Agreement between the Equitable Life Assurance Society
   and Centre Life Insurance Company.

Dear Bill,

In accordance with Section 7.6 of the Credit Support Agreement, attached is
the Credit Support Report as of December 31, 2008.

Sincerely,

*Richard Grilli*

Richard Grilli
President

## CLIC/Equitable Quota Share Reinsurance

### Credit Support Formula

#### Calculation @   September 30, 2007

| | Gross of ZIBB cession (000) |
|---|---|
| R(t) | $1,751,546 |
| F(t) | 0.62 |
| M(t) | $2,400,080 |
| LC(t) | $0 |
| Reserve Trust(t) | $1,570,938 |
| Security Trust(t) | $0 |
| Z(t) | $500,000 |
| Q(t) | N/A |
| Limit of XOLRe | $331,127 |
| Ceded Incurred Losses under XOLRe | $78,142 |
| Remaining XOLRe retention (B(t)) | $1,487,304 |
| N(t,CLIC) | $1 |
| q(t,CLIC) | 1 |
| N(t,ZIC) | $12,773,367 ** |
| q(t,ZIC) | 2.5 |
| N(t,CRUS) | $618,423 * |
| q(t,CRUS) | 2.5 |
| VOBA(t) | $0 |
| Required adjustment to Equity(t) to avoid double counting | $0 |
| | |
| T(t) | ($180,808) |
| D(t) | 2.50 |
| L(t) | $252,985 |
| X(t) | $252,985 |
| C(t) | $1,440,192 |
| K(t) | $1,512,569 =Total Credit Support |
| ME(t) | $680,608 |
| | |
| Equity(t) | $13,391,791 |
| Required Equity Floor | $1,440,192 |

* September 30, 2007 Actual
** December 31, 2006 Actual

---

26

# EQUITABLE LIFE
## INDIVIDUAL DISABILITY INCOME BUSINESS
### REPORT TO THE AUDIT COMMITTEE

*May 19, 1999*



EQUITABLE

*Member of the Global Group*

DISABILITY INCOME

HISTORICAL OVERVIEW

*High interest rates in the 1980's created a comfortable environment in which insurers chased market share at the expense of operating margins.*

1961 -- Equitable begins offering individual disability income policies.

1980 - 1988 -- High interest rates in the early 80's spur an industry war for market share

- Lower premium rates

- Liberalized contract provisions
  - COLA Riders
  - Life Time Benefits
  - "Own Occupation" Definition of Disability
  - Guaranteed Insurability Riders

- Liberal underwriting
  - Overinsurance
  - Relaxed Medical Standards

- Concentration by Equitable on high risk professions (Physicians, Dentists) and high risk states (NY, PA, FL, CA)

| DISABILITY INCOME |
| HISTORICAL OVERVIEW |

*The decline in interest rates in the late 80's exposed design and pricing deficiencies.*

1989 - 1992 -- Claims experience for the Equitable (and the industry) deteriorates significantly.

1993 -- Equitable discontinues the manufacturing of DI policies. A private label arrangement is created with Paul Revere for the sale of new DI policies by Equitable's agents.

1993 -- Equitable closes its DI claims office and enters into a TPA agreement with Paul Revere for the management of claims arising from Equitable's existing book of business.

1993 - 1996 -- Financial losses continue at unacceptable levels.

In late 1996 Equitable initiates two actions to address these losses.

• Claims Management Restructuring

• Reserve Strengthening

2

*Significant changes were made in 1997 to the DI claims management structure in order to address the deficiencies of the prior system.*

| | |
|---|---|
| **DISABILITY INCOME** | |
| **CLAIMS MANAGEMENT RESTRUCTURING** | |

## *Problem Area*

### Lack of Central Focus

- Equitable's claims were managed by examiners who also had responsibility for claims on Paul Revere's own paper.

- Conflicting priorities affected results.

## *Actions Taken*

### Dedicated Claims Office Created

- In February, 1997 Provident opens a new claims office in Springfield, MA dedicated exclusively to the Equitable. The new office is initially staffed with 30 Provident employees. Additional support is provided by Provident from its other claims offices.

- Certain types of claims continue to be administered by Provident's Worcester claims office until the Springfield office is fully functional.

- By January, 1999 the Springfield office is fully staffed with 70 Provident employees and only occasional use of Provident's non-Springfield employees is required.

3

*Contractual provisions were revised to align Equitable's and Provident's interests.*

| | |
|---|---|
| **DISABILITY INCOME** | **CLAIMS MANAGEMENT RESTRUCTURING** |

## *Problem Area*

### Incentives not Aligned

- The Revere/Equitable contract was on a fixed cost basis, which created a disincentive for Revere to provide the level of resources needed for proper management.

- Revere's compensation did not vary with the quality of work or with claims experience.

## *Actions Taken*

### Revised Administration Agreement

- Equitable and Provident agree on a new contract. The new contract is on a cost-plus basis under which Provident is not penalized for additional (appropriate) expenses.

- An incentive arrangement is also included in the contract to align Equitable's and Provident's interests.

### Quality Assurance

- A team of Equitable employees, sited in the Springfield office, is established in 1997 to monitor activity, ensure proper management and provide Equitable with timely information as to current results.

| DISABILITY INCOME |
| CLAIMS MANAGEMENT RESTRUCTURING |

*Litigation procedures were tightened to focus attention on this important aspect of the business.*

## Problem Area

### Litigated Claims

- Equitable attorneys were not directly involved in litigation process.

- Litigated claims were sent to local counsel with little follow-up/support from Revere.

## Actions Taken

### Litigation Process Strengthened

- In early 1998 Equitable and Provident attorneys create formal procedures for management of litigated claims.

- Provident dedicates three attorneys to Equitable business.

- Equitable creates a litigation quality control team consisting of one Equitable attorney and one outside counsel. The team reviews litigated claims and advises Equitable on large, high risk cases.

- Quarterly litigation communication meetings are held to review results, discuss strategy on specific cases and plan future activities.

5

*Disability Income is still a large book of business, even though new sales were discontinued in 1993.*

|  | DISABILITY INCOME RESERVE STRENGTHENING |  |  |
|---|---|---|---|
|  | 1996 | 1997 | 1998 |
|  | (End of year values excluding assumed business) |  |  |

At the end of 1998 there were 111,000 active policies.

|  | 1996 | 1997 | 1998 |
|---|---|---|---|
| Number of Active Policies | 125,000 | 119,000 | 111,000 |
| Premiums Incurred During Year | $122,000,000 | $117,000,000 | $112,000,000 |
| Active Life Reserves | $248,000,000 | $255,000,000 | $255,000,000 |
| Reserve per Active Life | $1,984 | $2,143 | $2,297 |

There were 3,728 disabled lives (3.3% of the active lives) at the end of 1998.

|  | 1996 | 1997 | 1998 |
|---|---|---|---|
| Number of Disabled Lives | 3,513 | 3,650 | 3,728 |
| Disabled Life Reserves | $707,000,000 | $743,000,000 | $781,000,000 |
| Reserve per Disabled Life | $201,252 | $203,562 | $209,496 |

6

*Equitable's Disability claims are strongly skewed by occupation and state of residence.*

| DISABILITY INCOME |
| RESERVE STRENGTHENING |

## Distribution of Active Policies by Occupation and State

|  | High Risk States (CA, FL, NY & PA) | Other States | Total |
|---|---|---|---|
| Health Professionals | 13% | 16% | 29% |
| Other Occupations | 31% | 40% | 71% |
| Total | 44% | 56% | 100% |

## Distribution of Claims by Occupation and State

|  | High Risk States (CA, FL, NY & PA) | Other States | Total |
|---|---|---|---|
| Health Professionals | 31% | 21% | 52% |
| Other Occupations | 27% | 21% | 48% |
| Total | 58% | 42% | 100% |

## Ratio of Claims to Active Policies by Occupation and State

|  | High Risk States (CA, FL, NY & PA) | Other States | Total |
|---|---|---|---|
| Health Professionals | 238% | 131% | 179% |
| Other Occupations | 87% | 53% | 68% |
| Total | 132% | 75% | 100% |

Note: Distributions are based on amounts of monthly income.

| DISABILITY INCOME |
| :---: |
| RESERVE STRENGTHENING |

*An analysis of 1995 and 1996 experience led to reserve strengthening of $320 million as of 12/31/96.*

- The new reserve basis reflects:

  – higher incidence rates

  – lower claim termination rates (particularly for physicians)

  – higher provisions for claims management expenses

- Analytical software and modelling capabilities are enhanced in 1997.

  – claims reporting patterns and termination rates are analyzed

  – certain reserve components are reallocated, but the total reserve amount and assumptions are revalidated

8

*Total earnings were slightly positive in 1998.*

| DISABILITY INCOME |
|:---:|
| EMERGING EXPERIENCE |

## 1998 GAAP Earnings*
### ($ Millions)

|  | Active Lives | Disabled Lives | Total |
|---|---|---|---|
| Premiums | 112.2 | 0.0 | 112.2 |
| Net Investment Income | 27.4 | 61.7 | 89.1 |
| Other Insurance Income | 2.7 | 0.0 | 2.7 |
| **Total Revenues** | 142.3 | 61.7 | 204.0 |
| Paid Benefits | 6.6 | 116.4 | 123.0 |
| Reserve Increase | 76.5 | (39.4) | 37.1 |
| Expense | 25.5 | 14.9 | 40.4 |
| **Total Deductions** | 108.6 | 91.9 | 200.5 |
| **Reported Adjusted Earnings** | 33.7 | (30.2) | 3.5 |

As discussed below earnings from Active lives were better than expected in 1998 due to lower than assumed incidence rates. Earnings from Disabled lives were lower than expected due to lower than assumed termination rates.

* Excludes reinsurance assumed.

9



*As expected, earnings are near zero with some quarterly volatility.*

DISABILITY INCOME
EMERGING EXPERIENCE

Adjusted Earnings Pre-tax

Q1 Q2 Q3 Q4 Q1 Q2 Q3 Q4 Q1 Q2 Q3 Q4 Q1
1997        1998        1999

10
5
0
-5
-10
-15

Note:  Q2 '98 earnings include a loss of $7.4 million due to settlements of several high risk litigated cases; Q1 '99 includes provision for a $2.2 million settlement.

10

*Full year earnings improved slightly from 1997 to 1998. Losses from morbidity were negligible, particularly in comparison to the size of the business.*

┌─────────────────────┐
│  DISABILITY INCOME  │
│                     │
│      EMERGING       │
│     EXPERIENCE      │
└─────────────────────┘

# Summary of Earnings by Source*

|                   | 1997 | 1998 |
|-------------------|------|------|
|                   | ($ Million) | |
| Interest Margin   | 11.6 | 16.8 |
| Expenses          | (13.3) | (15.9) |
| Persistency Losses | (4.6) | (2.8) |
| Morbidity Losses  | (.6) | (1.0) |
| Total             | (6.9) | (2.9) |

* Includes reinsurance assumed.

```
┌─────────────────────┐
│  DISABILITY INCOME  │
│  ─────────────────  │
│      EMERGING       │
│     EXPERIENCE      │
└─────────────────────┘
```

*Interest on equity which we allocate to DI contributed to earnings.*

- The reserve interest assumption was established at the end of 1996. Yields have declined since then, resulting in a reduction in portfolio yields as assets turn over.

- This shortfall has been more than offset by interest earnings on equity.

- The interest rate assumption is a long range assumption. However, if interest rates were to continue at current levels, we would consider strengthening reserves.

12

DISABILITY INCOME
---
EMERGING
EXPERIENCE

*Expense losses are attributable primarily to overhead, which cannot be funded.*

- We account for DI under "loss recognition" accounting principles, which prohibit prefunding of overhead expenses.

- Direct expenses (commissions, premium taxes, administration) are funded for as part of reserves.

13

14

┌─────────────────────┐
│  DISABILITY INCOME  │
│  ─────────────────  │
│      EMERGING       │
│     EXPERIENCE      │
└─────────────────────┘

*Persistency losses resulted from slightly lower lapse rates than assumed.*

- Reserves are based on assumed lapse rates. When a customer lapses coverage, we release the active life reserve which had been built up to fund for future benefits.

- Lapse rates in 1997 an 1998 were slightly lower than assumed. This higher persistency resulted in less reserves being released than assumed which in turn caused a slight earnings loss in each year.

```
┌─────────────────────┐
│  DISABILITY INCOME  │
│  ─────────────────  │
│     EMERGING        │
│    EXPERIENCE       │
└─────────────────────┘
```

## Morbidity losses were close to zero in 1997 and 1998

- Morbidity experience encompasses

  - incidence of claims
  - claim termination rates

- In both years, incidence rates were lower than assumed but terminations also were lower than assumed.

15

*Summary and Conclusions*

DISABILITY INCOME
SUMMARY

- We have addressed several weaknesses - procedural as well as financial - in claims management and taken corrective measures.

- We have just re-negotiated our claims administration agreement with Provident. The new agreement guarantees Equitable continuous service through 2020.

- Recent earnings have been close to zero.

- Reserve assumptions continue to be appropriate.

- If interest rates continue at current or lower levels, we will have to consider reserve strengthening.

- We are working with intermediaries and reinsurers to find ways to remove this business from our books.

16

27

Goldman, Sachs & Co. | 85 Broad Street | New York, New York 10004
Tel: 212-902-1000

**Goldman
Sachs**

<u>**PERSONAL AND CONFIDENTIAL**</u>

February 28, 1999

Mr. Stanley B. Tulin
Vice Chairman and Chief Financial Officer
The Equitable Companies
1290 Avenue of the Americas
New York, NY 10104

Dear Stan:

We are pleased to confirm the arrangements under which Goldman, Sachs & Co. ("Goldman Sachs")
is exclusively engaged by The Equitable Life Assurance Society of the United States (the "Company")
as financial advisor in connection with the possible disposition, sale or other transfer, in one or more
transactions, of its disability income business (the "Business"), including, without limitation, one or
more sales or other transfers (in which the Company may pay or receive consideration) of assets,
receivables and/or liabilities of the Business.

During the term of our engagement, we will provide you with financial advice and assistance in
connection with this potential transaction, which may include performing valuation analyses, assisting
in the preparation of offering materials, searching for a reinsurer acceptable to you, coordinating visits
of potential reinsurers and assisting you in negotiating the financial aspects of the transaction.

The fees for our engagement will depend on the outcome of the assignment.  The fee for our
engagement will be $2,250,000, payable to us in cash upon consummation of the transaction in which
all or a portion of the Business is disposed of, sold or transferred.

You also agree to reimburse us periodically, upon request, and upon consummation of the transaction
or transactions contemplated hereby or upon termination of our services pursuant to this agreement,
for our reasonable out-of-pocket expenses, including the fees and disbursements of our attorneys,
plus any sales, use or similar taxes (including additions to such taxes, if any) arising in connection
with any matter referred to in this letter.

In order to coordinate most effectively our efforts together to effect a transaction satisfactory to the
Company, the Company and its management will promptly inform us of any inquiry they may receive
concerning the availability of all or a portion of the Business for purchase. Also, during the period of
our engagement, neither the Company nor the management of the Company will initiate any
discussions looking toward the sale of the Business without first consulting with Goldman Sachs.

The Equitable Companies
February 28, 1999
Page Two

Please note that any written or oral advice provided by Goldman Sachs in connection with our engagement is exclusively for the information of the Board of Directors and senior management of the Company (including their legal counsel), and may not be disclosed to any third party or circulated or referred to publicly without our prior written consent.

In connection with engagements such as this, it is our firm policy to receive indemnification. The Company agrees to the provisions with respect to our indemnity and other matters set forth in Annex A which is incorporated by reference into this letter.

As you know, Goldman Sachs is a full service securities firm and as such may from time to time effect transactions, for its own account or the account of customers, and hold positions in securities or options on securities of the Company and other companies which may be the subject of the engagement contemplated by this letter.

Our services may be terminated by you or us at any time with or without cause effective upon receipt of written notice to that effect. We will be entitled to the applicable fee set forth above in the event that at any time prior to the expiration of two years after such termination an agreement is entered into with respect to the disposition, sale or other transfer of all or a portion of the Business which is eventually consummated and any of the acquirers or their affiliates were on the list of prospective acquirers provided by Goldman Sachs to the Company during the term of its engagement or Goldman Sachs or the Company, or the management, directors or affiliates of the Company had contact with the acquiring party, or any affiliate thereof, regarding such a transaction during the period of our engagement.

The Company recognizes that, in providing our services pursuant to this letter, we will rely upon and assume the accuracy and completeness of all of the financial and other information discussed with or reviewed by us for such purposes, and we do not assume responsibility for the accuracy or completeness thereof. Goldman Sachs will have no obligation to conduct any independent evaluation or appraisal of the assets or liabilities of the Business or to advise or opine on any related solvency issues. It is understood and agreed that Goldman Sachs will act under this letter as an independent contractor with duties solely to the Company and nothing in this letter or the nature of our services shall be deemed to create a fiduciary or agency relationship between us and the Company or its stockholders. Except as set forth in Annex A hereto, nothing in this letter is intended to confer upon any other person (including stockholders, employees or creditors of the Company) any rights or remedies hereunder or by reason hereof.

The Equitable Companies
February 28, 1999
Page Three

Please confirm that the foregoing is in accordance with your understanding by signing and returning to us the enclosed copy of this letter, which shall become a binding agreement upon our receipt.  We are delighted to accept this engagement and look forward to working with you on this assignment.

Very truly yours,

*(signature)*

(GOLDMAN, SACHS & CO.)

Confirmed:

_____

(THE EQUITABLE LIFE ASSURANCE SOCIETY OF THE UNITED STATES)

By:  _____
        Name:
        Title:

Date:  _____

The Equitable Companies
February 28, 1999
Page Four

### Annex A

*In the event that Goldman Sachs becomes involved in any capacity in any action, proceeding or investigation brought by or against any person, including stockholders of the Company, in connection with or as a result of either our engagement or any matter referred to in this letter, the Company periodically will reimburse Goldman Sachs for its legal and other expenses (including the cost of any investigation and preparation) incurred in connection therewith; provided however, that if it is found in any such action, proceeding or investigation that any loss, claim, damage or liability of Goldman Sachs has resulted from the gross negligence or bad faith of Goldman Sachs in performing the services which are the subject of this letter, Goldman Sachs shall repay such portion of the reimbursed amounts that is attributable to expenses incurred in relation to the act or omission of Goldman Sachs which is the subject of such finding. The Company also will indemnify and hold Goldman Sachs harmless against any and all losses, claims, damages or liabilities to any such person in connection with or as a result of either our engagement or any matter referred to in this letter, except to the extent that any such loss, claim, damage or liability results from the gross negligence, willful misconduct or bad faith of Goldman Sachs in performing the services that are the subject of this letter. If for any reason the foregoing indemnification is unavailable to Goldman Sachs or insufficient to hold it harmless, then the Company shall contribute to the amount paid or payable by Goldman Sachs as a result of such loss, claim, damage or liability in such proportion as is appropriate to reflect the relative economic interests of the Company and its stockholders on the one hand and Goldman Sachs on the other hand in the matters contemplated by this letter as well as the relative fault of the Company and Goldman Sachs with respect to such loss, claim, damage or liability and any other relevant equitable considerations. The reimbursement, indemnity and contribution obligations of the Company under this paragraph shall be in addition to any liability which the Company may otherwise have, shall extend upon the same terms and conditions to any affiliate of Goldman Sachs and the partners, directors, agents, employees and controlling persons (if any), as the case may be, of Goldman Sachs and any such affiliate, and shall be binding upon and inure to the benefit of any successors, assigns, heirs and personal representatives of the Company, Goldman Sachs, any such affiliate and any such person. The Company also agrees that neither Goldman Sachs nor any of such affiliates, partners, directors, agents, employees or controlling persons shall have any liability to the Company or any person asserting claims on behalf of or in right of the Company in connection with or as a result of either our engagement or any matter referred to in this letter except to the extent that any losses, claims, damages, liabilities or expenses incurred by the Company result from the gross negligence, willful misconduct or bad faith of Goldman Sachs in performing the services that are the subject of this letter. Prior to entering into any agreement or arrangement with respect to, or effecting, any proposed sale, exchange, dividend or other distribution or liquidation of all or a significant portion of its assets in one or a series of transactions or any significant recapitalization or reclassification of its outstanding securities that does not directly or indirectly provide for the assumption of the Company's obligations set forth in this Annex A, the Company will notify Goldman Sachs in writing thereof (if not previously so notified) and, if requested by Goldman Sachs, shall arrange in connection therewith alternative means of providing for the obligations of the Company set forth in this paragraph, including the assumption of such obligations by another party, insurance, surety bonds or the creation of an escrow, in each case in an amount and upon terms and conditions satisfactory to Goldman Sachs.* **Any right to trial by jury with respect to any action or proceeding arising in connection with or as a result of either our**

The Equitable Companies
February 28, 1999
Page Five

engagement or any matter referred to in this letter is hereby waived by the parties hereto. *The provisions of this Annex A shall survive any termination or completion of the engagement provided by this letter agreement, and this letter agreement shall be governed by and construed in accordance with the laws of the State of New York without regard to principles of conflicts of laws.*

*Promptly after receipt by Goldman Sachs of notice of its involvement in any action, proceeding or investigation, Goldman Sachs shall, if a claim for indemnification in respect thereof is to be made against the Company under this Annex A, notify the Company in writing of such involvement. Failure by Goldman Sachs to so notify the Company shall relieve the Company from the obligation to indemnify Goldman Sachs under this Annex A only to the extent that the Company suffers actual prejudice as a result of such failure, but shall not relieve the Company from it obligation to provide reimbursement and contribution to Goldman Sachs. If any person is entitled to indemnification under this Annex A (the "Indemnified Person") with respect to any action or proceeding brought by a third party that is also brought against the Company, the Company shall be entitled to assume the defense of any such action or proceeding with counsel reasonably satisfactory to the Indemnified Person. Upon assumption by the Company of the defense of any such action or proceeding, the Indemnified Person shall have the right to participate in such action or proceeding and to retain its own counsel but the Company shall not be liable for any legal expenses of other counsel subsequently incurred by such Indemnified Person in connection with the defense thereof unless (i) the Company has agreed to pay such fees and expenses, (ii) the Company shall have failed to employ counsel reasonably satisfactory to the Indemnified Person in a timely manner, or (iii) the Indemnified Person shall have been advised by counsel that there are actual or potential conflicting interests between the Company and the Indemnified Person, including situations in which there are one or more legal defenses available to the Indemnified Person that are different from or additional to those available to the Company. The Company shall not consent to the terms of any compromise or settlement of any action defended by the Company in accordance with the foregoing without the prior written consent of the Indemnified Person. The Company shall not be required to indemnify Goldman Sachs for any amount paid or payable by Goldman Sachs in the settlement of any action, proceeding or investigation without the written consent of the Company, which consent shall not be unreasonably withheld.*

28

# CENTRE

October 28, 1999

**CENTRE INSURANCE COMPANY**

**ZC SPECIALTY INSURANCE COMPANY**

**CENTRE LIFE INSURANCE COMPANY**

Mr. Mark W. Griffin
Vice President
Goldman Sachs & Co.
85 Broad Street
New York, New York 10004

By fax:  212-346-3895

Dear Mark,

We are pleased to provide this letter in response to your request for a proposal reinsuring Equitable's direct individual disability income business ("the Business").  This letter will address the items requested.

### (i) Cash Consideration

Based on our analysis and due diligence to date, we expect the cash consideration to Centre Life will be $1.3 Billion as of December 31, 1998.  This figure is still subject to significant uncertainty (both up and down) due to data quality issues that we are currently discussing with Equitable.  Based on our current understanding of the issues, we are not optimistic that the final price will drop below $1.2 billion.  We received information yesterday that Equitable believes conditions errors and is investigating; if it is correct, our price could increase significantly.

This figure is subject to a couple of adjustments, namely,

1)  since we are using projections from 12/31/98, the price needs to be adjusted to take into account the actual cash flows from that date to the closing date, and
2)  it does not include any cancellation fee due under the terms of UnumProvident Administration Agreement.

We are bidding on the basis of indemnity reinsurance only and, therefore, our price is not appropriate for assumption reinsurance.  Assumption reinsurance is not, in our opinion, a cost effective, workable solution because it will entail substantial time and costs without any guarantee that all policyholders will agree to the assumption.  We believe that this will not achieve Equitable's goal of being 100% out of the business and the resulting dual "ownership" of the policies will be a logistical nightmare.

### (ii) Comments on the Draft Agreements

The agreements are drafted with assumption reinsurance in mind.  While we understand that that is Equitable's ultimate goal, they are not appropriately drafted to suit indemnity reinsurance.  Given that, we have the following high level comments regarding the agreements:

1)  We believe that there should be four documents, i.e., indemnity reinsurance, administration agreement, transition services agreement and a master agreement tying them all together.

---

ONE CHASE
MANHATTAN PLAZA
NEW YORK, NY
10005

TEL: 212-898-5300
FAX: 212-898-5400

ONE EXCHANGE PLACE
SUITE 1000
JERSEY CITY, NJ
07302

TEL: 201-395-4715
FAX: 201-395-4716

ONE MARKET PLAZA
SPEAR STREET TOWER
SUITE 1715
SAN FRANCISCO, CA
94105-1017

TEL  415-977-7850
FAX  415-977-7851

*A member of the Zurich Financial Services Group*

**CONFIDENTIAL**

CTR-A 592791

# CENTRE

2) The master agreement we have in mind is significantly different from the acquisition agreement you sent to us in that it is simpler and much to of the asset transfer wording is taken out of it. This agreement could also say that we agree to work in good faith towards an assumption agreement.

3) With respect to the reinsurance agreement:
   a) This is the key document, not the acquisition agreement and, as such, we would like to see it on more of a stand-alone basis. For example, in the current format, the premium references a value in the acquisition agreement and the definitions are scattered in multiple documents.
   b) References to assumption reinsurance need to be removed, other than as a limitation on the term.
   c) Examples of some specific items whose treatment we do not agree with or have issue with include ceding commissions, dividend payments, definition of subject losses and guaranty fund assessments.

4) With respect to the administration agreement, we will be using a Third Party Administrator (an affiliate, Disability Management Services) and the agreement needs to be modified slightly to accommodate this. For example, they are required by law to identify themselves as a TPA and not as Equitable in certain communications with policyholders. They will also need access to various documents and marketing materials (the current agreements contemplate that the reinsurer and administrator are the same entity and, therefore, do not provide this access to the TPA). In addition, we expect that there needs to be a transition period wherein UnumProvident continues to manage the claims and policies until DMS takes over.

We have many specific comments and changes that are best left to the next round of discussions.

## (iii) Description of the Legal Entity

With respect to the risk bearing entity, the reinsurer will be Centre Life Insurance Company ("Centre Life"). Centre Life is domiciled in Massachusetts and licensed in all states. It is the former Massachusetts Casualty Insurance Company and has a sizeable book of disability income insurance currently in run-off.

Centre Life is a member of the Centre Group, which in turn is a member of the Zurich Financial Services Group. Please see the attached fact sheet on the Centre Group (Exhibit A).

With respect to the third party administrator, we expect to use Disability Management Services ("DMS") which is located in Springfield, MA, with offices in Syracuse, NY and Boston, MA. The Centre Group owns a 1/3 interest in DMS. We have used them for a number of other similar transactions and are confident that you will find that they will provide superior service to your policyholders. Attached is a short fact sheet on DMS (Exhibit B).

We would expect DMS to begin to take over the claims management in February, 2000 (after the year-end rush is over). We expect that administration will involve a transition period of 12 to 18 months.

CONFIDENTIAL

CTR-A 592792

# CENTRE

### (vii) Closing conditions

The specific conditions to close include:

1) Satisfactory negotiation and execution of definitive agreements appropriate to the transaction structure as we have proposed: master agreement; transition services agreement; administration agreement and indemnity agreement.
2) Completion of due diligence including, among others, data quality audit (inclusive of the systems producing the data), resolution of outstanding actuarial analyses, audit of Tillinghast model.
3) Finalization of our pricing based on 1) and 2).
4) Receipt of Board approval of the final terms and conditions.
5) Receipt of all regulatory approvals.

As a point of clarification, in your September 14 letter, you state that the Equitable "reserves the right, in its sole discretion and without liability therefor, to withhold any or all information...." This is a condition under which we are not willing to continue to work on this transition. If the Centre Group is selected, we would e3xpect that all requested information would be provided to us to the extent possible.

Please call me if you have any questions.

We look forward to hearing from you.

Sincerely,

Frank D. Pierson
CEO
Centre Life Insurance Company

**CONFIDENTIAL**

# CENTRE

Exhibit A
**CENTRE GROUP PROFILE**

The Centre Group is a pioneer in designing customized programs that help clients solve both their risk management and capital needs, ultimately enhancing shareholder value. The Company's clients include insurance companies, other financial institutions, corporations, and professional partnerships. The Centre Group also provides support for non-recourse project finance, asset finance, leasing transactions, securitization and credit enhancement.

These unique programs, which frequently combine elements of insurance, venture capital, commercial banking and investment banking, can improve financial ratings, increase cash flow, reduce tax liability, increase borrowing capacity, optimize project financing or leasing activities, and enable and enhance the closing of financial transactions.

With the structure of a boutique firm, but the capital and underwriting resources of a large financial services company, the Centre Group can respond rapidly to the risk management and capital needs of large and middle-market companies on a worldwide basis. The Centre Group enters into long term programs with its customers by underwriting insurance policies that transfer asset, credit, event & market risks from clients; providing insurance guarantees as substitutes for traditional forms of capital and credit; and, committing funded or contingent capital in various forms.

Centre is a member of the Zurich Financial Services Group, headquartered in Zurich, Switzerland. The Zurich Financial Services Group is one of the global leaders in the financial services industry, providing its customers with products and solutions in the area of financial protection and asset accumulation. With offices in some 60 countries, Zurich Financial Services reaches over 30 million customers and employs more than 68,000 people. Based on consolidated figures for 1998, the Group achieved gross premiums of more than USD 45 billion and net income of USD 2.8 billion (before special charges relating to merger with BAT). At December 31, 1998, the Group had USD 415 billion under management and USD 23 billion in shareholder's equity.

| | |
|---|---|
| Ratings: | "A" or "Excellent" by A.M. Best Company<br>"AA" or "Excellent" by Standard & Poor's Corporation |

Year-end 1998 financial information:
Assets: $2.9 billion
Surplus: $1.2 billion

| | |
|---|---|
| Customers: | Corporations, financial institutions and insurance companies including MONY, UNUM, John Hancock, Sun Life, and many others. |
| Founded: | 1988 |
| Worldwide<br>Management: | David Wasserman, Chief Executive Officer<br>Thomas Dickson, Chief Underwriting Officer<br>Frank Pierson, Chief Technical Officer |
| Office<br>Locations: | Bermuda, Dublin, Hong Kong, London, New York, San Francisco, Sydney, Zurich |
| Website: | www.centresolutions.com |

**CONFIDENTIAL**

CTR-A 592794

# CENTRE

### Exhibit B

## *Disability Management Services, Inc.*

Disability Management Services, Inc. ("DMS") is a third party administrator and consulting firm specializing in the management of disability insurance risk. Headquartered in Springfield, Massachusetts, the company was founded in 1995 to meet significant marketplace demand for independent claims management resources capable of optimally managing disability insurance claim outcomes. It is fundamental to the DMS mission to contribute to the profitability of its client companies through the applied practice of pro-active, cost-effective claims management techniques and the provision of efficient, professional administrative services.

