UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

| | |
|---|---|
| AXA EQUITABLE LIFE INSURANCE COMPANY (f/k/a THE EQUITABLE LIFE ASSURANCE SOCIETY OF THE UNITED STATES), <br><br> Plaintiff, <br><br> vs. <br><br> CENTRE LIFE INSURANCE COMPANY, <br><br> Defendant. | Civil Action No. _____ <br><br> **AFFIDAVIT OF LINDA H. MARTIN IN SUPPORT OF AXA EQUITABLE'S MOTION, BY ORDER TO SHOW CAUSE, FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF** <br><br> **[CONDITIONALLY] FILED UNDER SEAL** <br><br> **[SUBJECT TO APPLICATION TO FILE UNDER SEAL]** |

------------------------------------------------------------x

STATE OF NEW YORK    )
                     : ss.:
COUNTY OF NEW YORK   )

Linda H. Martin being duly sworn, deposes and says:

1. I am a member of the firm of Simpson Thacher & Bartlett LLP, counsel for Plaintiff AXA Equitable Life Insurance Company ("AXA Equitable"). I am fully familiar with the facts set forth in this affidavit, either from personal knowledge or on the basis of documents that have been provided to me and which are annexed hereto.

2. I submit this declaration in support of AXA Equitable's application to file its Motion, By Order to Show Cause, For Temporary Restraining Order and Preliminary and Permanent Injunctive Relief ("Reserve Trust Motion") and all documents in this action under seal.

I.   INTRODUCTION

3.  While in run-off and a serious financial condition, Centre Life Insurance Co. ("Centre" or "Centre Life") is in breach of its obligation to fund a trust which I understand was established for the purpose of insulating AXA Equitable from weakness in Centre's financial condition. Specifically, Centre has not deposited funds to make up a shortfall in the trust which now equals $179,454,336.

4.  In July 2000, AXA Equitable transferred its closed block of individual disability income insurance policies (the "Disability Block") to Centre. Documents reflect that at the time of the transaction, AXA Equitable stated its clear intention to be entirely out of the business. Therefore, and, upon information and belief, as a result of legal restrictions on AXA Equitable's ability to assign the primary liability for the underlying disability insurance policies, the transaction was structured as a 100% indemnity reinsurance agreement (the "Reinsurance Agreement") together with a number of ancillary credit support agreements designed to insulate AXA Equitable completely from the cost of future claims in the event Centre became insolvent. As part of the transaction, Centre agreed to bear 100% of the financial risk in connection with the Disability Block and, in return, AXA Equitable paid Centre approximately $1.5 billion.

5.  The credit support agreements required Centre to maintain the portion of its assets supporting its liabilities (known as "reserves") for the business in a reserve trust (the "Reserve Trust") in which AXA Equitable holds a security interest, so that AXA Equitable could ensure that Centre would be able to meet its actuarially expected obligations under the Reinsurance Agreement. Pursuant to the relevant agreements, Centre is required to "true-up" the Reserve Trust each quarter to account for fluctuations in the value of the assets and in the calculation of Centre's reserves.

6. Centre's most recent reports show that the trust has a current shortfall of nearly *$180 million*. Centre, however, is refusing to fund the shortfall. Moreover, Centre Life's unwillingness or inability to obtain support from its contractual sureties and guarantors, including its ultimate, Switzerland-based parent Zurich Insurance Company, bodes ill for AXA Equitable's own ability to seek relief from these entities. Centre's financial condition, and inability or refusal to fund the shortfall in the Reserve Trust, subjects AXA Equitable to irreparable harm.

7. This under-funding comes on the eve of an arbitration between the parties involving separate issues and claims. That arbitration involves claims for damages against AXA Equitable, which Centre asserts somehow relieves it of its obligation to fund the indisputable shortfall in the Reserve Trust. Centre's speculative and disputed arbitration claims against AXA Equitable will be resolved at some indeterminate future time by the arbitral panel.

