Alan B. Vickery (AV6842)
Scott L. Shuchart (SS2834)
BOIES, SCHILLER & FLEXNER LLP
575 Lexington Avenue, 7th Floor
New York, New York 10022
Telephone: (212) 446-2300
Fax: (212) 446-2350

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| AXA EQUITABLE LIFE INSURANCE COMPANY (f/k/a THE EQUITABLE LIFE ASSURANCE SOCIETY OF THE UNITED STATES),<br><br>                         Plaintiff,<br><br>        vs.<br><br>CENTRE LIFE INSURANCE COMPANY,<br><br>                         Defendant. | Civil Action No. *O8 Civ 1661 (AKH)*<br><br>**[CONDITIONALLY] FILED UNDER SEAL**<br><br>**[SUBJECT TO APPLICATION TO FILE UNDER SEAL]**<br><br>**DEFENDANT'S MOTION TO DISMISS OR STAY PENDING BINDING ARBITRATION; MEMORANDUM OF LAW IN SUPPORT THEREOF** |

Defendant Centre Life Insurance Company ("Centre") hereby moves this court to dismiss Plaintiff AXA Equitable Life Insurance Company's ("Equitable's") Complaint pursuant to Federal Rule of Civil Procedure 12(b)(1) or, in the alternative, to stay its proceedings in deference to an ARIAS-US arbitral panel currently seized with jurisdiction over the parties in a private jurisdiction arising from the very same reinsurance transaction. Centre bases its motion upon the attached Memorandum of Law in support hereof, the Declaration of Alan B. Vickery submitted herewith, the Declaration of Richard Grilli submitted herewith, and such other papers and argument as may be submitted to the Court in connection herewith.

<u>**MEMORANDUM OF LAW**</u>

Equitable is currently defending against a claim by Centre for rescission of the agreement at issue, or alternatively for over $300 million in damages, interest from July 2000 to the present, and other adjustments. In an attempt to disrupt the looming private arbitration that will consider this subject matter, and without attending to the prerequisites of federal jurisdiction, Equitable has filed an improper emergency complaint and order to show cause. This court lacks jurisdiction over the subject matter. Even if it did not, judicial respect for binding arbitration should lead the court to stay its hand while arbitration between the parties—set for a two-week hearing beginning March 10—is allowed to play out. In addition, Equitable has failed to demonstrate the irreparable harm necessary to obtain an injunction.

## I.    THE COURT LACKS SUBJECT-MATTER JURISDICTION OVER EQUITABLE'S CLAIM

Equitable's complaint cites diversity between Centre and Equitable as the basis for federal subject-matter jurisdiction in this case. Verified Compl. at ¶7 (citing 28 U.S.C. §1332). Diversity jurisdiction exists only between, for present purposes, "citizens of different States," 28 U.S.C. § 1332(a)(1), where "a corporation shall be deemed to be a citizen of any State by which it has been incorporated and of the State where it has its principal place of business," *id.* § 1332(b)(1). However, Equitable, a Delaware corporation with its principal place of business in New York, asserts that Centre, a Massachusetts corporation, has its principal place of business in Massachusetts. *Id.* at ¶10. Equitable is incorrect: Centre's principal place of business is in New York. *See* Declaration of Richard Grilli ("Grilli Decl."). Diversity therefore does not exist, because both plaintiff and defendant are deemed New York citizens.

Second Circuit law is clear on this point:

> In this Circuit, two tests are commonly employed to determine a corporation's principal place of business. *See Augienello v. Fed. Deposit Ins. Corp.*, 310 F. Supp. 2d 582, 590 (S.D.N.Y. 2004). The "nerve center" test defines the principal place of business as "the nerve center from which [a corporation] radiates out to its constituent parts and from which its officers direct, control and coordinate all activities without regard to locale, in the furtherance of the corporate objective." *Scot Typewriter Co. v. Underwood Corp.*, 170 F. Supp. 862, 865 (S.D.N.Y. 1959). Under this test, courts "focus on those factors that identify the place where the corporation's overall policy originates." *Augienello*, 310 F. Supp. 2d at 590 (citing *R.G. Barry Corp. v. Mushroom Makers, Inc.*, 612 F. 2d 651, 655 (2d Cir.1979)). The other test has been labeled the "place of operations" or "locus of operations" test. There, the effort is to identify the place in which a corporation conducts its principal operations. *See R.G. Barry Corp.*, 612 F.2d at 655. Courts generally apply the "nerve center" test when a corporation's operations are geographically widespread, and the "locus of operations" test when a corporation is centralized. *See Augienello*, 310 F. Supp. 2d at 590-91.

