# BOIES, SCHILLER & FLEXNER LLP

575 LEXINGTON AVENUE • 7TH FLOOR • NEW YORK, NY 10022 • PH. 212.446.2300 • FAX 212.446.2350



February 22, 2008

**By Hand Delivery**

Hon. Alvin K. Hellerstein
United States District Court
Room 1050
500 Pearl Street
New York, New York 10007

Re: *AXA Equitable Life Insurance Co. v. Centre Life Insurance Co.*,
No. 08-CV-1661 (AKH) [Under Seal]

Dear Judge Hellerstein:

At the conclusion of the hearing before Your Honor on Wednesday afternoon in the above-captioned matter, you urged the parties to try to work out "a satisfactory security arrangement" that would ensure that $180 million was immediately available if needed to top up the Reserve Trust at the conclusion of the arbitration regarding Centre Life's claim against AXA Equitable for rescission or in the alternative in excess of $300 million in damages (inclusive of interest). As described more fully in the enclosed letter to the Arbitration Panel (which we enclose without exhibits), Centre Life has made the following proposal to the Panel and Equitable:

- Centre Life will immediately deposit the approximately $180 million shortfall in question into a segregated trust account at the Bank of New York, which also happens to be the custodian of the Reserve Trust.

- As a part of its award in the arbitration, the Panel would be charged to determine if after the award of relief (whether rescission, which would moot the Reserve Trust issue, or damages, which, with interest, would be paid by Equitable into the Reserve Trust) there continues to be any shortfall in the Reserve Trust, in which case funds would be transferred from the segregated trust account to the Reserve Trust. Any and all amounts not so transferred would be returned from the segregated trust account to Centre Life.

- The documents establishing the segregated trust account will provide that the Bank of New York will disburse the funds only on instruction of the Panel as part of its Award in this arbitration to transfer some or all of the Funds into the Reserve Trust and the remainder, if any, back to Centre Life. (For statutory reporting reasons, Centre Life will need to include a provision in the documents giving Centre Life the right prior to an Award by the Panel to have the Bank of New York transfer some or all of the $180 million from the segregated trust account into the Reserve Trust, in which case the Panel's decision as to the Funds would be adjusted to account for this prior transfer.)

If the Panel agrees to this proposal, it should entirely moot Equitable's request for emergency relief.

BOIES, SCHILLER & FLEXNER LLP

A. Vickery to Hon. Hellerstein
February 22, 2008
Page 2

      This proposal also, we assume, would moot any need to continue the proceedings before this Court. We appreciate the Court's role in cutting through the parties' dispute over the obligation to top up the Reserve Trust pending the outcome of the Arbitration and suggesting a viable stand-still approach that fully protects both parties' interests.

      We do, however, recognize, as the Court does, that subject-matter jurisdiction cannot be waived by the parties, should Equitable not agree to this proposal and seek to proceed with its request for a TRO and a preliminary injunction. While Equitable has indicated its willingness to conduct jurisdictional discovery – and such discovery is appropriate where there is a good-faith basis for requesting it – we are prepared to tender to the Court the most recent official Report of the Statutory Examination of Centre Life Insurance Company from the Division of Insurance of the Commonwealth of Massachusetts, formally delivered by the Chief Examiner to Centre Life by letter dated May 31, 2007, addressed to Richard W. Grilli, President, Centre Life Insurance Company, 105 East 17th Street, New York NY 10003-2105, which states on page 1 that the examination of the "financial condition and affairs" of Centre Life was made "at its administrative office located at 105 East 17th Street, New York, N. Y. 10003-2105," and again on page 3 that "the statutory examination was performed at the Company's administrative office in New York, New York." Centre has no employees or presence in Massachusetts other than a mandatory "statutory office." Under *Mennen Co. v. Atlantic Mutual Life Insurance Co.*, 147 F.3d 287 (3d Cir. 1998), a "statutory home office" that is not an insurance company's true headquarters is not a basis for diversity jurisdiction.