### Company History

Founded July 24, 1995 by a group of disability insurance claims professionals, DMS established its offices in East Windsor, Connecticut to support the Travelers Insurance Company as a professional third party claims management resource. In June, 1996, DMS entered into a contractual relationship with Employers Reinsurance Corporation to provide third party claims management support to ERC ceding companies. In July, 1996, the company formed a strategic partnership with the Zurich Centre Group. In the first quarter of 1997, DMS contracted with Penn Mutual Life Insurance Company and Central States Health & Life Company of Omaha to provide third party claims management services. In April, 1997, the company relocated its operations to Springfield, Massachusetts. Effective January 1, 1998, DMS contracted with the Mutual Life Insurance Company of New York ("MONY") and Centre Life Reinsurance Limited to manage and administer the MONY disability insurance line of business. DMS established a satellite operation in Syracuse, New York in January, 1998 to service MONY policyholders. In April, 1998, DMS acquired Psychiatric Disability Consultants, Inc. ("PDC"), establishing PDC as a wholly owned subsidiary providing specialized consulting and independent medical examination (IME) appointment services to the disability insurance marketplace. Effective February 5, 1999, DMS contracted with the Massachusetts Casualty Insurance Company ("MCIC") and Centre Solutions (U.S.) Limited to manage and administer the MCIC insurance operations. DMS has established a satellite operation in Boston, Massachusetts in February, 1998 to service MCIC policyholders.

DMS currently employs approximately 130 people in Springfield, Massachusetts, Syracuse, New York and Boston, Massachusetts. The company is licensed to do business in 50 states and has active licenses to function as a third party administrator in all but four states requiring licensure (with applications pending to update licenses in those four states).

CONFIDENTIAL

CTR-A 592795

# CENTRE

### What Makes DMS Successful

DMS is geographically located in an area of the country where many of the largest disability insurance carriers were domiciled at the peak of the disability insurance market. As a result, DMS has built a substantial and effective claims management organization by hiring experienced and talented claims professionals and effectively supporting them with qualified legal, medical, financial and IT professionals. Given the competitive cost structure of the company coupled with state-of-the-art technology, DMS has the flexibility to integrate its services in accordance with the needs of its client companies.

### Client Companies

Disability Management Services, Inc. currently supports the following companies as a third party administrator and/or as a professional claims management resource:

- The Mutual Life Insurance Company of New York, Syracuse, NY
- Travelers Insurance Company, Hartford, CT
- Penn Mutual Life Insurance Company, Philadelphia, PA
- Central States Health & Life Company of Omaha, Omaha, NE
- New York Life Insurance Company, New York, NY
- MBL Life Assurance Corporation, Newark, NJ
- Federal Home Life Insurance Company, Orlando, FL
- Employers Reinsurance Corporation, Overland Park, KS
- Royal Maccabees Life Insurance Company, Southfield, MI
- Jefferson Pilot Life Insurance Company, Greensboro, NC
- Assurity Life Insurance Company, Lincoln, NE
- ITT Hartford Insurance Company, Simsbury, CT
- Centre Life Insurance Company, New York, NY

# CENTRE

October 28, 1999

Ms. Mark W. Griffin
Vice President
Goldman Sachs & Co.
85 Broad Street
New York, New York 10004

By fax: 212-346-2895

Dear Mark,

We are pleased to provide this letter in response to your request for a proposal whereby Equitable's direct individual disability income business ("the Business"). This letter will address the items requested.

**(i) Cash Consideration**

Based on our analysis and due diligence to date, we expect the cash consideration to Centre Life will be $1.3 Billion as of December 31, 1998. This figure is still subject to significant uncertainty (both up and down) due to data quality issues that we are currently discussing with Equitable. Based on our current understanding of the issues, we are not optimistic that the final price will drop below $1.2 billion. We received information yesterday that Equitable believe conditions errors and is investigating; if it is correct, our price could in some significantly.

This figure is subject to a couple of adjustments, namely,

1) since we are using projections from 12/31/98, the price needs to be adjusted to take into account the actual cash flows from that date to the closing date, and
2) it does not include any cancellation fee due under the terms of Unum-Provident Administration Agreement.

We are bidding on the basis of indemnity reinsurance only and, therefore, our price is not appropriate for assumption reinsurance. Assumption reinsurance is not, in our opinion, a cost effective, workable solution because it will entail substantial time and costs without any guarantee that all policyholders will agree to the assumption. We believe that this will not achieve Equitable's goal of being 100% out of the business and the resulting dual "ownership" of the policies will be a logistical nightmare.

**(ii) Comments on the Draft Agreement**

The agreements are drafted with assumption reinsurance in mind. While we understand that that is Equitable's ultimate goal, they are not appropriately drafted to suit indemnity reinsurance. Given that, we have the following high level comments regarding the agreements:

1) We believe that there should be four documents, i.e. indemnity reinsurance, administration agreement, transition services agreement and a master agreement tying them all together.

*A member of the Zurich Financial Services Group*

---

## TRANSMISSION REPORT

## THIS DOCUMENT WAS CONFIRMED
## (REDUCED SAMPLE ABOVE - SEE DETAILS BELOW)

### ** COUNT **
### TOTAL PAGES SCANNED : 6
### TOTAL PAGES CONFIRMED : 6

*** SEND ***

| No. | REMOTE STATION | START TIME | DURATION | #PAGES | MODE | RESULTS |
|---|---|---|---|---|---|---|
| 1 | Goldman, Sachs & Co. | 10-28-99  8:42AM | 2'07" | 6/  6 | EC | COMPLETED 14400 |

TOTAL   0:02'07"   6

NOTE:
No.  OPERATION NUMBER  48 : 4800BPS SELECTED  EC : ERROR CORRECT  G2 : G2 COMMUNICATION
PD : POLLED BY REMOTE  SF : STORE & FORWARD  RI : RELAY INITIATE  RS : RELAY STATION
MB : SEND TO MAILBOX  PG : POLLING A REMOTE  MP : MULTI-POLLING  RM : RECEIVE TO MEMORY

CONFIDENTIAL   CTR-A 592797

29

PROPRIETARY AND CONFIDENTIAL
Not To Be Duplicated Or Circulated



# EQUITABLE

*Member of the Global* **AXA** *Group*

# The Equitable Life Assurance Society of America
# Disability Income Business

## Information Materials

Goldman, Sachs & Co.
August 1999

# Disclaimer

This Information package contains confidential information regarding The Equitable Life Assurance Society of America. By accepting this information, the recipient agrees that it will cause its directors, officers, employees and representatives to use the information only to evaluate a specific transaction with The Equitable Life Assurance Society of America and for no other purpose, will not divulge any such information to any other party and shall return this information package together with any copies thereof to The Equitable Life Assurance Society of America upon request therefor.

The information contained in this package was obtained from The Equitable Life Assurance Society of America and other sources. Any estimates and projections contained herein have been prepared by the management of The Equitable Life Assurance Society of America and involve significant elements of subjective judgment and analysis which may or may not be correct. Neither The Equitable Life Assurance Society of America nor Goldman, Sachs & Co. makes any representation or warranty, expressed or implied, as to the accuracy or completeness of the information contained in this package, and nothing contained herein is, or shall be relied upon as, a promise or representation, whether as to the past or the future. This package does not purport to contain all of the information that may be required to evaluate such transaction and any recipient hereof should conduct its own independent analysis of The Equitable Life Assurance Society of America and the data contained or referred to herein. Goldman, Sachs & Co. has not independently verified any of such information and assumes no responsibility for its accuracy or completeness. Neither The Equitable Life Assurance Society of America nor Goldman, Sachs & Co. expects to update or otherwise revise the information package or other materials supplied herewith.

# Table of Exhibits

| | Exhibit |
| --- | --- |
| Transaction Overview | I |
| Overview of Disability Income Business | II |
| Benchmark Cash Flows and Sensitivity Analysis | III |
| Active Lives — Summary Statistics | IV |
| Disabled Lives — Summary Statistics | V |
| Claims Frequency Analysis | VI |
| Claims Termination Analysis | VII |
| Policy Persistency Analysis | VIII |
| | |
| Sensitivity Analysis Cash Flows | Appendix |
| Diskette with Cash Flows | A |
| | Back Cover |

1

# Transaction Overview

**The Transaction:**

■ The Equitable Life Assurance Society of America ("The Equitable") has engaged Goldman, Sachs & Co. to assist in the disposition of its Individual Disability Income business

— The Equitable intends to sell all the Individual Disability Income written under its terms prior to July 1994. The business is currently administered by the Provident Life Insurance Company

— The transaction will be in the form of an indemnity and/or assumption reinsurance agreement with an upfront cash payment. Interested parties will submit final bids by noon, October 13

— The subject book of business has over $1 billion of statutory reserves and produced approximately $112 million of premiums in 1998

**Benefits of the Transaction:**

■ 70% of the statutory reserves for the book of business are reserves against disabled lives and only 30% of statutory reserves represent active lives, reflecting the relatively seasoned nature of the book

■ The nature of the block of business will allow the winning bidder to manage a long duration asset portfolio with modest liquidity requirements

■ The block of business offers potential economies of scale with respect to administration

■ The transaction presents an opportunity to leverage existing infrastructure and significantly expand presence in the disability income business at a low acquisition cost

1

# Transaction Overview

**Selling Agent:**    Goldman, Sachs & Co.
                      85 Broad Street
                      New York, NY 10004
                      212-902-1000

**Transaction Team:**

| Contact | Phone | Fax | Email |
|---|---|---|---|
| Mark Griffin (primary) | 212-902-3887 | 212-357-0926 | mark.griffin@gs.com |
| David Reilly | 212-902-6568 | 212-357-0926 | david.reilly@gs.com |
| Barney Schauble | 212-902-9825 | 212-357-0926 | barney.schauble@gs.com |
| Per Johansson | 212-902-6629 | 212-357-0926 | per.johansson@gs.com |
| Kathy Park | 212-902-6387 | 212-422-9458 | katherine.park@gs.com |

# Transaction Process
## Timeline

- **Phase 1, August 23 – September 16**
  - A small number of Potential Acquirors are contacted to determine interest in and ability to acquire subject business
  - Selected parties are asked to sign a Confidentiality Agreement; and
  - Selected parties receive information on the subject business
  - Initial indication of interest bid due by noon on September 16
  - Potential Acquirors submitting most attractive bids will be chosen to participate in Phase 2

- **Phase 2, September 16 – October 13**
  - Potential Acquirors receive access to data room
  - Goldman Sachs will conduct due diligence on the Potential Acquirors
  - Final bids due by noon on October 13

- **Post Agreement**
  - Final due diligence on Acquiror
  - Review and approval by all entities involved
  - Transfer of block of business via indemnity and/or assumption reinsurance

Note: All information provided herein is as of 12/31/1998

3

# The Equitable's Disability Income Business
## Summary Description

Goldman Sachs

| Time Period | Book of Business | Policy Issuer | Policy Terms | Underwriter | Active Lives Admin. | Disabled Claims Admin. |
|---|---|---|---|---|---|---|
| **INCLUDED IN TRANSACTION** | | | | | | |
| Pre-July 1993 | Existing Book | Equitable | Equitable | Equitable | Equitable | Provident |
| July 1993 – June 1994 | Transition Book ■ Paul Revere coinsures all Equitable DI policies issued after July 1993 ■ Equitable retains 20% of the risk | Equitable | Equitable | Paul Revere | Equitable | Provident |
| **EXCLUDED FROM TRANSACTION** | | | | | | |
| February 1994(a) – December 1997 | Private Label Book ■ Policies based on policy forms developed by Paul Revere (purchased by Provident) for Equitable ■ Equitable retains 20% of risk | Equitable | Provident | Provident | Provident | Provident |

(a) Overlap based on when state approvals were received

4

# Reinsurance Term Sheet

| | |
|---|---|
| **Ceding Company:** | The Equitable Life Assurance Society of the United States |
| **Reinsurer:** | Potential Bidder entity |
| **Covered Policies (a)(b):** | Existing Book: Policies underwritten by Equitable prior to July 1993 |
| | Transition Book: Equitable policies underwritten by Paul Revere from July 1993 through June 1994 |
| **Effective Date:** | _____, 1999 |
| **Policy Benefits:** | Reinsurer will pay policy benefit and benefit from existing reinsurance treaties |
| **Reinsurance Premium:** | Cash as of effective date |
| **Term and Cancellation:** | Noncancellable, covering the remaining life of the contracts |
| **Form of Reinsurance:** | Indemnity leading to assumption reinsurance if permitted by states |
| **Administration: (c)** | Following an indemnity reinsurance transaction, the claims administration agreement between Equitable and Provident will remain in effect without change. The agreement may be assigned to Bidder by Equitable, subject to Provident's consent in cases where Bidder is non-creditworthy or a direct disability income competitor of Provident |

(a) Does not include assumed reinsurance business; estimated reserves as of June 1999 totaled approximately $139 million.
(b) Private label book is not included in experience data or analysis presented herein. Net statutory reserves for private label book as of 12/31/1998 totaled approximately $8 million.
(c) Bidder may choose to terminate the agreement. Under the agreement, a break-up fee is payable to Provident equal to 50% of the fees paid under the agreement for the preceding calendar year. Seller will be responsible for the payment of this fee if the termination is made at the Effective Date of the indemnity reinsurance. The claims administration agreement will automatically terminate upon sale through assumption reinsurance

5

2

# Existing and Transition Disability Income Business (a)
## Overview





(a)   Private Label business has not been included in Equitable experience information or sensitivity analyses.   Reserves for Private Label business total approximately $6.09 million as of 12/31/1998.

(b)   Pie chart excludes buy-sell policies totaling 378 as of 12/31/1998; buy-sell policies are included in bar chart above.

(c)   Reserves are net of reinsurance ceded (approximately $45.3 million as of 12/31/1998) and include all expense reserves and claim liabilities.

6

# The Equitable's Disability Income Business
## Chronology

| Period | Event |
|---|---|
| 1961 | ■ The Equitable begins offering individual disability income policies |
| 1980-1988 | ■ The Equitable introduces additional features:<br>   ☒ COLA Riders<br>   ☒ Lifetime Benefits<br>   ☒ "Own Occupation" definition of disability<br>   ☒ Guaranteed Insurability Riders |
| 1989-1992 | ■ Claims experience for the industry underperforms expectations |
| 1993-1996 | ■ The Equitable enters into marketing, underwriting and administration agreements with Paul Revere<br>■ The Equitable closes its Disability Income claims management and underwriting offices in July 1993<br>■ Paul Revere assumes responsibility for all Equitable Disability Income claims management and for the underwriting of all Equitable Disability Income Policies applied for after July 1993 (the "Transition Book")<br>■ Paul Revere agrees to coinsure all new Equitable Disability Income policies issued after July 1993 with Equitable retaining 20% of the risk<br>■ Paul Revere develops new Equitable labeled Disability Income policy forms (the "Private Label Book") with more prudent contract provisions. Equitable agents continue to market the older forms until the necessary state approvals are received, with the transition occurring between February 1994 and June 1994<br>■ Equitable continues to provide policy administration (billing, collection, address changes, etc.) for the pre-July 1993 book and transition book of business. Paul Revere assumes active life responsibility for the Private Label Book |
| 1997-1999 | ■ The Equitable discontinues the Private Label product line, and enters into a marketing agreement with Provident (which purchased Paul Revere) that provides The Equitable agents with the ability to sell Provident's disability income products<br>■ The Equitable enters into arrangement with Provident to administer the claims management of its existing book of Disability Income business |

# Basic Policy and Optional Rider Coverage

## Overview (a)

### Basic Policy

- The basic policy provides for a monthly income benefit in the event that the insured is Totally Disabled (b)(c)

- Benefits generally run for life or for certain policies to age 65. The benefit period may vary by the cause of disability (accident vs. sickness) and the age of the insured at the onset of disability

- Premiums vary based on the age, sex and occupation class of the insured

- Premiums are payable to age 65, and guaranteed not to change while the policy remains in force

- Coverage terminates at age 65

- There are no non-forfeiture values on disability income insurance policies

- Monthly income statistics included herein exclude disability buy-sell face amounts to avoid distortion (c)

### Optional Riders

- Equitable has offered a variety of Cost of Living Adjustment (COLA) Riders in connection with its Disability Income policies. The riders were available on an optional basis for an additional premium. The riders increased annually the amount of monthly income payable on disability beginning in the second year of disability. There were two main types of riders offered. The first type was available from 1974 to 1988 and provided a fixed annual Cost of Living Adjustment of 6%. The second type was introduced in 1986 and provided a Consumer Price Index (CPI) driven increase subject to a minimum and maximum at either 4 - 6% or 6 - 8%. As of December 31, 1998 there was $11.8 million of active life monthly income with the fixed COLA benefit and $53.6 million in force with the CPI linked benefit. (See Baseline Assumptions for modeling treatment of this benefit).

- Residual Rider provides for reduced payments in the event of partial disability. This generally means the insured is able to work part-time, but not full-time.

- Option to Purchase Additional Monthly Income Rider (Guaranteed Insurability Rider) provides the option to increase benefits at specified times after the policy is issued, regardless of health. Evidence of financial need is required when this option is exercised. Claimants may elect to receive the higher benefit, but the additional coverage does not apply to the current claim. Due to very low current utilization, the projections in Exhibit III and Annex A assume no further Guaranteed Insurability Rider elections after 12/31/1998

(a) This general description does not cover all variations. For example, special policy provisions are available for business sales (buy-sell agreements and overhead expense policies). (See also (c) below).
(b) Total disability is the inability to perform the duties of any occupation for which the insured is qualified with regard to education, experience or prior earnings. A more liberal definition, in which the insured is unable to perform the duties of his or her own occupation, is provided for in many policy forms.
(c) Equitable marketed disability buy-sell policies designed to replace the lost value to a business owner caused by a long term disability. The benefit is a lump sum payment of the policy face amount payable at disability durations of 1, 2 or 3 years. The face amounts sold ranged from $15,000 to $1,000,000 with an average of $250,000. At 12/31/1998, there were 378 of these policies inforce with an annualized premium of $800,000

# Individual Disability Income Reinsurance Arrangements – Risk Mitigation

The following excess coverage reinsurance provides meaningful downside protection should experience worsen:

— Excess Coverage Reinsurance: In 1987, Equitable began reinsuring disability income policies with large amounts of monthly income with Paul Revere on a level premium extended elimination period basis. The reinsurance benefit generally was 50% of monthly income in excess of a base amount payable after the insured had been disabled for two years. The reinsurance percentage, base amount and maximum coverage limits have varied slightly from 1987 to present. *Excess reinsurance coverage provides proportionately greater benefits in periods of adverse morbidity.*

— Transition Business Reinsurance: From July 1993 through approximately June 1994 Equitable co-insured all new disability income business with Paul Revere, with Equitable retaining 20% of the risk.

|  | Excess Coverage | Transition Business |
|---|---|---|
| **Active Lives** |  |  |
| Total Number of Policies | 2,680 | 4,526 |
| Total Statutory Reserve Credit ($ 000s) | $6,814.1 | $6,603.3 |
| **Disabled Lives** |  |  |
| Total Number of Policies | 141 | 54 |
| Total Statutory Reserve Credit ($ 000s) | $24,837.1 | $7,104.1 |
| TOTAL STAT RESERVE CREDIT ($ 000s) |  | $45,358.6 |

3

# Baseline Assumptions

<u>Definitions of Baseline</u>

- Claims Frequency (a): ■ The baseline rates of disability are multiples of the 1985 CID-A rates that vary by elimination Period and Occupation Class

| Occupation Class (CID-A) | Elimination Period | Incidence as % of 1985 CID-A (a) |
|---|---|---|
| 1 | Less than 90 days | 102 |
| 1 | Greater than or equal to 90 days | 155 |
| 2 | Less than 90 days | 90 |
| 2 | Greater than or equal to 90 days | 87 |
| 3 | Less than 90 days | 49 |
| 3 | Greater than or equal to 90 days | 62 |

Claims Termination (b):

| | % of 1985 CID-A | |
|---|---|---|
| Duration | Physicians | Non-Physicians |
| 1st Year | 54 | 72 |
| 2nd Year | 120 | 120 |
| 3rd Year | 110 | 110 |
| 4th Year | 105 | 105 |
| Years 5+ | 100 | 100 |

Policy Lapse Rates (c): ■ Rates vary by issue age, sex and 1985 CID-A occupation class (1-3), based on Equitable's experience where available and reflect policy coverage termination at age 65

(a) Refer to Exhibit VI Claims Frequency Analysis
(b) Refer to Exhibit VII Claims Termination Analysis
10 (c) Refer to Exhibit VIII Policy Persistency Analysis

# Baseline Assumptions

**COLA Benefits:**
- Modeled COLA increase: *Total Estimated Conservatism = $40 million*

| | Level | CPI Linked | |
|---|---|---|---|
| | 6.0% | 4.0 – 6.0% | 6.0 – 8.0% |
| **Active Life** | 6.0% | 6.0% | 6.0% |
| | | Estimated Conservatism = $10 million | Estimated Conservatism = $13 million |
| **Disabled Life** | 6.0% | 5.0% | 7.0% |
| | | Estimated Conservatism = $17 million | |

**Expenses (d):**
- 6.5% of incurred claims (present value of new claims)
- 6.5% of claim payments
- 3.5% of premium (includes premium tax)
- Commissions

| Policy Year | % of Premium |
|---|---|
| 1 | 55 |
| 2 | 15 |
| 3-6 | 10 |
| 7-10 | 5 |
| 11+ | 2 |

**Discount Rate:**
- Present value of future cash flow discounted at illustrative rate of 7.5%. Illustrative rate based on current yield of long term single A and triple B rated debt of approximately 7.5% with allowance for inclusion of some portion of less liquid, higher risk securities

(d) Expenses are estimates of actual costs before any profit loading by a third-party provider.

11

# Projected Cash Outflow Summary [a]

| | | Active Lives | | | | Disabled Lives | | |
|---|---|---|---|---|---|---|---|---|
| | (1) | (2) | (3) | (4) | (5) = (2)+(3)+(4)-(1) | (6) | (7) | (8) = (6)+(7) | (9) = (5)+(8) |
| Year | Premium | Benefits Paid on 12/31/1998 Actives | Commissions | General Expenses on Actives | Excess of Claims and Expenses over Premium | Benefits Paid on 12/1998 Disableds | Expenses on Disableds | Net Cash Flow on Disableds | Total Net Cash Flow |

Notes:

1. Cash flow projections based on "baseline assumptions" as shown on prior page.

2. Active Lives expenses are assumed to be 3.5% of premiums, 6.5% of newly incurred claims and 6.5% of paid claims. Disabled Lives expenses are assumed to be 6.5% of paid claims.

3. Present value of future cash flows discounted at 7.5% unless noted.

4. Cash flows do not reflect reinsurance ceded on excess coverage and Transition business (b).

5. Disabled Lives cash flows include the effect of Disability Premium Waiver Benefits, Accrued Benefits as of 12/31/1998 and claims Incurred But Not Reported (IBNR) as of 12/31/1998.

12    (a)  Projected Cash Flow Summary describes Present Value of Cash Flows, Scenarios 1 – 9 on the following page and in Appendix A
      (b)  See separate credit at bottom right on the following page, labeled "12/98 Statutory Reserve Ceded on Excess Coverage and Transition Reinsurance"

# Present Value of Cash Outflows
## Scenario 1 - Baseline

**Assumptions**

| Claim Frequency | Claim Termination | Interest | Loss |
|---|---|---|---|
| Baseline | Baseline | Baseline | Baseline |

| Period Year | Active Lives Cash Flows (1) | (2) | (3) | (4) | Disabled Lives Cash Flows (5) | (6) | (7) | (8) Ceded Cash Flows | Total Net Cash Flow |
|---|---|---|---|---|---|---|---|---|---|
| 1999 | 107,397,701 | 6,428,198 | 4,074,285 | 9,959,211 | (86,906,024) | 109,104,936 | 7,091,821 | 116,196,757 | 29,288,733 |
| 2000 | 98,791,345 | 20,483,930 | 2,940,186 | 10,771,698 | (46,555,551) | 95,344,282 | 6,197,376 | 101,541,690 | 36,880,109 |
| 2001 | 92,006,942 | 29,934,449 | 2,514,092 | 11,225,007 | (46,332,799) | 90,324,167 | 5,871,011 | 96,195,238 | 47,662,444 |
| 2002 | 85,706,655 | 38,792,146 | 2,237,598 | 11,668,903 | (39,530,608) | 86,420,242 | 5,617,318 | 92,037,558 | 56,529,950 |
| 2003 | 80,043,307 | 46,540,933 | 1,773,600 | 12,098,231 | (19,832,003) | 82,632,536 | 5,371,115 | 88,003,651 | 68,173,048 |
| 2004 | 71,664,897 | 53,156,019 | 1,424,002 | 12,227,790 | (14,859,088) | 79,334,285 | 5,157,054 | 84,466,349 | 79,639,259 |
| 2005 | 65,428,768 | 57,780,255 | 1,297,879 | 12,168,284 | 5,817,630 | 76,311,438 | 4,980,633 | 81,278,072 | 87,095,702 |
| 2006 | 59,428,153 | 62,305,610 | 1,175,610 | 12,120,747 | 16,174,023 | 73,748,745 | 4,793,668 | 76,542,413 | 94,718,436 |
| 2007 | 54,631,233 | 65,534,111 | 1,080,080 | 12,120,013 | 23,911,971 | 70,969,685 | 4,613,030 | 75,582,715 | 99,494,688 |
| 2008 | 49,659,760 | 69,537,077 | 994,186 | 12,139,297 | 32,800,760 | 67,988,959 | 4,419,262 | 72,608,241 | 105,209,021 |
| 2009 | 45,593,704 | 73,453,601 | 899,819 | 11,998,283 | 40,707,999 | 65,372,331 | 4,249,266 | 69,622,597 | 110,390,596 |
| 2010 | 40,056,148 | 77,205,449 | 790,804 | 11,700,658 | 49,640,783 | 62,866,528 | 4,092,854 | 67,091,482 | 116,702,245 |
| 2011 | 35,906,656 | 78,850,015 | 708,849 | 11,375,170 | 54,827,378 | 60,628,220 | 3,940,834 | 64,569,034 | 119,396,432 |
| 2012 | 32,274,171 | 80,680,062 | 647,124 | 11,144,941 | 59,698,846 | 57,920,778 | 3,765,436 | 61,696,214 | 121,394,080 |
| 2013 | 29,797,988 | 82,380,549 | 588,382 | 10,912,748 | 65,145,249 | 55,053,328 | 3,578,468 | 58,631,794 | 123,315,505 |
| 2014 | 22,709,866 | 80,426,771 | 449,307 | 10,088,237 | 65,469,232 | 52,254,190 | 3,403,022 | 55,757,212 | 123,902,461 |
| 2015 | 18,291,498 | 74,323,522 | 360,761 | 9,066,498 | 64,365,203 | 49,729,024 | 3,232,387 | 52,961,411 | 118,430,893 |
| 2016 | 15,302,615 | 70,923,867 | 301,806 | 8,439,985 | 62,147,015 | 46,822,395 | 3,043,458 | 49,865,851 | 114,228,874 |
| 2017 | 13,291,328 | 67,284,680 | 282,122 | 7,911,661 | 60,921,895 | 43,606,017 | 2,854,391 | 46,440,499 | 108,567,424 |
| 2018 | 10,909,396 | 60,360,355 | 209,141 | 7,371,795 | 56,447,639 | 41,005,916 | 2,665,386 | 43,871,001 | 104,592,198 |
| 2019 | 8,972,424 | 56,496,272 | 174,834 | 6,781,890 | 57,576,142 | 38,114,511 | 2,490,443 | 40,604,954 | 99,252,593 |
| 2020 | 6,442,226 | 58,605,040 | 144,134 | 6,339,146 | 55,548,168 | 35,580,641 | 2,312,742 | 37,893,383 | 95,471,525 |
| 2021 | 5,809,611 | 54,111,380 | 127,022 | 5,925,360 | 53,986,454 | 32,816,327 | 2,133,061 | 34,948,388 | 90,594,584 |
| 2022 | 5,174,244 | 52,570,498 | 114,548 | 5,570,157 | 52,741,144 | 30,231,851 | 1,905,070 | 32,198,921 | 86,163,375 |
| 2023 | 2,874,571 | 46,166,671 | 102,016 | 5,242,869 | 49,928,715 | 27,630,455 | 1,795,969 | 29,426,434 | 82,167,578 |
| 2024 | 1,857,733 | 41,800,235 | 55,667 | 4,579,948 | 44,002,465 | 25,121,325 | 1,532,698 | 26,754,211 | 76,682,928 |
| 2025 | 1,221,771 | 37,817,277 | 36,825 | 3,983,338 | 40,168,200 | 22,519,122 | 1,463,743 | 23,882,665 | 67,985,390 |
| 2026 | 915,571 | 34,333,741 | 24,086 | 3,488,508 | 36,551,619 | 20,173,404 | 1,311,271 | 21,484,675 | 61,650,875 |
| 2027 | 302,907 | 30,646,009 | 18,040 | 3,115,300 | 33,090,822 | 18,086,242 | 1,175,730 | 19,263,977 | 55,615,590 |
| 2028 | 4,053 | | 5,973 | 2,729,547 | | 81,769,289 | 5,064,690 | 86,823,979 | 119,504,601 |
| 2029 + | 0 | | 80 | 2,356,151 | 154,600,749 | | | | 154,600,749 |
| **PV at 12/98 at 8.5%** | 662,690,216 | 616,228,139 | 17,005,819 | 17,397,512 | 91,541,254 | 825,065,002 | 53,673,292 | 878,738,295 | 971,679,549 |
| **PV at 12/98 at 7.5%** | 679,235,263 | 651,539,225 | 17,359,571 | 126,260,175 | 115,921,788 | 655,091,687 | 55,556,642 | 910,648,529 | 1,026,570,318 |
| **PV at 12/98 at 7.0%** | 686,604,879 | 689,942,069 | 17,726,028 | 131,463,110 | 142,420,328 | 886,141,866 | 57,570,925 | 943,712,791 | 1,086,141,119 |

Less 12/98 Statutory Reserve Ceded on Excess Coverage and Transition Reinsurance  45,356,554

12/98 Present Value at 7.5% of DI Block Net of Reinsurance  981,211,764

125,516,048 in year 2029.
65,551,175 in year 2028.

Disabled Lives cash flows include the effect of Accrued Benefits as of 12/31/1998.

**Notes:**
(a) Includes terminal reserve of
(b) Includes terminal reserve of
(c) Includes terminal reserve of 65,551,175 Disability Premium Waiver Benefits, and claims Incurred But Not Reported (IBNR) as of 12/31/1998.