8. In the meantime, there is no valid basis for Centre to refuse to deposit into the Reserve Trust the funds that are now due and owing. It is undisputed that the Reserve Trust is under-funded. It also is beyond dispute that the Reserve Trust shortfall is owed to the Reserve Trust – and not to AXA Equitable – and therefore does not constitute an asset owned by AXA Equitable, or a debt owed by Centre Life to AXA Equitable. Rather, the agreements provide that the funds were set aside in a trust to ensure Centre's ability to meet its indemnity obligations with respect to the claims of the 90,000 disability insurance policyholders in the Disability Block.

## II. AXA EQUITABLE SEEKS TO DISPOSE OF ITS BLOCK OF INDIVIDUAL DISABILITY INCOME INSURANCE BUSINESS

9. Upon information and belief, in 1999, AXA Equitable decided to exit the individual disability insurance business by selling the Disability Block to another insurance

company. *See generally* Equitable Life Individual Disability Income Business Report to the Audit Committee (May 19, 1999), a true and correct copy of which is annexed hereto as Exhibit 26.

10. AXA Equitable engaged the services of prominent investment bank Goldman, Sachs & Co. ("Goldman"), to market and solicit bids for the Disability Block. *See* Letter from Goldman, Sachs & Co. to Stanley B. Tulin, Vice Chairman and Chief Financial Officer, The Equitable Companies (Feb. 28, 1999), a true and correct copy of which is annexed hereto as Exhibit 27.

11. AXA Equitable's goal in the transaction, as Centre Life recognized and acknowledged, was for AXA Equitable to be "100% out of the business" when the transaction was concluded. *See* Letter from Frank D. Pierson, CEO, Centre Life Insurance Company, to Mark W. Griffin, Vice President, Goldman, Sachs & Co. (Oct. 28, 1999), a true and correct copy of which is annexed hereto as Exhibit 28.

12. Goldman prepared and, in August 1999, circulated an information package to potential purchasers containing data and detailed projections of future experience under the Disability Block ("the Offering Memorandum"). *See* Goldman, Sachs & Co., *Information Materials for The Equitable Life Assurance Society of America Disability Income Business* (Aug. 1999), a true and correct copy of which is annexed hereto as Exhibit 29. The information in the Offering Memorandum was provided subject to an express disclaimer of representations and warranties. *Id.* (initial Disclaimer page).

13. The following month, before any negotiations or due diligence commenced, Centre Life and AXA Equitable executed a formal, written Confidentiality Agreement, which included an express disclaimer of representations and warranties made during

due diligence. *See* Confidentiality Agreement, a true and correct copy of which is annexed hereto as Exhibit 1.

### III. AXA EQUITABLE ENTERS INTO AGREEMENTS WITH CENTRE LIFE, INCLUDING REINSURANCE AGREEMENT AND RELATED AGREEMENTS PROVIDING FOR CREDIT SUPPORT OBLIGATIONS OF CENTRE LIFE

14. On July 20, 2000, Centre Life and AXA Equitable entered into a 100% Quota Share Reinsurance Agreement (the "Reinsurance Agreement"), a true and correct copy of which is annexed hereto as Exhibit 3. The transaction was structured as a 100% indemnity reinsurance contract together with various other related agreements to protect AXA Equitable against credit risk exposure to Centre Life. *Id.* Although AXA Equitable remained liable as the insurer on the disability insurance policies, the transaction was structured to relieve AXA Equitable of all future financial risk on its Disability Block. *See id.*

15. AXA Equitable paid over $1.5 billion in transferring this business – and that financial risk – to Centre Life. Ex. 3, Art. VI and Exh. A.