*Phoenix Four, Inc. v. Strategic Res. Corp.*, 446 F.Supp.2d 205, 214 (S.D.N.Y. 2006).

The determination of a corporation's principal place of business under 28 U.S.C. § 1332 is one of fact. *Leve v. Gen. Motors Corp.*, 246 F. Supp. 761, 762 (S.D.N.Y. 1965) (citing *Scot Typewriter Co. v. Underwood Corp.*, 170 F. Supp. 862 (S.D.N.Y. 1959)). Here, the burden of proof rests upon Equitable, which claims federal subject-matter jurisdiction, so that if the Court is in doubt, the motion to dismiss should be granted. *See id.* (citing *Puritan Fashions Corp. v. Courtaulds Ltd.*, 221 F. Supp. 690 (S.D.N.Y. 1963); *K.S. Corp. v. Chemstrand Corp.*, 198 F. Supp. 310 (S.D.N.Y. 1961); *Hughes v. United Eng'rs & Constructors, Inc.*, 178 F. Supp. 895 (S.D.N.Y. 1959)).

Centre has submitted evidence, in the form of a declaration from Centre President Richard Grilli, that makes it clear that under either test Centre's principal place of business is New York. Mr. Grilli, who is located in New York, declares that:

- Centre has no employees in Massachusetts. Grilli Decl. ¶ 3.

- Centre's corporate offices, headquarters, and books and records are all in New York City. *Id.* ¶¶ 4, 5.

- All of Centre's officers and employees are in New York. *Id.* ¶6.

- All of Centre's board meetings are held in New York. *Id.* ¶7.

It is undisputed that Centre is a Massachusetts corporation, that it is regulated as a Massachusetts insurer, and that it keeps a "statutory" office in Massachusetts.

Equitable has submitted no evidence to counter any of the facts included in Mr. Grilli's declaration. Accordingly, it has not met its burden of proof. Furthermore, Equitable simply will never be able to prove that diversity exists in light of these facts. Therefore, Centre's motion to dismiss for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) should be granted.[1]

## II.    IN THE ALTERNATIVE, THE COURT SHOULD STAY THE MOTION FOR INJUNCTIVE RELIEF AND ALLOW THE ARBITRATION PANEL TO DECIDE CENTRE'S OFFSET CLAIM

### A.    Equitable's Claim Should Properly Be Decided by the Arbitration Panel Already Appointed by the Parties and Not by the Court

In June 2006, Centre filed a Claim and Demand for Arbitration against Equitable. Declaration of Alan B. Vickery ("Vickery Decl.") ¶ 9. Simply put, Centre claims that Equitable breached the express duty of utmost good faith memorialized in Article XI.A of the Reinsurance Agreement between the parties. See Vickery Decl. Ex. G. The arbitration claim between the parties is scheduled to be heard by the arbitration panel

---

[1]    To the extent that Equitable argues that the Security Trust Agreement allows federal subject matter jurisdiction, the argument fails. It is black-letter law that parties cannot create such jurisdiction via contract. *U.S. v. Suffolk Constr. Co.*, No. 95 CIV. 9363 (SS), 1996 WL 391875 at *3 n.3 (S.D.N.Y. 1996) ("Federal jurisdiction cannot be created by contract alone, regardless of the intent of the parties. *See* U.S. CONST. art. III, § 2."); *see Capron v. Van Noorden*, 2 Cranch 126, 127 (U.S. 1804) ("Here it was the duty of the Court to see that they had jurisdiction, for the consent of the parties could not give it.").

commencing on March 10, 2008. *Id.* at ¶18.  That panel will decide the *exact* issue

Equitable seeks to put before this Court—how much money should be in the Reserve

Trust.  Indeed, if Centre prevails on its claim at the arbitration, Equitable will be required

to pay into the Reserve Trust the amount of the additional premium that it should have

paid when the reinsurance transaction between the two parties was completed in July

2000, an amount that would more than cover the "shortfall" of which Equitable now

complains.  See Grilli Decl. at ¶ 11.

On July 19, 2006—over eighteen months ago—Equitable Senior Vice President

William Casill pointed out a shortfall of $104,445,925.00 in the Reserve Trust

established as part of an agreement between the parties and demanded that Centre pay

that amount to "top up" the fund based on the same arguments it makes to this Court.