      Further in this regard, Equitable's argument concerning the third-party claims administrator, Disability Management Services, Inc. (DMS), an independent corporation (only minority owned by a separate Zurich company) which is under a joint contract with both Equitable and Centre Life to administer the policies and claims that comprise the block of business reinsured by Centre Life, is creative, but no amount of discovery can possibly turn it into a factual basis for diversity jurisdiction.

      We will keep Your Honor apprised of further developments.

                                       Respectfully submitted,

                                       Alan B. Vickery
                                       Counsel to Centre Life
                                       Insurance Company

cc:    Barry R. Ostrager, Esq.
         Linda Martin, Esq.
         Thorn Rosenthal, Esq.

Enclosure

**BOIES, SCHILLER & FLEXNER LLP**

575 LEXINGTON AVENUE • 7TH FLOOR • NEW YORK, NY 10022 • PH. 212.446.2300 • FAX 212.446.2350

February 22, 2008

**By E-Mail**

N. David Thompson
8824 South Sea Oaks Way
Vero Beach, Florida 32963

Ronald L. Wobbeking
7232 Kestrel Trail
Savage, Minnesota 55378

James F. Dowd
Fairfax, Inc.
300 First Stamford Place, 6th Floor
Stamford, Connecticut 06902

Re:   *Centre Life Insurance Co. / AXA Equitable Life Insurance Co. Arbitration*

Dear Panel Members:

At 2:30 on Tuesday afternoon, Equitable's attorney Linda Martin phoned me out of the blue to give Centre Life its first notice that Equitable is seeking "emergency" interim relief and would do so from a federal court, rather than from this Panel. Ms. Martin stated that she would be heading to court in forty-five minutes to file papers to seek a temporary restraining order and a preliminary injunction ordering Centre Life to fund the current shortfall in the Reserve Trust and invited me to come along. Ms. Martin dismissed my numerous objections to this unorthodox and unnecessary proceeding. Moreover, Ms. Martin did not at that time supply me with a copy of the papers she was rushing to Court to file, and Equitable's chief counsel, Barry Ostrager, professed inability to do so until after Ms. Martin returned from Court. I objected to the entire charade, and declined to be dragged to the courthouse under these circumstances, but offered to be available for an appearance the next day.

Equitable's voluminous papers – a stack of carefully crafted motions, declarations and supporting exhibits some three inches thick – had been in preparation for many days, as Mr. Ostrager later admitted, but no courtesy notification was given to Centre Life or its counsel that this action was forthcoming, despite numerous e-mails and phone calls among counsel for both parties on other issues that morning and in the immediately preceding days. Equitable transparently wanted to ambush Centre Life.

As the Panel has been made aware by Equitable's letter,[1] Equitable's "emergency" court papers concern a shortfall in the Reserve Trust, which Centre Life maintains under the

---

[1]   Remarkably, Mr. Ostrager's February 19 letter closes by alleging – without reference to any fact or evidence, or even an explanation – that Centre Life is guilty of a "lack of good faith and gamesmanship." Lewis Carroll would be impressed by Mr. Ostrager's attempts to reverse reality with a bit of clever writing.

BOIES, SCHILLER & FLEXNER LLP

A. Vickery to N. Thompson, J. Dowd & R. Wobbeking
February 22, 2008
Page 2

Reinsurance Agreement and Ancillary Agreements between Centre Life and Equitable with which the Panel is by now familiar. This shortfall had been raised by Equitable in July 2006, more than 18 months ago, right after the present arbitration was commenced. Centre Life promptly replied, in a July 31, 2006 letter to Equitable, that Centre Life was not obliged to "true up" the Reserve Trust because the amount of the shortfall was more than offset by the amount Equitable owed in additional premium in this arbitration, which amount was due from Equitable to the same Reserve Trust (into which the original $1.5 billion premium from Equitable had been deposited as well). As Centre Life noted in that letter, Article XII of the Reinsurance Agreement provides Centre Life with an expansive right of offset of "[a]*ny* debts or credits, matured or unmatured, liquidated or unliquidated, regardless of when they arose or were incurred, in favor of or against either [Equitable] or [Centre Life] with respect to [the Reinsurance Agreement], the *Reserve Trust Agreement*, the Credit Support Agreement and/or the Administrative Services Agreement" (emphasis added). In addition, paragraph D.1.d of the Credit Support Memorandum, a part of the Credit Support Agreement (as described below), provides that "[e]ach party's right of offset shall be maintained" with respect to the Reserve Trust.