13

# Projected Cash Outflow
## Baseline Assumption



Goldman
Sachs

Note:
Expected cash flows through 2027 only have been illustrated above; cash flows are expected to continue beyond 2027, as presented on the prior page.

14

# Frequency, Termination Rate and Discount Rate Sensitivities

| Scenario(a)(b) | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
|---|---|---|---|---|---|---|---|---|---|
| Claim Frequency Assumption | Baseline | Baseline | Baseline | 92.5% of Baseline | 92.5% of Baseline | 92.5% of Baseline | 107.5% of Baseline | 107.5% of Baseline | 107.5% of Baseline |
| Claim Termination Assumption | Baseline | 95% of Baseline | 105% of Baseline | Baseline | 95% of Baseline | 105% of Baseline | Baseline | 95% of Baseline | 105% of Baseline |
| PV of Premium | $679,235,253 | $679,037,060 | $678,859,210 | $678,695,020 | $679,068,126 | $678,345,861 | $679,773,505 | $680,203,731 | $679,370,718 |
| PV of Active Lives Claims | 651,936,925 | 696,220,963 | 610,101,392 | 603,823,945 | 645,297,635 | 565,369,917 | 699,072,597 | 746,942,315 | 654,671,997 |
| PV of Commissions | 17,358,857 | 17,366,585 | 17,351,067 | 17,347,661 | 17,355,103 | 17,340,695 | 17,369,440 | 17,378,022 | 17,361,403 |
| PV of Active Expenses | 126,260,775 | 133,693,478 | 119,392,893 | 118,730,387 | 125,628,526 | 112,358,603 | 133,762,387 | 141,727,411 | 126,402,632 |
| Net Active Lives Cash Flow | $115,321,718 | $167,643,965 | $67,986,142 | $61,206,973 | $109,213,139 | $16,723,353 | $170,430,919 | $225,844,017 | $119,065,303 |
| PV of Disabled Lives Claims | 855,091,887 | 874,265,894 | 837,099,523 | 855,091,887 | 874,265,894 | 837,099,523 | 855,091,887 | 874,265,894 | 837,099,523 |
| PV of Disabled Expenses | 55,556,642 | 56,800,850 | 54,380,142 | 55,556,642 | 56,800,850 | 54,380,142 | 55,556,642 | 56,800,850 | 54,380,142 |
| Net Disabled Cash Flow | 910,648,529 | 931,066,744 | 891,479,665 | 910,648,529 | 931,066,744 | 891,479,665 | 910,648,529 | 931,066,744 | 891,479,665 |
| **Total Net Cash Flow Before Reinsurance** | | | | | | | | | |
| At 8.0% | $974,678,549 | $1,039,539,977 | $908,485,508 | $919,829,715 | $984,195,472 | $859,884,074 | $1,023,335,697 | $1,094,667,307 | $956,913,918 |
| At 7.5% | 1,024,570,118 | 1,098,710,709 | 969,465,807 | 971,865,502 | 1,040,279,882 | 908,203,018 | 1,081,079,448 | 1,156,910,761 | 1,010,844,969 |
| At 7.0% | 1,066,741,119 | 1,162,969,810 | 1,014,768,666 | 1,028,322,128 | 1,101,182,917 | 960,624,059 | 1,143,741,398 | 1,224,491,151 | 1,068,718,140 |
| | | (Excess reinsurance coverage will provide proportionately greater benefits in periods of adverse morbidity) | | | | | | | |
| Reinsurance Ceded Credit | 43,003,371 | | | | | | | | |
| PV of Block at 7.5% Net of Reinsurance | $981,341,176 | | | | | | | | |

Refer to Appendix A for detailed cash flows for each scenario.

(a) Except as noted, net present value is calculated using 7.5% discount rate.
(b) Scenario 1 (Baseline) includes reinsurance ceded adjustment equal to the 12/31/1998 statutory reinsurance reserve credit of approximately $45 million. Scenarios 2 through 9 are not adjusted for ceded reinsurance premiums or recoveries.

15

# Lapse Sensitivities — Active Lives

| Scenario (a) | 1 | 2 (c) | 3 (c) |
|---|---|---|---|
| Lapse Rate Assumption | Baseline | Baseline Lapse Rates plus 2% | Baseline Lapse Rates less 2% |
| Present Value of Premium | $679,235,283 | $612,055,229 | $768,813,472 |
| Present Value of Claims | 651,538,325 | 577,186,696 | 745,889,975 |
| Present Value of Commissions | 17,358,571 | 15,919,325 | 19,300,877 |
| Present Value of Expenses (b) | 126,260,175 | 112,269,253 | 144,071,981 |
| Net Present Value | $115,921,788 | $93,320,045 | $140,449,360 |

(a)  Using 7.5% discount rate.
(b)  Expenses are calculated using 6.5% of claims paid and 6.5% of incurred claims plus 3.5% of premiums, which include premium taxes and miscellaneous expenses.
(c)  Sensitivities are estimated based on prior analyses.

16

4

# Geographic Distribution — Active Lives



| State Abbreviation | Non-Physician | | Physician | | Both | |
|---|---|---|---|---|---|---|
| **By Amount of Monthly Income** | | | | | | |
| Other | $ 94,098,621 | 55.8% | $30,098,729 | 56.3% | $124,197,350 | 55.9% |
| CA | 20,500,081 | 12.2 | 5,884,167 | 11.0 | 26,384,248 | 11.9 |
| FL | 11,306,906 | 6.7 | 3,923,468 | 7.3 | 15,230,374 | 6.9 |
| NY | 27,322,210 | 16.2 | 6,695,460 | 12.5 | 34,017,670 | 15.3 |
| PA | 15,436,807 | 9.2 | 6,857,791 | 12.8 | 22,294,598 | 10.0 |
| Total | $168,664,625 | | $53,459,615 | | $222,124,240 | |
| **By Policy Count** | | | | | | |
| Other | 47,046 | 57.6% | 9,122 | 56.9% | 56,168 | 57.5% |
| CA | 8,791 | 10.8 | 1,470 | 9.2 | 10,261 | 10.5 |
| FL | 5,167 | 6.3 | 1,113 | 6.9 | 6,280 | 6.4 |
| NY | 13,350 | 16.4 | 2,200 | 13.7 | 15,550 | 15.9 |
| PA | 7,265 | 8.9 | 2,136 | 13.3 | 9,401 | 9.6 |
| Total | 81,619 | | 16,041 | | 97,660 | |

Note: Excludes buy/sell policies. Active lives distribution includes both active and disabled lives.

Physician and Non-Physician By Monthly Income



Physician and Non-Physician By Policy Count



17

# Attained Age Distribution — Active Lives

| By Amount of Monthly Income | Non-Physician | | Physician | | Both | |
|---|---|---|---|---|---|---|
| | $ | % | $ | % | $ | % |
| Central Age | | | | | | |
| 25 | 250,848 | 0.1 | 0 | 0.0 | 250,848 | 0.1 |
| 35 | 25,681,156 | 15.2 | 1,694,580 | 3.2 | 27,375,736 | 12.3 |
| 45 | 82,227,124 | 48.8 | 24,724,507 | 46.2 | 106,951,631 | 48.1 |
| 55 | 51,175,585 | 30.3 | 22,051,098 | 41.2 | 73,226,683 | 33.0 |
| 62 | 9,329,912 | 5.5 | 4,989,430 | 9.3 | 14,319,342 | 6.4 |
| Total | 168,664,625 | | 53,459,615 | | 222,124,240 | |

## Monthly Income by Central Age



Non-Physician            Physician            Both

Note: Excludes buy/sell policies. Active lives distribution includes both active and disabled lives.

18

# Attained Age Distribution — Active Lives

| By Count | Non-Physician $ | % | Physician $ | % | Both $ | % |
|---|---|---|---|---|---|---|
| **Central Age** | | | | | | |
| 25 | 157 | 0.2 | 0 | 0.0 | 157 | 0.2 |
| 35 | 11,375 | 13.9 | 521 | 3.2 | 11,896 | 12.2 |
| 45 | 36,252 | 44.4 | 7,035 | 43.9 | 43,287 | 44.3 |
| 55 | 27,494 | 33.7 | 6,825 | 42.5 | 34,319 | 35.1 |
| 62 | 6,341 | 7.8 | 1,660 | 10.3 | 8,001 | 8.2 |
| Total | 81,619 | | 16,041 | | 97,660 | |



Policy Count by Central Age

Non-Physician / Physician / Both

Note: Excludes buy/sell policies. Active lives distribution includes both active and disabled lives.

19

# Distribution by Insurance Amount — Active Lives

| By Amount of Monthly Income | Non-Physician | | Physician | | Both | |
|---|---|---|---|---|---|---|
| | $ | % | $ | % | $ | % |
| **Benefit Band** | | | | | | |
| Under 1,000 | 8,924,229 | 5.3 | 603,614 | 1.1 | 9,527,843 | 4.3 |
| 1,000 to 1999 | 35,273,195 | 20.9 | 4,757,424 | 8.9 | 40,030,619 | 18.0 |
| 2,000 to 2,999 | 41,105,746 | 24.4 | 8,363,213 | 15.6 | 49,468,959 | 22.3 |
| 3,000 to 3,999 | 26,189,460 | 15.5 | 7,446,754 | 13.9 | 33,636,214 | 15.1 |
| 4,000 to 4,999 | 16,035,231 | 9.5 | 6,370,475 | 11.9 | 22,405,706 | 10.1 |
| 5,000 to 5,999 | 14,593,353 | 8.7 | 7,140,602 | 13.4 | 21,733,955 | 9.8 |
| 6,000 to 6,999 | 6,713,212 | 4.0 | 4,090,429 | 7.7 | 10,803,641 | 4.9 |
| 7,000 to 7,999 | 4,575,209 | 2.7 | 2,790,139 | 5.2 | 7,365,348 | 3.3 |
| 8,000 to 8,999 | 3,438,464 | 2.0 | 2,203,626 | 4.1 | 5,642,090 | 2.5 |
| 9,000 to 9,999 | 1,396,223 | 0.8 | 1,237,144 | 2.3 | 2,633,367 | 1.2 |
| 10,000 and up | 10,420,302 | 6.2 | 8,456,195 | 15.8 | 18,876,498 | 8.5 |
| Total | 168,664,625 | | 53,459,615 | | 222,124,240 | |



Breakdown of Amount of Monthly Income ($ millions)

Benefit Band

Legend: ■ Physician   ■ Non-Physician

| Benefit Band | Physician | Non-Physician |
|---|---|---|
| Under 1,000 | $0.60 | $0.92 |
| 1,000 to 1999 | $4.76 | $35.27 |
| 2,000 to 2,999 | $8.36 | $41.41 |
| 3,000 to 3,999 | $7.45 | $26.19 |
| 4,000 to 4,999 | $6.37 | $16.04 |
| 5,000 to 5,999 | $7.14 | $14.59 |
| 6,000 to 6,999 | $4.09 | $6.71 |
| 7,000 to 7,999 | $2.79 | $4.58 |
| 8,000 to 8,999 | $2.20 | $3.44 |
| 9,000 to 9,999 | $1.10 | $1.24 |
| 10,000 and up | $8.46 | $10.42 |

Note: Excludes buy/sell policies. Active lives distribution includes both active and disabled lives.

20

# Distribution by Insurance Amount — Active Lives

| By Count | Non-Physician | % | Physician | % | Both | % |
|---|---|---|---|---|---|---|
| **Benefit Band** | | | | | | |
| Under 1,000 | 17,445 | 21.4 | 1,082 | 6.7 | 18,527 | 19.0 |
| 1,000 to 1999 | 27,628 | 33.8 | 3,798 | 23.7 | 31,426 | 32.2 |
| 2,000 to 2,999 | 18,564 | 22.7 | 3,785 | 23.6 | 22,349 | 22.9 |
| 3,000 to 3,999 | 8,195 | 10.0 | 2,345 | 14.6 | 10,540 | 10.8 |
| 4,000 to 4,999 | 3,809 | 4.7 | 1,521 | 9.5 | 5,330 | 5.5 |
| 5,000 to 5,999 | 2,839 | 3.5 | 1,396 | 8.7 | 4,235 | 4.3 |
| 6,000 to 6,999 | 1,083 | 1.3 | 660 | 4.1 | 1,743 | 1.8 |
| 7,000 to 7,999 | 627 | 0.8 | 383 | 2.4 | 1,010 | 1.0 |
| 8,000 to 8,999 | 420 | 0.5 | 268 | 1.7 | 688 | 0.7 |
| 9,000 to 9,999 | 152 | 0.2 | 134 | 0.8 | 286 | 0.3 |
| 10,000 and up | 857 | 1.1 | 669 | 4.2 | 1,526 | 1.6 |
| **Total** | 81,619 | | 16,041 | | 97,660 | |



Breakdown by Policy Count

Legend: ■ Physician ■ Non-Physician

Benefit Band

Note: Excludes buy/sell policies. Active lives distribution includes both active and disabled lives.

21

# Distribution by Benefit Period — Active Lives

Policies may provide:

- A lifetime benefit period,

- Benefits for a fixed number of years or to age 65, or

- Lifetime benefits for disability occurring before age 60 but benefits limited to age 65 for disability occurring between age 60-64

Benefit statistics at right were developed assuming each of the active lives became disabled in 1999



**By Amount of Monthly Income**

**By Policy Count**

| If Disabled in 1999 (a) | Non-Physician | | Physician | | Both | |
|---|---|---|---|---|---|---|
| | $ | % | $ | % | $ | % |
| **By Amount of Monthly Income** | | | | | | |
| Not Lifetime | 83,286,599 | 49.4 | 18,759,813 | 35.1 | 102,046,412 | 45.9 |
| Lifetime | 85,378,026 | 50.6 | 34,699,802 | 64.9 | 120,077,828 | 54.1 |
| Total | 168,664,625 | | 53,459,615 | | 222,124,240 | |
| **By Count** | | | | | | |
| Not Lifetime | 44,269 | 54.5 | 4,967 | 31.0 | 49,236 | 50.4 |
| Lifetime | 37,350 | 46.0 | 11,074 | 69.0 | 48,424 | 49.6 |
| Total | 81,619 | | 16,041 | | 97,660 | |

Note: Excludes buy/sell policies. Active lives distribution includes both active and disabled lives.
(a) Data shown assumes current book if disabled in 1999.

22

# Distribution by Riders – Active Lives

| COLA | Residual | GIR | Non-Physician $ | % | Physician $ | % | Both $ | % |
|------|----------|-----|------|---|------|---|------|---|
| **By Amount of Monthly Income** | | | | | | | | |
| No | No | No | 47,438,129 | 28.1 | 12,495,578 | 23.4 | 59,933,707 | 27.0 |
| No | No | Yes | 8,855,439 | 5.3 | 1,119,478 | 2.1 | 9,974,917 | 4.5 |
| No | Yes | No | 42,387,536 | 25.1 | 16,661,274 | 31.2 | 59,048,810 | 26.6 |
| No | Yes | Yes | 26,896,069 | 15.9 | 5,915,097 | 11.1 | 32,811,166 | 14.8 |
| Yes | No | No | 4,745,872 | 2.8 | 1,031,851 | 1.9 | 5,777,723 | 2.6 |
| Yes | No | Yes | 2,232,974 | 1.3 | 254,360 | 0.5 | 2,487,334 | 1.1 |
| Yes | Yes | No | 18,262,559 | 10.8 | 10,148,658 | 19.0 | 28,411,217 | 12.8 |
| Yes | Yes | Yes | 17,846,047 | 10.6 | 5,833,319 | 10.9 | 23,679,366 | 10.7 |
| | | | 168,664,625 | | 53,459,615 | | 222,124,240 | |
| **By Count** | | | | | | | | |
| No | No | No | 29,869 | 36.6 | 4,139 | 25.8 | 34,008 | 34.8 |
| No | No | Yes | 4,013 | 4.9 | 261 | 1.6 | 4,274 | 4.4 |
| No | Yes | No | 19,790 | 24.2 | 5,306 | 33.1 | 25,096 | 25.7 |
| No | Yes | Yes | 9,789 | 12.0 | 1,516 | 9.5 | 11,285 | 11.6 |
| Yes | No | No | 2,546 | 3.1 | 326 | 2.0 | 2,872 | 2.9 |
| Yes | No | Yes | 1,012 | 1.2 | 64 | 0.4 | 1,076 | 1.1 |
| Yes | Yes | No | 8,270 | 10.1 | 3,042 | 19.0 | 11,312 | 11.6 |
| Yes | Yes | Yes | 6,350 | 7.8 | 1,387 | 8.6 | 7,737 | 7.9 |
| | | | 81,619 | | 16,041 | | 97,660 | |

Note: Excludes buy/sell policies. Active lives distribution includes both active and disabled lives.

5

# Geographic Distribution — Disabled Lives




Other:
Monthly Income: 42.7%
Policy Count: 44.5%



NY
Monthly Income: 16.0%
Policy Count: 17.9%
Monthly Income: 11.3%
Policy Count: 9.9%



FL
Monthly Income: %
Policy Count: 9.7%

|  | Non-Physician | | | | Physician | | | | Both | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| State | Policy Count | | Monthly Income | | Policy Count | | Monthly Income | | Policy Count | | Monthly Income | |
| Other | 1,741 | 46.0% | $3,227,297 | 46.9% | 382 | 44.5% | $1,335,788 | 41.6% | 2,123 | 45.7% | $4,563,085 | 45.2% |
| CA | 674 | 17.8% | 1,300,992 | 18.9% | 135 | 15.7% | 743,865 | 23.2% | 809 | 17.4% | 2,044,857 | 20.3% |
| FL | 253 | 6.7% | 478,062 | 6.9% | 132 | 15.4% | 441,066 | 13.7% | 385 | 8.3% | 919,128 | 9.1% |
| NY | 809 | 21.4% | 1,288,744 | 18.7% | 99 | 11.5% | 282,981 | 8.8% | 908 | 19.6% | 1,571,725 | 15.6% |
| PA | 309 | 8.2% | 588,148 | 8.5% | 110 | 12.8% | 408,478 | 12.7% | 419 | 9.0% | 996,626 | 9.9% |
| Total | 3,786 | | $6,883,243 | | 858 | | $3,212,178 | | 4,844 | | $10,095,421 | |



Physician and
Non-Physician
By Monthly Income



CA 21.1%
FL 10.0%
NY 15.0%
PA 11.3%
Other 42.7%



Physician and
Non-Physician
By Policy Count



CA 17.9%
FL 9.7%
NY 17.9%
PA 9.9%
Other 44.5%

24

# Distribution by Benefit Period — Disabled Lives

| Benefit Period | Residual | COLA | Non-Physician | | | | Physician | | | | Both | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Policy Count | (%) | Monthly Income ($) | (%) | Policy Count | (%) | Monthly Income ($) | (%) | Policy Count | (%) | Monthly Income ($) | (%) |
| Lifetime | No | No | 1,271 | 76.8 | 2,409,313 | 69.8 | 333 | 64.5 | 1,201,725 | 63.9 | 1,604 | 73.8 | 3,611,038 | 67.8 |
| | No | Yes | 385 | 23.2 | 1,041,033 | 30.2 | 183 | 35.5 | 677,862 | 36.1 | 568 | 26.2 | 1,718,895 | 32.2 |
| | | | 1,656 | | 3,450,346 | | 516 | | 1,879,587 | | 2,172 | | 5,329,933 | |
| Non-Lifetime | Yes | No | 26 | 1.2 | 45,500 | 1.3 | 11 | 3.2 | 41,000 | 3.1 | 37 | 1.5 | 86,500 | 1.8 |
| | Yes | Yes | 9 | 0.4 | 28,617 | 0.8 | 15 | 4.4 | 52,040 | 3.9 | 24 | 1.0 | 80,657 | 1.7 |
| | No | No | 1,908 | 89.6 | 2,990,181 | 87.1 | 283 | 82.7 | 1,088,591 | 81.7 | 2,191 | 88.6 | 4,078,772 | 85.6 |
| | No | Yes | 187 | 8.8 | 368,599 | 10.7 | 33 | 9.6 | 150,960 | 11.3 | 220 | 8.9 | 519,559 | 10.9 |
| | | | 2,130 | | 3,432,897 | | 342 | | 1,332,591 | | 2,472 | | 4,765,488 | |
| Total | | | 3,786 | | $6,883,243 | | 858 | | $3,212,178 | | 4,644 | | $10,095,421 | |

# Distribution by Benefit Amount — Disabled Lives

| By Amount of Monthly Income | Non-Physician | | Physician | | Both | |
|---|---|---|---|---|---|---|
| | $ | % | $ | % | $ | % |
| **Benefit Band** | | | | | | |
| Under 1,000 | $ 548,272 | 8.0 | $ 39,309 | 1.2 | $ 587,581 | 5.8 |
| 1,000 to 1999 | 1,474,954 | 21.4 | 221,697 | 6.9 | 1,696,651 | 16.8 |
| 2,000 to 2,999 | 1,509,896 | 21.9 | 416,627 | 13.0 | 1,926,523 | 19.1 |
| 3,000 to 3,999 | 1,017,317 | 14.8 | 363,348 | 11.3 | 1,380,665 | 13.7 |
| 4,000 to 4,999 | 553,894 | 8.0 | 335,211 | 10.4 | 889,105 | 8.8 |
| 5,000 to 5,999 | 499,326 | 7.3 | 402,814 | 12.5 | 902,140 | 8.9 |
| 6,000 to 6,999 | 229,504 | 3.3 | 270,462 | 8.4 | 499,966 | 5.0 |
| 7,000 to 7,999 | 175,596 | 2.6 | 189,873 | 5.9 | 365,469 | 3.6 |
| 8,000 to 8,999 | 113,680 | 1.7 | 98,100 | 3.1 | 211,780 | 2.1 |
| 9,000 to 9,999 | 45,496 | 0.7 | 63,506 | 2.0 | 109,004 | 1.1 |
| 10,000 and up | 715,308 | 10.4 | 811,229 | 25.3 | 1,526,537 | 15.1 |
| **Total** | $6,883,243 | | $ 3,212,178 | | $10,095,421 | |



Breakdown of Amount of Monthly Income ($ 000s)

Benefit Band

- Physician
- Non-Physician

$540.3 / $39.3 — Under 1,000
$1,475.0 / $221.7 — 1,000 to 1999
$1,509.9 / $416.6 — 2,000 to 2,999
$1,017.3 / $363.3 — 3,000 to 3,999
$553.9 / $335.2 — 4,000 to 4,999
$499.3 / $402.8 — 5,000 to 5,999
$229.5 / $270.5 — 6,000 to 6,999
$175.6 / $189.9 — 7,000 to 7,999
$113.7 / $98.1 — 8,000 to 8,999
$45.5 / $63.5 — 9,000 to 9,999
$715.3 — 10,000 and up

Note: Excludes buy/sell policies. Active lives distribution includes both active and disabled lives.

# Distribution by Benefit Amount — Disabled Lives

| By Policy Count | Non-Physician | % | Physician | % | Both | % |
|---|---|---|---|---|---|---|
| **Benefit Band** | | | | | | |
| Under 1,000 | 1,281 | 33.8 | 70 | 8.2 | 1,351 | 29.1 |
| 1,000 to 1999 | 1,158 | 30.6 | 176 | 20.5 | 1,334 | 28.7 |
| 2,000 to 2,999 | 682 | 18.0 | 190 | 22.1 | 872 | 18.8 |
| 3,000 to 3,999 | 318 | 8.4 | 115 | 13.4 | 433 | 9.3 |
| 4,000 to 4,999 | 132 | 3.5 | 80 | 9.3 | 212 | 4.6 |
| 5,000 to 5,999 | 98 | 2.6 | 79 | 9.2 | 177 | 3.8 |
| 6,000 to 6,999 | 37 | 1.0 | 44 | 5.1 | 81 | 1.7 |
| 7,000 to 7,999 | 24 | 0.6 | 26 | 3.0 | 50 | 1.1 |
| 8,000 to 8,999 | 14 | 0.4 | 12 | 1.4 | 26 | 0.6 |
| 9,000 to 9,999 | 5 | 0.1 | 7 | 0.8 | 12 | 0.3 |
| 10,000 and up | 37 | 1.0 | 59 | 6.9 | 96 | 2.1 |
| Total | 3,786 | | 858 | | 4,644 | |



Breakdown by Policy Count

■ Physician
■ Non-Physician

Benefit Band

Note: Excludes buy/sell policies. Active lives distribution includes both active and disabled lives.

6

# Claim Frequency Experience and Baseline Assumption — Active Lives

| Occupation Class | Elimination Period | Actual vs. Expected (Expected = 100% of 1985 CID-A) | | | | | | | Baseline Assumption (a) (%) |
|---|---|---|---|---|---|---|---|---|---|
| | | 1993 (%) | 1994 (%) | 1995 (%) | 1996 (%) | 1997 (%) | 1998E (b) (%) | |
| 1 | Less than 90 Days | 120.7 | 129.5 | 112.5 | 126.1 | 87.4 | 92.4 | 102 |
| 1 | 90 Days or More | 167.5 | 176.6 | 183.1 | 150.7 | 121.5 | 193.6 | 155 |
| 2 | Less than 90 Days | 137.7 | 113.3 | 109.4 | 96.3 | 88.1 | 86.7 | 90 |
| 2 | 90 Days or More | 121.6 | 112.0 | 96.2 | 87.7 | 77.7 | 95.8 | 87 |
| 3 | Less than 90 Days | 55.7 | 50.4 | 50.4 | 54.1 | 44.1 | 48.5 | 49 |
| 3 | 90 Days or More | 59.6 | 68.0 | 63.4 | 54.2 | 61.8 | 68.5 | 62 |
| All | All | 99.9 | 99.3 | 95.2 | 92.0 | 75.2 | 91.0 | |

(a)  Baseline assumptions calculated as arithmetic mean of 1996, 1997, 1998E.
(b)  1998 figures based on actual claims up to 4/30/1999 adjusted for completion factors developed using historical data.

28

# Claims Frequency Study
## Summary Overview

| Category | Components | Actual to Expected Results (a) | | | | | 5 Year Totals | | |
|---|---|---|---|---|---|---|---|---|---|
| | | 1993 (%) | 1994 (%) | 1995 (%) | 1996 (%) | 1997 (%) | Actual | Expected | A/E (%) |
| Sex | Male | 81.8 | 85.1 | 84.7 | 86.6 | 70.6 | 11,875,649 | 14,527,829 | 81.7 |
| | Female | 136.7 | 127.1 | 115.9 | 103.2 | 84.9 | 8,244,489 | 7,196,149 | 114.6 |
| Class | CIDA 1 | 136.4 | 146.1 | 138.1 | 135.3 | 100.9 | 10,445,176 | 7,947,020 | 131.4 |
| | CIDA 2 | 133.1 | 112.9 | 105.3 | 93.5 | 83.6 | 4,611,345 | 4,323,339 | 106.7 |
| | CIDA 3 | 56.6 | 54.5 | 53.6 | 54.2 | 48.3 | 5,063,617 | 9,453,616 | 53.6 |
| Attained Age | 20-29 | 165.3 | 151.3 | 209.4 | 128.1 | 84.8 | 542,206 | 335,477 | 161.6 |
| | 30-39 | 159.1 | 140.7 | 154.5 | 157.5 | 146.3 | 6,340,136 | 4,173,512 | 151.9 |
| | 40-49 | 87.8 | 94.2 | 86.2 | 82.8 | 69.2 | 7,190,525 | 8,522,517 | 84.4 |
| | 50-59 | 70.7 | 77.3 | 74.7 | 79.3 | 61.7 | 4,875,931 | 6,738,496 | 72.4 |
| | 60& up | 51.6 | 72.3 | 55.7 | 56.0 | 63.0 | 1,171,341 | 1,953,875 | 59.9 |
| Elimination Period | Less Than 90 Days | 92.8 | 88.9 | 83.0 | 86.3 | 67.2 | 12,853,782 | 15,295,756 | 84.0 |
| | 90 Days or More | 118.6 | 124.6 | 123.6 | 104.9 | 93.1 | 7,266,356 | 6,428,224 | 113.0 |
| Occupation | Physicians | 85.6 | 100.0 | 88.7 | 99.6 | 87.6 | 4,689,636 | 5,087,396 | 92.2 |
| | Non-Physicians | 104.3 | 99.1 | 97.1 | 89.6 | 71.2 | 15,430,503 | 16,636,584 | 92.8 |
| Totals | | 99.9 | 99.3 | 95.2 | 92.0 | 75.2 | 20,120,139 | 21,723,980 | 92.6 |

(a) Expected case is 100% of 1985 CID-A

29



# Claims Frequency Study
## Summary Overview

30

# Claims Frequency Study
## Elimination Period of 90 Days or Less (a)





| Class | 1993 A/E (%) | 1994 A/E (%) | 1995 A/E (%) | 1996 A/E (%) | 1997 A/E (%) | 1993 - 1997 | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | Actual | Expected | A/E (%) |
| 1 | 120.7 | 129.5 | 112.5 | 126.1 | 87.4 | 5,966,742 | 5,080,642 | 115.5 |
| 2 | 137.7 | 113.3 | 109.4 | 96.3 | 88.1 | 3,290,432 | 2,984,921 | 110.2 |
| 3 | 56.7 | 50.4 | 50.5 | 54.1 | 44.1 | 3,696,608 | 7,230,186 | 51.1 |
| Total | 92.8 | 88.9 | 83.0 | 86.3 | 67.2 | 12,853,782 | 15,295,749 | 84.0 |

| Attained Age | 1993 A/E (%) | 1994 A/E (%) | 1995 A/E (%) | 1996 A/E (%) | 1997 A/E (%) | 1993 - 1997 | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | Actual | Expected | A/E (%) |
| 20 | 173.8 | 159.6 | 203.2 | 139.7 | 98.3 | 388,117 | 230,963 | 168.0 |
| 30 | 146.7 | 136.8 | 144.6 | 151.5 | 148.1 | 4,636,657 | 3,201,780 | 144.8 |
| 40 | 77.2 | 80.2 | 69.6 | 76.5 | 56.7 | 4,409,057 | 6,093,636 | 72.4 |
| 50 | 65.1 | 60.9 | 58.3 | 70.4 | 52.2 | 2,718,016 | 4,451,861 | 61.1 |
| 60 | 47.1 | 60.5 | 55.6 | 48.7 | 54 | 701,735 | 1,317,507 | 53.3 |
| Total | 92.8 | 88.9 | 83.0 | 86.3 | 67.2 | 12,853,782 | 15,295,747 | 84.0 |





(a) Expected case is 100% of 1985 CIDA.