16. AXA Equitable received extensive credit support for Centre Life's obligations. The parties agreed that Centre Life would provide the credit support memorialized in a Credit Support Agreement, dated as of July 1, 2000, by and between AXA Equitable and Centre Life ("Credit Support Agreement"), a true and correct copy of which is annexed hereto as Exhibit 4, as well as other related agreements. These included a Reserve Trust Agreement, dated as of July 1, 2000, by and between AXA Equitable, Centre Life and The Bank of New York ("Reserve Trust Agreement"), a true and correct copy of which is annexed hereto as Exhibit 5, and a Security Trust Agreement, dated as of July 1, 2000, by and between AXA Equitable, Centre Life and The Bank of New York ("Security Trust Agreement"), a true and correct copy of which is annexed hereto as Exhibit 6.

17.     Inadequate credit support from Centre Life was, upon information and belief, a deal-breaker for AXA Equitable. The credit support memorialized in the Reinsurance Agreement and the related agreements was consistent with AXA Equitable's conditioning of the closing of the transaction on (i) the execution and delivery of a credit support agreement, and (ii) AXA Equitable finding satisfactory Centre Life's credit support proposal. *See* Letter of Intent between Centre Life and AXA Equitable, May 18, 2000 at sec. 1(a)(v), (f), a true and correct copy of which is annexed hereto as Exhibit 2. In addition, AXA Equitable reserved the right to walk away from the transaction if Centre Life's credit support proposal proved unsatisfactory. *See id.* at sec. 3(g).

18.     Under these credit support obligations, Centre Life must maintain, in a "Reserve Trust," assets at a market value equal to or in excess of its reserves with respect to the Disability Block computed quarterly on a U.S. GAAP basis (the "Reserve Amount"). *See* Ex. 4 (Credit Support Areement) at Exhibit A, sec. A.1.a. (providing that Reserve Trust "will at all times during the term of the Transaction hold assets at market value equal to or in excess of the [Centre Life] reserves . . . attributable to the reinsured disability income business, computed quarterly on a U.S. GAAP basis"); Ex. 5 (Reserve Trust Agreement) § 1(a), (d); *id.* § 10 (defining "Reserve Amount" as "the amount of gross reserves and other liabilities or contra assets attributable to the liabilities of [Centre Life] under the [Reinsurance Agreement], calculated . . . in accordance with generally accepted accounting principles in the United States"); *see also* Ex. 3 (Reinsurance Agreement) art. IX (providing that Centre Life "shall establish and maintain adequate reserves with respect to the [Disability Block]").

19.     If at the end of any calendar quarter the current fair market value of the assets in the Reserve Trust (as set forth in a Trustee Valuation Report) is less than the Reserve

Amount, Centre Life is required to deposit the difference in the Reserve Trust within ten business days after the Trustee's delivery of the Valuation Report (which itself must be sent within ten business days after the end of each month). Ex. 5 (Reserve Trust Agreement) § 1(d), (e).

20. AXA Equitable is the beneficiary of the Reserve Trust, and of a security interest in it, but does not own the Trust or the funds therein. *See* Ex. 5 (Reserve Trust Agreement) § 1(a), (f); *see also* the UCC Financing Statement, a true and correct copy of which is annexed hereto as Exhibit 7. Furthermore, AXA Equitable is entitled to withdraw funds from the Reserve Trust in the ordinary course to "pay[] or reimburs[e] payment of then current claims and claims expenses under the reinsured business." Ex. 4 (Credit Support Agreement) § 5.1(b) & Exhibit A., sec. D.1.c.

21. Centre Life also entered into related surety bond agreements, dated as of January 1, 2000, with Centre Reinsurance (U.S.) Limited ("CRUS") and Centre Solutions (U.S.) Limited ("CSUS"), under which CRUS and CSUS agreed to provide Centre Life with sufficient funds to make up certain shortfalls in Centre Life's net worth. True and correct copies of these agreements are annexed hereto as Exhibits 8 and 9. Under these agreements, Centre Life must enforce its rights against the sureties, for the benefit of AXA Equitable, if it fails to meet its obligations to fund the Reserve Trust. Ex. 8 § 7; Ex. 9 § 7.