Vickery Decl. Ex. A.  Centre's reply on July 31, 2006, invoked Article XII of the

Reinsurance Agreement between the parties and claimed an offset of the damages Centre

was entitled to based upon Equitable's breach of its duty of utmost good faith to Centre.

Vickery Decl. Ex. B.  Had Equitable not breached that duty, it would have paid sufficient

additional reinsurance premium to create a surplus, rather than a shortfall, in the Reserve

Trust today.

On January 30, 2007, the arbitration panel conducted its initial meeting.  In that

meeting, counsel for Equitable again noted the discrepancy and informed the panel of

Equitable's intent to move for relief concerning the issue of the funding of the trusts—the

exact issue it now tries to bring before this Court, a year later and in an order to show

cause proceeding for which it gave Centre forty-five minutes notice:[2]

> **Mr. Ostrager:**   There is a security trust account that Centre Life is
> obligated to true up to make sure that all of the reserves are adequately
> covered.   It's my understanding and belief that that hasn't been done of
> late.
>
> And we would anticipate that, in the median term, Equitable will be
> making two applications to this panel.   One will relate to the obligation
> that Centre Life has to true up the security trust account, and the other
> application will be essentially a motion for summary judgment that,
> based on the contractual agreements and understandings among the
> parties, there is no basis for a claim based on data inaccuracies.

Vickery Decl Ex. C at 131-132; Vickery Decl. ¶¶ 21-22; Vickery Decl. Ex. J.  Equitable

did eventually move the panel for summary judgment, but did not move the panel

concerning the Reserve Trust issue.  *Id.* At ¶13.  When questioned by counsel for Centre

as to why Equitable did not act regarding the Reserve Trust issue, Equitable attorney

Michael Ledley responded that there was too much fluctuation in the value of the Reserve

Trust and the Equitable would not seek relief from the Panel.  *Id.* at ¶ 14.  Now, more

than eighteen months since it first raised the issue, Equitable suddenly seeks

"emergency" relief from the Court concerning the exact same issue that it raised in July

2006.

   More importantly, the relief Equitable seeks is prohibited by the Reinsurance

Agreement at issue and is inextricably entwined with the subject matter of the arbitration

between the parties, which is less than three weeks from commencing.  The panel, having

---

[2]     Centre does not believe that counsel for Equitable could have attested in good
faith to the exigency of their motion or the need to notify counsel for Centre, out of the
blue, forty-five minutes before presenting papers to the court that had been drafted over
the course of several days, as Equitable's counsel admitted to Centre attorney Alan
Vickery.  Vickery Decl. Ex. P.

heard Equitable's ill-fated summary judgment motion, is informed concerning the agreement between the parties and is—by Equitable's own admission—more than capable of addressing and rendering a decision on the merits. *See id.* at ¶¶5, 13-20.

Article XXIII of the Reinsurance Agreement is clear as to the method of dispute resolution chosen by the parties:

> Any dispute or claim arising out of or relating to this Agreement shall be referred to arbitration.

Vickery Decl. Ex. D at art. XXIII.

The Credit Support Agreement between the parties, executed concurrently with the Reinsurance Agreement is equally clear as to the preferred method of dispute resolution:

> Except as set forth above, any disputes arising under this Credit Support Agreement shall be resolved by Arbitration, in accordance with the procedures set forth in Article XXIII of the CLIC Reinsurance Agreement.

Vickery Decl. Ex. E at § 7.1

The Credit Support Agreement then notes that "the parties shall have the right to injunctive or other equitable relief to prevent breaches and to enforce specifically the terms and conditions *of this Credit Support Agreement* in any court . . . ." Vickery Decl. Ex. E at § 7.4 (emphasis added).

Equitable, however, seeks a preliminary injunction based on the fact that Centre has failed to fund the Reserve Trust, a fund established and governed by a separate Reserve Trust Agreement. Vickery Decl. Ex. F. The Reserve Trust Agreement contains no remedy provision whatsoever, but is covered by the general arbitration provision of the Reinsurance Agreement quoted *supra*. Centre has informed Equitable that it is

claiming an Offset, pursuant to Article XII of the Reinsurance Agreement. Vickery Decl. Ex. D at art. XII. This claim, which cannot be separated from the claim currently before the court, arises exclusively from the Reinsurance Agreement and is thus a claim "arising out of" the Reinsurance Agreement and unequivocally required to be decided by the arbitration panel.