Six months later, Mr. Ostrager again raised the Reserve Trust shortfall issue, this time before the Panel, in the January 30, 2007 organizational meeting, over a year ago. At that time Mr. Ostrager advised the Panel on the record that he would bring two summary judgment motions "within the next 45 to 60 days at the outside" (Tr. 135:24-25; a copy of the relevant pages is attached hereto). One such motion concerned Equitable's liability on Centre Life's claim. Equitable made that motion in the fall of 2007. The other motion Centre Life was led to expect by April 2007 would concern Centre Life's purported obligation to "true up the security trust account." That motion was never made to this Panel.

The current shortfall in the Reserve Trust can be traced directly to the breach of Utmost Good Faith by Equitable. Equitable gave inaccurate and incomplete underwriting information to Centre Life, causing Centre Life to undercharge Equitable by more than $190 million in the 2000 reinsurance premium. Had Centre Life been given accurate information to calculate the premium, Equitable would have paid Centre Life over $190 million more than it did, all of which would have been deposited in the Reserve Trust and grown to over $300 million by today, far more than the current $180 million shortfall. As provided in the Reinsurance Agreement and Credit Support Memorandum, Centre Life is entitled to offset amounts owed by Equitable from its obligation to top up the Reserve Trust.

Equitable never made the promised summary judgment motion on the Reserve Trust issue. In September of this year, when the summary judgment motion deadline had passed, I asked one of Mr. Ostrager's colleagues if Equitable still intended to bring a motion on the Reserve Trust issue and was advised that because the size of the Reserve Trust's excess or shortfall over the Reserve Amount target fluctuated so substantially with variations in interest rates, Equitable had decided not to bring the motion. At that time, Equitable had the report as of June 30, 2007, which showed a shortfall of $71,258,000 in the Reserve Trust. And that was the

BOIES, SCHILLER & FLEXNER LLP

A. Vickery to N. Thompson, J. Dowd & R. Wobbeking
February 22, 2008
Page 3

last I, my co-counsel Thorn Rosenthal or our client heard of the issue until Ms. Martin's surprise call Tuesday afternoon.

After finally receiving Equitable's papers after 6 p.m. on Tuesday, Centre Life prepared response papers overnight and met Equitable at the federal courthouse at 9 a.m. the next morning. I enclose a copy of the papers Centre Life prepared in opposition to Equitable's request for relief, principally on the basis of the absence of federal court subject matter jurisdiction, the untimeliness of the motion and the absence of irreparable injury (without the voluminous exhibits, which are available at the Panel's request). The Honorable Alvin Hellerstein called the parties in for a hearing on the motion at 3 p.m. the same day.

At that hearing, Mr. Ostrager made jaw-dropping and entirely unfounded factual assertions regarding Centre Life.[2] He told Judge Hellerstein that the office of Disability Management Services, Inc. (DMS), a private company (in which a different Centre Group company, not Centre Life, owns a minority interest) that is the *joint agent of both Centre Life and Equitable* constitutes *Centre Life's* principal place of business.[3] He alleged out of thin air that Centre Life was managed directly by personnel in Springfield, Massachusetts, and by executives of its ultimate corporate parent in Zurich, Switzerland. (Tr. 6:24-7:9; we attach the transcript of the hearing before Judge Hellerstein.) In fact, Centre Life from prior to the Equitable reinsurance transaction in 2000 to date at all times has had its principal place of business in New York, New York, where its President (Eileen Sweeney from 2000 to early 2004 and Richard Grilli since that time) and other senior executives have been based (depending upon the time, at One Chase Manhattan Plaza, 105 East 17th Street and/or 1 Liberty Plaza). To the same effect, the Report of the Statutory Examination of Centre Life Insurance Company for the year ending December 31, 2005, from the Division of Insurance of the Commonwealth of Massachusetts, formally delivered by the Chief Examiner to Centre Life by letter dated May 31, 2007, addressed to Richard W. Grilli, President, Centre Life Insurance Company, 105 East 17th Street, New York NY 10003-2105, states on page 1 that the examination of the "financial condition and affairs" of Centre Life was made "at its administrative office located at 105 East 17th Street, New York, N. Y. 10003-2105," and again on page 3, "the statutory examination was performed at the Company's administrative office in New York, New York."