31

# Claims Frequency Study
## Elimination Period of 90 Days or Less (a)



| Occupation | 1993 A/E (%) | 1994 A/E (%) | 1995 A/E (%) | 1996 A/E (%) | 1997 A/E (%) | 1983 - 1997 Actual | Expected | A/E (%) |
|---|---|---|---|---|---|---|---|---|
| Physician | 74.1 | 80.2 | 72.5 | 82.5 | 71.5 | 2,857,497 | 3,753,805 | 76.1 |
| Non Physician | 98.9 | 91.7 | 88.4 | 87.6 | 95.8 | 9,996,285 | 11,541,947 | 86.6 |
| Total | 92.8 | 88.9 | 83.0 | 86.3 | 67.2 | 12,853,782 | 16,295,762 | 84.0 |

| Sex | 1993 A/E (%) | 1994 A/E (%) | 1995 A/E (%) | 1996 A/E (%) | 1997 A/E (%) | 1983 - 1997 Actual | Expected | A/E (%) |
|---|---|---|---|---|---|---|---|---|
| Male | 71.6 | 68.8 | 68.3 | 76.9 | 58.5 | 6,901,885 | 10,023,201 | 68.9 |
| Female | 133.1 | 126.1 | 110.4 | 104.6 | 84.4 | 5,951,897 | 6,272,551 | 112.9 |
| Total | 92.8 | 88.9 | 83.0 | 86.3 | 67.2 | 12,853,782 | 16,295,762 | 84.0 |



(a) Expected case is 100% of 1985 CID-A.

32

# Claims Frequency Study
## Elimination Period of 90 Days or Greater (a)

**Goldman Sachs**

| | 1993 A/E (%) | 1994 A/E (%) | 1995 A/E (%) | 1996 A/E (%) | 1997 A/E (%) | 1993 - 1997 Actual | Expected | A/E (%) |
|---|---|---|---|---|---|---|---|---|
| **Class** | | | | | | | | |
| 1 | 167.5 | 176.6 | 183.1 | 150.7 | 121.5 | 4,569,103 | 2,866,376 | 159.4 |
| 2 | 121.6 | 112.0 | 96.2 | 87.7 | 77.7 | 1,330,244 | 1,338,416 | 99.4 |
| 3 | 59.6 | 68.0 | 63.4 | 54.2 | 61.8 | 1,367,009 | 2,223,428 | 61.5 |
| Total | 118.6 | 124.6 | 123.6 | 104.9 | 93.1 | 7,266,356 | 6,248,220 | 113.0 |
| **Attained Age** | | | | | | | | |
| 20 | 144.0 | 133.5 | 221.6 | 105.7 | 58.8 | 154,088 | 104,512 | 147.4 |
| 30 | 204.2 | 153.5 | 185.8 | 176.5 | 140.5 | 1,703,279 | 971,830 | 175.3 |
| 40 | 116.3 | 129.1 | 126.7 | 98.2 | 100.4 | 2,781,468 | 2,428,924 | 114.5 |
| 50 | 82.4 | 109.6 | 105.9 | 96.0 | 80.2 | 2,157,915 | 2,286,628 | 94.4 |
| 60 | 62.0 | 98.5 | 55.8 | 70.0 | 80.4 | 469,606 | 636,329 | 73.8 |
| Total | 118.6 | 124.6 | 123.5 | 104.9 | 93.1 | 7,266,356 | 6,428,223 | 113.0 |





(a) Expected case is 100% of 1985 CID-A.

33

# Claims Frequency Study
## Elimination Period of 90 Days or Greater (a)



| | 1993 A/E (%) | 1994 A/E (%) | 1995 A/E (%) | 1996 A/E (%) | 1997 A/E (%) | 1993 - 1997 Actual | 1993 - 1997 Expected | 1993 - 1997 A/E (%) |
|---|---|---|---|---|---|---|---|---|
| **Occupation** | | | | | | | | |
| Physician | 120.9 | 156.0 | 133.9 | 145.4 | 129.6 | 1,832,136 | 1,333,590 | 137.4 |
| Non-Physician | 118.0 | 118.3 | 120.8 | 94.1 | 82.9 | 5,434,216 | 5,084,635 | 106.7 |
| Total | 118.6 | 124.6 | 123.6 | 104.9 | 93.1 | 7,266,366 | 6,248,220 | 113.0 |
| **Sex** | | | | | | | | |
| Male | 108.5 | 122.2 | 120.5 | 107.2 | 95.9 | 4,973,764 | 4,504,626 | 110.4 |
| Female | 147.7 | 129.9 | 130.5 | 90.5 | 88.1 | 2,282,592 | 1,923,595 | 119.2 |
| Total | 118.6 | 124.6 | 123.6 | 104.9 | 93.1 | 7,266,356 | 6,428,223 | 113.0 |





(a) Expected case is 100% of 1985 CID-A.

34

# Claims Frequency Study
## Males (a)

**Goldman Sachs**

| Class | 1993 A/E (%) | 1994 A/E (%) | 1995 A/E (%) | 1996 A/E (%) | 1997 A/E (%) | 1993 - 1997 Actual | Expected | A/E (%) |
|---|---|---|---|---|---|---|---|---|
| 1 | 137.1 | 142.8 | 146.7 | 144.0 | 109.4 | 7,733,406 | 5,692,400 | 135.9 |
| 2 | 88.7 | 79.1 | 62.7 | 69.6 | 53.9 | 1,157,163 | 1,623,054 | 71.3 |
| 3 | 40.6 | 41.5 | 39.5 | 44.2 | 41.4 | 2,985,079 | 7,208,372 | 41.4 |
| Total | 81.8 | 85.1 | 84.7 | 86.7 | 70.6 | 11,875,649 | 14,523,826 | 81.8 |

| Attained Age | 1993 A/E (%) | 1994 A/E (%) | 1995 A/E (%) | 1996 A/E (%) | 1997 A/E (%) | 1993 - 1997 Actual | Expected | A/E (%) |
|---|---|---|---|---|---|---|---|---|
| 20 | 48.1 | 58.7 | 11.3 | 65.6 | 0.0 | 44,200 | 98,736 | 44.8 |
| 30 | 127.1 | 104.5 | 146.8 | 163.2 | 129.6 | 2,112,771 | 1,612,282 | 131.0 |
| 40 | 88.2 | 92.4 | 91.0 | 89.9 | 73.8 | 4,820,545 | 5,510,112 | 87.5 |
| 50 | 64.2 | 74.6 | 70.9 | 78.8 | 63.1 | 3,859,665 | 5,534,354 | 69.7 |
| 60 | 50.8 | 71.0 | 52.6 | 53.5 | 63.4 | 1,038,469 | 1,772,434 | 58.5 |
| Total | 81.8 | 85.1 | 84.7 | 86.6 | 70.6 | 11,875,649 | 14,527,918 | 81.7 |





(a)  Expected case is 100% of 1985 CID-A.



# Claims Frequency Study
## Males (a)

| | | | 1993 - 1997 | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 1993 AVE (%) | 1994 AVE (%) | 1995 AVE (%) | 1996 AVE (%) | 1997 AVE (%) | Actual | Expected | A/E (%) |
| **Elimination Period** | | | | | | | | |
| <90 | 71.6 | 68.8 | 68.3 | 76.9 | 58.5 | 6,901,885 | 10,023,201 | 68.9 |
| ≥90 | 106.5 | 122.2 | 120.5 | 107.2 | 95.9 | 4,973,764 | 4,504,626 | 110.4 |
| Total | 81.8 | 85.1 | 84.7 | 86.6 | 70.6 | 11,875,649 | 14,527,827 | 81.7 |
| **Occupation** | | | | | | | | |
| Physician | 80.4 | 99.9 | 94.5 | 101.8 | 87.8 | 3,955,193 | 4,271,124 | 92.6 |
| Non Physician | 82.3 | 79.1 | 80.7 | 80.1 | 63.3 | 7,920,459 | 10,256,705 | 77.2 |
| Total | 81.8 | 85.1 | 84.7 | 86.6 | 70.6 | 11,875,649 | 14,527,829 | 81.7 |



(a) Expected case is 100% of 1985 CID-A.

# Claims Frequency Study
## Females (a)



| Class | 1993 A/E (%) | 1994 A/E (%) | 1995 A/E (%) | 1996 A/E (%) | 1997 A/E (%) | 1993 - 1997 Actual | Expected | A/E (%) |
|---|---|---|---|---|---|---|---|---|
| 1 | 134.8 | 184.3 | 116.7 | 112.9 | 78.2 | 2,711,770 | 2,254,620 | 120.3 |
| 2 | 159.0 | 133.2 | 131.1 | 108.8 | 101.9 | 3,454,178 | 2,696,285 | 128.1 |
| 3 | 110.8 | 89.8 | 97.0 | 88.6 | 71.2 | 2,078,552 | 2,245,244 | 92.6 |
| Total | 136.7 | 127.1 | 116.9 | 103.2 | 84.9 | 8,244,489 | 7,196,149 | 114.6 |

| Attained Age | 1993 A/E (%) | 1994 A/E (%) | 1995 A/E (%) | 1996 A/E (%) | 1997 A/E (%) | 1993 - 1997 Actual | Expected | A/E (%) |
|---|---|---|---|---|---|---|---|---|
| 20 | 222.4 | 191.0 | 283.8 | 148.7 | 108.2 | 498,005 | 236,827 | 210.3 |
| 30 | 182.8 | 184.9 | 189.2 | 154.4 | 154.2 | 4,227,365 | 2,561,328 | 166.0 |
| 40 | 86.9 | 97.6 | 77.5 | 70.2 | 82.2 | 2,369,980 | 3,012,405 | 78.7 |
| 50 | 104.6 | 90.0 | 91.4 | 90.6 | 55.7 | 1,016,266 | 1,204,142 | 84.4 |
| 60 | 60.8 | 87.7 | 87.5 | 78.8 | 59.9 | 132,872 | 181,452 | 73.2 |
| Total | 136.7 | 127.1 | 116.9 | 103.2 | 84.9 | 8,244,489 | 7,196,144 | 114.6 |





(a) Expected case is 100% of 1985 CIDA.

37



# Claims Frequency Study
## Females (a)



| | 1993 A/E (%) | 1994 A/E (%) | 1995 A/E (%) | 1996 A/E (%) | 1997 A/E (%) | 1993 - 1997 Actual | 1993 - 1997 Expected | 1993 - 1997 A/E (%) |
|---|---|---|---|---|---|---|---|---|
| **Elimination Period** | | | | | | | | |
| <90 | 133.1 | 126.1 | 110.4 | 104.6 | 84.4 | 5,851,097 | 5,272,551 | 112.9 |
| ≥90 | 142.7 | 129.8 | 130.5 | 99.5 | 86.1 | 2,292,692 | 1,923,596 | 119.2 |
| Total | 138.7 | 127.1 | 116.9 | 103.2 | 84.9 | 8,244,489 | 7,196,147 | 114.6 |
| | | | | | | | | |
| **Occupation** | | | | | | | | |
| Physician | 112.2 | 100.9 | 56.5 | 68.0 | 86.9 | 734,443 | 816,270 | 90.0 |
| Non Physician | 139.9 | 130.3 | 123.0 | 105.2 | 84.6 | 7,510,046 | 6,379,879 | 117.1 |
| Total | 138.7 | 127.1% | 116.9 | 103.2 | 84.9 | 8,244,489 | 7,196,149 | 114.6 |





(a) Expected case is 100% of 1985 CIDA.

38

# Claims Frequency Study
## Physicians

Goldman Sachs

| Class | 1993 A/E (%) | 1994 A/E (%) | 1995 A/E (%) | 1996 A/E (%) | 1997 A/E (%) | 1993 - 1997 Actual | Expected | A/E (%) |
|---|---|---|---|---|---|---|---|---|
| 1 | 119.1 | 153.7 | 137.1 | 161.2 | 136.3 | 3,774,991 | 2,672,497 | 141.3 |
| 2 | 204.6 | 0.0 | 222.4 | 270.1 | 42.1 | 15,900 | 10,578 | 149.9 |
| 3 | 49.2 | 39.5 | 33.5 | 32.5 | 32.5 | 898,745 | 2,404,219 | 37.4 |
| Total | 87.6 | 99.6 | 88.7 | 100.0 | 95.8 | 4,689,636 | 5,087,394 | 92.2 |

| Attained Age | 1993 A/E (%) | 1994 A/E (%) | 1995 A/E (%) | 1996 A/E (%) | 1997 A/E (%) | 1993 - 1997 Actual | Expected | A/E (%) |
|---|---|---|---|---|---|---|---|---|
| 20 | 0.0 | 0.0 | 0.0 | 1,222.2 | 247.8 | 4,700 | 1,306 | 359.9 |
| 30 | 275.5 | 213.7 | 101.2 | 151.0 | 144.8 | 531,591 | 337,351 | 157.6 |
| 40 | 88.7 | 97.2 | 89.2 | 103.2 | 82.9 | 1,852,616 | 1,979,667 | 95.1 |
| 50 | 85.6 | 101.3 | 82.5 | 81.7 | 79.9 | 1,731,500 | 2,098,642 | 82.5 |
| 60 | 113.7 | 60.0 | 70.9 | 93.5 | 85.2 | 539,228 | 670,425 | 80.4 |
| Total | 87.6 | 99.6 | 88.7 | 100.0 | 95.8 | 4,689,636 | 5,087,382 | 92.2 |



39   (a) Expected case is 100% of 1985 CIDA.





|  | 1993 A/E (%) | 1994 A/E (%) | 1995 A/E (%) | 1996 A/E (%) | 1997 A/E (%) | 1993 - 1997 | | |
|---|---|---|---|---|---|---|---|---|
| **Elimination Period** | | | | | | Actual | Expected | A/E (%) |
| <90 | 71.5 | 82.5 | 72.5 | 80.2 | 74.1 | 2,857,497 | 3,753,805 | 76.1 |
| >90 | 129.6 | 145.4 | 133.9 | 158.0 | 120.9 | 1,832,138 | 1,333,590 | 137.4 |
| Total | 87. | 89.6 | 88.7 | 100.0 | 86.6 | 4,689,636 | 5,087,397 | 92.2 |
| | | | | | | | | |
| **Sex** | | | | | | | | |
| Male | 87.8 | 101.8 | 94.5 | 99.9 | 80.4 | 3,955,193 | 4,271,124 | 92.6 |
| Female | 86.9 | 88.0 | 85.5 | 100.8 | 112.2 | 724,443 | 816,270 | 90.0 |
| Total | 87.6 | 99.6 | 88.7 | 100.0 | 86.6 | 4,689,636 | 5,087,394 | 92.2 |

# Claims Frequency Study
## Physicians



40  (a) Expected case is 100% of 1985 CIDA.

# Claims Frequency Study
## Non-Physicians(a)

Goldman Sachs

| | 1993 A/E (%) | 1994 A/E (%) | 1995 A/E (%) | 1996 A/E (%) | 1997 A/E (%) | 1993 - 1997 Actual | Expected | A/E (%) |
|---|---|---|---|---|---|---|---|---|
| **Class** | | | | | | | | |
| 1 | 136.5 | 138.8 | 138.6 | 125.0 | 91.5 | 6,570,247 | 5,274,522 | 125.5 |
| 2 | 133.3 | 112.5 | 105.0 | 93.8 | 83.4 | 4,595,383 | 4,312,660 | 106.6 |
| 3 | 64.8 | 61.8 | 60.4 | 59.3 | 47.8 | 4,164,872 | 7,049,397 | 59.1 |
| Total | 104.3 | 99.1 | 97.1 | 89.6 | 71.2 | 15,430,873 | 16,636,679 | 92.8 |
| **Attained Age** | | | | | | | | |
| 20 | 164.6 | 149.3 | 0.0 | 0.0 | 0.0 | 537,506 | 334,167 | 160.8 |
| 30 | 160.8 | 130.8 | 158.7 | 153.5 | 139.3 | 5,308,545 | 3,836,799 | 151.4 |
| 40 | 89.5 | 69.8 | 82.3 | 78.6 | 64.1 | 5,307,909 | 6,542,850 | 81.1 |
| 50 | 66.5 | 75.4 | 71.2 | 69.1 | 58.5 | 3,144,431 | 4,639,854 | 67.8 |
| 60 | 49.8 | 61.0 | 47.0 | 53.9 | 38.4 | 632,112 | 1,283,449 | 49.3 |
| Total | 104.3 | 99.1 | 97.1 | 89.6 | 71.2 | 15,430,873 | 16,636,679 | 92.7 |





41  (a) Expected case is 100% of 1985 CID-A.



| Elimination Period | 1993 A/E (%) | 1994 A/E (%) | 1995 A/E (%) | 1996 A/E (%) | 1997 A/E (%) | 1993 - 1997 Actual | Expected | A/E (%) |
|---|---|---|---|---|---|---|---|---|
| <90 | 98.9 | 91.7 | 86.4 | 87.6 | 65.8 | 9,996,285 | 11,541,947 | 86.6 |
| ≥90 | 118.0 | 116.3 | 120.9 | 94.1 | 82.9 | 5,434,218 | 5,094,635 | 106.7 |
| Total | 104.3 | 99.1 | 97.1 | 89.6 | 71.2 | 15,430,503 | 16,636,582 | 92.8 |
| **Sex** | | | | | | | | |
| Male | 62.3 | 79.1 | 80.7 | 80.1 | 63.3 | 7,920,456 | 10,256,705 | 77.2 |
| Female | 139.9 | 130.3 | 123.0 | 105.2 | 84.6 | 7,510,046 | 6,379,879 | 117.7 |
| Total | 104.3 | 99.1 | 97.1 | 89.6 | 71.2 | 15,430,503 | 16,636,584 | 92.8 |

# Claims Frequency Study
## Non-Physicians(a)





(a) Expected case is 100% of 1985 CIDA.

42

7

# Claims Termination Study
## Overview of Actual to Expected Ratios (a)

| | 1996 Calendar Year Study | | | 1997 Calendar Year Study | | | Baseline Assumptions | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Physicians (%) | Non-Physicians (%) | Total (%) | Physicians (%) | Non-Physicians (%) | Total (%) | Physicians (%) | Non-Physicians (%) |
| **First Year** | | | | | | | | |
| 1993 | 55.52 | 71.23 | 68.12 | 49.59 | 69.98 | 65.94 | | |
| 1994 | 56.35 | 74.30 | 70.46 | 55.07 | 74.88 | 70.64 | | |
| 1995 | 60.42 | 72.05 | 69.55 | 49.86 | 71.17 | 66.64 | | |
| 1996 | N.A. | N.A. | N.A. | 54.80 | 77.82 | 71.97 | | |
| Totals | 67.29 | 72.63 | 69.35 | 52.43 | 73.21 | 68.68 | 54 | 72 |
| **Second Year** | | | | | | | | |
| 1993 | 142.67 | 153.10 | 150.77 | 142.41 | 159.03 | 155.16 | | |
| 1994 | 139.76 | 149.92 | 147.32 | 106.34 | 131.40 | 125.22 | | |
| 1995 | N.A. | N.A. | N.A. | 107.38 | 172.51 | 155.92 | | |
| 1996 | N.A. | N.A. | N.A. | N.A. | N.A. | N.A. | | |
| Totals | 141.20 | 151.64 | 149.15 | 120.04 | 154.35 | 146.76 | 120 | 120 |
| **Third Year** | | | | | | | | |
| 1993 | 218.11 | 248.19 | 240.88 | 115.90 | 170.77 | 155.42 | | |
| 1994 | N.A. | N.A. | N.A. | 365.74 | 184.13 | 239.35 | | |
| 1995 | N.A. | N.A. | N.A. | N.A. | N.A. | N.A. | | |
| 1996 | N.A. | N.A. | N.A. | N.A. | N.A. | N.A. | | |
| Totals | 218.11 | 248.19 | 240.88 | 251.31 | 177.31 | 198.26 | 110 | 110 |
| **Fourth Year** | | | | | | | | |
| 1993 | N.A. | N.A. | N.A. | 281.93 | 177.21 | 208.88 | 105 | 105 |
| **Fifth Year** | | | | | | | | |
| 1993 | N.A. | N.A. | N.A. | N.A. | N.A. | N.A. | 100 | 100 |



(a) Expected case is 100% of 1985 CID-A.
(b) Baseline assumption for termination year 1 is the truncated arithmetic mean of 1996 and 1997. For fifth and subsequent years, baseline assumptions are set to 100% of 1985 CID-A. For years 2, 3 and 4, baseline assumptions are set to a smoothed blend of 1996 and 1997 experience and 1985 CID-A.

**1996 Calendar Year Study Total A/E Ratio (%)**

**1997 Calendar Year Study Total A/E Ratio (%)**

# 1997 Claims Termination Study
## All Policies (a)

| Year | In Force Numbers | | Actual Terminations | | | | | A/E Ratio (b) (%) |
|------|------|------|------|------|------|------|------|------|
| | Count | Amount ($) | Count | Amount ($) | Rate (%) | Amount ($) | Rate (%) | |
| 1993 | 2,452 | 4,598,420 | | | | | | |
| 1994 | 2,317 | 4,512,566 | | | | | | |
| 1995 | 2,002 | 3,886,692 | | | | | | |
| 1996 | 1,787 | 3,636,224 | | | | | | |
| Total | 8,558 | 16,633,902 | | | | | | |
| **At The End of Year 1** | | | | | | | | |
| 1993 | 1,024 | 2,101,081 | 1,428 | 2,497,339 | 54.31 | 3,787,123 | 82.36 | 65.94 |
| 1994 | 865 | 1,930,125 | 1,452 | 2,502,441 | 57.23 | 3,655,954 | 81.02 | 70.64 |
| 1995 | 811 | 1,809,591 | 1,191 | 2,077,101 | 53.44 | 3,117,066 | 80.20 | 66.64 |
| 1996 | 632 | 1,535,906 | 1,155 | 2,100,318 | 57.26 | 2,918,475 | 80.26 | 71.97 |
| Total | 3,332 | 7,376,703 | 5,226 | 9,267,199 | 56.65 | 13,478,618 | 81.03 | 68.68 |
| **At The End of Year 2** | | | | | | | | |
| 1993 | 548 | 1,258,041 | 476 | 843,040 | 40.12 | 543,321 | 25.86 | 155.16 |
| 1994 | 587 | 1,352,936 | 278 | 577,189 | 29.90 | 460,927 | 23.88 | 125.22 |
| 1995 | 510 | 1,141,781 | 301 | 667,810 | 36.90 | 428,310 | 23.67 | 155.92 |
| Total | 1,645 | 3,752,758 | 1,055 | 2,088,039 | 35.75 | 1,432,558 | 24.53 | 146.76 |
| **At The End of Year 3** | | | | | | | | |
| 1993 | 435 | 1,069,695 | 113 | 188,346 | 14.97 | 120,414 | 9.57 | 156.42 |
| 1994 | 478 | 1,059,578 | 109 | 293,358 | 21.68 | 122,566 | 9.06 | 239.35 |
| Total | 913 | 2,129,273 | 222 | 481,704 | 18.45 | 242,980 | 9.31 | 198.26 |
| **At The End of Year 4** | | | | | | | | |
| 1993 | 368 | 917,247 | 67 | 152,448 | 14.25 | 72,983 | 6.82 | 208.88 |

(a) Excludes buy sell policies, transition business, pending claims, "Drop" claims and litigation claims.
(b) Expected case as 100% of 1985 CID-A.



Actual to Expected Rate (%)

Claims Termination Year

• Totals ◆ 1993 ▪ 1994 ■ 1995 • 1996

# 1997 Claims Termination Study

## Physicians (a)



| Year | In Force Numbers | | Actual Terminations | | | Amount ($) | Rate (%) | A/E Ratio (b) (%) |
|---|---|---|---|---|---|---|---|---|
| | Count | Amount ($) | Count | Amount ($) | Rate (%) | | | |
| 1993 | 268 | 933,911 | | | | | | |
| 1994 | 271 | 1,005,434 | | | | | | |
| 1995 | 232 | 859,972 | | | | | | |
| 1996 | 249 | 957,245 | | | | | | |
| Total | 1,019 | 3,756,562 | | | | | | |
| **At The End of Year 1** | | | | | | | | |
| 1993 | 144 | 562,200 | 124 | 371,711 | 39.80 | 749,557 | 80.26 | 49.59 |
| 1994 | 156 | 574,025 | 115 | 431,409 | 42.91 | 783,454 | 77.92 | 55.07 |
| 1995 | 137 | 529,500 | 95 | 330,472 | 38.43 | 662,758 | 77.07 | 49.98 |
| 1996 | 120 | 550,455 | 128 | 406,790 | 42.50 | 742,374 | 77.55 | 54.80 |
| Total | 557 | 2,216,180 | 462 | 1,540,382 | 41.01 | 2,938,143 | 78.21 | 52.43 |
| **At The End of Year 2** | | | | | | | | |
| 1993 | 92 | 382,201 | 52 | 179,999 | 32.02 | 126,398 | 22.48 | 142.41 |
| 1994 | 119 | 440,225 | 37 | 133,800 | 23.31 | 123,498 | 21.51 | 108.34 |
| 1995 | 106 | 412,350 | 31 | 117,150 | 22.12 | 109,103 | 20.60 | 107.38 |
| Total | 317 | 1,234,776 | 120 | 430,949 | 25.87 | 358,999 | 21.55 | 120.04 |
| **At The End of Year 3** | | | | | | | | |
| 1993 | 84 | 345,701 | 8 | 35,500 | 9.55 | 31,493 | 8.24 | 115.90 |
| 1994 | 90 | 303,925 | 29 | 136,300 | 30.96 | 37,267 | 8.47 | 365.74 |
| Total | 174 | 649,626 | 37 | 172,800 | 21.01 | 68,760 | 8.36 | 251.31 |
| **At The End of Year 4** | | | | | | | | |
| 1993 | 69 | 283,473 | 15 | 62,228 | 18.00 | 22,072 | 6.38 | 281.93 |

(a) Excludes buy sell policies/transition business/pending claims/"drop" claims/litigation claims.
(b) Expected case as 100% of 1985 CIDA.

# 1997 Claims Termination Study
## Non-Physicians (a)

| Year | In Force Numbers | | ACTUAL TERMINATIONS | | | | | A/E Ratio (b) (%) |
|---|---|---|---|---|---|---|---|---|
| | Count | Amount ($) | Count | Amount ($) | Rate (%) | Amount ($) | Rate (%) | |
| 1993 | 2,184 | 3,664,509 | | | | | | |
| 1994 | 2,046 | 3,507,132 | | | | | | |
| 1995 | 1,770 | 3,026,720 | | | | | | |
| 1996 | 1,539 | 2,678,979 | | | | | | |
| Total | 7,539 | 12,877,340 | | | | | | |
| **At The End of Year 1** | | | | | | | | |
| 1993 | 880 | 1,538,881 | 1,304 | 2,125,628 | 58.01 | 3,037,566 | 82.69 | 69.98 |
| 1994 | 709 | 1,356,100 | 1,337 | 2,151,032 | 61.33 | 2,872,500 | 81.90 | 74.88 |
| 1995 | 674 | 1,280,091 | 1,096 | 1,746,629 | 57.71 | 2,454,308 | 81.09 | 71.17 |
| 1996 | 512 | 985,451 | 1,027 | 1,693,528 | 63.22 | 2,176,101 | 81.23 | 77.82 |
| Total | 2,775 | 5,160,523 | 4,764 | 7,716,817 | 59.93 | 10,540,476 | 81.85 | 73.21 |
| **At the End of Year 2** | | | | | | | | |
| 1993 | 456 | 875,840 | 424 | 663,041 | 43.09 | 416,923 | 27.09 | 159.03 |
| 1994 | 468 | 912,711 | 241 | 443,389 | 32.70 | 337,429 | 24.88 | 131.40 |
| 1995 | 404 | 729,431 | 270 | 550,660 | 43.02 | 319,207 | 24.94 | 172.51 |
| Total | 1,328 | 2,517,982 | 935 | 1,657,090 | 39.69 | 1,073,659 | 25.71 | 164.35 |
| **At The End of Year 3** | | | | | | | | |
| 1993 | 351 | 723,994 | 105 | 151,846 | 17.34 | 88,921 | 10.15 | 170.77 |
| 1994 | 388 | 755,653 | 80 | 157,059 | 17.21 | 85,299 | 9.35 | 184.13 |
| Total | 739 | 1,479,647 | 185 | 308,904 | 17.27 | 174,220 | 9.74 | 177.31 |
| **At the End of Year 4** | | | | | | | | |
| 1993 | 299 | 633,774 | 52 | 90,220 | 12.46 | 50,911 | 7.03 | 177.21 |

(a) Excludes buy sell policies/transition business/pending claims/"drop" claims/litigation claims.
(b) Expected case as 100% of 1985 CID-A.

46

8

# Lapse Rate Baseline Assumptions
## 1999 Projections (a): Occupation Class 1, Males

Goldman Sachs



Legend:
- Central Issue Age = 30 yrs.
- Central Issue Age = 40 yrs.
- Central Issue Age = 50 yrs.
- Central Issue Age = 60 yrs.

Duration

| Central Issue Age | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 | 32 | 33 | 34 | 35 | 36 | 37 | 38 | 39 | 40 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 30 | 12.41 | 8.76 | 8.27 | 7.05 | 6.32 | 6.05 | 5.35 | 4.38 | 4.14 | 3.89 | 3.89 | 3.16 | 2.92 | 2.92 | 2.92 | 2.92 | 2.92 | 2.92 | 2.92 | 2.92 | 2.92 | 3.89 | 3.66 | 3.41 | 3.89 | 4.86 | 5.84 | 6.57 | 6.81 | 7.78 | 9.24 | 10.70 | 12.65 | 14.59 | 17.03 | | | | | |
| 40 | 8.76 | 8.27 | 7.78 | 5.84 | 5.59 | 5.35 | 5.11 | 4.86 | 4.38 | 4.14 | 3.89 | 3.65 | 3.41 | 3.89 | 3.89 | 4.86 | 5.84 | 6.57 | 6.81 | 7.78 | 9.24 | 10.70 | 12.65 | 14.59 | 17.03 | | | | | | | | | | | | | | | |
| 50 | 9.73 | 7.78 | 7.30 | 6.81 | 6.57 | 6.08 | 5.84 | 6.32 | 6.81 | 7.78 | 9.24 | 10.70 | 12.65 | 14.59 | 17.03 | | | | | | | | | | | | | | | | | | | | | | | | | |
| 60 | 16.67 | 15.57 | 15.57 | 16.54 | 17.51 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |

47  (a) Coverage terminates at age 65.



# Lapse Rate Baseline Assumptions
## 1999 Projections (a): Occupation Class 1, Females

| Central Issue Age | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 | 32 | 33 | 34 | 35 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 30 | 13.26 | 9.84 | 8.68 | 7.23 | 5.79 | 5.54 | 5.30 | 4.82 | 4.34 | 3.86 | 3.86 | 2.89 | 2.89 | 2.89 | 2.89 | 2.89 | 4.58 | 4.10 | 4.10 | 4.10 | 4.10 | 4.10 | 4.58 | 5.06 | 6.27 | 6.76 | 6.27 | 5.79 | 6.59 | 6.92 | 10.61 | 12.05 | 13.26 | 14.22 | 18.29 |
| 40 | 8.92 | 7.71 | 7.23 | 6.99 | 6.51 | 5.54 | 4.58 | 4.10 | 4.10 | 4.10 | 4.10 | 4.10 | 4.58 | 5.06 | 6.27 | 6.75 | 6.27 | 5.79 | 6.59 | 6.92 | | | | | | | | | | | | | | | |
| 50 | 6.03 | 6.68 | 7.71 | 6.99 | 6.99 | 6.75 | 6.27 | 5.79 | 6.59 | 6.92 | 10.61 | 12.05 | 13.26 | 14.22 | 18.29 | | | | | | | | | | | | | | | | | | | | |
| 60 | 18.32 | 9.84 | 9.84 | 9.84 | 9.84 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |

48    (a) Coverage terminates at age 65.