22. In February 2004, Standard & Poor's ("S&P") downgraded the credit rating of various Centre companies, including downgrading CRUS and CSUS to an "A-" rating. *See* Exhibit 30, a true and correct copy of which is annexed hereto.

23. After its ratings downgrade, CRUS entered into a Guarantee Agreement with its parent Zurich Insurance Company ("ZIC"), pursuant to which the latter guaranteed

CRUS's obligation under the Surety Bond. *See* Guarantee Agreement, a true and correct copy of which is annexed hereto as Exhibit 10; *see also* the Guaranty Rights Agreement, a true and correct copy of which is annexed hereto as Exhibit 11.

### IV. CENTRE LIFE BREACHES THE PARTIES' AGREEMENTS, INCLUDING THE CREDIT SUPPORT AGREEMENT AND THE RESERVE TRUST AGREEMENT

24. At the end of 2007 and, upon information and belief, as was notified to AXA Equitable just weeks ago, Centre restated its reserves in connection with the Disability Book. *See* Email from Timothy P. Swankey, Actuary, Disability Management Services, Inc., to Samuel Gut, AXA Equitable Life Insurance Company, *et al.* (Jan. 9, 2008), a true and correct copy of which is annexed hereto as Exhibit 34. Upon information and belief, Disability Management Services, Inc. ("DMS"), in which Centre Life has an ownership interest, is the administrator of the Disability Block.

25. As a result, the Reserve Trust is under-funded by about $180 million. Specifically, as of December 31, 2007, Centre Life's Reserve Amount was $1,751,546,000, as reflected in the Reserve Amount Statement for 4Q2007, a true and correct copy of which is annexed hereto as Exhibit 19. At the same time, a Valuation Report issued by the trustee in January, a true and correct copy of relevant excerpts of which is annexed hereto as Exhibit 12, shows the market value of the assets in the Reserve Trust to be $1,572,091,664 as of December 31, 2007. This results in a difference of *$179,454,336* (the "Reserve Trust Shortfall").

26. Centre was required to deposit this amount in the Reserve Trust within ten days of receiving the Valuation Report, *see* Ex. 3 (Reserve Trust Agreement) § 1(d), but to my knowledge, and upon information and belief, has not done so.

27. Upon information and belief, the market value of the assets in the Reserve Trust has fluctuated over the past two years due primarily to interest rate changes which has

resulted in prior instances of under- or over- funding.[1] The Reserve Trust Shortfall has increased fourfold from the prior shortfall of about $42.4 million in the third quarter of 2007. *See* Ex. 21 (Reserve Amount Statement for 3Q2007), Ex. 13 (Valuation Report for 3Q2007 (excerpt)). Furthermore, upon information and belief and based on Mr. Swankey's email, contrary to prior shortfalls, the current Shortfall is due primarily to the restatement by Centre Life of its reserves made "after an extensive review of claims experience." *See* Ex. 34. According to Centre Life, these restatements reflect its own "best estimates based on mortality improvements seen in past experience and expected in the future." *Id.*

28.   Finally, unlike prior instances of under-funding, this Shortfall results from a reserve increase during the fourth quarter of 2007. Although Centre Life's 2007 year-end financial statement has not yet been released, its third quarter statement as of September 30, 2007, shows a surplus of only about $85 million. *See* Centre Life Insurance Company, Life Statement of Operations 2003-2007YTD, a true and correct copy of which is annexed hereto as Exhibit 35.