In its Memorandum of Law, Equitable (at p. 15) asserts that Centre's Offset claim is doomed because somehow Equitable, as the beneficiary of the Reserve Trust, does not share mutuality with Centre. As Centre explains in Section II.B, *supra*, this is a question of arbitrability that was vested in the panel by the parties to the Reinsurance Agreement. However, Equitable's argument to the Court is simply incorrect on a basic level. The authority cited by Equitable for the proposition that an obligation is non-mutual when one party is a trust beneficiary and the other is a creditor is inapplicable in this dispute. *See Westinghouse Credit Corp. v. D'Urso*, 278 F.3d 138, 149 (2d Cir. 2002). This is because Equitable's nonmutuality argument directly contradicts the plain language of the Reinsurance Agreement, which states:

> Any debts or credits, matured or unmatured, liquidated or unliquidated, regardless of when they arose or were incurred . . . *are deemed mutual debts or credits* . . . and shall be set off, and only the net balance shall be allowed or paid.

Vickery Ex. D at art. XII (emphasis added). In this case, despite Equitable's protestations to the contrary, there is no basis to argue that the debt that Centre owes to Equitable is nonmutual.

In addition, Equitable's argument in opposition to an offset fails to understand the implications of the Reserve Trust. As Mr. Grilli notes, any award paid by Equitable would necessarily be added to the Reserve Trust. Grilli Decl. ¶ 11. Given this fact,

Equitable's attempt to claim that somehow its role as beneficiary of the Reserve Trust makes it a different party than the party that would pay an arbitration claim should be flatly rejected by the Court.

From these simple facts alone, it is evident that the Court should stay Equitable's request for a preliminary injunction until the arbitration panel, the forum selected by the parties, has the opportunity to decide whether Equitable's attempt to circumvent the arbitration process is proper. Equitable's claim is for a breach of the Reserve Trust Agreement and not for a breach of the Credit Support Agreement alone. As such, Equitable is prohibited by the plain language of both the Reinsurance Agreement and the Credit Support Agreement that requiring that "any" disputes raised between the parties that are not the exclusive domain of the Credit Support Agreement be submitted to arbitration.

**B.      The Arbitrability of Equitable's Claim Should Be Decided by the Arbitration Panel**

Under both New York and federal law, the question of arbitrablity is properly decided by the arbitration panel when the parties have expressed their intent to submit the question of arbitrability to the panel. *Shaw Group Inc. v. Triplefine Int'l Corp.*, 322 F.3d 115, 120-23 (2d Cir. 2003) (citing New York and federal cases). Under both New York and federal law, the use of the terms such as "any" and "related to" are clear evidence of the intent of the parties to submit the question of arbitrablity to the arbitration panel. *Id.* at 121 (""In *PaineWebber Inc. v. Bybyk*, [81 F.3d. 1193 (2d Cir. 1996),] we held that even absent an express contractual commitment of the issue of arbitrability to arbitration, a referral of "any and all" controversies reflects such a "broad grant of power to the arbitrators" as to evidence the parties' clear "inten[t] to arbitrate

issues of arbitrability." *Id.* at 1199-1200.'"). The *Shaw Group* court went on to note that "[c]iting approvingly to *PaineWebber*, the New York Court of Appeals reached the same conclusion in *Smith Barney Shearson Inc. v. Sacharow*, [91 N.Y.2d at 43, 46,] holding that language providing for '[a]ny controversy' between the parties to be 'settled by arbitration,' was sufficiently 'plain and sweeping' to indicate an intent to have arbitrability decided by the arbitrators." *Shaw Group*, 322 F.3d at 121.

Here, such intent is clear from the Credit Support Agreement and the Reinsurance Agreement, which refer "any" disputes "arising out of" or "relating to" these contract to the Panel. The dispute before the Court arises out of the Reinsurance Agreement, the Reserve Trust Agreement and the Credit Support Agreement. In addition, Centre's argument that any shortfall of the Reserve Trust is properly offset against the damages it is entitled to as a result of Equitable's breach of its duty of utmost good faith is based directly on Article XII of the Reinsurance Agreement ("Offset") and the question of applicability of the offset is clearly one for the panel and is not properly considered by the Court.[3] Thus, the Court should find that the question of whether or not the issue is arbitrable is one for the arbitration panel.