---

[2]   These assertions were needed because Equitable sought to invoke the federal court's "diversity" jurisdiction, which is only available (between corporate parties) where the parties are neither incorporated *nor* have their principal places of business in the same state.

[3]   As counsel for Equitable is well aware from the discovery and related meet-and-confer disputes in the course of this arbitration, Centre Life has produced documents that would be privileged but for the fact that they were at some point disclosed to DMS, thus waiving any claim of privilege. Privilege waiver plainly would not have occurred, and these otherwise privileged documents would not have been produced to Equitable, if DMS was Centre's alter ego and principal place of business.

BOIES, SCHILLER & FLEXNER LLP

A. Vickery to N. Thompson, J. Dowd & R. Wobbeking
February 22, 2008
Page 4

    Judge Hellerstein recognized that "Mr. Ostrager has a tough hill to climb" with Equitable's lawsuit. "He's got to show irreparable damage and he's got to show that it is of such moment that he can't wait until the arbitration ends."[4] (Tr. 23:17-19.) Judge Hellerstein recognized that the broad right of offset contained in Article XII of the Reinsurance Agreement would encompass Centre Life's approach to the Reserve Trust shortfall during the pendency of the arbitration. (Tr. 29:22-25.) He also noted that the panel would "[u]ndoubtedly" and "inevitably" reach the issue of what should be in the Reserve Trust. (Tr. 32:18 and 33:9-10.) And he noted his only jurisdiction was to consider whether a provisional remedy in aid of arbitration was needed, under the strict standards above. He expressed concern – and rightly so – that the federal court should not "make findings on the merits" and that he needed to avoid intruding into the "province of the arbitrators." (Tr. 33:16-34:1.)

    At the conclusion of the hearing, to avoid the serious jurisdictional and substantive problems that would have to be resolved to rule on Equitable's request, Judge Hellerstein urged the parties to try to resolve this issue. He suggested that Centre Life consider posting an interim letter of credit or other security to ensure that the $180 million would be available if needed after this Panel conducts the March 10 hearing and issues its award. (Tr. 34:3-18.) An award for Centre Life granting rescission of the Reinsurance Agreement or damages (and interest) to Centre Life in excess of the $180 million shortfall would moot the issue.

    Mr. Ostrager misrepresented the facts in telling Judge Hellerstein that Equitable was exposed to a bona fide risk if $180 million were not immediately infused into the Reserve Trust, which stood at $1,577,359,000 as of January 31, 2008 – notwithstanding Equitable's having failed to pursue the point since July 2006. Having waited one and one-half years to pursue this issue, Equitable does not even pretend to offer an explanation why it would be prejudiced if it waits an additional month or longer until the conclusion of the hearing and the award of the Panel.[5]

---

[4] To receive the "extraordinary and drastic remedy" of a temporary restraining order and preliminary injunction, Equitable is required to make a "clear showing" that it will suffer "irreparable injury," *Sussman v. Crawford*, 488 F.3d 136, 139-40 (2d Cir. 2007), and must also show that it has a likelihood of success on the merits or that the balance of hardships "tip[] decisively in its favor." *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 1441, 153-54 (2d Cir. 2007).