# Lapse Rate Baseline Assumptions
1999 Projections (a): Occupation Class 2, Males

49   (a) Coverage terminates at age 65.



(a) Coverage terminates at age 65.



# Lapse Rate Baseline Assumptions
## 1999 Projections (a): Occupation Class 3, Males



(a) Coverage terminates at age 65.

51



(a) Coverage terminates at age 65.

# Historical Monthly Income Lapse Rates
## Occupation Class 1, Males and Females (a)



| | Occupation Class 1: Males | | | |
| | Central Issue Age | | | |
| Duration | 30 | 40 | 50 | 60 |
|---|---|---|---|---|
| 1 | 12.71% | 9.10% | 7.77% | 16.79% |
| 2 | 7.90 | 8.57 | 10.11 | 14.27 |
| 3 | 9.45 | 8.76 | 8.57 | 21.17 |
| 4 | 6.67 | 6.03 | 7.32 | 13.29 |
| 5 | 6.09 | 5.49 | 6.45 | 18.20 |
| 6 | 6.97 | 5.58 | 5.93 | 21.11 |
| 7 | 5.07 | 5.11 | 6.85 | 19.24 |
| 8 | 4.49 | 4.94 | 6.30 | 27.28 |
| 9 | 4.30 | 4.38 | 7.03 | 26.69 |
| 10 | 3.85 | 4.36 | 7.90 | 38.42 |
| 11 | 4.48 | 4.33 | 8.41 | 56.11 |
| 12 | 2.75 | 3.72 | 10.79 | 28.01 |
| 13 | 2.67 | 3.62 | 14.70 | 30.25 |
| 14 | 3.16 | 3.08 | 14.62 | |
| 15 | 2.94 | 6.86 | 14.63 | |

| | Occupation Class 1: Females | | | |
| | Central Issue Age | | | |
| Duration | 30 | 40 | 50 | 60 |
|---|---|---|---|---|
| 1 | 13.78% | 9.35% | 6.36% | 19.00% |
| 2 | 10.04 | 6.88 | 11.54 | 16.71 |
| 3 | 9.53 | 7.37 | 6.14 | 1.93 |
| 4 | 6.38 | 7.49 | 8.31 | 10.45 |
| 5 | 5.79 | 6.79 | 6.62 | 1.57 |
| 6 | 5.79 | 5.90 | 7.11 | 15.13 |
| 7 | 6.03 | 4.49 | 6.98 | 22.59 |
| 8 | 4.99 | 4.60 | 4.84 | 29.50 |
| 9 | 4.69 | 4.64 | 7.28 | 40.50 |
| 10 | 3.88 | 4.16 | 9.90 | 28.85 |
| 11 | 3.56 | 3.66 | 9.75 | 74.91 |
| 12 | 2.15 | 4.24 | 14.41 | 0.00 |
| 13 | 2.33 | 4.26 | 10.94 | 55.21 |
| 14 | 1.85 | 6.05 | 18.73 | |
| 15 | 3.40 | 6.96 | 21.52 | |

(a) Excludes buy-sell policies

53

# Historical Monthly Income Lapse Rates

## Occupation Class 2, Males and Females (a)





**Occupation Class 2: Males**

| Duration | Central Issue Age | | | |
|---|---|---|---|---|
| | 30 | 40 | 50 | 60 |
| 1 | 13.41% | 11.34% | 11.07% | 4.01% |
| 2 | 11.04 | 11.28 | 13.35 | 24.92 |
| 3 | 12.20 | 10.20 | 9.90 | 11.06 |
| 4 | 10.84 | 8.93 | 6.61 | 25.75 |
| 5 | 8.84 | 8.40 | 5.65 | 12.94 |
| 6 | 9.12 | 7.81 | 6.77 | 22.02 |
| 7 | 8.91 | 6.29 | 10.25 | 21.16 |
| 8 | 6.41 | 7.13 | 6.94 | 12.66 |
| 9 | 6.47 | 5.74 | 13.18 | 58.65 |
| 10 | 6.04 | 8.71 | 4.75 | 53.31 |
| 11 | 8.63 | 6.34 | 9.03 | 57.89 |
| 12 | 5.59 | 4.86 | 6.46 | |

**Occupation Class 2: Females**

| Duration | Central Issue Age | | | |
|---|---|---|---|---|
| | 30 | 40 | 50 | 60 |
| 1 | 14.52% | 11.89% | 8.84% | 8.50% |
| 2 | 10.22 | 8.80 | 10.04 | 16.27 |
| 3 | 14.59 | 8.13 | 11.63 | 9.97 |
| 4 | 9.16 | 8.22 | 8.51 | 14.33 |
| 5 | 7.52 | 6.36 | 7.57 | 9.63 |
| 6 | 8.53 | 7.75 | 8.64 | 25.70% |
| 7 | 6.30 | 7.44 | 7.06 | 26.86 |
| 8 | 5.93 | 5.97 | 6.25 | 21.27 |
| 9 | 6.45 | 4.86 | 7.92 | 20.24 |
| 10 | 6.31 | 6.70 | 9.31 | 36.36 |
| 11 | 4.22 | 5.64 | 12.66 | 44.44 |
| 12 | 0.53 | 4.74 | 18.49 | |

(a)  Excludes buy-sell policies

54

# Historical Monthly Income Lapse Rates
## Occupation Class 3, Males and Females (a)



### Occupation Class 3: Males

| Duration | Central Issue Age | | | |
|---|---|---|---|---|
| | 30 | 40 | 50 | 60 |
| 2 | 21.18% | 14.80% | 1.59% | 0.00% |
| 3 | 13.71 | 14.77 | 8.40 | 5.74 |
| 4 | 11.92 | 10.26 | 9.22 | 29.00 |
| 5 | 12.56 | 7.16 | 10.08 | 26.42 |
| 6 | 8.15 | 6.94 | 5.41 | 31.83 |
| 7 | 7.66 | 8.19 | 11.40 | 40.43 |
| 8 | 8.56 | 8.00 | 7.63 | 18.36 |
| 9 | 5.73 | 6.30 | 7.21 | 29.69 |
| 10 | 6.90 | 3.99 | 9.95 | 41.98 |
| 11 | 3.90 | 5.75 | 10.27 | 33.33 |
| 12 | 2.99 | 6.38 | 12.90 | 8.00 |
| 13 | 3.56 | 4.82 | 15.63 | 43.82 |
| 14 | 2.77 | 4.37 | 15.87 | 30.42 |
| 15 | 3.73 | 4.61 | 19.19 | 3.85 |
| 16 | 3.16 | 3.69 | 23.13 | 0.00 |
| 17 | 2.92 | 4.83 | 23.23 | 11.11 |
| 18 | 3.93 | 5.47 | 30.20 | |
| 19 | 3.69 | 5.24 | 31.00 | |
| 20 | 3.30 | 5.56 | 51.85 | |

### Occupation Class 3: Females

| Duration | Central Issue Age | | | |
|---|---|---|---|---|
| | 30 | 40 | 50 | 60 |
| 2 | 17.42% | 8.65% | 12.22% | 0.00% |
| 3 | 11.86 | 9.36 | 8.82 | 19.16 |
| 4 | 10.43 | 8.54 | 10.62 | 16.44 |
| 5 | 11.14 | 9.38 | 9.47 | 15.11 |
| 6 | 8.32 | 7.86 | 10.22 | 15.99 |
| 7 | 7.07 | 7.69 | 10.07 | 10.57 |
| 8 | 7.02 | 8.29 | 7.56 | 29.65 |
| 9 | 5.49 | 4.26 | 8.34 | 48.08 |
| 10 | 6.38 | 5.36 | 11.24 | 67.37 |
| 11 | 6.86 | 6.03 | 7.85 | 100.00 |
| 12 | 4.60 | 4.83 | 10.35 | |
| 13 | 9.10 | 6.02 | 19.51 | |
| 14 | 3.53 | 5.47 | 21.29 | |
| 15 | 6.44 | 5.00 | 29.34 | |
| 16 | 5.69 | 4.58 | 21.51 | |
| 17 | 3.55 | 7.48 | 16.33 | |
| 18 | 3.76 | 8.43 | 19.00 | |
| 19 | 2.15 | 5.34 | 43.42 | |
| 20 | 4.67 | 4.22 | 54.78 | |

(a)  Excludes buy-sell policies

55

# Historical Lapse Rates
## All Plans (a):  By Monthly Income



| Grouping % | Lapse Rate During | | | |
|---|---|---|---|---|
| | 1995 | 1996 | 1997 |
| **Issue Ages** | | | |
| Under 30 | 6.67 | 6.70 | 6.46 |
| 30-39 | 5.95 | 6.02 | 5.91 |
| 40-49 | 7.29 | 7.33 | 7.28 |
| 50 and higher | 14.06 | 14.86 | 15.13 |
| | | | |
| **Policy Duration** | | | |
| 1-3 years | 10.36 | 8.72 | 9.11 |
| 4 years | 8.07 | 8.58 | 7.16 |
| 5 years | 6.77 | 7.82 | 8.05 |
| 4-5 years | 8.55 | 8.29 | 8.16 |
| 6 years | 7.00 | 7.34 | 7.50 |
| 7 years | 6.04 | 6.47 | 6.68 |
| 8 years | 5.37 | 6.18 | 6.11 |
| 9 years | 5.24 | 5.93 | 5.98 |
| 10 years | 4.85 | 5.64 | 5.99 |
| 6-10 years | 5.88 | 6.41 | 6.47 |
| 10 or more years | 6.36 | 6.85 | 6.88 |

# Historical Lapse Rates
## All Plans (a): By Monthly Income



| Grouping % | Lapse Rate During | | |
|---|---|---|---|
| | 1995 | 1996 | 1997 |
| **Attained Age** | | | |
| Less than 30 | 13.63 | 12.41 | 11.56 |
| 30-39 | 7.40 | 7.43 | 7.18 |
| 40-49 | 5.30 | 5.25 | 5.19 |
| 50 and Higher | 8.73 | 9.14 | 8.62 |
| | | | |
| **CID-A Occupation Class** | | | |
| 1 | 6.11 | 5.94 | 5.96 |
| 2 | 8.20 | 7.92 | 7.73 |
| 3 | 7.49 | 8.09 | 7.81 |
| 4 | 9.68 | 10.79 | 11.56 |

(a) Excludes buy sell policies/transition business/pending claims/"drop" claims/litigation claims

57

# Historical Lapse Rates
## All Plans (a): By Monthly Income

| Grouping % | Lapse Rate During | | |
|---|---|---|---|
| | 1995 | 1996 | 1997 |
| **Occupation Code** | | | |
| Physician | 4.63 | 4.91 | 5.16 |
| Dentist | 3.74 | 3.82 | 4.40 |
| Chiropractor | 5.13 | 6.30 | 5.69 |
| Nurse | 7.59 | 8.24 | 7.01 |
| All other | 7.99 | 7.94 | 7.80 |
| **State of Residence** | | | |
| California | 7.37 | 7.26 | 6.90 |
| Florida | 6.64 | 6.58 | 6.89 |
| New York | 7.24 | 7.77 | 7.12 |
| All Others | 6.89 | 6.89 | 6.88 |





(a) Excludes buy sell policies/transition business/pending claims/"drop" claims/litigation claims

58

# Historical Lapse Rates
## All Plans (a):  By Monthly Income



| Grouping % | Lapse Rate During | | |
|---|---|---|---|
| | 1995 | 1996 | 1997 |
| **Monthly Income** | | | |
| Less than 1,000 | 7.71 | 8.20 | 8.28 |
| 1,000 to 1,999 | 6.60 | 7.05 | 6.97 |
| 2,000 to 2,999 | 6.67 | 6.88 | 6.46 |
| 3,000 to 3,999 | 7.12 | 6.54 | 6.08 |
| 4,000 to 4,999 | 6.50 | 6.20 | 5.96 |
| 5,000 to 5,999 | 7.27 | 6.17 | 6.85 |
| 6,000 to 6,999 | 5.70 | 5.49 | 5.00 |
| 7,000 to 7,999 | 5.39 | 5.67 | 4.94 |
| 8,000 to 8,999 | 7.29 | 4.69 | 6.37 |
| 9,000 to 9,999 | 5.26 | 6.29 | 5.34 |
| 10,000 and higher | 7.96 | 6.73 | 7.72 |
| **Annualized Premium** | | | |
| Less than 500 | 7.14 | 7.49 | 7.53 |
| 500 to 999 | 6.78 | 6.78 | 6.58 |
| 1,000 to 1,499 | 6.86 | 6.87 | 6.54 |
| 1,500 to 1,999 | 6.95 | 6.98 | 6.77 |
| 2,000 to 2,499 | 7.20 | 6.76 | 6.99 |
| 2,500 to 2,999 | 7.18 | 6.99 | 6.47 |
| 3,000 to 3,499 | 7.31 | 8.04 | 6.29 |
| 3,500 to 3,999 | 8.10 | 6.81 | 8.80 |
| 4,000 and higher | 7.59 | 7.10 | 7.19 |
| All Policies: | 6.98 | 7.05 | 6.92 |

59 (a) Excludes buy sell policies/transition business/pending claims/"drop" claims/litigation claims

# Historical Lapse Rates
## All Plans (a): By Amount

Goldman Sachs

| Grouping % | Lapse Rate During | | |
|---|---|---|---|
| | 1995 | 1996 | 1997 |
| **Issue Ages** | | | |
| Under 30 | 8.32 | 6.53 | 5.59 |
| 30-39 | 6.53 | 5.35 | 6.89 |
| 40-49 | 6.98 | 6.30 | 9.37 |
| 50 and higher | 15.42 | 10.90 | 14.90 |
| | | | |
| **Policy Duration** | | | |
| 1-3 years | 9.23 | 8.24 | 8.66 |
| 4 years | 9.10 | 5.62 | 3.04 |
| 5 years | 7.95 | 4.41 | 10.73 |
| 1-5 years | 8.76 | 5.56 | 9.00 |
| 6 years | 7.47 | 7.38 | 8.28 |
| 7 years | 6.67 | 6.84 | 9.11 |
| 8 years | 5.14 | 5.62 | 12.38 |
| 9 years | 5.24 | 5.62 | 5.04 |
| 10 years | 4.80 | 5.23 | 6.11 |
| 6-10 years | 6.40 | 6.50 | 8.80 |
| 10 or more years | 5.59 | 6.03 | 6.22 |



(a) Excludes buy sell policies/transition business/pending claims/'drop' claims/litigation claims



# Historical Lapse Rates
## All Plans (a): By Amount

Goldman Sachs

**Lapse Rate During**

| Grouping % | 1995 | 1996 | 1997 |
|---|---|---|---|
| **Attained Age** | | | |
| Less than 30 | 12.39 | 11.16 | 10.78 |
| 30-39 | 8.30 | 6.46 | 5.91 |
| 40-49 | 5.95 | 5.80 | 7.88 |
| 50 and higher | 9.83 | 7.04 | 10.44 |
| | | | |
| **CID-A Occupation Class** | | | |
| 1 | 7.33 | 5.87 | 6.90 |
| 2 | 8.69 | 6.27 | 19.87 |
| 3 | 7.37 | 7.78 | 7.39 |

61  (a) Excludes buy sell policies/transition business/pending claims/'drop' claims/litigation claims

# Historical Lapse Rates
## All Plans (a): By Amount



| Grouping % | Lapse Rate During | | |
| --- | --- | --- | --- |
| | 1995 | 1996 | 1997 |
| **Occupation Code** | | | |
| Physician | 6.11 | 4.00 | 6.72 |
| Dentist | 2.84 | 5.27 | 3.76 |
| Chiropractor | 5.33 | 6.96 | 5.58 |
| Nurse | 7.70 | 8.37 | 6.82 |
| Lawyer | 4.31 | 9.87 | 4.08 |
| All other | 8.66 | 6.46 | 9.60 |
| | | | |
| **State of Residence** | | | |
| California | 4.92 | 9.14 | 4.23 |
| Florida | 8.36 | 6.68 | 4.97 |
| New York | 6.51 | 6.23 | 6.93 |
| All Others | 8.14 | 5.53 | 9.67 |

(a) Excludes buy sell policies/transition business/pending claims/'drop' claims/litigation claims

# Historical Lapse Rates
## All Plans (a): By Amount

Goldman Sachs

| Grouping % | Lapse Rate During | | |
|---|---|---|---|
|  | 1995 | 1996 | 1997 |
| **Monthly Income** | | | |
| Less than 1,000 | 7.34 | 7.75 | 7.62 |
| 1,000 to 1,999 | 6.81 | 7.07 | 6.94 |
| 2,000 to 2,999 | 6.67 | 6.89 | 6.44 |
| 3,000 to 3,999 | 7.08 | 6.52 | 6.07 |
| 4,000 to 4,999 | 6.53 | 6.15 | 5.96 |
| 5,000 to 5,999 | 7.25 | 6.15 | 6.85 |
| 6,000 to 6,999 | 5.69 | 5.47 | 4.96 |
| 7,000 to 7,999 | 5.39 | 5.72 | 4.96 |
| 8,000 to 8,999 | 7.33 | 4.68 | 6.38 |
| 9,000 to 9,999 | 5.21 | 6.33 | 5.40 |
| 10,000 and higher | 8.69 | 5.46 | 11.46 |
| **Annualized Premium** | | | |
| Less than 500 | 9.30 | 6.22 | 5.97 |
| 500 to 999 | 8.67 | 7.46 | 8.28 |
| 1,000 to 1,499 | 7.72 | 7.65 | 8.89 |
| 1,500 to 1,999 | 5.12 | 6.50 | 8.50 |
| 2,000 to 2,499 | 5.20 | 3.58 | 5.46 |
| 2,500 to 2,999 | 5.32 | 3.59 | 11.69 |
| 3,000 to 3,499 | 14.14 | 6.34 | 8.06 |
| 3,500 to 3,999 | 4.12 | 3.32 | 16.97 |
| 4,000 and higher | 7.97 | 4.76 | 5.28 |
| **All Policies** | 7.49 | 6.17 | 8.30 |





63

(a) Excludes buy-sell policies/transition business/pending claims/"drop" claims/litigation claims

A

# Present Value of Cash Outflows
## Scenario 1 - Baseline

**Assumptions**

| | |
|---|---|
| Claim Frequency | Baseline |
| Claim Termination | Baseline |

| Period / Age | Active Lives Cash Flows (a) | (b) | (c) | Expected Net Cash Outflows | Excess Coverage and Termination Reinsurance | Disabled Lives — Total Expected Paid Claims Net of Reinsurance | PV of Excess Coverage Reinsurance | Total Present Value | Total Present Value Cash Flow |
|---|---|---|---|---|---|---|---|---|---|
| 1999 | 107,367,701 | 6,426,198 | 4,074,288 | 9,059,211 | (86,808,024) | 109,104,936 | 7,091,821 | 118,194,757 | 29,286,733 |
| 2000 | 99,781,245 | 20,483,930 | 2,940,106 | 10,711,698 | (64,655,551) | 98,344,282 | 6,197,378 | 101,541,680 | 36,886,199 |
| 2001 | 92,008,942 | 29,934,449 | 2,514,692 | 11,225,007 | (48,332,794) | 90,324,167 | 5,871,071 | 98,193,238 | 37,992,444 |
| 2002 | 85,706,655 | 38,292,146 | 2,237,998 | 11,668,903 | (33,507,608) | 86,420,242 | 5,617,316 | 92,001,559 | 46,529,954 |
| 2003 | 80,043,387 | 46,340,933 | 1,773,600 | 12,098,231 | (19,830,803) | 82,632,536 | 5,371,115 | 88,003,651 | 68,173,046 |
| 2004 | 71,684,497 | 53,198,019 | 1,424,002 | 12,227,780 | (4,857,096) | 79,339,295 | 5,157,054 | 84,498,349 | 76,639,253 |
| 2005 | 65,423,788 | 57,780,255 | 1,282,879 | 12,168,264 | 5,817,630 | 76,317,438 | 4,990,833 | 81,278,072 | 87,095,702 |
| 2006 | 59,428,153 | 62,305,619 | 1,175,810 | 12,120,747 | 16,174,023 | 73,748,745 | 4,793,668 | 78,542,413 | 87,885,702 |
| 2007 | 54,831,233 | 65,534,111 | 1,083,000 | 12,128,013 | 23,811,977 | 70,969,985 | 4,613,030 | 75,582,715 | 94,718,438 |
| 2008 | 49,859,760 | 69,537,077 | 984,186 | 12,139,297 | 32,800,760 | 67,986,959 | 4,419,282 | 72,406,241 | 99,494,688 |
| 2009 | 45,583,704 | 73,453,601 | 898,819 | 11,998,283 | 40,767,999 | 65,373,331 | 4,249,266 | 69,622,597 | 105,206,021 |
| 2010 | 40,005,148 | 77,205,449 | 790,804 | 11,700,658 | 49,640,763 | 62,968,528 | 4,092,954 | 67,061,482 | 110,390,598 |
| 2011 | 35,906,656 | 78,650,015 | 708,849 | 11,375,170 | 55,827,376 | 60,628,220 | 3,940,834 | 64,560,054 | 116,702,244 |
| 2012 | 32,774,171 | 80,880,952 | 647,124 | 11,114,941 | 59,908,946 | 57,929,778 | 3,765,436 | 61,695,214 | 119,398,432 |
| 2013 | 29,797,968 | 82,950,648 | 568,382 | 10,512,744 | 64,663,711 | 55,053,328 | 3,578,468 | 58,631,784 | 121,394,090 |
| 2014 | 22,769,068 | 80,426,771 | 449,307 | 10,036,237 | 66,145,249 | 52,446,249 | 3,403,022 | 55,757,212 | 123,315,605 |
| 2015 | 18,291,496 | 74,333,321 | 380,761 | 9,086,496 | 65,469,282 | 49,729,024 | 3,232,387 | 52,691,411 | 123,002,461 |
| 2016 | 15,302,015 | 70,923,867 | 301,806 | 8,439,985 | 64,363,023 | 46,822,395 | 3,043,456 | 49,855,651 | 118,420,893 |
| 2017 | 13,291,328 | 67,284,580 | 262,122 | 7,911,641 | 62,147,015 | 43,606,017 | 2,834,391 | 46,440,409 | 114,228,914 |
| 2018 | 10,609,396 | 63,950,355 | 229,141 | 7,311,795 | 60,921,895 | 41,005,916 | 2,665,385 | 43,671,301 | 108,587,424 |
| 2019 | 8,872,424 | 60,363,239 | 174,634 | 6,889,180 | 56,447,939 | 38,314,511 | 2,490,443 | 40,804,954 | 104,593,198 |
| 2020 | 7,311,410 | 58,408,272 | 144,134 | 6,339,146 | 57,578,147 | 35,580,941 | 2,312,742 | 37,883,383 | 95,471,525 |
| 2021 | 6,442,228 | 56,035,040 | 127,022 | 5,925,380 | 55,645,198 | 32,816,327 | 2,133,081 | 34,949,388 | 90,894,564 |
| 2022 | 5,609,611 | 54,111,360 | 114,548 | 5,570,157 | 53,906,454 | 30,231,851 | 1,965,070 | 32,198,321 | 90,252,593 |
| 2023 | 5,174,241 | 52,570,498 | 102,018 | 5,242,669 | 52,741,144 | 27,630,455 | 1,795,990 | 29,426,434 | 82,167,678 |
| 2024 | 2,874,571 | 48,186,671 | 55,667 | 4,579,948 | 49,928,715 | 25,121,325 | 1,632,866 | 26,754,211 | 76,662,926 |
| 2025 | 1,857,733 | 41,900,235 | 36,623 | 3,923,238 | 44,002,465 | 22,519,122 | 1,463,743 | 23,982,685 | 67,965,330 |
| 2026 | 1,221,771 | 37,877,377 | 24,086 | 3,486,508 | 40,196,200 | 20,172,404 | 1,311,271 | 21,484,675 | 61,850,875 |
| 2027 | 915,571 | 34,333,741 | 16,049 | 3,115,400 | 36,551,619 | 18,088,242 | 1,175,736 | 19,283,977 | 55,815,509 |
| 2028 | 302,907 | 30,648,009 | 5,973 | 2,729,547 | 33,080,022 | 81,759,288 | 5,004,690 | 86,633,979 | 19,904,601 |
| 2028+ | 4,063 | 152,246,581 | 80 | 2,356,151 | 154,600,749 | 0 | 0 | | 154,600,749 |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| PV at 12/98 at 6.0% | 662,690,216 | 616,228,139 | 17,006,619 | 121,397,512 | 91,941,254 | 820,065,002 | 53,673,292 | 879,738,295 | 971,679,549 |
| PV at 12/98 at 7.5% | 679,235,283 | 651,538,325 | 17,359,571 | 126,260,175 | 115,921,788 | 855,091,867 | 55,555,642 | 910,646,529 | 1,025,570,318 |
| PV at 12/98 at 7.0% | 696,804,879 | 689,842,069 | 17,728,028 | 131,461,110 | 142,428,328 | 896,141,868 | 57,570,925 | 943,712,791 | 1,085,141,119 |

Less 12/98 Statutory Reserve Ceded on Excess Coverage and Transition Reinsurance    45,358,554

12/98 Present Value at 7.5% of DI Block Net of Reinsurance    981,211,764

**Notes:**

(a) Includes terminal reserve of 125,516,048 in year 2029.

(b) Includes terminal reserve of 85,691,175 in year 2028.

(b) Disability Premium Waiver Benefits, and claims incurred but Not Reported (IBNR) as of 12/31/1998. Disabled Lives cash flows include the effect of Accrued Benefits as of 12/31/1998.

# Present Value of Cash Outflows Before Reinsurance Ceded Amount
## Scenario 2

| Assumptions | | |
|---|---|---|
| | Baseline | Baseline |
| Disability Frequency | Baseline | |
| Claim Termination | 95% Baseline | |

| Period | (1) Total Premium (Cash Flow) | Active Lives Cash Flows | | | | Disabled Lives Cash Flows | | | Total |
|---|---|---|---|---|---|---|---|---|---|
| | | (2) Total Paid Claims (Cash Flow) | (3) Commissions | (4) General & Admin Expenses | (5) Excess (Deficiency) of Premium Over Paid Claims & Expenses | (6) Expected Benefits | (7) Expected Expenses | (8) Total Unreimbursed Disabled Life Benefits | (9) Total Net Cash Flow |
| 1999 | 107,367,854 | 6,812,832 | 4,074,271 | 10,401,511 | (86,279,240) | 109,537,506 | 7,119,938 | 116,657,446 | 30,378,206 |
| 2000 | 98,793,068 | 21,312,416 | 2,940,211 | 11,204,396 | (63,336,044) | 96,097,079 | 6,246,310 | 102,343,389 | 39,007,245 |
| 2001 | 92,012,395 | 31,343,095 | 2,514,827 | 11,763,153 | (46,391,319) | 91,261,283 | 5,931,983 | 97,193,268 | 50,801,947 |
| 2002 | 85,717,576 | 40,250,104 | 2,238,258 | 12,249,373 | (30,979,840) | 87,511,277 | 5,688,233 | 93,199,510 | 62,219,670 |
| 2003 | 80,061,835 | 46,842,668 | 1,773,990 | 12,719,861 | (16,725,316) | 83,852,526 | 5,450,414 | 89,302,940 | 72,577,624 |
| 2004 | 74,826,201 | 56,155,483 | 1,424,464 | 12,882,271 | (1,227,983) | 80,869,928 | 5,243,545 | 85,913,474 | 84,685,491 |
| 2005 | 65,459,721 | 61,180,291 | 1,298,472 | 12,838,742 | 9,858,773 | 77,756,176 | 5,054,151 | 82,810,328 | 92,869,101 |
| 2006 | 59,462,847 | 66,061,880 | 1,176,498 | 12,805,564 | 20,601,462 | 75,293,633 | 4,894,086 | 80,187,719 | 100,789,202 |
| 2007 | 54,973,720 | 69,603,361 | 1,083,918 | 12,827,782 | 28,641,341 | 72,608,840 | 4,719,575 | 77,328,414 | 105,969,755 |
| 2008 | 49,909,551 | 73,940,908 | 985,168 | 12,858,990 | 37,608,840 | 69,710,940 | 4,531,211 | 74,242,151 | 112,117,563 |
| 2009 | 45,542,590 | 76,195,235 | 900,980 | 12,723,877 | 46,177,303 | 67,180,133 | 4,386,709 | 71,546,841 | 117,724,144 |
| 2010 | 40,115,658 | 82,273,674 | 791,977 | 12,425,044 | 55,375,339 | 64,857,468 | 4,215,735 | 69,073,203 | 124,448,541 |
| 2011 | 35,971,270 | 83,943,407 | 710,124 | 12,099,357 | 60,781,618 | 62,596,504 | 4,068,773 | 66,665,277 | 127,446,895 |
| 2012 | 32,649,094 | 86,217,216 | 648,604 | 11,870,392 | 65,887,118 | 59,958,550 | 3,897,306 | 63,855,856 | 129,742,974 |
| 2013 | 29,885,356 | 88,750,402 | 590,108 | 11,636,904 | 71,092,058 | 57,126,045 | 3,713,193 | 60,839,238 | 131,931,295 |
| 2014 | 22,639,128 | 86,135,260 | 490,889 | 10,734,279 | 74,481,002 | 54,467,165 | 3,540,366 | 58,007,531 | 132,498,533 |
| 2015 | 18,050,728 | 79,874,028 | 361,929 | 9,726,113 | 71,579,341 | 51,874,828 | 3,371,864 | 55,246,692 | 126,826,033 |
| 2016 | 15,356,842 | 76,378,202 | 302,875 | 9,077,780 | 70,402,014 | 49,679,028 | 3,183,637 | 52,162,666 | 122,564,680 |
| 2017 | 13,345,120 | 72,691,611 | 263,184 | 8,520,387 | 68,046,063 | 45,730,031 | 2,972,452 | 48,702,483 | 116,750,546 |
| 2018 | 10,655,001 | 69,175,081 | 210,039 | 7,997,396 | 66,097,916 | 43,130,305 | 2,803,470 | 45,833,775 | 112,631,280 |
| 2019 | 8,915,682 | 65,472,725 | 175,665 | 7,349,747 | 64,082,476 | 40,423,532 | 2,627,530 | 43,051,062 | 107,133,537 |
| 2020 | 7,349,595 | 63,491,013 | 144,887 | 6,886,829 | 63,173,133 | 37,659,960 | 2,447,897 | 40,107,837 | 103,280,990 |
| 2021 | 6,461,103 | 61,061,563 | 127,788 | 6,453,410 | 61,161,039 | 34,849,812 | 2,265,238 | 37,115,049 | 98,276,889 |
| 2022 | 5,652,432 | 59,085,570 | 115,392 | 6,079,803 | 59,428,334 | 32,215,532 | 2,094,010 | 34,309,541 | 93,737,875 |
| 2023 | 5,221,217 | 57,494,459 | 102,946 | 5,733,949 | 58,110,076 | 29,550,289 | 1,920,769 | 31,471,058 | 89,581,134 |
| 2024 | 2,300,894 | 52,798,921 | 57,188 | 5,031,695 | 56,986,810 | 26,964,471 | 1,752,691 | 28,717,162 | 83,703,972 |
| 2025 | 1,974,830 | 48,133,066 | 36,956 | 4,334,158 | 48,635,452 | 24,270,309 | 1,577,570 | 25,847,879 | 74,483,331 |
| 2026 | 1,233,639 | 41,679,795 | 24,324 | 3,666,708 | 44,539,986 | 21,833,603 | 1,419,184 | 23,252,787 | 67,792,773 |
| 2027 | 926,314 | 38,111,176 | 18,260 | 3,472,864 | 40,975,987 | 19,659,344 | 1,277,857 | 20,937,201 | 61,613,188 |
| 2028 | 307,033 | 34,168,975 | 6,054 | 3,059,352 | 38,871,346 | 91,940,895 | 5,703,121 | 97,643,817 | 134,571,164 |
| 2029 + | 4,099 | 174,011,131 | 81 | 2,657,668 | 176,694,761 | 0 | 0 | 0 | 176,664,781 |
| PV at 12/98 at 8.0% | 663,088,574 | 658,130,625 | 17,013,370 | 128,497,251 | 140,572,672 | 844,122,059 | 54,845,206 | 898,967,205 | 1,039,539,977 |
| PV at 12/98 at 7.5% | 679,637,080 | 696,220,963 | 17,388,585 | 133,693,478 | 167,843,965 | 874,285,894 | 56,800,850 | 931,086,744 | 1,098,710,709 |
| PV at 12/98 at 7.0% | 697,031,945 | 737,567,579 | 17,736,643 | 139,255,990 | 197,528,167 | 906,537,465 | 58,894,178 | 965,431,643 | 1,162,959,810 |

Notes:
(a) Includes terminal reserve of   144037617.2   in year 2029
(b) Includes terminal reserve of   74,356,842   in year 2028.   Disabled Lives cash flows include the effect of Accrued Benefits as of 12/31/1998,
    Disability Premium Waiver Benefits, and claims incurred But Not Reported (IBNR) as of 12/31/1998.