---

[1]   The Reserve Trust was over-funded by about $15.6 million at one point (the second quarter of 2006), and under-funded by varying amounts during other quarters. *See* Reserve Amount Statements, true and correct copies of which are annexed hereto as Exhibits 19 to 24, and Valuation Reports, true and correct copies of excerpts of which are annexed hereto as Exhibits 12 to 18. At the time of the largest prior shortfall, in the second quarter of 2006, Equitable notified Centre Life that the latter was required to deposit the difference of $104 million into the Reserve Trust within ten business days after receipt of the Trustee's June 30, 2006 Valuation Report. *See* Letter from William J. Casill, Senior Vice President and Actuary, AXA Equitable Life Insurance Company, to Richard Grilli, President, Centre Life Insurance Company (July 19, 2006), a true and correct copy of which is annexed hereto as Exhibit 31. Pursuant to section 2(b) of the Security Trust Agreement, Centre Life then requested that the approximately $59.5 million in a "Security Trust Account." *See* Letter from Richard Grilli, President, Centre Life Insurance Company, to The Bank of New York (July 25, 2006), a true and correct copy of which is annexed hereto as Exhibit 32. The Security Trust now is entirely depleted. *See* Credit Support Report for 4Q2007, a true and correct copy of which is annexed hereto as Exhibit 25.

V.   **CENTRE'S BREACH OCCURS ON THE EVE OF ARBITRATION PERTAINING TO SEPARATE CLAIMS BROUGHT BY CENTRE AND IN THE FACE OF CENTRE'S PERILOUS FINANCIAL CONDITION**

29.    The current Reserve Trust Shortfall comes on the eve of an arbitration hearing, concerning separate and disputed claims brought by Centre Life against Equitable (the "Arbitration"). Centre has refused to fund the shortfall owing to the Reserve Trust on the basis of these separate and distinct claims it has against Equitable.

30.    At approximately the time when S&P downgraded the credit rating of various Centre companies, and after having entered runoff, upon information and belief, Centre Life brought in new management, resulting in a change in tone between Centre Life and AXA Equitable. On April 29, 2005, Centre Life's current president, run-off specialist Richard Grilli, sent a letter to AXA Equitable complaining about, *inter alia*, alleged errors in data provided in connection with the reinsurance transaction. A true and correct copy of that letter is annexed hereto as Exhibit 36.

31.    Centre Life initiated arbitration in June 2006 and a hearing is scheduled to begin on March 10, 2008 with respect to this dispute. An arbitral award will be issued in due course; there is of course no known time-line for an ultimate resolution.

32.    When AXA Equitable has demanded previously that Centre Life make up what then was a smaller shortfall in the trust, Centre Life responded by citing to the right of offset provided in Article XII of the Reinsurance Agreement. *See* Letter from Richard Grilli, President, Centre Life Insurance Company, to William J. Casill, Senior Vice President and Actuary, AXA Equitable Life Insurance Company (July 31, 2006), a true and correct copy of which is annexed hereto as Exhibit 33.

33.    That provision provides Centre Life with the right to set off mutual debts, *i.e.,* "[a]ny debts or credits . . . in favor of or against either the Company [AXA Equitable] or the

Reinsurer [Centre Life]" under the inter-related transaction documents. Ex.3 (Reinsurance Agreement) art. XII. The offset provision does not state that a "disputed" debt can be used as a set off. Instead, it states only that a party can set off mutual "debts or credits" which are "matured or unmatured" or "liquidated or unliquidated." *Id.*

34. The parties specifically agreed that this Court is an appropriate forum for AXA Equitable to obtain injunctive relief in the event that Centre breaches – as it has done – its obligation to "provide Credit Support consisting of its own net worth and the Reserve Trust." *See* Ex. 4 (Credit Support Agreement) Exhibit A, sec. A.1. Specifically, the parties agreed that Equitable is entitled to "injunctive or other equitable relief to prevent breaches and to enforce specifically the terms and provisions of this Credit Support Agreement in any court in the State of New York, or any court of the United States located in the State of New York." Ex. 4 (Credit Support Agreement) § 7.4.

35. I contacted Allen Vickery, counsel for Centre Life, prior to filing the Motion. Mr. Vickery stated that he objects to the motion, and that he would not appear in court today in connection with this motion.

Dated: February 19, 2008

_____
Linda H. Martin

Sworn to before me this
19 th day of February, 2008.

_____
Notary Public

MARCELO GONZALEZ
NOTARY PUBLIC, State of New York
No. 01GO6078739
Qualified in New York County
Commission Expires August 05, 2010