Equitable has already acknowledged that the panel is the proper forum for this *exact* complaint. Equitable attorney Barry Ostrager expressly informed the Panel more than a full year ago that he would file a motion for summary judgment on this issue with the arbitration panel "certainly within the next 45 to 60 days at the outside." (Ex. C at

---

[3]    Equitable's argument in its Memorandum of Law (at 15) that this particular claimed Offset is not covered by the language of Article XII of the Reinsurance Agreement due to the fact that it is "disputed" obviously requires the Court to interpret the Reinsurance Agreement, a duty specifically left to the arbitrators by Article XXIII of the Reinsurance Agreement.

135). The panel agreed to hear the motion. Mr. Ostrager did not file it then, or by a later summary judgment deadline. When asked, his colleague, Michael Ledley, told Centre's counsel Alan Vickery that Equitable had chosen not to pursue the issue because the value of the Reserve Trust fluctuated up and down. Vickery Decl. ¶ 14. Indeed, as of September 30, 2007, the shortfall in the Reserve Trust was about $43 million. *Compare* Declaration of Linda H. Martin, Ex. 13 (indicating Reserve Trust balance of $1.546 billion) *with id.* Ex. 20 (indicating GAAP Reserves of $1.589 billion—a difference of $43 million). Perhaps Equitable had decided then to use the issue as a diversionary tactic to bring on the eve of the arbitration hearing. In any event, Mr. Ostrager was correct the first time he argued this issue and the Court should reject Equitable's current attempt at forum shopping and manipulation[4] of the arbitration panel.

## III.    CENTRE IS ENTITLED TO THE DEFENSE OF LACHES

Equitable's claim also is also barred by the doctrine of laches. Laches apply upon a showing of four material elements: "(1) conduct by an offending party giving rise to the situation complained of, (2) delay by the complainant asserting his or her claim for relief despite the opportunity to do so, (3) lack of knowledge or notice on the part of the offending party that the complainant would assert his or her claim for relief, and (4) injury or prejudice to the offending party in the event that relief is accorded the complainant." *Dwyer v. Mazzola*, 567 N.Y.S.2d 281, 282 (N.Y. App. Div. 1991). The most important element of the laches defense is prejudicial delay, but all four elements are met here. *Id.* As laches is an equitable defense, any application of it will be heavily fact-sensitive, thus preventing clear-cut statements of the "length" of time necessary for

---

[4]    Preposterously decrying *Centre's* "bad faith" tactics, though identifying none, Equitable's attorneys informed the Panel of this motion within an hour of its filing. See Vickery Decl. ¶¶ 23-24, Exs. L & K.

laches to apply. "Even a relatively short period of time can establish laches if the delay is prejudicial to the allegedly offending party." 13 Jack B. Weinstein, Harold L. Korn, Arthur R. Miller, New York Civil Practice: CPLR § 6301.07[6] (2d ed. 2007).

With respect to the first element, Equitable's conduct, specifically its failure to abide by the duty of utmost good faith expressly imposed upon the parties by Article XI.A of the Reinsurance Agreement, has caused the shortfall in the reserves of which Equitable now complains. *See* Vickery Decl. Ex. G. As to the second, Equitable has not only had the opportunity to complain about this very topic, they have actually done so twice: once to the panel and once to Mr. Grilli. Vickery Decl. Exs. A & C. These delays of more than a year are clearly sufficient to permit Centre's laches defense. The third element was admitted by Equitable attorney Linda Martin in a conversation with Centre attorney Alan B. Vickery, when she, for the first time, informed him that Equitable planned to file the present motion in less than an hour. Vickery Decl. at ¶ 21. The final element is satisfied because the intricacies of the Credit Arrangements between Centre and Equitable make it extremely difficult for Centre to recover any of the monies that it places into the Reserve Trust, thus losing premium investment opportunities that are the bedrock of the insurance business. Grilli Decl. at ¶¶ 10-11. Accordingly, Centre is entitled to invoke the defense of laches to prohibit Equitable from belatedly seeking relief from the Court.