[5] Indeed, the true risk with regard to "topping up" the Reserve Trust is to Centre, not Equitable. If Centre places another $180 million in the Reserve Trust, notwithstanding its offset claim against Equitable, and if Centre prevails in its claims before the Panel, and if the Panel does not grant Centre rescission of the Reinsurance Agreement, but does grant the over $300 million in supplemental reinsurance premium Centre seeks, those Equitable funds will be paid into the Reserve Trust, which would then be *substantially* over-funded. Under the terms of the Reserve Trust Agreement and the Security Trust Agreement, while such excesses can be moved *into* the Security Trust, it would take many years before Centre would be allowed to withdraw

BOIES, SCHILLER & FLEXNER LLP

A. Vickery to N. Thompson, J. Dowd & R. Wobbeking
February 22, 2008
Page 5

In fact, Equitable is not at risk. The balance in the Reserve Trust was $1,570,938,000 as of December 31, 2007, and $1,577,359,000 as of January 31, 2008. Any obligation of Centre Life to Equitable to "top up" a shortfall in the Reserve Trust is protected by a belt-and-suspenders set of credit supports and guarantees backed by Zurich Insurance Company ("ZIC"), which is indisputably a deep pocket sufficient to give Equitable complete peace of mind: ZIC's credit ratings are AA-/stable (S&P); A1/stable (Moody's), A/positive (A.M. Best), and A+/Positive (Fitch), and it is the highest-level insurance company within Zurich Financial Services Group, which has publicly reported invested assets in excess of $185 billion.

The credit supports and guarantees backing Centre Life's obligations with ZIC's balance sheet include the following:

- Under paragraph A.1 of the June 8, 2000 Memorandum of Understanding between Centre Life and Equitable ("Credit Support Memorandum"), which was incorporated into the final Credit Support Agreement between the parties by Article III, Section 2.1 thereof, Centre Life provided credit support to Equitable in the form of "its own net worth and the Reserve Trust," *plus* the Security Trust, various Surety Bonds, and "the retrocession agreement between [Centre Life Insurance Company] and Zurich Insurance Company, Bermuda Branch ("ZIBB")." ZIBB is a branch of ZIC, whose balance sheet carries assets and net worth far in excess of any conceivable indemnity Centre Life might have to provide under the Reinsurance Agreement.

- Each provider of a Surety Bond under the Credit Support Memorandum was to be a subsidiary of the Zurich Financial Services Group with "an audited net worth of at least $300 million" at the outset and at least $200 million at all times. Credit Support Memorandum ¶A.1.d(i), d(i)(b). At the outset, Centre Life's sureties were Centre Life Solutions (US) ("CSUS") and Centre Life Reinsurance (US) ("CRUS"), which at the time had AA credit ratings and a combined net worth over $1.3 billion. *Id.* ¶A.1.d(iv).[6]

- Centre Life's surety bonds guarantee its net worth for purposes of the Credit Support Memorandum and its ability to make any needed payments under the Reinsurance Agreement. For example, the CRUS surety bond (the "CLIC CRUS Net Worth Surety Bond") requires that "[i]f at any time the net worth of [Centre Life] is less than the greater of (a) one million United States dollars (US$1,000,000) or (b) the minimum Net Worth required in accordance with applicable insurance law and regulations, [CRUS] will provide to [Centre Life] on a timely basis sufficient funds to make up such shortfall. (Amended and Restated Surety Bond (January 1, 2000), ¶ 3.) Moreover, should Centre

---

that excess from the Security Trust, due to the formulas and tables governing Centre's and Equitable's rights under the Security Trust Agreement.

[6]   Although the credit ratings of the sureties later changed, appropriate adjustments were made to keep Centre Life in compliance with paragraph B of the Credit Support Memorandum.

BOIES, SCHILLER & FLEXNER LLP

A. Vickery to N. Thompson, J. Dowd & R. Wobbeking
February 22, 2008
Page 6

> Life ever lack liquidity to make "any payment required under the terms of" the Reinsurance Agreement with Equitable, CRUS must provide "on a timely basis . . . the amount of funds that [Centre Life] needs in order to meet such payment obligation." *Id.* ¶ 4.

- The Credit Support Memorandum, paragraph E.1, allowed Equitable to seek "third-party beneficiary rights to enforce the Surety Bonds" in which Equitable would "step into the shoes of [Centre Life] for purposes of enforcing the Surety Bonds." Equitable did, in fact, obtain such "cut-through" rights. Pursuant to a letter, dated July 19, 2000, CRUS agreed that Equitable has the right to enforce directly against CRUS in Equitable's own name the obligations of CRUS under the CLIC CRUS Net Worth Surety Bond as if Equitable had stepped into the shoes of CLIC.