# Present Value of Cash Outflows Before Reinsurance Ceded Amount
## Scenario 3

| Assumptions | |
|---|---|
| Claim Cost | Baseline |
| Claim Termination | 105% Baseline |
| % Lapse | Baseline |

| Period | Active Lives Cash Flows | | | | Disabled Lives Cash Flows | | | | Total |
|---|---|---|---|---|---|---|---|---|---|
| | Projected Reserves (a) | Scenario 3 (b) | Excess Reserves (b) | Excess Cash Flows (b) | Excess Cash Flows | Benefit Payments | Excess Outflows | Total Inflows | Total Outflows |
| 1999 | 107,347,550 | 6,245,304 | 4,074,283 | 9,551,207 | (67,496,776) | 106,677,333 | 7,094,027 | 115,741,359 | 28,244,583 |
| 2000 | 88,789,681 | 19,691,162 | 2,940,121 | 10,255,546 | (65,902,863) | 94,000,391 | 6,149,415 | 100,755,807 | 34,852,944 |
| 2001 | 92,001,713 | 29,598,031 | 2,514,584 | 10,725,905 | (50,185,213) | 99,406,747 | 5,811,439 | 95,218,185 | 45,052,973 |
| 2002 | 85,698,230 | 38,439,277 | 2,237,748 | 11,129,946 | (35,889,259) | 85,353,461 | 5,547,970 | 90,901,435 | 65,012,176 |
| 2003 | 80,025,765 | 43,979,744 | 1,773,230 | 11,520,635 | (8,266,800) | 81,441,258 | 5,293,682 | 86,734,940 | 63,992,764 |
| 2004 | 71,042,795 | 50,332,918 | 1,423,564 | 11,619,513 | 2,028,200 | 78,041,295 | 5,072,084 | 83,113,979 | 7,447,179 |
| 2005 | 65,400,644 | 54,584,247 | 1,297,319 | 11,545,077 | 12,024,556 | 74,915,999 | 4,869,540 | 79,785,539 | 81,611,739 |
| 2006 | 59,395,429 | 58,760,860 | 1,175,164 | 11,483,871 | 19,464,352 | 72,246,256 | 4,696,007 | 76,942,262 | 86,668,819 |
| 2007 | 54,791,213 | 61,719,538 | 1,082,291 | 11,473,936 | 28,054,281 | 69,378,409 | 4,509,597 | 73,888,006 | 93,372,358 |
| 2008 | 49,812,985 | 65,413,205 | 983,204 | 11,470,797 | 35,712,973 | 66,320,585 | 4,310,638 | 70,631,423 | 98,685,704 |
| 2009 | 45,528,408 | 69,017,896 | 898,729 | 11,324,755 | 44,266,387 | 63,926,514 | 4,135,723 | 67,762,238 | 103,475,210 |
| 2010 | 40,000,365 | 72,468,664 | 799,703 | 11,028,185 | 49,275,755 | 61,146,374 | 3,974,514 | 65,120,889 | 109,407,276 |
| 2011 | 35,846,177 | 73,710,396 | 707,657 | 10,703,902 | 56,734,113 | 58,734,113 | 3,817,717 | 62,551,830 | 111,827,585 |
| 2012 | 32,704,052 | 75,521,147 | 645,740 | 10,473,193 | 53,936,029 | 55,982,514 | 3,638,663 | 59,621,377 | 113,557,406 |
| 2013 | 29,716,207 | 77,608,565 | 586,766 | 10,244,839 | 56,721,963 | 53,069,253 | 3,449,501 | 56,518,754 | 115,240,717 |
| 2014 | 22,703,734 | 75,120,358 | 448,018 | 9,395,545 | 62,260,187 | 50,337,278 | 3,271,923 | 53,609,201 | 115,869,389 |
| 2015 | 18,238,445 | 69,226,408 | 359,676 | 8,459,971 | 59,806,608 | 47,886,716 | 3,053,020 | 50,784,535 | 116,094,961 |
| 2016 | 16,252,312 | 65,879,339 | 300,814 | 7,653,822 | 58,781,662 | 46,776,060 | 2,910,444 | 47,686,504 | 106,498,767 |
| 2017 | 13,241,470 | 62,340,137 | 261,140 | 7,346,080 | 56,705,887 | 41,595,994 | 2,703,740 | 44,299,734 | 101,005,820 |
| 2018 | 10,567,238 | 59,141,060 | 208,310 | 6,820,877 | 55,609,009 | 39,002,072 | 2,535,135 | 41,537,207 | 97,146,216 |
| 2019 | 8,832,059 | 55,672,958 | 171,049 | 6,263,720 | 53,276,188 | 38,332,019 | 2,361,581 | 38,693,600 | 91,971,768 |
| 2020 | 7,276,257 | 53,749,723 | 143,442 | 5,840,608 | 52,457,514 | 33,633,150 | 2,186,155 | 35,819,305 | 88,276,818 |
| 2021 | 6,406,435 | 51,444,033 | 126,316 | 5,445,985 | 50,609,869 | 30,916,870 | 2,009,727 | 32,926,596 | 83,539,495 |
| 2022 | 5,770,205 | 49,579,225 | 113,771 | 5,108,684 | 50,916,870 | 28,357,882 | 1,845,212 | 30,233,095 | 79,284,570 |
| 2023 | 5,130,952 | 48,094,266 | 101,166 | 4,799,324 | 48,397,862 | 25,652,054 | 1,680,442 | 27,533,397 | 75,397,200 |
| 2024 | 2,850,295 | 43,968,175 | 56,189 | 4,172,485 | 47,863,804 | 23,421,703 | 1,522,411 | 24,944,114 | 70,291,669 |
| 2025 | 1,842,213 | 38,075,334 | 36,319 | 3,555,464 | 45,347,555 | 20,911,581 | 1,355,253 | 22,270,824 | 62,095,737 |
| 2026 | 1,210,682 | 34,260,493 | 23,808 | 3,144,799 | 39,624,904 | 18,656,352 | 1,212,683 | 19,869,015 | 56,107,494 |
| 2027 | 905,698 | 30,952,847 | 17,854 | 2,797,951 | 36,236,478 | 16,659,202 | 1,052,848 | 17,742,050 | 50,605,004 |
| 2028 | 299,113 | 27,510,807 | 5,898 | 2,438,001 | 32,662,953 | 75,662,068 | 4,611,179 | 80,273,288 | 50,928,960 |
| 2029 + | 4,028 | 133,394,246 | 80 | 2,090,969 | 29,655,592 | 0 | 0 | 0 | 135,481,267 |
| PV at 12/98 at 6.0% | 662,335,972 | 577,342,292 | 16,998,747 | 114,838,296 | 46,841,663 | 809,080,461 | 52,563,184 | 861,643,645 | 908,485,508 |
| PV at 12/98 at 7.5% | 678,859,210 | 610,101,392 | 17,351,067 | 119,392,893 | 67,986,142 | 837,099,523 | 54,380,142 | 891,479,665 | 959,465,807 |
| PV at 12/98 at 7.0% | 696,205,239 | 645,615,260 | 17,720,059 | 124,285,491 | 91,395,571 | 867,051,082 | 56,322,013 | 923,373,095 | 1,014,768,668 |

Notes:
(a) Includes terminal reserve of 109534604.6 in year 2029.
(b) Includes terminal reserve of 59,695,440 in year 2028.
Disability Premium Waiver Benefits, and claims incurred But Not Reported (IBNR) as of 12/31/1998.
Disabled Lives cash flows include the effect of Accrued Benefits as of 12/31/1998.

# Present Value of Cash Outflows Before Reinsurance Ceded Amount
## Scenario 4

| Assumptions | |
|---|---|
| Claims Termination | Baseline |
| Benefit Termination | Baseline |
| Lapse | 92.5% of Baseline |
| Mortality | Baseline |

| Period | Active Lives Cash Flows | | | | Disabled Lives Cash Flows | | | | Total |
|---|---|---|---|---|---|---|---|---|---|
| 1999 | 107,366,502 | 5,946,229 | 4,074,232 | 9,496,482 | (87,849,579) | 109,104,936 | 7,091,821 | 116,196,757 | 28,347,178 |
| 2000 | 98,784,883 | 18,960,659 | 2,939,989 | 10,173,251 | (66,710,994) | 95,344,282 | 6,197,378 | 101,541,660 | 34,830,676 |
| 2001 | 91,992,247 | 27,716,054 | 2,514,325 | 10,632,642 | (51,129,226) | 90,324,167 | 5,871,071 | 96,195,238 | 45,086,011 |
| 2002 | 85,682,011 | 35,462,249 | 2,237,402 | 11,028,921 | (36,053,439) | 86,420,242 | 5,617,316 | 92,037,558 | 55,084,119 |
| 2003 | 80,006,159 | 42,924,920 | 1,772,812 | 11,413,310 | (23,695,410) | 82,632,598 | 5,371,115 | 88,003,651 | 64,108,233 |
| 2004 | 71,623,210 | 49,246,330 | 1,423,115 | 11,512,992 | (9,441,650) | 79,339,295 | 5,157,054 | 84,496,349 | 75,054,699 |
| 2005 | 65,379,623 | 53,535,104 | 1,296,906 | 11,442,577 | 894,965 | 76,317,438 | 4,960,633 | 81,278,072 | 82,173,036 |
| 2006 | 59,374,626 | 57,734,107 | 1,174,782 | 11,334,407 | 10,916,003 | 73,748,745 | 4,793,698 | 78,542,413 | 89,460,716 |
| 2007 | 54,768,444 | 60,731,716 | 1,081,841 | 11,378,003 | 18,423,186 | 70,959,665 | 4,613,030 | 75,582,715 | 94,005,681 |
| 2008 | 49,789,890 | 64,448,816 | 982,807 | 11,378,571 | 27,020,304 | 67,998,959 | 4,419,282 | 72,408,241 | 104,340,754 |
| 2009 | 45,503,981 | 68,096,428 | 898,246 | 11,237,443 | 34,716,157 | 65,373,331 | 4,248,288 | 69,621,597 | 110,390,232 |
| 2010 | 39,978,128 | 71,571,505 | 789,283 | 10,948,109 | 43,330,749 | 62,968,528 | 4,092,954 | 67,061,482 | 113,091,307 |
| 2011 | 35,824,591 | 72,813,578 | 707,330 | 10,636,037 | 48,432,253 | 60,626,220 | 3,940,834 | 64,599,054 | 114,876,648 |
| 2012 | 32,680,415 | 74,801,867 | 645,272 | 10,414,707 | 53,181,432 | 57,929,778 | 3,765,436 | 61,695,214 | 116,561,956 |
| 2013 | 29,690,322 | 76,942,245 | 586,284 | 10,191,985 | 56,030,162 | 55,053,328 | 3,578,466 | 58,631,794 | 117,459,231 |
| 2014 | 22,697,024 | 74,577,525 | 447,067 | 9,363,831 | 61,702,019 | 52,354,190 | 3,403,022 | 55,757,212 | 112,465,788 |
| 2015 | 18,225,620 | 68,919,523 | 359,462 | 8,451,012 | 59,504,377 | 49,729,024 | 3,232,387 | 52,961,411 | 108,539,206 |
| 2016 | 15,244,012 | 65,754,293 | 300,650 | 7,662,424 | 55,673,355 | 46,822,395 | 3,043,456 | 49,865,851 | 103,194,701 |
| 2017 | 13,234,019 | 62,359,853 | 260,993 | 7,387,468 | 54,754,292 | 43,606,017 | 2,834,391 | 46,440,409 | 99,464,280 |
| 2018 | 10,582,676 | 59,286,969 | 208,220 | 6,860,466 | 55,782,979 | 41,005,916 | 2,665,385 | 43,671,301 | 94,418,101 |
| 2019 | 8,930,105 | 55,960,199 | 174,001 | 6,300,052 | 53,613,147 | 38,314,511 | 2,490,445 | 40,804,956 | 90,803,220 |
| 2020 | 7,274,985 | 54,146,531 | 143,415 | 5,894,777 | 52,909,938 | 35,580,641 | 2,312,742 | 37,893,383 | 86,127,773 |
| 2021 | 6,405,313 | 51,848,508 | 126,284 | 5,508,696 | 51,178,385 | 32,816,327 | 2,133,081 | 34,949,388 | 81,886,583 |
| 2022 | 5,769,064 | 50,167,096 | 113,748 | 5,177,862 | 49,899,642 | 30,231,851 | 1,866,010 | 32,196,921 | 76,012,118 |
| 2023 | 5,123,834 | 49,741,627 | 101,143 | 4,872,746 | 48,585,684 | 27,630,455 | 1,795,980 | 29,426,434 | 72,870,675 |
| 2024 | 2,850,076 | 46,657,678 | 56,185 | 4,252,677 | 48,116,664 | 25,121,325 | 1,632,886 | 26,754,211 | 64,660,003 |
| 2025 | 1,841,873 | 38,842,178 | 36,312 | 3,641,123 | 40,877,738 | 22,519,122 | 1,463,743 | 23,982,865 | 59,643,276 |
| 2026 | 1,210,315 | 35,110,568 | 23,661 | 3,234,497 | 37,158,600 | 20,173,404 | 1,311,221 | 21,484,675 | 53,090,662 |
| 2027 | 905,351 | 31,824,551 | 17,847 | 2,889,638 | 33,808,985 | 16,088,242 | 1,175,738 | 19,203,977 | 117,468,596 |
| 2028 | 298,988 | 28,407,133 | 5,895 | 2,530,547 | 30,844,587 | 81,759,289 | 1,044,690 | 86,823,979 | |
| 2029 * | 4,026 | 141,102,701 | 80 | 2,183,714 | 0 | 0 | 0 | 0 | 143,282,468 |
| | | | | | | | | | |
| PV at 12/98 at 8.0% | 662,178,384 | 571,093,020 | 16,995,473 | 114,181,310 | 40,091,420 | 826,085,002 | 53,673,292 | 879,758,295 | 919,629,715 |
| PV at 12/98 at 6.0% | 678,695,020 | 603,823,945 | 17,347,651 | 118,730,387 | 61,206,973 | 855,091,887 | 55,556,642 | 910,648,529 | 971,855,502 |
| PV at 12/98 at 7.0% | 686,034,083 | 639,329,926 | 17,718,512 | 123,596,961 | 64,609,336 | 846,141,866 | 57,570,925 | 943,712,791 | 1,026,322,128 |

Notes
(a) Includes terminal reserve of     116,526,464.1   in year 2029.
(b) Includes terminal reserve of     65,651,175   in year 2028.     Disabled Lives cash flows include the effect of Accrued Benefits as of 12/31/1998,
Disability Premium Waiver Benefits, and claims Incurred But Not Reported (IBNR) as of 12/31/1998.

# Present Value of Cash Outflows Before Reinsurance Ceded Amount
## Scenario 5

| Period | Active Lives Cash Flows | | | | Assumptions — Claim Frequency Elimination / Claim Lapse / Baseline (92.2% Baseline, 95% Baseline) | | Disabled Lives Cash Flows | | Total |
|---|---|---|---|---|---|---|---|---|---|
| Year | (a) | (b) | (3) | (4) Cash Flows | (c) Combined Claim Continuation | (d) Frequency Elimination | (e) | (f) Cash Flows | (g) Cash Flows |
| 1999 | 107,366,644 | 6,119,948 | 4,074,236 | 9,905,798 | 109,537,508 | (87,267,663) | 7,119,936 | 116,657,446 | 29,389,783 |
| 2000 | 98,786,479 | 19,717,622 | 2,940,032 | 10,625,570 | 96,097,079 | (65,469,055) | 6,246,310 | 102,343,389 | 35,854,334 |
| 2001 | 91,997,289 | 29,021,091 | 2,514,450 | 11,131,324 | 91,281,283 | (49,330,434) | 5,931,983 | 97,193,266 | 47,862,832 |
| 2002 | 85,692,134 | 37,276,946 | 2,237,644 | 11,597,072 | 87,551,277 | (34,610,472) | 5,688,233 | 93,199,510 | 56,559,038 |
| 2003 | 80,023,284 | 45,244,145 | 1,773,173 | 11,989,857 | 83,852,339 | (21,016,109) | 5,450,414 | 89,302,940 | 68,286,831 |
| 2004 | 71,644,826 | 52,025,413 | 1,423,603 | 12,120,217 | 80,869,928 | (6,075,592) | 5,245,545 | 85,913,474 | 79,837,862 |
| 2005 | 65,407,400 | 56,699,227 | 1,297,455 | 12,064,790 | 77,756,176 | 4,644,064 | 5,054,151 | 82,810,328 | 87,454,391 |
| 2006 | 59,406,816 | 61,239,057 | 1,175,388 | 12,200,108 | 75,293,633 | 15,026,737 | 4,894,086 | 80,187,719 | 95,214,455 |
| 2007 | 54,807,675 | 64,508,303 | 1,082,618 | 12,029,631 | 72,608,840 | 22,812,678 | 4,719,575 | 77,328,414 | 100,141,093 |
| 2008 | 49,836,093 | 66,535,739 | 953,717 | 12,040,948 | 69,710,940 | 31,731,311 | 4,531,211 | 74,242,151 | 105,973,402 |
| 2009 | 45,558,637 | 72,488,961 | 899,324 | 11,911,229 | 67,180,133 | 39,740,877 | 4,366,709 | 71,546,841 | 111,287,718 |
| 2010 | 40,033,391 | 76,278,128 | 790,253 | 11,621,314 | 64,857,468 | 48,656,403 | 4,215,735 | 69,073,203 | 117,729,806 |
| 2011 | 35,884,604 | 77,829,603 | 708,414 | 11,306,826 | 62,596,504 | 53,982,240 | 4,068,773 | 66,665,277 | 120,627,517 |
| 2012 | 32,750,023 | 79,944,072 | 646,847 | 11,008,732 | 59,958,550 | 58,929,428 | 3,697,308 | 60,839,238 | 122,785,284 |
| 2013 | 29,771,535 | 82,202,355 | 597,658 | 10,866,860 | 57,128,045 | 63,563,558 | 3,713,193 | 63,655,856 | 124,822,796 |
| 2014 | 22,752,123 | 79,880,939 | 448,972 | 10,010,564 | 54,467,065 | 64,281,995 | 3,540,368 | 58,000,531 | 125,595,882 |
| 2015 | 18,280,645 | 74,035,999 | 360,547 | 9,063,766 | 51,874,428 | 65,179,667 | 3,371,864 | 55,246,692 | 120,478,359 |
| 2016 | 15,294,390 | 70,819,862 | 301,643 | 8,454,870 | 48,979,029 | 64,234,377 | 3,183,637 | 52,162,666 | 118,444,650 |
| 2017 | 13,263,998 | 67,316,076 | 261,978 | 7,940,321 | 45,730,031 | 62,234,377 | 2,972,452 | 48,702,483 | 110,908,449 |
| 2018 | 10,905,051 | 64,138,725 | 209,055 | 7,413,663 | 43,130,305 | 61,156,392 | 2,803,470 | 45,933,775 | 107,090,167 |
| 2019 | 8,707,004 | 60,204,554 | 174,792 | 6,836,428 | 40,423,532 | 58,105,108 | 2,627,530 | 43,051,062 | 101,896,032 |
| 2020 | 7,310,374 | 58,867,974 | 144,114 | 6,403,392 | 37,659,990 | 56,300,572 | 2,447,897 | 40,107,857 | 98,212,963 |
| 2021 | 6,441,469 | 56,615,780 | 127,007 | 5,998,234 | 34,849,812 | 55,742,735 | 2,265,238 | 37,115,049 | 93,416,621 |
| 2022 | 5,608,875 | 54,755,992 | 114,533 | 5,651,115 | 32,215,052 | 53,571,141 | 2,094,010 | 34,309,541 | 89,052,276 |
| 2023 | 5,173,576 | 53,314,157 | 102,006 | 5,328,754 | 29,550,289 | 50,813,257 | 1,920,769 | 31,471,058 | 85,042,999 |
| 2024 | 2,874,643 | 42,776,774 | 56,669 | 4,672,093 | 26,964,411 | 44,976,251 | 1,752,691 | 28,717,162 | 79,530,419 |
| 2025 | 1,857,575 | 38,825,237 | 36,622 | 4,022,430 | 24,270,309 | 41,217,007 | 1,577,570 | 25,847,879 | 70,826,129 |
| 2026 | 1,221,529 | 35,330,077 | 24,081 | 3,590,117 | 21,833,603 | 37,654,129 | 1,419,184 | 23,252,787 | 64,470,094 |
| 2027 | 915,334 | | 18,044 | 3,221,343 | 19,659,344 | 34,214,058 | 1,277,857 | 22,937,201 | 58,591,330 |
| 2028 | 302,824 | 31,674,352 | 5,971 | 2,836,559 | 91,940,695 | | 5,703,121 | 97,643,817 | 131,951,875 |
| 2029 + | 4,000 | 161,291,085 | 80 | 2,453,450 | 0 | 163,750,534 | 0 | | 983,750,534 |
| PV at 12/98 at 8.0% | 862,529,735 | 609,985,693 | 17,002,485 | 120,769,723 | 844,122,099 | 85,228,167 | 54,645,206 | 898,867,305 | 984,195,472 |
| PV at 12/98 at 7.5% | 879,088,126 | 645,297,635 | 17,355,103 | 125,628,526 | 874,265,694 | 109,213,139 | 56,800,850 | 931,066,744 | 1,040,279,882 |
| PV at 12/98 at 7.0% | 696,430,660 | 683,628,631 | 17,724,419 | 130,826,984 | 906,537,465 | 135,751,274 | 58,894,178 | 965,431,643 | 1,101,162,917 |

Notes:
(a) Includes terminal reserve of 135607852.3 in year 2029.
(b) Includes terminal reserve of 74,356,842 in year 2028.    Disabled Lives cash flows include the effect of Accrued Benefits as of 12/31/1998,
of Disability Premium Waiver Benefits, and claims incurred But Not Reported (IBNR) as of 12/31/1998.

# Present Value of Cash Outflows Before Reinsurance Ceded Amount
## Scenario 6

**Assumptions**

| | |
|---|---|
| Claim Frequency | 92.5% Baseline |
| Claim Termination | 105% Baseline |
| Interest | Baseline |

| Period | Action Lives Cash Flows — Beginning Terminal Reserve [(a)(b)] | Release in Terminal Reserve | Claim Benefits | Expected Claim Benefits | Expected Change in Reserve | Disabled Lives Cash Flows — Beginning Claim Reserve | Expected Claim Payments | Actual Claim Benefits | Total — Net Cash Flow |
|---|---|---|---|---|---|---|---|---|---|
| 1999 | 107,366,363 | 5,778,824 | 4,074,229 | 9,118,869 | (88,394,441) | 108,677,933 | 3,064,027 | 115,741,359 | 27,346,918 |
| 2000 | 96,785,342 | 18,026,583 | 2,939,948 | 9,750,798 | (87,865,014) | 94,606,391 | 6,146,415 | 100,755,607 | 32,889,792 |
| 2001 | 91,967,402 | 26,476,143 | 2,514,206 | 10,170,174 | (82,826,879) | 89,606,747 | 5,811,439 | 95,218,185 | 42,291,306 |
| 2002 | 85,672,348 | 33,745,080 | 2,237,171 | 10,529,306 | (39,160,791) | 85,353,461 | 5,547,975 | 90,901,436 | 51,740,045 |
| 2003 | 79,989,855 | 40,735,612 | 1,772,468 | 10,877,672 | (28,604,102) | 81,441,258 | 5,293,682 | 86,734,940 | 60,120,838 |
| 2004 | 71,902,715 | 46,627,386 | 1,422,769 | 10,946,737 | (12,603,822) | 78,041,295 | 5,072,684 | 83,113,979 | 70,510,157 |
| 2005 | 65,353,330 | 50,570,639 | 1,296,366 | 10,884,348 | (2,621) | 74,915,999 | 4,869,540 | 79,785,539 | 77,163,592 |
| 2006 | 59,344,268 | 54,445,544 | 1,174,153 | 10,793,004 | 7,068,432 | 72,246,256 | 4,696,007 | 76,942,262 | 84,010,695 |
| 2007 | 54,231,309 | 57,191,897 | 1,081,109 | 10,772,735 | 14,314,431 | 69,378,409 | 4,509,597 | 73,888,006 | 88,202,437 |
| 2008 | 49,746,459 | 60,621,378 | 981,952 | 10,757,870 | 22,614,742 | 66,320,585 | 4,310,836 | 70,631,423 | 93,246,164 |
| 2009 | 45,452,826 | 63,966,755 | 897,234 | 10,611,975 | 30,025,338 | 63,626,514 | 4,135,723 | 67,762,238 | 103,480,121 |
| 2010 | 39,926,330 | 57,173,774 | 788,242 | 10,323,555 | 36,359,232 | 61,146,374 | 3,974,514 | 65,120,889 | 105,629,141 |
| 2011 | 35,768,425 | 68,327,056 | 708,122 | 10,012,558 | 43,277,311 | 58,734,113 | 3,817,717 | 58,518,754 | 107,451,195 |
| 2012 | 32,615,286 | 70,010,398 | 643,986 | 9,790,729 | 47,629,816 | 55,982,514 | 3,638,863 | 59,621,377 | 109,041,703 |
| 2013 | 29,614,356 | 69,648,808 | 584,753 | 9,569,651 | 52,492,946 | 53,069,253 | 3,449,501 | 56,518,754 | 109,844,984 |
| 2014 | 26,626,332 | 64,176,950 | 446,490 | 8,766,817 | 58,235,783 | 50,337,278 | 3,271,923 | 53,609,201 | 105,034,051 |
| 2015 | 18,174,491 | 61,070,579 | 356,455 | 7,886,764 | 54,247,698 | 47,686,716 | 3,099,637 | 50,786,353 | 101,177,424 |
| 2016 | 15,197,290 | 57,787,799 | 293,729 | 7,316,101 | 53,490,920 | 44,776,060 | 2,910,444 | 47,686,504 | 98,002,181 |
| 2017 | 13,187,705 | 54,831,990 | 260,090 | 6,942,274 | 51,702,447 | 41,595,994 | 2,703,740 | 44,299,734 | 92,397,560 |
| 2018 | 10,523,515 | 51,605,879 | 207,449 | 6,354,459 | 50,860,373 | 39,032,072 | 2,635,135 | 41,537,207 | 87,507,926 |
| 2019 | 8,793,052 | 49,823,844 | 173,272 | 5,827,928 | 48,431,026 | 35,832,019 | 2,361,581 | 38,693,600 | 85,185,305 |
| 2020 | 7,242,225 | 47,686,564 | 142,772 | 5,431,901 | 48,156,092 | 33,832,019 | 2,186,155 | 35,618,305 | 79,432,578 |
| 2021 | 6,372,054 | 46,959,657 | 125,839 | 5,063,834 | 46,503,992 | 30,918,870 | 2,009,727 | 32,928,596 | 76,322,773 |
| 2022 | 5,732,438 | 44,585,795 | 113,028 | 4,749,433 | 45,089,678 | 28,387,862 | 1,845,212 | 30,223,086 | 71,590,814 |
| 2023 | 5,089,692 | 40,760,208 | 100,350 | 4,460,984 | 44,067,518 | 26,852,654 | 1,690,442 | 27,533,397 | 66,807,928 |
| 2024 | 2,827,513 | 35,292,400 | 55,740 | 3,875,379 | 41,863,815 | 23,421,703 | 1,522,411 | 24,844,114 | 59,071,645 |
| 2025 | 1,427,453 | 31,772,077 | 36,028 | 3,299,739 | 36,800,712 | 20,911,581 | 1,359,253 | 22,270,634 | 53,382,973 |
| 2026 | 1,200,014 | 28,667,590 | 23,698 | 2,917,437 | 33,513,958 | 18,656,352 | 1,212,663 | 19,860,016 | 48,146,241 |
| 2027 | 896,181 | 25,496,532 | 17,696 | 2,595,116 | 30,404,190 | 16,659,202 | 1,082,848 | 17,742,050 | 107,740,240 |
| 2028 | 285,464 | | 5,826 | 2,260,079 | 27,495,972 | 75,682,088 | 4,611,179 | 80,273,288 | |
| 2029 + | 3,994 | | 79 | 1,937,731 | 125,548,876 | | 0 | 0 | 125,548,876 |
| PV at 12/98 at 8.0% | 661,849,459 | 535,006,693 | 16,988,908 | 108,094,126 | (1,759,671) | 805,080,461 | 52,963,184 | 851,643,645 | |
| PV at 12/98 at 7.5% | 678,545,861 | 565,319,917 | 17,340,695 | 112,356,603 | 16,723,353 | 837,099,523 | 54,380,142 | 851,479,665 | 908,203,018 |
| PV at 12/98 at 7.0% | 695,683,017 | 598,286,360 | 17,709,113 | 116,918,509 | 37,250,984 | 867,051,082 | 56,322,013 | 923,373,095 | 960,624,059 |

Notes:

(a) Includes terminal reserve of 101503868.8 in year 2029.