## IV. EQUITABLE CANNOT MEET THE HEIGHTENED STANDARD FOR OBTAINING A PRELIMINARY INJUNCTION

In the Second Circuit, a preliminary injunction will only issue when the two-prong test established in *Sonesta Int'l Hotels Corp. v. Wellington Assocs.*, 483 F.2d 247 (2d Cir. 1973), is satisfied. "[A] preliminary injunction should issue only upon a clear

showing of either (1) probable success on the merits and possible irreparable injury, or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Id.* at 250. Even though the second prong of the *Sonesta* test does not mention the requirement for irreparable injury, subsequent decisions have clarified this ambiguity, stating that "the established test requires a showing of irreparable harm should the injunction not be granted." *Chem. Bank v. Haseotes*, 13 F.3d 569, 573 (2d Cir. 1994). Additionally, as noted in Moore's Federal Practice, "if a party is seeking a mandatory positive preliminary injunction that alters the status quo by commanding a positive act, the likelihood of success on the merits must be established by a clear or substantial showing of a likelihood of success." 13 James Wm. Moore et al., *Moore's Federal Practice* § 65.22[5][b][iv] (citing *D.D. ex rel. V.D. v. New York Bd. of Educ.*, 465 F.3d 503, 510 (2d Cir. 2006)).

Equitable has roundly failed to meet the burden required to receive the extraordinary relief sought. The idea that, in the next ten days, the Reserve Trust, which contains more than 1.5 *billion* dollars, would fall short of the amount needed to cover benefits on the roughly 90,000 disability policies to which it relates—when that $1.5 billion constitutes the better part of the money that will be needed to cover those benefits for the lifetime of the business—is impossible.

Nor would a shortfall—no matter how fanciful—be irreparable. Equitable's papers assiduously fail to explain to the Court that while Centre has a net worth of approximately $90 million, *see* Grilli Decl. ¶8, its obligations to the Reserve Trust are backed by a surety bond from its affiliate Centre Reinsurance (U.S.) Limited, a bond

directly guaranteed by Zurich Insurance Company, and as to which Equitable has negotiated direct enforcement rights. *See* Vickery Decl. Exs. M-O. Zurich Insurance Company is a major financial company with excellent ratings from the major American credit ratings agencies and a net worth in the billions. *See* http://www.zurich.com/main/ investorrelations/ratings/ratings.htm (last visited February 20, 2008). If, in short, the Reserve Trust is not brought up to the contractual levels by the deposit of a supplemental reinsurance premium from Equitable following an arbitration award, the shortfall can undisputedly be rectified through the surety bonds and other devices agreed upon by the parties.

Equitable acknowledges as much in their memorandum of law (at 13) and then argues that they should not be burdened with having to pursue other solvent creditors. However, they have made absolutely no argument whatsoever as to why they would be responsible for pursuing any creditors. Indeed Equitable has not produced one iota of evidence that indicates that Centre would be unwilling or unable to recover sufficient funds from its guarantors in the event it is required to pay into the Reserve Trust. Centre's contractual offset of the Reserve Trust monies is not based on any inability to pay. Instead, it is based upon the good faith belief that it is not required to pay based on the plain language of Article XII of the Reinsurance Agreement.

## V. THE COURT SHOULD REQUIRE EQUITABLE TO POST A SECURITY DEPOSIT IN ORDER TO PROTECT CENTRE WHEN EQUITABLE'S MOTION FAILS

Federal Rule of Civil Procedure 65(c) states plainly that a "court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c).

14

Contrary to the text of the Rule, Equitable asserts in its Memorandum of Law at 16 that it should not be required to post any security. It cites as support a line of cases that can be traced back to *Doctor's Associates, Inc. v. Distajo*, 107 F.3d 126 (2d Cir. 1997). In that case, the Second Circuit found that the district court did not abuse its discretion by issuing injunctions without requiring bonds, since there had been no proof of likelihood of harm from injunctions. *Id.* at 136. Unlike *Doctor's Associates*, in this case there is a clear and tangible harm that would occur if an injunction is issued. Centre would be faced with no access to its funds for a period of many years, until the Security Trust's withdrawal calculation allowed it to access those funds. Grilli Decl. ¶ 10. Given this proof of potential harm, the Court should adhere to the text of Rule 65(c) and disregard Equitable's attempt to circumvent the requirements of the Rule via a line of inapplicable precedent.

Equitable has, accordingly, failed to prove critical aspects of the relief it seeks.

Dated:  February 20, 2008

Respectfully submitted,

Alan B. Vickery (AV6842)
Scott L. Shuchart (SS2834)
BOIES, SCHILLER & FLEXNER LLP
575 Lexington Avenue, 7th Floor
New York, New York 10022
Telephone: (212) 446-2300
Fax: (212) 446-2350

*Attorneys for Defendant Centre Life*
*Insurance Company*

Of counsel:

Thorn Rosenthal
CAHILL GORDON & REINDELL LLP
80 Pine Street
New York, New York 10005
Telephone: (212) 701-3000
Facsimile: (212) 269-5420

16