- In addition, in a December 29, 2004, Guaranty Rights Agreement among Equitable, CRUS, and Zurich Insurance Company, Equitable:

  o agreed "to count ZIC's net worth as the net worth of CRUS for purposes of the Credit Support Agreement" (Guaranty Rights Agreement ¶1);

  o made it clear that Equitable has a cut-through right "to enforce directly against ZIC" all of Equitable's rights against CRUS under the CLIC CRUS Net Worth Surety Bond (*id.*; see also the Guarantee Agreement (the "ZIC CRUS Guarantee") between CRUS and ZIC appended to the Guaranty Rights Agreement); and

  o the ZIC CRUS Guarantee contains the ZIC guarantee of CRUS's obligations to Equitable under the CLIC CRUS Net Worth Surety Bond. Both the ZIC CRUS Guarantee and the CRUS CLIC Net Worth Surety Bond contain certain waivers of defenses. We are not aware of any defenses not covered by these waivers that would present any material obstacle to immediate recovery by Equitable directly against ZIC in New York courts if such recovery were sought by Equitable.

- As a consequence of the foregoing, Equitable has a direct right to seek, *from ZIC*, any amount needed to cover any liability Centre Life is unable to cover.

- As allowed by the Credit Support Memorandum, Centre Life has also reinsured at least 85% of its obligations on the Equitable transaction to ZIBB. In addition to its rights under the Credit Support Agreement, Equitable has separately obtained Centre Life's agreement that "during the term of the Transaction it will not consent to the termination, change, or recapture" of the retrocession to ZIBB "without Equitable's consent." (*See* July 19, 2000, letter from Lynn Frankel to Michael Deevy.) ZIBB as a branch of ZIC has abundant assets to ensure that any benefits owed out of the Reserve Trust will be paid in a timely manner, rendering Equitable's exposure to any consequence of a Reserve Trust shortfall nil.

BOIES, SCHILLER & FLEXNER LLP

A. Vickery to N. Thompson, J. Dowd & R. Wobbeking
February 22, 2008
Page 7

      Notwithstanding all of these reasons why Equitable does not require further protection, but pursuant to Judge Hellerstein's suggestion, Centre Life hereby proposes a means by which Equitable's gambit can be mooted before it further distracts the Panel and Centre Life from preparing for the hearing:

- Centre Life will promptly deposit the approximately $180 million shortfall in question into a segregated trust account at the Bank of New York, which also happens to be the custodian of the Reserve Trust.

- As a part of its award in the arbitration, the Panel would be charged to determine if after the award of relief (whether rescission, which would moot the Reserve Trust issue, or damages, which, with interest, would be paid by Equitable into the Reserve Trust) there continues to be any shortfall in the Reserve Trust, in which case funds would be transferred from the segregated trust account to the Reserve Trust. Any and all amounts not so transferred would be returned from the segregated trust account to Centre Life.

- The documents establishing the segregated trust account will provide that the Bank of New York will disburse the funds only on instruction of the Panel as part of its Award in this arbitration to transfer some or all of the Funds into the Reserve Trust and the remainder, if any, back to Centre Life. (For statutory reporting reasons, Centre Life will need to include a provision in the documents giving Centre Life the right prior to an Award by the Panel to have the Bank of New York transfer some or all of the $180 million from the segregated trust account into the Reserve Trust, in which case the Panel's decision as to the Funds would be adjusted to account for this prior transfer.)

      If the Panel agrees to this proposal, it should entirely moot Equitable's request for emergency relief.

      Assuming the Panel indicates its agreement to the proposal, Centre requests that Equitable promptly acknowledge its agreement to this proposal, notify the Court that it is withdrawing its request for emergency relief, and dismiss its federal complaint so that Centre Life can make the proposed deposit and the parties and the Panel can focus their attention on the merits.

Respectfully submitted,

*/s/ Alan B. Vickery*

Alan B. Vickery

cc: Hon. Alvin K. Hellerstein
     Barry R. Ostrager, Esq.
     Linda H. Martin, Esq.
     Thorn Rosenthal, Esq.