(b) Includes terminal reserve of 59,685,446 in year 2028.

Disabled Lives cash flows include the effect of Accrued Benefits as of 12/31/1998.

Disabled Lives cash flows include the effect of 12/31/1998.

Disability Premium Waiver Benefits, and claims Incurred But Not Reported (IBNR) as of 12/31/1998.

# Present Value of Cash Outflows Before Reinsurance Ceded Amount
## Scenario 7

| Assumptions | Claim Frequency | Claim Termination | |
|---|---|---|---|
| | Baseline | Baseline | Baseline |
| | 107.5% of Baseline | | |

| Period | Active Lives Cash Flows | | | | | | | | Disabled Lives Cash Flows | | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | (a) | (b) | (c) Commissions | (d) | | | | | | Expense | Total | Total |
| 1999 | 107,368,898 | 6,905,846 | 4,074,302 | 10,421,574 | (85,997,176) | 109,104,936 | 7,091,921 | 116,196,757 | | | | 30,229,581 |
| 2000 | 98,797,799 | 22,005,112 | 2,940,341 | 11,249,211 | (62,603,136) | 95,344,282 | 6,197,378 | 101,541,660 | | | | 39,938,525 |
| 2001 | 92,021,611 | 32,148,583 | 2,515,080 | 11,618,017 | (45,541,951) | 90,324,167 | 5,871,071 | 96,195,238 | | | | 50,653,287 |
| 2002 | 85,731,245 | 41,115,360 | 2,233,591 | 12,307,127 | (30,070,167) | 86,420,242 | 5,617,316 | 92,037,558 | | | | 72,226,401 |
| 2003 | 80,080,427 | 49,747,849 | 1,774,347 | 12,766,999 | (16,777,250) | 82,632,538 | 5,371,115 | 88,003,651 | | | | 84,209,424 |
| 2004 | 71,708,464 | 57,054,616 | 1,424,827 | 12,940,096 | (1,036,915) | 79,339,325 | 5,157,054 | 84,496,349 | | | | 92,001,893 |
| 2005 | 65,477,767 | 62,011,456 | 1,298,850 | 12,691,282 | 10,723,821 | 76,317,438 | 4,960,633 | 81,278,072 | | | | 99,953,465 |
| 2006 | 59,481,512 | 66,861,152 | 1,176,865 | 12,854,547 | 21,411,053 | 73,748,745 | 4,793,998 | 78,542,413 | | | | 110,966,466 |
| 2007 | 54,893,809 | 70,319,780 | 1,084,318 | 12,870,066 | 29,300,152 | 70,969,685 | 4,613,030 | 75,582,716 | | | | 116,415,047 |
| 2008 | 49,929,415 | 74,605,397 | 985,558 | 12,696,684 | 38,558,224 | 67,988,959 | 4,419,282 | 72,408,241 | | | | 122,984,568 |
| 2009 | 45,663,139 | 78,798,552 | 901,387 | 12,755,650 | 46,792,450 | 65,373,331 | 4,249,286 | 69,622,597 | | | | 125,763,004 |
| 2010 | 40,133,658 | 82,814,932 | 792,338 | 12,449,673 | 55,923,085 | 62,968,528 | 4,092,954 | 67,061,482 | | | | 127,881,490 |
| 2011 | 35,988,382 | 84,361,100 | 710,463 | 12,110,769 | 61,193,949 | 60,628,220 | 3,940,834 | 64,569,054 | | | | 129,937,109 |
| 2012 | 32,867,510 | 86,533,212 | 648,969 | 11,871,605 | 68,186,276 | 57,929,778 | 3,765,436 | 61,695,214 | | | | 130,314,325 |
| 2013 | 29,905,100 | 88,990,028 | 590,499 | 11,623,888 | 71,390,315 | 55,053,328 | 3,578,466 | 58,631,794 | | | | 129,937,109 |
| 2014 | 22,650,731 | 89,247,638 | 450,919 | 10,700,269 | 71,495,112 | 52,254,190 | 3,403,022 | 55,757,212 | | | | 124,367,922 |
| 2015 | 18,357,087 | 79,722,490 | 362,055 | 9,678,054 | 71,025,948 | 49,729,024 | 3,232,397 | 52,961,411 | | | | 119,692,769 |
| 2016 | 15,360,967 | 78,070,151 | 302,957 | 9,014,807 | 70,028,948 | 46,622,395 | 3,043,456 | 49,665,851 | | | | 113,596,060 |
| 2017 | 13,348,385 | 72,147,509 | 263,246 | 8,453,279 | 67,515,652 | 43,606,017 | 2,863,391 | 46,469,409 | | | | 109,899,273 |
| 2018 | 10,655,908 | 68,593,081 | 210,057 | 7,880,741 | 66,027,972 | 41,005,916 | 2,665,385 | 43,671,301 | | | | 104,065,814 |
| 2019 | 8,914,552 | 64,747,194 | 175,663 | 7,252,555 | 63,280,861 | 39,314,511 | 2,490,443 | 40,804,954 | | | | 100,119,206 |
| 2020 | 7,347,768 | 62,647,267 | 144,851 | 6,781,473 | 62,225,824 | 38,580,641 | 2,312,742 | 37,893,393 | | | | 95,041,634 |
| 2021 | 6,478,965 | 60,103,552 | 127,746 | 6,339,913 | 60,092,246 | 32,816,327 | 2,133,061 | 34,948,386 | | | | 90,460,891 |
| 2022 | 5,849,959 | 58,037,938 | 115,343 | 5,980,647 | 58,263,970 | 30,231,851 | 1,965,070 | 32,196,921 | | | | 86,303,938 |
| 2023 | 5,218,415 | 56,381,751 | 102,890 | 5,611,276 | 56,877,503 | 27,630,455 | 1,795,980 | 29,429,434 | | | | 80,477,602 |
| 2024 | 2,898,945 | 51,959,444 | 57,148 | 4,805,044 | 53,723,391 | 25,121,325 | 1,632,686 | 26,754,211 | | | | 71,295,848 |
| 2025 | 1,873,522 | 44,945,211 | 36,936 | 4,204,358 | 47,312,984 | 22,519,122 | 1,463,743 | 23,982,865 | | | | 64,646,006 |
| 2026 | 1,233,177 | 40,632,714 | 24,311 | 3,737,483 | 43,141,390 | 20,173,494 | 1,311,271 | 21,484,875 | | | | 66,529,440 |
| 2027 | 925,743 | 36,832,704 | 18,249 | 3,340,253 | 39,285,463 | 18,088,242 | 1,173,736 | 19,263,977 | | | | 122,330,007 |
| 2028 | 306,805 | 32,879,922 | 6,049 | 2,927,762 | 35,508,929 | 61,759,289 | 5,064,690 | 86,823,979 | | | | 165,876,001 |
| 2029 + | 4,096 | 183,352,094 | 61 | 2,527,924 | 185,876,001 | 0 | | 0 | | | | |
| PV at 12/98 at 8.0% | 663,200,124 | 661,193,907 | 17,016,128 | 128,587,492 | 143,597,402 | 828,865,002 | 53,673,292 | 879,738,295 | | | | 1,023,335,697 |
| PV at 12/98 at 7.5% | 679,773,505 | 699,072,597 | 17,369,440 | 133,769,387 | 170,430,919 | 855,091,887 | 55,555,642 | 910,646,529 | | | | 1,081,079,448 |
| PV at 12/98 at 7.0% | 697,173,528 | 740,162,410 | 17,739,502 | 139,300,223 | 200,028,607 | 886,141,866 | 57,570,925 | 943,712,791 | | | | 1,143,741,398 |

Notes:

(a) Includes terminal reserve of .......... 134,670,803.3   In year 2029.

(b) Includes terminal reserve of .......... 65,661,175   In year 2028.

Disabled Lives cash flows include the effect of Accrued Benefits as of 12/31/1998,
Disability Premium Waiver Benefits, and claims incurred But Not Reported (IBNR) as of 12/31/1998.

# Present Value of Cash Outflows Before Reinsurance Ceded Amount
## Scenario 8

**Assumptions**

| | |
|---|---|
| Claim Termination | 107.5% Baseline |
| Claim Incidence | 95% Baseline |
| | Baseline |

| Period | Active Lives Cash Flows (1) | (2) | (3) | Excess (4) | (5) | Disabled Lives Cash Flows — Baseline (6) | Excess (7) | Total Disabled Lives Cash Flows (8) | Total (9) |
|---|---|---|---|---|---|---|---|---|---|
| 1999 | 107,369,063 | 7,106,383 | 4,074,307 | 10,898,804 | (85,291,569) | 106,537,508 | 7,119,938 | 116,657,446 | 31,365,876 |
| 2000 | 98,799,649 | 22,894,783 | 2,940,391 | 11,778,197 | (61,188,269) | 96,097,079 | 6,246,310 | 102,343,389 | 41,157,120 |
| 2001 | 92,027,463 | 33,660,513 | 2,515,204 | 12,393,494 | (43,459,262) | 91,261,283 | 5,931,983 | 97,193,266 | 53,735,005 |
| 2002 | 85,742,961 | 43,216,012 | 2,238,871 | 12,929,724 | (27,358,354) | 87,511,277 | 5,688,233 | 93,199,510 | 65,841,157 |
| 2003 | 80,100,279 | 52,430,941 | 1,774,804 | 13,447,462 | (12,447,071) | 83,852,528 | 5,450,414 | 89,302,940 | 76,855,899 |
| 2004 | 71,731,450 | 60,268,388 | 1,425,322 | 13,641,569 | 3,603,809 | 80,669,928 | 5,243,545 | 85,913,474 | 89,517,282 |
| 2005 | 65,509,874 | 65,655,964 | 1,299,485 | 13,609,710 | 15,055,284 | 77,756,178 | 5,054,151 | 82,810,328 | 97,865,612 |
| 2006 | 59,518,694 | 70,908,024 | 1,177,600 | 13,588,578 | 28,155,507 | 75,293,633 | 4,894,086 | 80,187,719 | 106,343,227 |
| 2007 | 54,939,332 | 74,678,749 | 1,085,213 | 13,622,447 | 34,447,078 | 72,608,840 | 4,719,575 | 77,328,414 | 111,775,492 |
| 2008 | 49,982,730 | 78,322,697 | 988,609 | 13,667,281 | 44,993,856 | 69,710,940 | 4,531,211 | 74,242,151 | 118,236,007 |
| 2009 | 45,726,200 | 83,876,742 | 902,630 | 13,532,323 | 52,560,395 | 67,180,133 | 4,366,709 | 71,546,841 | 124,132,236 |
| 2010 | 40,197,583 | 88,241,914 | 793,595 | 13,225,640 | 62,003,327 | 64,857,468 | 4,215,735 | 69,073,203 | 131,136,531 |
| 2011 | 36,057,561 | 90,028,842 | 711,828 | 12,885,906 | 67,559,015 | 62,598,504 | 4,088,773 | 66,666,277 | 134,234,292 |
| 2012 | 32,947,703 | 92,460,295 | 650,552 | 12,648,026 | 72,811,171 | 59,958,550 | 3,897,306 | 63,855,856 | 136,687,027 |
| 2013 | 29,998,804 | 95,166,116 | 592,346 | 12,404,943 | 76,164,701 | 57,126,045 | 3,713,193 | 60,839,238 | 139,003,938 |
| 2014 | 22,925,706 | 92,357,691 | 452,399 | 11,454,200 | 81,336,584 | 54,467,165 | 3,540,366 | 58,007,531 | 138,655,528 |
| 2015 | 18,420,466 | 85,619,806 | 363,304 | 10,385,137 | 87,947,761 | 51,874,828 | 3,371,864 | 55,246,692 | 133,194,453 |
| 2016 | 15,419,007 | 81,910,153 | 304,101 | 9,697,615 | 76,492,862 | 48,979,029 | 3,183,537 | 52,162,566 | 128,655,528 |
| 2017 | 13,062,692 | 77,882,379 | 264,383 | 9,113,555 | 73,834,365 | 45,730,031 | 2,972,452 | 48,702,483 | 122,536,648 |
| 2018 | 10,704,715 | 74,147,899 | 211,019 | 8,518,401 | 72,216,604 | 43,422,500 | 2,803,470 | 45,933,775 | 118,146,379 |
| 2019 | 8,960,840 | 70,218,644 | 176,574 | 7,800,572 | 69,295,160 | 40,423,532 | 2,627,530 | 43,051,062 | 112,346,212 |
| 2020 | 7,386,623 | 68,092,559 | 145,656 | 7,367,930 | 66,217,917 | 37,659,960 | 2,447,897 | 40,107,857 | 106,325,389 |
| 2021 | 6,520,575 | 65,486,629 | 128,566 | 6,905,396 | 65,999,986 | 34,849,812 | 2,265,238 | 37,115,049 | 103,115,035 |
| 2022 | 5,895,755 | 63,064,805 | 116,246 | 6,506,410 | 64,091,708 | 32,215,532 | 2,094,010 | 34,309,541 | 98,401,247 |
| 2023 | 5,288,712 | 61,654,439 | 103,881 | 6,137,185 | 62,626,773 | 29,550,289 | 1,920,769 | 31,471,058 | 94,097,831 |
| 2024 | 2,927,205 | 56,620,202 | 57,704 | 5,389,589 | 59,140,291 | 26,964,471 | 1,752,691 | 28,717,162 | 87,857,453 |
| 2025 | 1,891,601 | 49,485,984 | 37,292 | 4,644,493 | 52,276,167 | 24,270,309 | 1,577,570 | 25,847,879 | 78,124,046 |
| 2026 | 1,246,081 | 44,920,974 | 24,585 | 4,148,082 | 47,847,531 | 21,833,603 | 1,419,184 | 23,252,787 | 71,100,318 |
| 2027 | 931,240 | 40,860,311 | 18,475 | 3,723,316 | 43,884,882 | 19,659,344 | 1,277,857 | 20,937,201 | 64,822,083 |
| 2028 | 311,221 | 36,653,057 | 6,136 | 3,261,214 | 39,625,187 | 91,940,695 | 5,703,121 | 97,643,817 | 137,273,003 |
| 2029 + | 4,138 | | 82 | 2,851,097 | 189,526,982 | | | 0 | 189,526,982 |
| PV at 12/98 at 8.0% | 863,805,281 | 706,085,774 | 17,024,212 | 136,195,296 | 195,700,001 | 844,122,099 | 54,845,206 | 898,967,305 | 1,094,667,307 |
| PV at 12/98 at 7.5% | 680,203,731 | 748,942,316 | 17,378,022 | 141,727,411 | 225,844,017 | 874,265,894 | 56,800,850 | 931,066,744 | 1,166,910,761 |
| PV at 12/98 at 7.0% | 697,630,824 | 791,291,386 | 17,748,619 | 147,650,325 | 259,059,608 | 906,537,465 | 58,894,178 | 965,431,643 | 1,224,491,151 |

Notes:
(a) Includes terminal reserve of 154,526,076 In year 2029.
(b) Includes terminal reserve of 74,356,842 In year 2028.
Disabled Lives cash flows include the effect of Accrued Benefits as of 12/31/1998.
Disability Premium Waiver Benefits, and claims Incurred But Not Reported (IBNR) as of 12/31/1998.

# Present Value of Cash Outflows Before Reinsurance Ceded Amount
## Scenario 9

| | Assumptions | | |
|---|---|---|---|
| | Claim Payment | 107.5% Baseline | 105% Baseline |
| | Baseline | | |

| Period | Active Lives Cash Flows | | | | | Disabled Lives Cash Flows | | | Total |
|---|---|---|---|---|---|---|---|---|---|
| Year | Premium (a) | Baseline Premium (b) | Commission (c) | Partial Claim Payment 107.5% Baseline (d) | Partial Claim Payment 105% Baseline (e) | Disabled Baseline Claim | Expenses | Disabled Lives Cash Flow | Total Net Cash |
| 1999 | 107,368,737 | 8,711,475 | 4,074,298 | 9,983,190 | (86,599,774) | 106,877,333 | 7,064,027 | 113,741,359 | 29,141,586 |
| 2000 | 98,798,012 | 21,153,763 | 2,840,293 | 10,759,443 | (63,942,522) | 100,755,807 | 8,149,415 | 108,905,391 | 38,813,284 |
| 2001 | 92,015,598 | 30,711,955 | 2,514,921 | 11,280,406 | (47,508,716) | 99,406,747 | 5,811,439 | 105,218,185 | 47,709,489 |
| 2002 | 85,720,061 | 39,127,308 | 2,236,323 | 11,720,996 | (32,825,435) | 85,553,461 | 5,547,975 | 90,901,436 | 58,276,601 |
| 2003 | 80,061,621 | 47,215,250 | 1,773,990 | 12,181,651 | (18,910,730) | 81,441,258 | 5,293,682 | 86,734,940 | 67,824,210 |
| 2004 | 74,852,787 | 54,027,480 | 1,424,357 | 12,288,007 | (3,942,883) | 78,041,295 | 5,072,684 | 83,113,979 | 79,171,098 |
| 2005 | 65,447,402 | 58,555,181 | 1,296,249 | 12,223,416 | 6,659,444 | 74,915,999 | 4,899,540 | 79,765,539 | 86,444,983 |
| 2006 | 59,446,436 | 63,061,895 | 1,176,173 | 12,172,165 | 16,983,797 | 73,246,256 | 4,696,007 | 76,942,262 | 93,906,059 |
| 2007 | 54,650,923 | 66,230,789 | 1,003,470 | 12,172,363 | 24,635,700 | 69,376,409 | 4,509,597 | 73,886,006 | 98,523,706 |
| 2008 | 49,879,281 | 70,187,084 | 984,571 | 12,180,744 | 33,473,118 | 66,320,665 | 4,310,838 | 70,631,423 | 104,104,541 |
| 2009 | 46,603,909 | 74,047,081 | 900,219 | 12,034,439 | 41,377,830 | 63,606,514 | 4,135,723 | 67,762,238 | 109,140,098 |
| 2010 | 40,074,113 | 77,742,016 | 791,159 | 11,729,659 | 50,188,733 | 61,146,374 | 3,974,514 | 65,120,889 | 115,309,822 |
| 2011 | 35,923,610 | 79,070,992 | 709,185 | 11,392,103 | 55,246,670 | 58,734,113 | 3,817,717 | 62,551,830 | 117,800,500 |
| 2012 | 32,792,443 | 81,007,946 | 647,487 | 11,152,484 | 56,734,113 | 55,982,514 | 3,638,683 | 59,621,377 | 119,836,851 |
| 2013 | 29,817,595 | 83,238,508 | 588,770 | 10,912,811 | 60,015,474 | 53,069,253 | 3,449,500 | 56,519,784 | 121,441,246 |
| 2014 | 22,760,788 | 80,586,624 | 449,539 | 10,021,303 | 64,932,494 | 50,337,276 | 3,271,923 | 53,609,201 | 121,665,670 |
| 2015 | 18,298,148 | 74,233,561 | 360,893 | 9,028,576 | 66,258,669 | 47,686,716 | 3,099,633 | 50,786,353 | 118,131,337 |
| 2016 | 15,307,110 | 70,667,721 | 301,895 | 8,367,169 | 65,344,984 | 44,776,000 | 2,910,444 | 47,686,504 | 111,736,179 |
| 2017 | 13,295,010 | 68,673,270 | 262,196 | 7,847,939 | 64,049,674 | 41,595,994 | 2,703,740 | 44,299,734 | 105,987,848 |
| 2018 | 10,610,778 | 63,441,987 | 209,188 | 7,297,208 | 61,686,115 | 39,002,072 | 2,535,135 | 41,537,207 | 101,874,792 |
| 2019 | 8,671,859 | 59,723,155 | 174,823 | 6,697,613 | 59,337,985 | 36,332,016 | 2,361,561 | 38,693,500 | 98,417,332 |
| 2020 | 7,310,144 | 57,659,493 | 144,110 | 6,247,532 | 57,723,212 | 33,533,150 | 2,186,155 | 35,819,305 | 92,560,238 |
| 2021 | 6,440,663 | 55,185,610 | 126,991 | 5,825,473 | 56,740,931 | 30,918,810 | 2,006,727 | 32,928,598 | 87,827,207 |
| 2022 | 5,607,786 | 53,183,425 | 114,512 | 5,466,368 | 52,956,509 | 28,367,892 | 1,845,212 | 30,233,085 | 83,189,604 |
| 2023 | 5,172,109 | 51,957,443 | 101,977 | 5,136,198 | 51,653,508 | 25,852,954 | 1,680,442 | 27,533,397 | 79,166,905 |
| 2024 | 2,872,971 | 47,162,258 | 56,638 | 4,470,316 | 48,816,237 | 23,421,703 | 1,522,411 | 24,944,114 | 73,760,351 |
| 2025 | 1,856,910 | 40,846,975 | 36,609 | 3,810,161 | 42,836,836 | 20,911,581 | 1,359,253 | 22,210,834 | 65,107,869 |
| 2026 | 1,221,308 | 36,778,243 | 24,077 | 3,371,275 | 38,952,290 | 18,656,352 | 1,212,663 | 19,869,015 | 58,821,305 |
| 2027 | 915,176 | 33,209,355 | 18,041 | 3,000,013 | 35,312,233 | 16,659,202 | 1,082,848 | 17,742,050 | 53,054,284 |
| 2028 | 302,746 | 29,517,449 | 5,969 | 2,615,357 | 31,855,930 | 75,692,088 | 4,611,179 | 80,273,288 | 112,109,197 |
| 2029 + | 4,061 | 143,139,351 | 60 | 2,243,650 | 145,378,020 | 0 | 0 | 0 | 145,378,020 |
| PV at 12/98 at 8.0% | 662,820,712 | 619,526,330 | 17,008,552 | 121,556,103 | 95,270,273 | 809,080,461 | 52,653,184 | 861,643,645 | 956,913,918 |
| PV at 12/98 at 7.5% | 679,370,718 | 654,671,997 | 17,361,403 | 128,402,632 | 119,065,303 | 837,089,523 | 54,390,142 | 891,479,665 | 1,010,544,969 |
| PV at 12/98 at 7.0% | 696,746,508 | 692,772,363 | 17,710,986 | 131,586,623 | 145,345,045 | 867,051,082 | 56,322,013 | 923,373,095 | 1,088,716,140 |

Notes:

(a) includes terminal reserve of    175,536,649.9    in year 2029.

(b) includes terminal reserve of    59,685,446    in year 2028.

Disability Premium Waiver Benefits, and claims incurred but not Reported (IBNR) as of 12/31/1998.

Disabled Lives cash flows include the effect of Accrued Benefits as of 12/31/1998.

30

Case 1:08-cv-01661-AKH    Document 5-8    Filed 12/26/2008    Page 87 of 88

Select 'Company

1) Insurance F...
2) LT Local Is...
3) Financial S...

## Centre Reinsurance Ltd

### Financial Strength    ~S&P

| RATING | | EFFECTIVE |
|---|---|---|
| NR | | 12/ 3/04 |
| **BBB-** | | **12/ 2/04** |
| BBB+ | * | 3/15/84 |
| A- | * | 2/18/03 |
| A | * | 12/20/02 |
| A | ** | 9/16/03 |
| A+ | ** | 10/11/02 |
| A+ | * | 9/ 5/02 |
| AA- | * | 2/15/02 |
| **AA** | **\*-** | **6/25/97** |

UP / ??? / NEUTRAL

[MENU] to return to credit profile

Case 1:08-cv-01661-AKH   Document 5-8   Filed 02/26/2008   Page 88 of 88

Related Functions   Company Tree Ratings   CREDIT PROFILE   Page 1/1

elect 'Company   Centre Solutions US Ltd
1) Insurance F
MO                  Financial Strength       S&P

STANDAR
2) LT Local Is
3) Financial S    RATING    EFFECTIVE
                  NR        12/ 3/04
                  BBB-      12/ 2/04
                  BBB-      3/16/04
                  BB        2/18/04
                  A-        5/16/03
                  A+        10/11/02
                  AA-       9/ 5/02
                  AA   *-   2/15/02
                  AA        4/21/99

**MENU** to return to credit profile

UP / **DOWN** / NEUTRAL

31



William J. Casill, FSA
Senior Vice President and Actuary

July 19, 2006


Mr. Richard Grilli
President
Centre Life Insurance Company
One Chase Manhattan Plaza
New York, NY 10005

      Re:    Credit Support and Reserve Trust Agreements dated as of July 1, 2000

Dear Richard:

The Centre Life Insurance Company ("CLIC") Credit Support Report for
June 30, 2006 shows a Reserve Amount of $1,570,144,000 while the Bank of New
York's Valuation Report shows a Reserve Trust balance of $1,465,698,075. Pursuant to
the Reserve Trust Agreement dated as of July 1, 2000 by and among Centre Life
Insurance Company, AXA Equitable Life Insurance Company (formerly The Equitable
Life Assurance Society of the United States) ("AXA Equitable") and The Bank of New
York as Trustee ("Reserve Trust Agreement"), the difference of $104,445,925 must be
deposited into the Reserve Trust within 10 business days following receipt of the
Trustee's June 30, 2006 Valuation Report. The Valuation Report was received on
July 18, 2006. CLIC's additional deposit must therefore be made by August 1, 2006.

Compliance with the above provisions of the Reserve Trust Agreement is also required
by the Credit Support Agreement by and between AXA Equitable and CLIC dated as of
July 1, 2000 ("Credit Support Agreement").

AXA Equitable reserves all of its rights and remedies respecting any and all violations of
the Reserve Trust and Credit Support Agreements, including without limitation AXA
Equitable's right to enforce specifically, by court order, CLIC's obligation to make
required deposits into the Reserve Trust.


cc:   Zurich Centre Group
      Attn: General Counsel

      Jonathan Gaines

AXA Equitable Life Insurance Company
1290 Avenue of the Americas. New York, NY 10104
Tel: (212) 314-3385 Fax: (212) 314-4456  william.casill@axa-equitable.com
—— Be Life Confident ——

32

# CENTRE

CENTRE INSURANCE
COMPANY

ZC SPECIALTY
INSURANCE COMPANY

CENTRE LIFE
INSURANCE COMPANY

July 25, 2006

VIA FACSIMILE

AXA Equitable Life Insurance Company
1290 Avenue of the Americas
New York, NY 10104
Attention: Chief Actuary
Fax: 212-314-4456

The Bank of New York
101 Barclay Street, Floor 21 West
New York, NY 10286
Attention: Insurance Trust and Escrow Unit
Fax: 212-815-5707

105 EAST 17TH STREET
NEW YORK, NY
10003

TEL:   212-859-2600
FAX:   212-859-2794

Re: Security Trust Account

To Whom It May Concern:

ONE EXCHANGE PLACE
SUITE 1000
JERSEY CITY, NJ
07302

TEL:   201-395-4715
FAX:   201-395-4716

In accordance with section 2(b) of security Trust Agreement dated as of July 1, 2000 between Centre Life Insurance Company, The Equitable Life Assurance Society of the United States, and The Bank of New York, Centre Life Insurance Company is giving notice ("Claims Notice") to request withdrawal of assets from the Security Trust Account with a book value of $62,919,175.36 and a market value including accrued interest of $59,549,833.33 be transferred to the Reserve Trust Account.

This withdrawal is being made under the Claims Notice as of June 30, 2006 since the assets in the Reserve Trust Account are less than the Reserve Amount.

Please see the attached schedules that detail the securities movements.

Richard Grilli
President
Centre Life Insurance Company

Oliver J. Horbelt
Chairman of the Board
Centre Life Insurance Company

Cc: AXA Equitable Life Insurance Company
1290 Avenue of the Americas
New York, NY 10104
Attention: General Counsel
Fax: 212-707-7677



**Centre**

# Fax

| | | | |
|---|---|---|---|
| **TO:** | Chief Actuary | **From:** | Richard Grilli |
| | AXA Equitable Life Insurance Company | | |
| **Fax:** | 212-314-4456 | **Pages:** | 3 |
| | | **Date:** | 07/25/2006 |
| **Re:** | Security Trust Account | **CC:** | AXA Equitable Life Insurance Company |
| | | | 212-707-7677 |



33

# CENTRE

CENTRE INSURANCE
COMPANY

ZC SPECIALTY
INSURANCE COMPANY

CENTRE LIFE
INSURANCE COMPANY

Mr. William J. Casill
Senior Vice President and Actuary
AXA Equitable Life Insurance Company
1290 Avenue of the Americas
New York, NY 10104

By Fax: 212-314-4456

July 31, 2006

Re: Reserve Trust Agreement

Dear Bill:

105 EAST 17TH STREET
NEW YORK, NY
10003

TEL·  212-859-2600
FAX:  212-859-2794

I write in response to your letter of July 19, 2006. On July 25, 2006, I instructed the Bank of New York to transfer assets with market value of $59,549,833.33 to the Reserve Trust Account (a copy of my letter is enclosed). As to the balance of the amount demanded in your letter, approximately $44.9 million-the claim we have asserted against AXA Equitable in the pending arbitration significantly exceeds this amount, and, as you are aware, the Quota Share Agreement in Article XII provides for offsets of amounts due under that agreement and, among others, the Reserve Trust Agreement. Accordingly, it is Centre's view that the $44.9 million (or whatever the corresponding amount may be at the relevant time) will be covered by offset against the amount Centre anticipates recovering in the arbitration. As you also are aware, the assets currently in the Reserve Trust Account far exceed any reasonably anticipated claims that may become due during the pendency of the arbitration, so there will not be any cash flow issue.

ONE EXCHANGE PLACE
SUITE 1000
JERSEY CITY, NJ
07302

TEL·  201-395-4715
FAX:  201-395-4716

Sincerely,

*Richard Grilli*

Richard Grilli

cc: Jonathan Gaines, Esq
    Thorn Rosenthal, Esq.
    Alan Vickery, Esq.

*A member of the ⓩ Zurich Fi n cial Services Group*

34

**From:** Tim Swankey [mailto:Tim_Swankey@di-mgmt.com]
**Sent:** Wednesday, January 09, 2008 2:01 PM
**To:** Nitzan, Andrea; Andy Cohen; Carrie Barnes; diana.branciforte@centresolutions.com; John Anderson; John Midghall; Kathleen Brennan; michael.distasi@centresolutions.com; Robert Bonsall; Ron Fehrman; Casill, William; William Hughes; Paul Ziobrowski; mike.deevy@bm.zurich.com; Gut, Samuel; Richard.Grilli@centresolutions.com; Matt Bentz; bob.beal@milliman.com; Ernest.Wilson@centresolutions.com; Steven Gaeta; Donald.Grant@xlgroup.com; Neil.Russell@xlgroup.com; Tim O'Connor; DMS-Client Accounting; Lorber, Sandra; Saunders, Marshall; Steve Miller; Scott Green; Dominique Desmarais
**Subject:** AXA Equitable Financial Reports - December 2007

Attached are the financial reports for AXA Equitable as of December 31, 2007. Reserves have been restated as of December 31, 2007 after an extensive review of claims experience. These restated reserves reflect best estimates based on mortality improvements seen in past experience and expected in the future. The difference in net reserves between the old "CTR65" basis and the new "A2" basis is 236.7mm. This increase has triggered reinsurance under a treaty with XL Re for 75.35mm, bringing the total net difference in reserves to 161.3mm. I've provided two overview tabs this month; "Overview" includes the reserve restatement and "CTR65 Basis" excludes it.

Excluding the increase for restated reserves, incurred claims for the month of December were 220.0% of earned premiums, bringing the incurred claim ratio to 242.1% for the year. Incurred claims for the fourth quarter were 203.4% of premium, prior to restatement.

All the comparisons below are based on reserves prior to restatement:

The increase in reserves due to newly reported claims was 3.3mm, below the average of 6.6mm for 2006 and below the 2007 average of 5.9mm.

The change in reserves due to reopened claims in December was 1.0mm, lower than the 2006 average of 1.3mm and the 2007 average of 1.2mm.

The reserve for cases in litigation remained constant for the month, as the number of cases in litigation was unchanged from November.

Reserves released for reasons other than settlement were 4.4mm in December, below the 7.0mm average for 2006 and below the 2007 average of 6.8mm.

The reserve release due to settlements in December was 7.7mm. Settlement payments in December were 5.4mm, on 22 settlements. An average month in 2006 saw 13 settlements and 3.2mm in settlement payments with 5.0mm in reserves released. For 2007, there was an average of 12 settlements per month with 2.0mm in payments and 3.4mm in reserves released.

The increase in reserves due to claims that were on the reserve file at both the beginning and end of the month was 4.3mm, above the 2006 average of 3.9mm and the 2007 average of 4.0mm.

Here is a summary of these reserve changes:

|           | Dec. 2007 | 2007 Total | 2007 Avg. | 2006 Avg. |
|-----------|-----------|------------|-----------|-----------|
| New       | 3.3       | 70.4       | 5.9       | 6.6       |
| Reopened  | 1.0       | 14.0       | 1.2       | 1.3       |
| Litigated | 0.0       | - 4.8      | -0.4      | 0.3       |

```
Non-settlement        -  4.4     -  81.7      -6.8      -7.0
Settlement            -  7.7     -  41.9      -3.5      -5.0
Same-to-same             4.3        47.8       4.0       3.9
===============================================================
SUBTOTAL              -  3.5         3.8       0.3       0.1
Reserve Restatement    236.7       236.7       xxx       xxx
XL Re                 - 75.3     -  75.3       xxx       xxx
===============================================================
TOTAL                  157.9       165.1       xxx       xxx
```

Please let me know if you have any comments or questions.

**_Timothy P. Swankey, ASA, MAAA, FLMI_**
Actuary



Disability Management Services, Inc.
1 Park Place, 300 S. State St., Suite 250
Syracuse, NY  13202-2041
315.399.1330 • fax 315.234.4201
tim_swankey@di-mgmt.com
www.disabilitymanagementservices.com


**************************************************************

Confidentiality Note: This message and any attachments
may contain legally privileged and/or confidential information.
Any unauthorized disclosure, use or dissemination of this e-mail
message or its contents, either in whole or in part, is prohibited.
If you are not the intended recipient of this e-mail message,
kindly notify the sender and then destroy it.

**************************************************************

35

# SNL*i*

*SNL Financial*

## Centre Life Insurance Company [handwritten: Zurich Ins. Gnrville ; (NAS)]

[handwritten: NMC 80896]
[handwritten: Grp Zurich Ins Grp]

### Life Statement of Operations (Pg. 4)

| Period Ended (Dollars in Thousands) | 2003 Y 12/31/2003 | 2004 Y 12/31/2004 | 2005 Y 12/31/2005 | 2006 Y 12/31/2006 | 09/07 Q 9/30/2007 | 09/07 YTD 9/30/2007 |
|---|---|---|---|---|---|---|
| **Income** | | | | | | |
| Net Premiums & Annuity Consid: Life, A&H | (274,520) | 5,357 | 5,170 | 4,511 | 30 | 2,084 |
| Considerations for Contracts w/ Life Conting | 0 | 0 | 0 | 0 | 0 | 0 |
| Net Investment Income Earned | 97,613 | 98,166 | 96,238 | 95,175 | 23,447 | 71,186 |
| Amortization of Interest Maintenance Reserve | 698 | (23) | 263 | 132 | 12 | 47 |
| Separate Accts Realized Net Gains from Ops | 0 | 0 | 0 | 0 | 0 | 0 |
| Commissions & Exp Allowance: Ceded Insurance | 29,176 | 40,481 | 40,760 | 35,668 | 11,019 | 27,824 |
| Reserve Adj: Reinsurance Ceded | 0 | 0 | 0 | 0 | 0 | 0 |
| Fee Income: Investment Mgmt & Sep Acct Contracts | 0 | 0 | 0 | 0 | 0 | 0 |
| Fee Income: Deposit type Contracts | 0 | 0 | 0 | 0 | 0 | 0 |
| Aggregate Write Ins for Misc Income | 1,994 | (1) | 96 | 9,675 | 203 | 502 |
| Revenue: Life | (145,040) | 143,980 | 142,526 | 145,162 | 34,711 | 101,643 |
| **Death Benefits** | 0 | 0 | 0 | 0 | 0 | 0 |
| Matured Endowments Excl Annual Pure Endowments | 0 | 0 | 0 | 0 | 0 | 0 |
| Annuity Benefits | 0 | 0 | 0 | 0 | 0 | 0 |
| Disability, A&H Benefits | 18,945 | 0 | 0 | 0 | 0 | 0 |
| Coupons, Pure Endowment & Similar Benefits | 0 | 0 | 0 | 0 | 0 | 0 |
| Surrender Benefits, Withdrawals for Life Contracts | 0 | 0 | 0 | 0 | 0 | 0 |

SNL Interactive: Briefing Book: Life Statement of Operations (Pg. 4)

Page 2 of 3

| | 03 | 04 | 05 | 06 | Q3 | YTD |
|---|---|---|---|---|---|---|
| Group Conversions | 0 | 0 | 0 | 0 | 0 | 0 |
| Interest & Adj on Deposit Type Contracts | 0 | 0 | 0 | 0 | 0 | 0 |
| Pymts on Supp Contracts w/ Life Contingencies | 0 | 0 | 0 | 0 | 0 | 0 |
| Increase in Aggregate Reserve | (197,026) | 6,255 | 5,352 | 3,883 | 28 | 2,086 |
| Benefits & Losses | (178,081) | 6,255 | 5,352 | 3,883 | 28 | 2,086 |
| Commissions on Prems, Annty, Deposit Fnds (Direct) | 8,759 | 8,074 | 7,537 | 6,933 | 1,649 | 4,834 |
| Reserve Adj: Reinsurance Assumed | 0 | 0 | 0 | 0 | 0 | 0 |
| General Insurance Expenses | 39,632 | 35,078 | 36,153 | 29,747 | 9,635 | 24,422 |
| Taxes, Lic, & Fee Expenses Incurred | 1,660 | 1,587 | 1,585 | 871 | 261 | 1,137 |
| Inc In Load In Deferred, Uncollected Premiums | 0 | 0 | 0 | 0 | 0 | 0 |
| Net Transfer to Separate Accts | 0 | 0 | 0 | 0 | 0 | 0 |
| Aggregate Write-Ins for Underwriting Deductions | 78,185 | 95,722 | 102,681 | 98,847 | 21,621 | 67,031 |
| Underwriting Deductions | (49,845) | 146,716 | 153,308 | 140,281 | 33,194 | 99,510 |
| Net Gains before Dividends & Federal Income Taxes | (95,195) | (2,737) | (10,782) | 4,881 | 1,518 | 2,133 |
| Dividends To Policyholders | 0 | 0 | 0 | 0 | 0 | 0 |
| Pre-Tax Operating Income | (95,195) | (2,737) | (10,782) | 4,881 | 1,518 | 2,133 |
| Federal & Foreign Income Taxes | (55,777) | 0 | (10,388) | (1,558) | 813 | 1,473 |
| Net Gains After Div, Fed Inc Tax, before Cap Gains | (39,418) | (2,737) | (394) | 6,439 | 704 | 660 |
| Net Realized Capital Gains Less Taxes | (5,976) | 0 | 0 | 0 | 0 | 0 |
| Capital Gains Tax | 15,017 | 862 | 19,291 | (594) | (1,943) | (1,791) |
| Capital Gains Taxes Transferred to IMR | 18,237 | 862 | 10,388 | (594) | (1,116) | (965) |
| Net Income | (45,393) | (2,737) | (394) | 6,439 | 704 | 660 |
| **Capital & Surplus Account** | | | | | | |
| Capital & Surplus, Beginning of Period | 120,606 | 79,458 | 70,091 | 66,897 | 74,823 | 75,125 |
| Net Income | (45,393) | (2,737) | (394) | 6,439 | 704 | 660 |
| Net Chg In Unrealized Capital Gains Less Taxes | 0 | 0 | 0 | 0 | 0 | 0 |

SNL Interactive: Briefing Book: Life Statement of Operations (Pg. 4)

| | | | | | | |
|---|---|---|---|---|---|---|
| Net Chg Unrealized Foreign Exchange Capital Gains | 0 | 0 | 0 | 0 | 0 | 0 |
| Net Chg In Deferred Income Taxes | (9,339) | 3,373 | 138 | (3,426) | 7,538 | 9,285 |
| Chg In NonAdm Assets | 6,437 | (8,995) | 701 | 5,698 | 2,156 | 415 |
| Chg In Liability: Unauthorized Reinsurance | 0 | 0 | 0 | 0 | 0 | 0 |
| Decrease In Reserve Due to Chg in Valuation Basis | 0 | 0 | 0 | 0 | 0 | 0 |
| Chg In Asset Valuation Reserve | (1,154) | (1,008) | (631) | (482) | (136) | (399) |
| Chg in Treasury Stock | 0 | 0 | 0 | 0 | 0 | 0 |
| Surplus Withdrawn From Protected Cells | 0 | 0 | 0 | 0 | 0 | 0 |
| Other Chgs In Surplus: Separate Accts | 0 | 0 | 0 | 0 | 0 | 0 |
| Chg In Surplus Notes | 8,300 | 0 | 0 | (48,300) | 0 | 0 |
| Effect of Chgs In Accounting Principles | 0 | 0 | 0 | 0 | 0 | 0 |
| Capital Chgs Paid In | 0 | 0 | 0 | 0 | 0 | 0 |
| Capital Transferred from Surplus (Stock Dividend) | 0 | 0 | 0 | 0 | 0 | 0 |
| Capital Chgs Transferred To Surplus | 0 | 0 | 0 | 0 | 0 | 0 |
| Surplus Adj Paid In | 0 | 0 | 0 | 48,300 | 0 | 0 |
| Surplus Adj Transferred to Capital (Stock Div) | 0 | 0 | 0 | 0 | 0 | 0 |
| Surplus Adj Transferred from Capital | 0 | 0 | 0 | 0 | 0 | 0 |
| Chg In Surplus Due to Reinsurance | 0 | 0 | 0 | 0 | 0 | 0 |
| Dividends To Stockholders | 0 | 0 | 0 | 0 | 0 | 0 |
| Aggregate Wrt for Gains In Surplus | 0 | 0 | (3,009) | 0 | 0 | 0 |
| Chg In Surplus As Regards Policyholders | (41,149) | (9,366) | (3,195) | 8,228 | 10,263 | 9,961 |
| Surplus as Regards Policyholders | 79,458 | 70,091 | 66,897 | 75,125 | 85,086 | 85,086 |

Site content and design Copyright © 2008, SNL Financial LC
Usage of this product is governed by the Master Subscription Agreement.

SNL Financial LC, One SNL Plaza, PO Box 2124, Charlottesville, Virginia 22902, (434) 977-1600

36

# CENTRE

April 29, 2005

WILLIAM CASILL
SENIOR VICE PRESIDENT

MAY - 1 2005

REFERRED

**CENTRE INSURANCE COMPANY**

**ZC SPECIALTY INSURANCE COMPANY**

**CENTRE LIFE INSURANCE COMPANY**

AXA Equitable Life Insurance Company
1290 Avenue of the Americas
New York, NY 10104
Attention: Mr. William Casill

Re:     **100% Quota Share Reinsurance Transaction**

Gentlemen:

As you know, we have been undertaking a review, in conjunction with Disability Management Services ("DMS"), of certain contract issues that have arisen in connection with the administration of the 100% Quota Share Reinsurance Agreement (the "Reinsurance Agreement") between AXA Equitable Life Insurance Company (f/k/a The Equitable Life Assurance Society of the United States ("ELAS")) and Centre Life Insurance Company ("CLIC"). Capitalized terms used but not defined herein have the meanings set forth in the Reinsurance Agreement.

105 EAST 17TH STREET
NEW YORK, NY
10003

TEL: 212-859-2600
FAX: 212-859-2794

ONE EXCHANGE PLACE
SUITE 1000
JERSEY CITY, NJ
07302

TEL: 201-395-4715
FAX: 201-395-4716

In this letter, we set forth certain of those issues as well as, in some cases, the estimated amounts of reserve adjustments resulting from such issues. We would be pleased to meet with you to discuss these issues and our proposals for resolution of them at your convenience. In the meantime, as you will see from this letter, we believe that a significant dollar amount is due to CLIC in respect of these issues. In light of this, we believe it is not appropriate for CLIC to pay the amount of $779,969, which payment was requested in an email from Arnold Greenspoon dated December 9, 2004, or any further amounts that may be billed by ELAS in respect of certain legal fees and administrative expenses while there are larger unresolved amounts outstanding that may be due from ELAS to CLIC.

A.     <u>Incorrect Reserve Information/Nondisclosure of Assumption</u>

1.     <u>Incorrect Age/Benefits Information</u>. You will recall that, prior to CLIC's entering into the Reinsurance Agreement, ELAS provided information about the reserves established by ELAS in respect of the Reinsured Policies. This reserve information affected the projections performed by Tillinghast that were used in its appraisal of the Reinsured Policies. As you are aware, CLIC relied on the reserve information provided by ELAS, and CLIC used the projections and appraisal developed by Tillinghast from that reserve information in calculating the Initial Reinsurance Premium paid to CLIC under the Reinsurance Agreement. Recently, CLIC learned that, in some cases, the reserves set by ELAS were based upon

# CENTRE

April 29, 2005
Page 2

incorrect information. Chief among these errors was an erroneous determination in respect of certain claims categories that benefits payable in respect of such claims in such categories would be payable only until the claimant reached age 65. CLIC subsequently discovered that benefits in respect of such claims are payable until the claimant's death. This erroneous determination resulted in ELAS's under-reserving for such claims. As a result, Tillinghast's appraisal, from which CLIC calculated the Initial Reinsurance Premium, did not accurately reflect the reserves required to be established in connection with such benefits. Due to this error by ELAS, CLIC has had to increase claim reserves by $12.3 million.

In addition, CLIC has identified one particular Reinsured Policy pursuant to which benefits are payable in the amount of $3,000 per month until the claimant reaches age 65. At that point, by agreement between ELAS and the insured, which agreement pre-dated CLIC's entering into the Reinsurance Agreement, monthly benefits increase to $10,000 per month. The increased monthly benefits amount from and after age 65 was not reflected in the reserve amounts provided by ELAS to Tillinghast. As a result, CLIC has had to increase claim reserves by $0.6 million.

2.  <u>Incorrect Occupation Class Mapping</u>. CLIC discovered recently that ELAS's reserve and due diligence information supplied by ELAS, which was utilized by Tillinghast in its projections and appraisal, incorrectly mapped certain policyholders, including physicians, to the incorrect CIDA occupation class. Due to this classification/mapping error, CLIC has had to allocate $4.3 million of its VOBA balance to cover the eventual active life reserve shortfall.

3.  <u>Undisclosed Discounting for Claims Payments Already Due</u>. CLIC has learned that the portion of reserves earmarked for claims payments already due was understated by ½ month. Due to ELAS's failure to disclose to Tillinghast and CLIC its practice of discounting reserves for claims payments already due by ½ month, CLIC has had to increase claim reserves by $4.0 million.

4.  <u>Nondisclosure of Assumption</u>. ELAS failed to disclose an assumption that it used to calculate its active life reserves, which affected the projections performed by Tillinghast that were subsequently used in its appraisal of the Reinsured Policies. ELAS utilized both a lapse assumption and a death assumption for purposes of decreasing its active life population. Customary industry practice is to use a lapse assumption that incorporates a death assumption. Although the lapse assumption was fully disclosed, the separate and additional death assumption used to further reduce the active life

2

# CENTRE

April 29, 2005
Page 3

population was not. Had the death assumption been disclosed, CLIC would have reversed the impact of that additional death assumption, which would have increased active life reserves by $12.7 million and therefore increased CLIC's Initial Reinsurance Premium, accordingly. As a result of ELAS's failure to disclose this additional assumption, CLIC has had to allocate $12.7 million of its VOBA balance to cover the eventual active life reserve shortfall, which will result from this nondisclosure.

5.    <u>Incorrect Reserve Calculation for Physician Policyholders.</u> CLIC has discovered that when ELAS calculated its reserves, which affected the projections performed by Tillinghast that were subsequently used in its appraisal of the Reinsured Policies, it incorrectly reserved for certain physician policyholders. ELAS had coded physicians into several different occupation codes, including code 201. When ELAS calculated its reserves (both active life and claim reserves) for its physician policyholders, it only gathered and included physician policyholders classified in occupation code 201. The remaining physician policyholders were incorrectly counted for reserve calculation purposes as something other than physicians. As a result of the reserve calculation error, CLIC has had to increase claim reserves by $0.8 million and has had to allocate $12.7 million of its VOBA balance to cover the eventual active life reserve shortfall.

In total, ELAS's incorrect reserve information and calculation, incorrect occupation class mapping and failure to disclose the death assumption have resulted in CLIC's having to address these issues by, respectively, (i) increasing claim reserves by $17.7 million and (ii) allocating $29.7 million of its VOBA balance to cover the eventual active life reserve shortfall. Under Article XI.A of the Reinsurance Agreement (as well as common law and practice), ELAS had and has a duty of utmost good faith, which has not lapsed. Irrespective of whether or not ELAS knew that it was supplying inaccurate reserve information and failing to disclose the death assumption, ELAS is liable in respect thereof by virtue of its duty of utmost good faith. CLIC relied to its detriment on this inaccurate reserve information, and the projections and appraisal developed from it by Tillinghast, to calculate the Initial Reinsurance Premium. CLIC would have increased the Initial Reinsurance Premium substantially had ELAS provided accurate reserve information.

CLIC hereby requests ELAS to compensate it in an amount equivalent to the increase in Initial Reinsurance Premium to cover the additional reserves established, and VOBA balance allocations made, by CLIC as a result of ELAS's inaccurate information.

3

# CENTRE

April 29, 2005
Page 4

**B.     Transition Business Expenses**

Pursuant to the proviso to clause (iv) of the definition of Ultimate Net Loss Article VI of the Reinsurance Agreement, CLIC is responsible for 20% of actual expenses (including Defense Costs) arising out of the administration of those Reinsured Policies constituting the Transition Business, as defined in the Reinsurance Agreement. ELAS is responsible for the remaining 80%. Notwithstanding the language in clause (iv) of the definition of Ultimate Net Loss to that effect, ELAS incorrectly has been billing CLIC for 100% of actual expenses and CLIC has paid such higher amounts.

CLIC has determined that this arises from two problems with the Reinsurance Agreement administration:

1.      Disability Management Services. As contemplated by Article X of the Reinsurance Agreement, DMS took over administration of the Transition Business from UNUM. Although expenses for DMS's services fall within the ambit of the 20%/80% expense split set forth in clause (vi) of the definition of Ultimate Net Loss, CLIC has been paying 100%, instead of 20%, of such expenses. CLIC hereby requests that ELAS reimburse it for 80% of these administrative expenses, which have been paid by CLIC but were properly for ELAS' account.

2.      UNUM Provident. Even though DMS has been the third party administrator for the Transition Business, we understand that ELAS has paid and continues to pay UNUM a monthly fee for expenses incurred in administration of the Transition Business. However, it is our understanding that UNUM is performing no claims, actuarial or policyholder services to earn this monthly administrative fee as all such administration is being performed by DMS. While UNUM may be performing certain underwriting functions, we understand that these are extremely limited in nature and the scope thereof is nowhere near commensurate with the fees being charged. Moreover, ELAS has been billing CLIC for 100% of the monthly fees paid to UNUM despite the 20% / 80% fee split set forth in clause (iv) of Ultimate Net Loss.

The upshot of the foregoing paragraphs 1 and 2 is that CLIC is paying 100% of DMS's monthly administrative fees and 100% of UNUM's monthly administrative fees, or a total of 200% of the costs, even though CLIC's contractual share of such costs is only 20%. We do not understand why ELAS is continuing to pay UNUM a full monthly administrative services fee when, in fact, we understand that UNUM performs extremely limited ongoing services for the ELAS Transition Business.

4

# CENTRE

April 29, 2005
Page 5

CLIC hereby requests that ELAS reimburse it for 80% of DMS' expenses and the entirety of the UNUM administrative expenses which have been incorrectly billed to, and paid by CLIC. CLIC further requests that ELAS immediately cease billing CLIC for any portion of the fees paid to UNUM for administrative services in connection with the ELAS Transition Business in light of the fact that all such services are being performed by DMS and no such services are being performed by UNUM.

C.    **Legal Fees**

1.    **ECL and Legal Fees and Expenses Incurred in Defending ECL.** ELAS has billed CLIC for reimbursement of amounts incurred by ELAS, either directly or indirectly through UNUM, for ECL and defense of ECL claims brought in connection with lawsuits involving Reinsured Policies which arise out of alleged conduct of UNUM.

Under the Reinsurance Agreement, CLIC does not reinsure ELAS against ECL or legal fees incurred defending against ECL arising from policy and claim administration by ELAS or by UNUM on behalf of ELAS. Many of the lawsuits managed by UNUM and some of the lawsuits managed by DMS include such allegations. Because legal bills submitted by outside counsel do not provide sufficient detail to separate fees incurred in defending against such allegations from fees incurred defending against reinsured contractual allegations, it is impossible to accurately calculate ELAS's and CLIC's respective shares of such fees. CLIC and ELAS have reached agreements on fee allocations for specific lawsuits managed by DMS. However, all fees incurred in lawsuits managed by UNUM, and associated UNUM overhead markups, apparently have been passed along to and paid by CLIC.

In a memorandum to ELAS attorney Michael Eng dated March 12, 2004, DMS attorneys Andy Cohen and Michele Allen described the issue and suggested a methodology for appropriately allocating legal fees between ELAS and CLIC. They reviewed the legal fees in lawsuits where it was possible to accurately allocate fees and reviewed the characteristics of those lawsuits that drove ECL defense costs. Cohen and Allen then reviewed what they knew about the characteristics of the remaining cases to arrive at a recommendation that ELAS pay 28% of the legal fees incurred in lawsuits managed by UNUM. ELAS has not yet responded to the March 12, 2004 memorandum. A copy of that memorandum is attached to this letter.

In addition, the most recent ELAS request for reimbursement includes requests for reimbursement of legal fees and costs incurred by UNUM that do

5

# CENTRE

April 29, 2005
Page 6

not reflect an allocation that has been agreed upon by ELAS and CLIC. The request includes several entries pertaining to fees incurred in a lawsuit filed by Timothy Mock. Mock's policy and ongoing claim for disability are reinsured by CLIC. However, his lawsuit involves allegations that investigators retained by UNUM took tortious actions while gathering information about his claim. ELAS and CLIC have agreed that CLIC is not liable for any fees incurred while defending against these extra-contractual claims involving administration by UNUM on behalf of ELAS. Nevertheless, the request contains several entries pertaining to Mock's lawsuit. ELAS' request does not break down UNUM's costs or overhead markups by lawsuit. To the extent that such costs and markup are attributed to the *Mock* lawsuit, they are not reinsured.

Earlier requests for reimbursement do not contain sufficient detail to determine if *Mock* legal fees were inadvertently included or whether fees involving several other lawsuits for which ELAS and CLIC specifically agreed upon appropriate allocations were miscalculated. An audit is necessary to determine whether any such fees were inadvertently misallocated.

2.    <u>Legal Fees and Expenses for Unreinsured Policies.</u>  DMS has advised CLIC of at least one request from ELAS for reimbursement of expenses paid by ELAS to UNUM in connection with UNUM's defense of a lawsuit brought by Douglas Altschuler, a holder of a policy that is not one of the Reinsured Policies. Rather, the policy apparently is one of the "private label" policies that CLIC never reinsured. This appears in the most recent ELAS request for reimbursement, dated December 9, 2004. From this billing, we also need to subtract out UNUM's costs in connection with the lawsuit and its overhead markup. Earlier requests for reimbursement do not contain sufficient detail to determine whether legal fees attributable to this case were included inadvertently and whether fees involving other unreinsured policies were inadvertently included. As with paragraph 1 above, an audit with DMS' assistance will be needed to determine the amount incorrectly paid by CLIC in connection with this lawsuit and other suits involving policies that were not reinsured by CLIC. CLIC hereby requests reimbursement of such amounts and will advise ELAS of the requested amounts of reimbursement at the conclusion of the audit.

3.    <u>Legal Fees and Expenses for Unreserved Lawsuits, including</u> <u>ECL</u>.  The definition of Ultimate Net Loss provides that CLIC will not be responsible to pay benefits and claims settlements in respect of claims in litigation on or prior to the Inception Date for which no reserves were established by ELAS (the "Unreserved Lawsuits"). Illogically, however, the

# CENTRE

April 29, 2005
Page 7

provision seems to provide that CLIC has liability for legal fees and expenses incurred by ELAS in defending such lawsuits and does not have liability for agent commissions in respect of the policies involved in such lawsuits. We understand, as Eileen Sweeney has expressed during numerous discussions with Selig Ehrlich at various times in the past, that CLIC never agreed to pay legal fees and expenses, but did agree to pay the agent commissions.

CLIC hereby requests reimbursement from ELAS for legal fees and expenses, including without limitation, those associated with ECL, incurred by ELAS in connection with the Unreserved Lawsuits, which amounts were incorrectly billed to, and paid by CLIC. CLIC anticipates that it will conduct an audit, with DMS' assistance, of amounts paid to ELAS for the foregoing expenses and will advise ELAS of the requested amount of reimbursement at the conclusion of that audit.

4.    Legal Fees and Expenses Incurred in Defending a Class Action Lawsuit; Effect of Lawsuit Commissions. ELAS requested and received reimbursement from CLIC for $154,983 for legal fees ELAS incurred while successfully defending against a class action lawsuit referenced as *Siefe*. CLIC subsequently learned that *Siefe* was filed in approximately November 2000 in California state court. The lawsuit was brought by former ELAS agents. It alleged that ELAS breached its agreements with the agents by failing to pay commissions based on the commission schedules in force as of the date of the applications for certain disability income policies. On May 4, 2001, the judge denied plaintiffs' motion for certification of an interstate class. On September 25, 2001, the judge ordered summary judgment in favor of ELAS, thus ending the lawsuit. From the limited information provided by ELAS, CLIC does not know whether the plaintiffs appealed or whether additional legal fees were incurred and billed to CLIC in undetailed reimbursement requests.

ELAS would have been liable for the bulk of commission obligations for which recovery was sought in the *Siefe* litigation, and accordingly ELAS should be responsible for the bulk of defense costs in respect of that litigation. Because DMS and CLIC were never notified of *Siefe* and, therefore, never participated in defending the case, CLIC does not have sufficient information to suggest a precise allocation of the defense costs.

CLIC hereby requests ELAS to provide full information about the *Siefe* case, including information regarding the effect on commissions incurred both before and after the Inception Date.

# CENTRE

April 29, 2005
Page 8

**D.    Consultants' Fees**

Through June 2001, ELAS requested and received $217,391.75 from CLIC for fees paid to ELAS claims consultant Jim McMullin and to outside counsel Steve Kasten. This figure represents 90% of the $241,546.37 that McMullin and Kasten billed ELAS during the period covered by the request. ELAS indicated that it deducted 10% based on its assumption that 10% of the work was performed dealing with ECL and therefore should not be reimbursed by CLIC.

Billing records indicate that the time spent by McMullin and Kasten include (1) supervising the transition of reinsured litigation from UNUM to DMS; (2) assisting DMS by providing historical information necessary to resolve litigation, claims and policyholder service issues; (3) debating ECL allocations with CLIC; (4) supervising UNUM's management of litigation that CLIC declined to control due to ECL risks; and (5) supervising UNUM's management of litigation involving policies that CLIC did not reinsure. Items (1) and (2) are reimbursable, but items (3) and (5) are not. For Item (4), CLIC is responsible for McMullin's and Kasten's time spent on contractual issues but not for time spent on ECL issues. The vast majority of the bills appear to be for items (3), (4) and (5), and McMullin orally confirmed that most of his time was spent on items (3), (4) and (5). As DMS and CLIC have had very little interaction with Kasten, it similarly appears that his time was spent predominately and perhaps exclusively, on items (4) and (5). Therefore, CLIC's share likely is significantly less than 90%.

In their March 12, 2004 memorandum to Eng, Cohen and Allen suggested that McMullin's involvement in transition issues covered by CLIC decreased over time. Accordingly, they recommended that 75% of McMullin's fees from July 2000 through January 2001 should be allocated to CLIC, 50% of McMullin's fees from February through April 2001 should be allocated to CLIC and 20% of McMullin's fees during the remaining time that he provided services should be allocated to CLIC. Cohen and Allen recommended that all of Kasten's time should be allocated to ELAS.

It is unclear whether any subsequent ELAS requests for reimbursement contain fees paid to McMullin or Kasten. An audit is necessary to determine whether any such fees have been included and to determine what percentages of such fees ELAS passed along to CLIC.

\*    \*    \*

8

# CENTRE

April 29, 2005
Page 9

The foregoing list of issues is not intended to be exhaustive. We have made a good faith effort to set forth all of the issues of which we presently are aware, but we may have overlooked some points and, of course, we may learn of additional issues in the future. CLIC reserves its rights accordingly.

If you would like to discuss any of the foregoing, please feel free to call me at (212) 859-2606. Pursuant to Article XVI of the Reinsurance Agreement, we hereby request access to the relevant books and records in order to perform the audits described above, and, following a report thereon, we believe that it would be most productive if we were to schedule a meeting to attempt to resolve these items amicably and without resort to arbitration.

Very truly yours,

CENTRE LIFE INSURANCE COMPANY

By: *Richard Grilli*

Richard Grilli
Senior Vice President